UNITED STATES of America, Plaintiff,

v.

STATE OF MICHIGAN, James J. Blanchard, Governor of Michigan, Michigan Corrections Commission; Gwen Andrew, Chairman, Michigan Corrections Commission, Thomas Eardley, G. Robert Cotton, Dwayne Waters, Don Le Duc, Members, Michigan Corrections Commission, Michigan Department of Corrections, Perry M. Johnson, Director, Michigan Department of Corrections, Robert Brown, Jr., Deputy Director, Michigan Department of Corrections, Dale Foltz, Regional Administrator, State Prison of Southern Michigan, John Jabe, Warden, Michigan Reformatory, Theodore Koehler, Warden, Marquette Branch Prison, John Prelesnik, Administrator, Reception and Guidance Center, State Prison of Southern Michigan, and Jack Bergman, Administrator, Michigan Intensive Programming Center, Defendants.

No. G84–63.

United States District Court,
W.D. Michigan.

COMPILATION OF OPINIONS
AND ORDERS
(Through July 27, 1987).

Arthur E. Peabody, Jr., Chief, Special Litigation Section, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., by Andrew J. Barrick, for plaintiff.

Patricia A. Streeter, Detroit, Mich., for amicus curiae Hadix plaintiffs.

Elizabeth Alexander, Adjoa Aiyetoro, for National Prison Project of the American Civil Liberties Union, Washington, D.C.

William Fette, Kalamazoo, Mich., for Michigan American Civil Liberties Union Foundation.

Frank J. Kelly, Atty. Gen., State of Mich., Lansing, Mich., by Thomas Nelson, Brian MacKenzie, for defendants.

### COMPILATION OF OPINIONS AND ORDERS

**(Through July 27, 1987)**

### INTRODUCTORY STATEMENT AND TABLE OF CONTENTS

ENSLEN, District Judge.

The following is a collection of opinions the United States District Court for the Western District of Michigan has issued in the case of *United States v. Michigan*, No. G84–63. The United States Department of Justice filed the case on January 18, 1984 under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997–1997j, following a two-year investigation into conditions in three Michigan prisons. On July 13, 1984 the Court approved a Consent Decree setting forth the parties' agreement to settle the suit. The Court has been overseeing the implementation of the Consent Decree for the past three years, during which time it has conducted numerous hearings on compliance issues and has issued numerous opinions. The opinions that are labeled "bench opinion" were issued from the bench during those hearings. The Court has not edited these opinions; what appears in written form here was taken almost verbatim from the transcripts of the hearings. The reader accordingly

occasionally may find it difficult to follow the bench opinions. The Court felt, however, that it should remain faithful to the actual record of the case.

## TABLE OF CONTENTS

1. Bench Opinion of March 23, 1984 Granting *Hadix* Plaintiffs and the National Prison Project *Amicus Curiae* Status, page 935.

2. Bench Opinion of March 23, 1984 Rejecting Proposed Consent Decree, page 944.

3. Bench Opinion of June 22, 1984 Denying *Jasson* Plaintiff's and *Knop* Plaintiffs' Motions to Intervene and Approving Consent Decree, page 949.

4. Bench Opinion of June 21, 1985 Approving Parties' Stipulation and Announcing Intent to Appoint a Special Master, page 953.

5. Memorandum Opinion and Order of August 5, 1985 Announcing Intent to Appoint an Independent Expert, page 956.

6. Bench Opinion of August 21, 1985 Extending the Parties' Stipulation; Denying the *Knop Amicus'* Motion to Amend the State Plan; and Denying the United States' Request for Sanctions Against the *Knop Amicus*, page 957.

7. October 2, 1985 Appointment of F. Warren Benton as Independent Expert and Order for Instructions, page 962.

8. Opinion of December 2, 1985 Denying the *Hadix* Plaintiffs' Request to Exclude the Central Complex and the Reception and Guidance Center from Coverage Under the Consent Decree, page 964.

9. Bench Opinion of February 13, 1986 Denying Defendants' Motion to Modify the State Plan Regarding a Mental Health Plan and Granting the United States' Motion to Enforce the Consent Decree Regarding Mental Health, page 970.

10. Order of February 21, 1986 Establishing Supplementary Mental Health Care Requirements, page 978.

11. Memorandum Opinion and Order of March 19, 1986 Regarding an Independent Psychiatric Expert, page 983.

12. Bench Opinion of March 27, 1986 Allowing *Knop Amicus* to Present Witnesses and Appointing an Independent Psychiatric Expert, page 984.

13. Order of April 2, 1986 Appointing an Independent Psychiatric Expert, page 988.

14. Memorandum Opinion and Order of April 3, 1986 Granting Defendants' Motion to Modify in Part, page 988.

15. Bench Opinion of May 9, 1986 Granting United States' Motion for Relief and Sanctions Regarding Mental Health; Denying United States' Motion to Terminate the Authority of the Independent Expert; and Rejecting Parties' Stipulation Clarifying Issues Under the Consent Decree, page 989.

16. Order of May 12, 1986 Granting the United States' Motion for Relief and Sanctions, page 999.

17. Order of June 30, 1986 Extending and Revising the Independent Expert's Order of Appointment, page 1001.

18. Opinion of July 15, 1986 Interpreting Certain Provisions of the Consent Decree and the State Plan for Compliance, page 1001.

19. Opinion of July 15, 1986 Granting in Part and Denying in Part Defendants' Motion for Relief from Order, page 1005.

20. Opinion of July 22, 1986 Regarding March 1986 Compliance Hearing, page 1007.

21. Order of July 22, 1986 Granting Plaintiffs' Motion for Order Enforcing Consent Decree and Stipulation, page 1015.

22. Opinion of August 29, 1986 Scheduling a Mental Health Hearing, page 1018.

23. Opinion of August 29, 1986 Resolving Various Motions, page 1019.

24. Opinion of September 26, 1986 Extending Authority of Independent Psychiatric Expert, page 1021.

25. Bench Opinion of October 24, 1986 Purging the Defendants of Contempt Regarding Mental Health, page 1022.

26. Order of October 29, 1986 Purging Defendants of Contempt, page 1025.

27. Opinion and Order of January 29, 1987 Enforcing the Fire Safety Provisions of the Consent Decree, the State Plan for Compliance, and the Stipulation, and Granting Defendants' Request for Modification of the State Plan, page 1025.

28. Opinion of March 27, 1987 Modifying in Part the Parties' Stipulation Regarding Mental Health Care, page 1037.

29. Show Cause Order of April 1, 1987 Regarding Overcrowding, page 1038.

30. Opinion of May 8, 1987 Enforcing the Medical Care Requirements of the Consent Decree, the State Plan for Compliance, and the Stipulation, page 1039.

31. Bench Opinion of May 21, 1987 Issuing Temporary Restraining Order Regarding Overcrowding at the Reception and Guidance Center, page 1045.

32. May 22, 1987 Temporary Restraining Order, page 1047.

33. Bench Opinion of May 22, 1987 Finding the Defendants in Contempt of Court Regarding Overcrowding at the Decree Institutions, page 1047.

34. Order of May 28, 1987 Holding Defendants in Contempt of Court, page 1053.

35. Opinion of July 2, 1987 Scheduling Mental Health Hearing, page 1054.

36. Opinion of July 20, 1987 Denying *Pro Se* Motion to Intervene and Motion for Order of Contempt, page 1055.

37. Opinion and Order of July 28, 1987 Enforcing Provisions of the Consent Decree, the State Plan for Compliance, and the Stipulation Regarding Overcrowding and Protection from Harm and Sanitation, Safety, and Hygiene, page 1056.

BENCH OPINION OF MARCH 23, 1984 GRANTING *HADIX* PLAINTIFFS AND THE NATIONAL PRISON PROJECT *AMICUS CURIAE* STATUS

The Court has before it two motions. One is the motion to intervene on behalf of the *Hadix* plaintiffs, so-called *Hadix* plaintiffs, or in the alternative for status as *amicus curiae*. And the motion on behalf of the A.C.L.U. group, to be *amicus curiae*

only, and, of course, the *Hadix* interest is only in a portion of the proposed consent decree. That is to say, the Jackson Prison portion. I am taking the *Hadix* motion first, since that is the way that we listened to arguments. The *Hadix* applicant or applicants move for grant of intervention pursuant to Rule 24(a)(2). They are the plaintiff class in an action pending in the United States District Court, Eastern District of Michigan, before Judge John Feikens, Chief Judge, styled *Hadix, et al. vs. Johnson, et al.* That suit as I understand it is against various officials of the State of Michigan Department of Corrections and the State Prison of Southern Michigan at Jackson only. They are not involved, as I indicated earlier, in the Ionia or Marquette situation.

Pursuant to an order of the court in *Hadix*, the applicant claims, the Michigan Attorney General representing the defendant was ordered to appear to explain the relationship if any existing between the proposed consent decree herein and the *Hadix* case. In fact, I had first heard about the *Hadix* interest by means of a letter from counsel for *Hadix*, and later, and I responded to that letter, and to counsel for all sides with a copy of the letter to Judge Feikens. I think that may have been in January or perhaps early February. On February 16, 1984, the applicants claim Elaine Fischhoff took the position in the open courtroom that the proposed decree will not be made the basis for a legal claim of mootness as to any similar constitutional issues in *Hadix*, but that it may have an impact on the negotiations and possible litigation in *Hadix*. The transcript never arrived, and I don't know what was said. But, I have heard Mr. Quinn's representation, and I have heard Mr. Bennett's representation. I am not so sure that it makes any difference.

Applicants state in the written motion that based upon the statement of the Attorney General they ought to be entitled to intervention herein as a matter of right. They contend, as I understand it, that they seek intervention for the sole purpose of excluding the State Prison of Southern Mi-

chigan, the Central Complex of that prison, including the Reception and Guidance Center, from these proceedings, and they argue that, or they kind of alternatively argue, that if they are granted some kind of intervention status or *amicus* status their interest is limited to the Jackson penitentiary, the state prison at Jackson. As reported by the applicants with portions disputed by the defendant State, *Hadix* was filed in 1980, as I understand it, at least, *in propria persona*. Since that date, it evidently has become a class action. There was an amended complaint filed, and I assume by counsel for the *Hadix* group, in 1982, I think in July.

The subject of that amended complaint, which has been furnished to the Court and summarized by the applicants, touches virtually all of the conditions of confinement at that facility located in Jackson. According to the defendant, the *Hadix* complaint is in reality a "totality of conditions" claim. This appears to be correct to me from a reading of the language of the amended complaint, but it doesn't seem to have a lot of relevance to what is before us.

Trial, apparently, in the *Hadix* case was scheduled in 1983 in the early part of the year, but before the trial, either the defendants requested an opportunity to negotiate or the plaintiffs, and the defendants told Judge Feikens that they would like to negotiate, and they would like to have a court-supervised settlement discussion. Negotiations took place, whoever suggested them, and whoever was the moving party, and they continued throughout the summer of 1983. Numerous documents were compiled and exchanged, and, apparently, some discovery goes on today as I understand the arguments. In July of 1983, the applicants argue that there were only some unresolved issues remaining which required Judge Feikens' intervention, and the court then issued an order establishing a time schedule for proceedings and a possible trial date. And that has been furnished to me. The negotiations continued into the fall involving, mainly, and I think argued by Mr. Bennett today, the physical structure of the facilities involved both—well, all the facilities were argued on today, and

the sufficiency of the administrative staff if that is part of the structure argument, and I guess it is.

Applicants assert that Judge Feikens was assured by Governor Blanchard that defendant Perry Johnson was authorized to negotiate regarding this issue of the overall operation of the Jackson facility. Defendants say the evidence shows that the statement that by July, 1983 they had reached agreement on most issues is imprecise at best, and seem to deny, and I believe deny, Johnson's authority. They also say that there is privileged information which is not relevant to this case.

In any event, shortly after Judge Feikens' meeting with Governor Blanchard—and I understand they met—there was a settlement between Justice and the State in this case. Defendants did not thereafter return to the negotiation table with the applicants. The defendants argue this is because of the applicant's counsel. I don't know the answer to that.

Judge Feikens issued the order requiring the Attorney General, that I mentioned earlier, to explain the impact on *Hadix,* and it obviously bothered Judge Feikens. It was in response to this order that the applicants alleged the Attorney General represented that the case before me would not be made a basis of a claim for mootness, but would impact negotiations and possibly litigation. But there is no question about that now. The defendants now state they reserve the right to raise the claims of mootness should the negotiations fail in *Hadix,* and, perhaps, that is what they said in front of Judge Feikens, or perhaps it isn't. But it is absolutely clear to me that is what they said in their written pleadings, and that is what Mr. Quinn argued today.

The applicants as I indicated advised me of this by letter and then later filed a motion. The motion is for leave to intervene as a matter of right under Rule 24(a)(2). 24(a)(2) says, in part:

Intervention of Right. Upon a timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to

the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The parties do not appear to me to dispute the elements necessary to establish non-statutory intervention as a matter of right. The four elements that the parties agree on are: First, the application must be timely; Second, the applicants must show an interest relating to the property or transaction which is the subject of the action; Third, the applicants must show that the protection of the interest may as a practical matter be impaired or impeded by the disposition of the action; and Fourth, and finally, the applicants must show that their interest is not adequately represented by an existing party. That comes out of Moore on *Federal Practice*, not cited by the lawyers. But I have read *Blanchard v. Johnson*, which is a Sixth Circuit case in 1976; also *County of Fresno v. Andrus*, which is a Ninth Circuit case in 1980; and also my fellow District Judge Gibson's decision in *Usery v. Brandel*, 87 F.R.D. 670 (W.D. Mich.1980). It is clear to me that the applicants have the burden of showing that 24(a)(2)'s requirements are satisfied because *Blanchard v. Johnson* says so. *Blanchard*'s cite, by the way, since it wasn't cited by the parties, is 532 F.2d 1074. The *Fresno* cite is 622 F.2d 436.

First, then as to the timeliness. The applicants make no argument in their written pleadings whatsoever concerning the requirement of timeliness, but Mr. Bennett does make that argument today. The defendants argue that this motion should be denied solely on timeliness grounds.

Defendants argue that the applicants have known or should have known of the Department of Justice's proceedings under CRIPA since at least as late as 1982. It sounded to me that in argument Mr. Bennett may have known about it about that time or perhaps before then. Defendants argue that the applicants did not attempt to consolidate an approach to remediation of allegedly violative conditions in Michigan prisons. Defendants cite two cases in support of their argument. The first is *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648, a 1973 Voting Rights Act case, from the Supreme Court. The Court stated in *NAACP* that timeliness is to be determined from all the circumstances involved. This determination is left to the sound discretion of the trial court. The Court found in the *NAACP* case that the applicant's motion to intervene was untimely. In reaching that conclusion, the Court stated that applicants knew or should have known of the pendency of the action involved because of a *New York Times* article discussing the lawsuit, the public comment by community leaders, and the size and astuteness of the membership of the organizational applicants, and the questioning of two of the applicants by Department of Justice attorneys investigating the matter. The Court also found that applicants had failed to protect their interest in a timely fashion after the date they allege they were first informed of the pendency of the action. At that point, the suit was three months old, and it had reached a critical stage, or at least the Supreme Court said that it was a critical stage because among other things a summary judgment was pending.

Defendants also cite for me *Stallworth v. Monsanto Company*, 558 F.2d 257, which is a Fifth Circuit case in 1977 wherein the court in *Monsanto* enunciated four factors that ought to be considered in making a timeliness determination. In brief, those four factors from *Monsanto* were: First, the length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; Two, the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; Third, the extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; Fourth, and finally, the existence of un-

usual circumstances militating either for or against a determination that an application is timely.

In the *Usery* case, which is my Brother Gibson's opinion, not cited by the defendants for timeliness, Judge Gibson found that a motion to intervene filed ten months after the complaint was not untimely. I note that not only did he find that, but also the brief was filed fourteen months after the motion. So Judge Gibson was facing a 24–month delay. Judge Gibson noted that alacrity is but one of the factors among several to be addressed by the court, and the primary attention must be focused on the stage of the proceedings in which the application to intervene is made. Assessment must be made as to whether the intervention will: "One, prejudice the rights of the existing parties to the litigation, or, two, substantially interfere with the orderly processes of the court." That is a quote, essentially.

In *EEOC v. United Air Lines*, 515 F.2d 946, a Seventh Circuit case in 1975, also not cited by the defendants in this section of their brief, the *EEOC* court opined that the trial court should be more lenient with timeliness requirements in cases of intervention as of right as opposed to permissive intervention. I find no merit whatsoever in defendant's timeliness argument. The fatal flaw in the argument is that there wasn't any action whatsoever in which to intervene until the complaint was filed. The complaint was not filed until January of 1984. The case law deals with timely applications to intervene in pending lawsuits, not in pre-lawsuit governmental investigations. It would be unreasonable for me to hold that the applicants should somehow have tried to intervene in the Justice Department's investigation, it seems to me for obvious reasons.

■ The complaint was filed on January 18, 1984. The applicants sent the letter to me that I referred to earlier on February 2nd, and the instant motion was filed February 27th, a little bit over a month after the instant action was filed, which Mr. Bennett argues he heard about by reading in the newspaper. The Court believes that the applicant acted in a timely fashion, and without having to go over all of that again as far as timeliness is concerned, I make the same finding with regard to the A.C.L.U. application. There is no merit that the applications are not timely.

■ Second, the second condition for mandatory intervention is whether or not there is an interest relating to the property or the transaction which is the subject matter of the action. 24(a)(2) requires a significant protectable interest in the pending litigation. In *Donaldson v. United States,* according to the District of Columbia and Ninth Circuits, the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process. Two cases'not cited by the parties, one from the D.C. Circuit is *Nuesse v. Camp,* 385 F.2d 694 (1967), which is the District Court for the District of Columbia, and second is the *County of Fresno v. Andrus,* which I mentioned earlier. But one can also look at other cases. From the District of Minnesota comes the *U.S. v. Reserve Mining Company* case. Thus, the interest requirement is viewed as a prerequisite to intervention rather than a determinative criterion. The interest requirement should be considered in light of the type of case with which the Court is concerned.

■ In this case, the applicants argue that since a substantial number of the issues raised in the *Hadix* action are encompassed in the proposed consent decree, and thus subject to interpretation by this Court, the requirement that they have a protectable interest is met. The Justice Department makes no specific argument regarding this second requirement. However, the Department in arguing that it adequately represents the interests of applicants points out that the *Hadix* class and the Department in this case both seek to remedy federal constitutional violations, which is true. In *addition,* the *Hadix* class seeks to vindicate Michigan constitutional and statutory rights. Therefore, although the interest of the United States may be more limited than that of applicants, they basi-

cally are identical, and in fact both seek the same goal, that is, of course, the operation of a correctional facility consistent with the constitutional requirements. This appears to me to be a recognition by the Department that the interest requirement of Rule 24(a)(2) is met, and I don't think the Department of Justice seriously challenges that.

The defendants, on the other hand, argue that the applicants have no interest that is significant or protectable herein. In support of this argument, defendants contend it is significant that applicants have raised no specified objection to the adequacy and fairness of the relief proposed in the consent decree. In my opinion, the applicants satisfied the second requirement of 24(a)(2). I think that the United States Department of Justice's analysis is correct. The *Hadix* case seeks broader relief, but both that class and the Department are concerned with conditions at Jackson for federal constitutional purposes. CRIPA was after all designed to protect the applicants and others like them. This surely creates a sufficient "interest," with I guess quotes around the word "interest," on their part to be involved in the subject matter of these proceedings. So I find the second test of the applicants is met.

The third test, the protection of the interest may as a practical matter be impaired or impeded by the disposition of this action. In *Usery*, once again, my Brother Gibson recognized that an undesired precedent on the same facts is a practical impairment. However, in *United States v. City of Jackson*, 519 F.2d 1147, from the Fifth Circuit in 1975, it was noted by the Fifth Circuit that courts "fully understand" that consent decrees do not purport to be "definitive statements of the parties' legal rights and will accord them little or no weight in the determination of the rights of persons not party to them." CRIPA provides in section 1997j that its provisions do not expand or restrict the authority of private parties to enforce their legal rights.

Applicants argue that entry of the consent decree will impair and/or impede their ability to protect their interests in the pending *Hadix* case. They cite the fact that they have been negotiating for more than twelve months in that action, which has been pending for four years. Applicants believe that statements by the Attorney General that the decree will have an impact on the negotiating process therein establishes this element, and also that the mootness argument put forth by the Attorney General satisfies that interest.

Defendants, however, point out that the applicants do not argue that their interests will not be served by the implementation of the consent decree. The Justice Department argues that the mere conclusory allegation that there will be impact upon the private cause of action is insufficient, is not sufficient. Applicants are free in the *Hadix* litigation to pursue all of the rights and remedies they deem appropriate. The Department contends there has been no demonstration that the relief applicants seek privately will be impaired, impeded, or is even in conflict with that afforded in the consent decree.

The Court believes that the applicants, however, satisfy this third requirement of Rule 24(a)(2). The rule requires that there be a showing that protection of applicants' interest may as a practical matter be impaired or impeded, not that it will. Applicants have been involved in a class action lawsuit involving conditions at the facility at Jackson for four years. Extensive negotiations have taken place. Included in the issues involved are federal constitutional questions, some of the very same questions involved in the instant litigation. Although applicants would be free to pursue federal constitutional remedies in the *Hadix* case even after entry of this proposed consent decree, I believe the decree's provisions regarding actions constitutionally mandated at Michigan prisons, including Jackson, may quite possibly impair and/or impede their efforts to seek relief therein. I am convinced this is true as to any future settlement negotiations in the case, and after listening to the arguments today, any future trial. The defendant's apparent contradictory statements concerning the effect

of the consent decree support my conclusion with regard to item number three.

I also believe that the impact—and I am not sure that I can make this clear. I also think that the impact argument is strengthened of the applicants by the comparison to a decree with a voluntary plan attached. That plaintiffs lose in *Hadix* on the grounds of mootness, and later the State, which has the power to amend the agreement ex parte, will have one effect on the clients of the plaintiffs, versus, on the other hand, a more comprehensive decree which includes mandatory language and injunctive language, and the plaintiffs lose the *Hadix* litigation on mootness, which leaves their client in a very different position. And, therefore, I find that argument, while I don't know the answer to the argument, supports the impact requirement, the third requirement of Rule 24.

■ And finally, is the interest of the applicants adequately represented by an existing party? In *Trbovich v. United Mine Workers*, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686, a 1977 Supreme Court case, the Supreme Court indicated that the requirement that there is inadequate representation by existing parties is satisfied if the applicants show the representation of their interest may be—and the words "may be" come directly from Trbovich—"may be" inadequate; and the "burden of making that showing should be treated as minimal." That is an absolute quote. And by the way, the Supreme Court at that moment decided to cite and did cite Moore on *Federal Practice.* So the standard in *Trbovich* is a very simple one. "May be"—the representation may be inadequate, and "the burden on the applicants is minimal." That is also Judge Gibson's finding in *Usery v. Brandel* that I have cited at least three times.

The burden, however, whether it is minimal or not, remains with the applicants. There have been case holdings that the government is inadequate to represent the interests of private parties. *See National Farm Lines v. I.C.C.*, 564 F.2d 381 (10th Cir.1977) and other cases cited by the parties. These decisions frequently turn on the conflict created when the government is attempting to protect both the public interest and the private interests of the applicants. That is sort of from *National Farm Lines.* In making this determination, practical as well as formal representation of the applicants' interest should be assessed. That is what Gibson said in *Usery.* Judge Gibson in that case indicated that applicants' burden may be met by demonstrating collusion, disinterest in the case, or imcompetence. Also, if the interests of the applicants and the party in question are divergent so that their interests are similar but not identical, intervention should ordinarily be allowed, Judge Gibson argues, citing Wright & Miller, *Federal Practice and Procedure.* Nevertheless, slight differences in interests between applicant and the existing party do not show inadequacy if they both seek the same outcome.

In the *County of Fresno* case that I mentioned earlier, the Ninth Circuit stated that a "would-be intervenor is adequately represented if: (1) the interests of a party to the suit are such that it will undoubtedly make all of the intervenor's arguments; (2) the present party is capable of and willing to make such arguments; and (3) the intervenor would not offer any necessary element to the proceedings that the other parties would neglect." *County of Fresno*, 662 F.2d 439. The plaintiff Department also cites *U.S. v. South Bend Community School Corporation*, 692 F.2d 623, a Seventh Circuit case in 1982 in Indiana, coming out of Indiana. There the court held that the NAACP would not be allowed intervention as of right in a school desegregation case brought by the federal government. The NAACP first sought to represent as of right all black students in the district and their parents, even though the interests of that class were represented by the government under the Civil Rights Act of 1964 and the Equal Educational Opportunities Act of 1974. The NAACP conceded that it and the government had a similar objective, desegregation of students and staff, but they disagreed as to the appropriate method to achieve that goal.

The court held that since the NAACP and the government had the same ultimate objective, it would be presumed that the government adequately represents the NAACP. The court found this conclusion especially appropriate because the government was charged by law with representing the interests of the absentee, and there had been no showing of gross negligence or bad faith on the part of the government. Nor had there been any collusion between the parties, nor, the court also found, did the government represent any interest adverse to those of the NAACP, or that the government counsel was ineffective—or, it was effective, in other words. The NAACP had not attacked the proposed consent decree as constitutionally or otherwise inadequate, but had merely suggested improvements in it.

This case before us today is, of course, distinguishable from the circumstances involved herein, because applicants do attack the proposed consent decree as inadequate. Furthermore, they believe that the United States does not seek the same goal as they do in *Hadix.* The applicants, remembering that they only have to show that they may be inadequately represented and have a minimal burden, make the following arguments in a general sense—and this I gleaned not very much from the written briefs, but from the arguments I heard today: The applicants argue that the United States admitted today, and that is true, that it does not represent the inmates. That was one of Ms. Russell's first statements. Only the United States. So that there is a distinction with regard to whether or not the *Hadix* group is adequately represented. Second, it is not proven by any means, but there is an allegation made in this courtroom that the United States accepted less than the State of Michigan offered. That is hotly contested by the defendants, but it is an allegation made by the applicant group. Third, applicants argue that the constitutional interpretation of the Justice Department's Civil Rights Division is not the same as the plaintiff's constitutional interpretation of CRIPA, and, therefore, argue the applicants, how could we be adequately represented when on the face of it we view the constitutional questions differently as lawyers. As kind of in support of that argument, the applicants argue that the United States is not as vigorous as we are in representing our clients. Fourth, the applicants claim that the State has the ability to amend *ex parte* and monitor the plan by itself without involvement of the Justice Department which is, argues the plaintiffs and the applicants, not sufficient representation for plaintiffs' group. Then there is the argument about the voluntary plan and the mootness argument that I have already gone over, and in an earlier section which is simply another argument—it is an adverse impact argument. It is also an adequacy of representation argument. I won't burden the record further by that.

Next there are, the Court is in receipt of two separate petitions coming, I think from *Hadix,* one clearly from *Hadix,* and the other I think. One is in the form of a letter by a prisoner named Frederick Spalla. He starts his letter by saying that he favors the American Civil Liberties Union and the National Prison Project intervention, makes no particular reference to the *Hadix* litigation except he makes the comment that, as follows—it is only a letter. It is open to more than one conclusion. He says that:

> On more than one occasion I have contacted the Justice Department Civil Division. I have requested pursuant to the Freedom of Information Act the correspondence that has been generated between Justice and Michigan Department of Corrections as a result of the former's 1981 report on Michigan prison conditions. To date I have not received any information. Months have passed.... I request that this failure of the Justice Department to disclose the requested information amounts to no more than mere indifference. The whole scenario reminds me of a sweetheart deal. All too often the approach has been utilized....

The sum and substance of the Spalla letter, perhaps on behalf of the ACLU, perhaps not on behalf of the *Hadix* people, is that he doesn't believe that a proper representa-

tion is happening to him as a member of the *Hadix* group. This morning I received a petition signed by numerous prisoners. I have no idea how many—a substantial amount of prisoners—under a *Re Hadix v. Perry Johnson* heading, with a case number that is not my case number. It is Judge Feikens' case number. John R. Ford, a prisoner, with his number, essentially is suggesting that the class of *Hadix* people are not being well represented by the Department of Justice, asks any prisoners who agree with that proposition to sign the petition. The petition as I have indicated bears the signatures of many, many, many prisoners, and was only filed today. The letter to his fellow prisoners was written, he alleges, on March 20th and 21st. The postmark is dated the 22nd, but it arrived at this Court today. I also believe that, although it is subject to a motion to strike by the defendants, that the testimony of two U.S. Justice Department lawyers indicates that the representation by the Justice Department, not by the State of Michigan, is inadequate.

Although the showing, as I have indicated, is of a mere showing with regard to element four that they may not be properly represented, and that the burden which is theirs is minimal, based upon that, I believe the applicants have satisfied the burden of demonstrating that the United States' representation of their interests may, certainly not is, may be inadequate. The applicants among other things, as I have just summarized in great length, seek much broader relief than advocated by the plaintiff. The interests are the same in many respects. The interest of the United States is a little bit more limited. It is likely that the United States would not make the same arguments that the plaintiffs make. Furthermore, I have at least some concern about the allegations made in these various documents that have been furnished to me. There is absolutely no proof of any of the allegations. Nevertheless, because the applicants' issue is minimal, I am going to grant their motion to intervene on a limited basis. The limited basis is on the basis of their interest in the Jackson Prison case in this case, and I am not extending it any

broader at this moment than their right to argue about the consent decree in the litigation pending before us.

With regard to the *amicus curiae* proposition, motion of the applicants to intervene on a limited basis is granted.

██ The ACLU argument, they don't seek to intervene—it doesn't seek to intervene. The two plaintiffs don't seek to intervene. The Michigan Civil Liberties Union Foundation and the National Prison Project of the American Civil Liberties Union merely request to appear as what they describe as litigating *amicus curiae*. Their litigating position in this case is identical, they claim, because both organizations are represented by the same two counsel that signed the pleadings. They are simply petitioners.

They have filed this motion following a review, apparently, only of the proposed consent decree. At least, I heard the argument that they were not privy to all of the pleadings. They argue to me that the particular circumstances surrounding the filing of litigation and the substance of the proposed decree raise serious and troubling questions as to whether the decree should enter in its present form. The proposed decree, they argue, will have a major impact on the conditions of confinement of Michigan inmates, none of whom had any voice in the proposed decree.

As I indicated earlier, I can't be sure that the two prisoner applications I have don't refer to them instead of the *Hadix* people, but it appears in one case to relate to both. The petitioner believes that prior to the entry of a decree the Court should hear from a source other than the parties. Petitioners make a long argument in their petition, and cite the two, or add the materials that are objected to by the defendants.

They talk about the fact that when the case was filed three and one-half years had passed since the passage of CRIPA. They argue that it was only the second time that the Department utilized its authorization under the statute. They make some argument with regard to internal policy within the Department of Justice which is not

before the Court unless it is before the Court in the limited sense that they argue that there is somehow an inadequate representation of the interests they serve, namely, the inmates in all three of the prisons as opposed to the *Hadix* petition which is only at Jackson.

Regarding the proposed consent decree, the petitioners believe its provisions deserve close scrutiny. I think I will save their arguments for the arguments made on the decree itself because they, in their petition, specifically attack the decree in some major fashion. That is why they added the two, the testimony of the two ex-Justice Department lawyers, and make the allegation that was spoken to briefly by Mr. Curry. I think that even besides that, of the two lawyers involved in *U.S. v. Michigan* before us here, one has quit the Department entirely, and the other has left the case. That we will find out when we listen to arguments in a few minutes, but that is the substance of what they say.

They only seek *amicus* status as I understand it for the limited purpose of arguing about the decree. They talk about litigating status, and I am not certain even after I hear their arguments what it is that they intend to litigate. The plaintiff Department and the defendant Attorney General oppose the involvement of the two ACLU groups on many grounds as *amici*. One ground is that they are serving an interest and are not in fact a friend, friends of the Court. The plaintiff Department also argues that if the Court is persuaded that the petitioners are prepared to submit an objective legal memorandum, the U.S. would not oppose the filing with *amicus* brief, at least in the case of the *Hadix* people, and I presume meaning the same thing with regard to the ACLU. The Department states, however, that it is not sure what the applicants' interest in *Hadix* is, and I, therefore, take that to mean it is not sure of the ACLU's position, either.

The defendants oppose the applicants and the petitioner's *amicus* status. The applicants don't need an *amicus* status because I have permitted them to come in as stated. The argument is that there could

be no value to the Court whatsoever. They are partisan, argues both the United States and the defendant State of Michigan. In *Bradley v. Milliken*, 460 F.Supp. 320 (E.D. Mich.1978), which is a case that all of the lawyers know about, the court denied intervention to representatives of a Hispanic community in the remedial phase of a school desegregation case. The court found that the applicants could protect their interest, which was recognized as legitimate and substantial, by petitioning to be allowed to speak as *amici curiae* in future proceedings if there happened to be a remand. In *Brewer v. Republic Steel Corporation*, 513 F.2d 1222 (6th Cir.1975), in this Circuit, not cited by any of the lawyers that I know of, the court denied a motion by the Ohio Civil Rights Commission to intervene in a private employment discrimination case, but invited the Commission to participate as *amicus curiae* by filing briefs and making evidentiary presentations.

The defendants cite three cases on the *Hadix* brief in support of their opposition to *amicus* position on behalf of the *Hadix* people, and I take it make the same argument with regard to *amicus* positions sought by the ACLU. In this case, it appears to the Court that the ACLU at least on the face of it is not a partisan in the matter. It is an organization devoted to concerns about such rights as the rights of prisoners who are incarcerated or are mentally retarded as the Act talks about, or juveniles. It doesn't seem to me to harm anyone to permit the two organizations to intervene as *amicus* or *amici* since there are two of them. I don't, however, act upon their motion to be a litigating *amici*. I think that awaits a decision as to what to do on the consent decree. The purpose of allowing them *amicus* status or *amici* status is for them to be able to argue the consent decree which is before the Court today, and which is of the greatest importance to everybody.

Therefore, I grant the petition of the two ACLU plaintiffs to act as *amici curiae* for the limited purpose of arguing the consent decree.

BENCH OPINION OF MARCH 23, 1984
REJECTING PROPOSED
CONSENT DECREE

Well, there are a number of things that I want to say, and I guess that I will say them as briefly as possible. The hour is late. I thought some while I was stretching my legs, and trying to figure out if there were any blood left between the top of my head and the toes, and thought maybe I ought to have you come back tomorrow. And I though that might be a cruel and unusual punishment against lawyers, especially Mr. LaVille who has been sitting here from Grand Rapids doing nothing except accompanying the Justice Department lawyers. But I don't think that there is a plane out of Kalamazoo this late anyways, but just the same I don't think people ought to have to come back.

I think the briefing done in this case was extraordinarily well done by everybody in the room, and most helpful to me, although terribly voluminous in its nature. I think the arguments done by the lawyers were fine oratorical experiences for me. It is a very important case.

I hesitate to do things when it is late at night and when I am tired, and when I have been suffering some kind of a Michigan virus, I guess curious to Michigan, but perhaps not. When I first heard about this case, I did not realize it was a case as a matter of fact. I read about it in the newspapers, and I thought that it was a case that had been assigned to some court and settled, and I was, as any citizen would be, pleased that the United States and the State of Michigan had gotten together and made some kind of an agreement involving the penal situation in Michigan. And lo and behold, a day or two later, the case was filed in the Western District of Michigan, for whatever reason I don't know, and assigned to me for whatever reason I don't know, either. All I knew at the time was what one newspaper article said, and what the consent decree with the plan attached to it said. And since I didn't understand much of anything, events went from there.

I start off as a judge terribly interested in the settlement of lawsuits. We, as any other district court, are burdened to the point of almost being unable to continue with the caseload. I don't know a federal judge in the country that wants a massive prison suit dumped on him or her, or a school case, or any other case that goes on forever. There are lots of reasons for it, but the principal reason is that it eats up so much of the court's time that the court has very little time for other litigants who are as deserving of being heard as anyone is. It is a constant problem. It seems to me that the federal district court, whatever its failings or merits, is the workhorse of the federal government, and who else, what other judge in his right mind would be sitting in a courtroom a quarter to seven on Friday night with tickets to Peter, Paul and Mary—and I am, I am not going to see Peter, Paul and Mary which would have taken me perhaps, back to my youthful days to the sixties. I guess that is beside the point, too.

By the same token, of course, I don't want to enter something that is meaningless and continues to plug up the docket for many years. I am not as familiar as all of the counsel here are with the prison problems of the United States, or as Mr. Quinn is with the State of Michigan, or as Mr. Bennett is with the State of Michigan. I have—this is not my first jail or prison case, however, and it looks like it may be one of the worst, but it is not the first.

The problem, it seems to me is, it is oftentimes like a dog chasing its tail. There are good-willed people that are trying to resolve the issues involved in overcrowding, for example, which leads to the myriad of other sins that have occurred in our prisons. But it is judges that put people in jail, not the lawyers in this room, or who deny bond, and it is for those reasons that the overcrowding situation occurs.

It is particularly a relevant personal issue because the public in the political atmosphere in which we live cries for swift justice and the incarceration of people charged with crimes. Elected state judges are not un-hearing of those loud cries. So it is left to somebody else to try to resolve the problems, and the lawyers in this room,

it seems to me, are morally and legally dedicated to a resolution.

I particularly like the arguments made by Mr. Quinn this last time that he argued to me with regard to what the State of Michigan was prepared to do from his point of view without any decree, or in terms of modifying any decree as the case may be. Mr. Bennett to some degree contests that by saying with all of the goodwill Mr. Quinn may have, and all of the legal talent he has, one of his clients, to-wit, the Department of State Prisons, is not as compliant with Mr. Quinn's desires as Mr. Quinn may want it to be. However that is, I don't know. I have had in this courtroom a member of that department recently in the Grand Rapids prison case, county jail case, and he strikes me as a man who is after a resolution to the problems of the overcrowded county jails, and is not falling over for the Kent County argument that it has solved its problem. I am very impressed with his background and the amount of time that he has spent in the system, what he is trying to do for it.

So as an initial proposition, I start out, one, absolutely wanting to resolve the lawsuit without a lawsuit on just general principles, and, two, I start off wanting to be in any way possible helpful to the parties who have reached agreement here, that is to say, the United States of America and the State of Michigan.

The question, of course, is, can I be of that assistance with regard to the proposed decree that is in front of me. The Court has spent a good deal of time thinking about what my role is when parties come to an agreement. It happens all the time, and it happens in litigation that is more private than this litigation. Particularly in tort litigation do I find parties coming into the courtroom and agreeing to a settlement of a longstanding lawsuit, breathing a sigh of relief, being doubly anxious to, oh, resolve the matter as the parties want to resolve it, and simply become a scrivener. On one occasion in the short four years that I have sat on this bench, I did such a thing only to find that heirs who were not represented at the hearing did not agree with the consent that had been reached by others, that I was not aware were involved, and it led to a protracted problem which was finally resolved. With that single exception, however, every consent judgment I have been asked to enter I have entered. I want to enter this one. Let's see if I can on the basis of what is in front of me.

In general, the fact that the judgment is entered by means of a consent decree does not affects its validity or enforceability. Of course, the law favors, encourages compromise settlements for the reasons that I have just set forth. Nevertheless, a court cannot enter a consent decree without an appropriate review. The lawyers have cited to me, and I cite simply back to the record, some of the cases that they have called to my attention. *Williams v. Vukovich*, 720 F.2d 909, is a case out of this circuit. It is a very recent case. It is a 1983 case. The Sixth Circuit there addressed specifically the test for approval of the consent decree.

In the *Williams v. Vukovich* case, which was a case involving black police officers who had filed a class action against the city of Youngstown, Ohio, and city officials, alleging that the city had engaged in racially discriminatory hiring and promotion practices, unlike this case, in the *Williams* case, there had been a five and one-half year period of negotiations, and a consent decree that finally resolved the hiring and promotion issues that were involved in the Youngstown case. Several class members, however, objected to the decree. The district court in Ohio held that it was unreasonable, but granted a stay for appeal.

The Circuit then held that the decree was illegal and contrary to the public interest because it embodied impermissible waivers of future discrimination. The Court then outlined a procedure for approving consent decrees. And, the procedure was, as follows: The consent decree, said the Sixth Circuit, is essentially a settlement agreement subject to continued judicial policing. The terms of the decree unlike those of a simple contract have unique properties. A consent decree has attributes of both contract and of a judicial act.

On the one hand, a consent decree is a voluntary settlement agreement which can be fully effective without judicial intervention. In this sense, the decree merely memorializes the bargained-for position of the parties. The consent decree, therefore, should be strictly construed to preserve the bargained-for position of the parties. The court has no occasion to resolve the merits of the disputed issues or the factual underpinnings of the various legal theories advanced by the parties. This is a random quote, and not entirely a quote. I have skipped, but it is, what I have read, was a quote.

Skipping some more:

A consent decree, however, is also a final judicial order. Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties. Judicial approval, therefore, may not be obtained for an agreement which is illegal, a product of collusion, or contrary to the public interest. Once approved, the prospective provisions of the consent decree operate as an injunction. The injunctive quality of the consent decree compels the court to, one, retain jurisdiction over the decree during the term of its existence, two, protect the integrity of the decree with its contempt powers, and, three, modify the decree should changed circumstances subvert its intended purposes.

That essentially comes from page 920 of *Williams v. Vukovich*, some eleven pages into the opinion. The court also cited another Sixth Circuit opinion, *Stotts v. Memphis Fire Department*, which was also a recent case, a 1982 case, which was cited in the litigation by the plaintiff Department of Justice, but not by the defendants, for the proposition that suggested procedures for approving consent decrees, which was a class action, involved three steps:

First, preliminary approval—in order to determine if a compromise is illegal or tainted with collusion. To determine if the decree is a product of an arm's length negotiation, the party who objects has a heavy burden of demonstrating that the decree is unreasonable.

Second, notice should be given to all individuals who may be affected by the decree, which of course discusses giving class members the best notice practicable. And this is not a class action. The *Stotts* case is.

 Third, a reasonableness determination after a hearing is held in which all interested parties may comment on the proposed decree. The court will then determine if the decree is fair, adequate and reasonable. The court must consider the fairness of the decree to those affected, the adequacy of the settlement of the class, and the public interest. Articulated reasons should be given for rejecting a decree. The Court must also evaluate the adequacy of the decree by weighing the plaintiff's likelihood of success on the merits against the amount and the form of the relief offered in the settlement, which, of course, is another way of talking about the *Mason County* standard and the first test of the *Mason County* standard.

 Finally, the court should consider whether the proposed consent decree is consistent with the public interest. In *Stotts*, the court elaborated on the reasonableness determination that should be made by a court. "The reasonableness determination is an issue of law," said *Stotts*, "to be determined by the court, not by others." This reasonableness determination is an issue of law, and in making it the court is under a duty to evaluate three factors:

 First, the court must consider whether the decree is a fair and adequate resolution of the allegations contained in the complaint. Ordinarily, the following factors should be considered: The complexity, suspense, and likely duration of the litigation; the state of proceedings, and the amount of discovery completed; the risks of litigation; the resources of the defendant; and the reasonableness of the settlement in light of the best possible recovery.

The Court notes that because both *Williams* and *Stotts* involved class actions

both parties to the lawsuit here argue that the procedures outlined in those cases need not be strictly followed by me here. In that regard, either the intervening party or the *amicus curiae* called my attention to the Fifth Circuit's statement in the case of *United States v. City of Miami, Florida,* 664 F.2d 435, which is a 1981 Fifth Circuit case, that a court's duty when presented with a consent decree is to give it greater scrutiny than would be given a proposed compromise in a class action.

In discussing intense scrutiny, the Fifth Circuit, discussing intense scrutiny, said:

Because the decree does not merely validate a compromise, but by virtue of its injunctive provisions reaches into the future, and has a continuing effect, its determinations require more than careful scrutiny. Even when it affects only the parties, the court should examine it carefully to ascertain not only that it is a fair settlement, but also that it does not put the court's sanction and power behind a decree that violates the Constitution, statute or jurisprudence. This involves the determination that the proposal involves a reasonable factual and legal determination based upon the facts of record, whether established by evidence, affidavit or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed. In assessing the problem of giving judicial imprimature to the consent decree, the court must also consider the nature of the litigation and the purpose to be served by the decree. If the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be obtained by the Congress.

That comes, in essence, from page 441 of the *City of Miami*. The Court's first look at the two documents gave the Court considerable concern long before I heard any kind of, perhaps, not altogether relevant issues about policies of the Justice Department. The five-page consent decree did not read to me like a consent decree has ever read.

I realize that I have only been in the profession twenty-six years, but I have never seen a consent, five-page document like this five-page document. I couldn't read it. I couldn't decide what I was doing or what I was being asked to do. It didn't seem like I was being asked to do anything. Then I read the forty-two page plan or fifty-four page plan, however many pages it is. It doesn't come to fifty-four to me, because it stops before that and has some appendixes that are important. And I saw things in there that I thought were extraordinarily well done by the parties, and some not so well done. I recognized some problems.

I recognized, number one, that *Pennhurst*, a very recent case, does not allow me as the federal district judge to order the State of Michigan to comply with state law, and there are provisions in the plan document—I am going to call it the plan document as opposed to the five-page decree—which could require a court to do that.

The lawyers are bright here and know that I can't do that. So we put that aside. There are also some things in the forty or fifty plus page document, however many pages it is, which I don't think rise to a level of a constitutional question. They vary. They have been addressed by the lawyers here. There are others that very clearly do come to a constitutional issue, very clearly come to a constitutional issue. The lawyers know what they are. They are included, but not limited to the overcrowding, the supervision of prisoners so that they don't harm each other, the fire protection problems which appear to be difficult in the Michigan prisons mentioned here if I believe what I read in the documents, the medical, psychiatric care, and so forth. These are areas that I think lawyers on both sides of all tables agree are of constitutional magnitude.

The point is that in its present form it seems to me that I do nothing by signing the five-page consent decree. I don't know what it means, and if I don't know what it means, I can't see how anybody else does. And I agree with one of the lawyers who argued I will have to litigate this case from

now until the end of my term inasmuch as I will not be able to understand what it is a) that is claimed to be a constitutional violation, and b) if it is a constitutional violation, what it is that I am supposed to do or what evidence I am going to have to hear to make a determination if that really happened. "Minimally adequate" language doesn't particularly distress me because the statute talks about minimally adequate. I would have preferred, I suppose, to see the word "adequate" instead of "minimally adequate," but that doesn't bother me. The term, however, as I relate it to the remainder of the forty-two page document is indefinite, and in my determination potentially unenforceable.

I have particular concern with a part of the decree—and the record should show that when I am talking about the decree I am talking only about the five page document. I am not talking about the whole decree as some of the parties have characterized, but I am only talking about the five pages. There is a statement that I am going to have to find. It is on page four of the five page document. It says: "Such plan shall not be construed as a specification per se of constitutional required acts on the part of the state." That is a most perplexing sentence. I think that I know what the parties meant to say there, but I don't think that they said it, and that seems to me to present an argument on any enforcement attempt by the United States that opens up the Pandora's box of deciding what parts of the fifty page document relate to constitutional acts and which do not. A most distressing sentence to me.

There are other sentences that I am distressed about in the first five or six pages. "Defendant's failure to comply with provisions of the plan shall not be construed as a constitutional violation of any sort whatsoever." "Compliance with the plan shall constitute full and complete compliance with the decree." That language bothers me greatly. If defendants are as it says willing—as they say today—willing to comply with the entire plan, why not make it a requirement in the consent decree? I don't understand what the language is intended

to mean. I don't know what the defendants are promising.

I am concerned about a portion of the five page document that I mentioned to counsel during the arguments. The decree states that after the defendants have complied with the terms of the degree, "they may apply to terminate this Court's jurisdiction, and this Court shall grant the application upon a showing of pattern and practice of ongoing full compliance." That sentence can be read, I suspect, to say that a hearing would have to be held in which I would have to decide if there was full compliance, which I can't do because I can't read the decree; but if I do, an argument could be made about the State of Michigan that I would have no option except to grant the application made by the defendant. Perhaps, perhaps, that is not the way it was intended to read. It is the only way that I read it the first time. That is why I asked a question about it today. It doesn't comply as I indicated to counsel in argument even with the complaint filed. It looks to the Court like a complaint was prepared prior to the time the consent was altered, but for whatever reason.

The remedy section of the, in fact, paragraph 26 and paragraph 27 of the United States' compliant signed by William French Smith is the kind of remedy that I would have expected the government to ask for, and it is the kind of language that I would have expected to find in the five-page consent decree. It is exactly the way that I would expect the consent decree on this kind of a matter to go. Whether the defendant had agreed to do additional things that were not of a constitutional nature or whether it hadn't—it simply seems obvious to me. Well, I am not going to keep everybody all night.

I have examined the proposed consent decree, and I believe under the standards of the Sixth Circuit, and certainly under the standards of the Fifth Circuit, and I think any circuit, the decree as I read it is inadequate. It says very little. It is impossible for me to know what has been agreed upon, and I don't know how such an agreement is to be enforced. I will, therefore,

not sign the consent decree in its present form.

That is not to say, however, that the attached plan is deficient. I find much in the attached plan that is efficient, and very much that ought to be a part of a consent decree. That plan with modifications to remove any possible Eleventh Amendment *Pennhurst* problems may or may not be adequate to withstand my scrutiny, but I suspect that it may be adequate. That is without deciding what that does directly right now to the intervening parties in the Eastern District matter. Because I find it inadequate, I issue the following order:

I order the plaintiff and the defendants to meet with an attempt to redraft into enforceable language a new consent decree for the Court to consider. I give them thirty (30) days to accomplish that task from this date, and to immediately submit their new effort to me for scrutiny. At that moment, they shall serve on the *amici curiae* and the intervening parties copies only of the proposed consent decree. Those two parties, meaning the intervening and the *amicus curiae* parties, shall have fifteen (15) days to respond in any fashion they wish to in writing as to their feelings about the proposed consent. In fairness, I give the United States and the State of Michigan fifteen (15) days from the day to reply to any objections raised by an intervening party or by the *amici curiae.* That will consume sixty (60) days. And to me it is a matter of some sadness because I want to have the consent decree signed so that the plan can get on its way. I am heartened, Mr. Quinn, by your remarks to me today, and hope that during those sixty (60) days those things that you have indicated to me so clearly as an officer of this court go forward.

. . . .

That will consume sixty (60) days. I then want to set a hearing in which all the parties will have submitted all of their materials to me and will once again try to, we will once again try to see if it isn't possible that the United States of America and the State of Michigan can't provide a consent decree to me that I can sign that can pass the muster and can comply with the Sixth Circuit standards as I believe to be correct. I think that I set that day for June 11, but I left—is that correct? At 9:30. June 11th is a Monday which I think will cause minimal problems with the movement of the lawyers from various places. I set it in the morning so that we wouldn't have a repeat of this miserable afternoon and evening affair. I will be most anxious to see what has happened by that time. I consider this order to be an ongoing order, and that the State of Michigan and the United States of America can continue to amend their agreement up to the time of the hearing.

Of course, I want as much notice as possible as to what is in it, but just because I have only given them thirty (30) days it could be that they will see a suggestion made or an objection made by the intervening party or parties or the *amici curiae* and want to make an alteration to overcome that objection. I have no reason to be concerned about that, either. I could string out the time problem, but this is such an important case involving such an important issue that I don't want it to slip away from me. Neither do I want to try it piecemeal, little by little, as I would have to do in my judgment if I entered the matter set before me. I don't intend to do that, and I hope that it continues to be a consent decree. I certainly never want to be any part of having to litigate this case in its entirety.

BENCH OPINION OF JUNE 22, 1984 DENYING *JANSSON* PLAINTIFFS' AND *KNOP* PLAINTIFFS' MOTIONS TO INTERVENE AND APPROVING CONSENT DECREE

I want the lawyers to know, and through the media to know, the public to know, that I believe the decree ought to be signed, and I can't imagine why the single sentence would cause any great difficulty after my explanation. It may not be the most perfect consent decree ever issued, but I am satisfied with it, and we have worked hard at it. Everybody has had an opportunity to have input, and I believe that is important in matters of public concern. And I have

some confidence in the lawyers that have appeared in this courtroom, and in an effort to resolve the issue. As far as I am concerned, there is a consent decree—I will sign it if we have all of the things that we have before us today, and I am pleased with the whole thing.

I turn to the question of intervention because I must resolve without—and I do this at this stage to assist the lawyers that are in this room from having to answer things, and try to put this matter to bed. I don't think that I have to really address the non-intervention because of the comment made by Ms. Alexander, but I do have to address the *Jansson* case.

The motions to intervene were both brought under 24(a)(2). The first was filed on May 16, 1984, and involves an action brought in pro per by several inmates of Jackson Prison. The action which is styled *Jansson, J-a-n-s-s-o-n, v. Michigan,* and is our file number 84–1263, is currently pending in the Eastern District of Michigan before Judge Thornton, having been filed on February 8, 1984, in that district. In a complaint naming various officials of the Michigan Department of Corrections and the State Prison of Southern Michigan, the named plaintiffs complain generally of the conditions of confinement at the South and North Complexes of Jackson. In support of their motion to intervene, these plaintiffs allege that the consent decree in this case will impair or impede their ability to protect their interests that they have expressed in their own district action. They base this argument upon prior statements that they claim the Attorney General of Michigan made in *Hadix,* and argue that since the Attorney General has, "said that the agreement will have an impact in *Hadix,* applicants having similar claims will also be impacted." End of quote, out of their pleading. They seek to exclude the South and North Complexes from the consent decree as in *Hadix.*

The second motion to intervene before the Court was filed June 11th, 1984, the same day the case was filed, and that is the *Knop case v. Johnson,* that we have talked about, and is G84–651. Somewhat like the *Jansson* action, this action names various officials of the Michigan Department of Corrections, the State Prison of Southern Michigan, Michigan Reformatory of Ionia, and the Prison at Marquette, and raises claims based upon the totality of conditions at these institutions. This case is styled as a class action, but has not been certified as such by me. Attorneys for plaintiffs are the same as represent the *amici,* to-wit, William Fette and Elizabeth Alexander. In support of their motion to intervene, the *Knop* plaintiffs originally asserted that the entry of the proposed consent decree in this case will have a practical impact on their ability to litigate their case.

In a supplemental pleading filed yesterday, June 21st, 1984, applicants assert that they should be allowed to intervene in the enforcement of this litigation, stating, "Despite serious reservations applicants do not oppose the entry of the revised consent decree if an appropriate mechanism for monitoring enforcement will exist." And in my judgment, such a mechanism now exists in the event that the last sentence is worked out. Applicants believe that it is necessary that this Court hear from someone other than the parties when an issue of enforcement or modification emerges. Although both plaintiff and defendants have had notice of these motions, I have received no response whatsoever to *Jansson,* and the response to the *Knop* motion came only from the State defendants and was filed only yesterday.

As everyone knows, I have previously rendered a lengthy oral opinion on the question of limited intervention for the *Hadix* group. I now attempt to be very brief today and simply draw the parties' attention to the previous ruling, and specifically incorporate and rely upon the facts and case law that I recited at that time.

Rule 24(a)(2) provides:

(a) Intervention of Right. Upon a timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action

may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. The parties previously were not in disagreement as to the elements necessary to establish the nonstatutory intervention as of right. Those elements are: First, the application must be timely; second, the applicants must show an interest relating to the property or transaction which is the subject of the action; third, the applicants must show that the protection of the interest may as a practical matter be impaired or impeded by the disposition of the action; and fourth, the applicants must show that their interest is not adequately represented by an existing party. For those four propositions, I cite Moore's *Federal Practice,* 24.07(1), pages 24 to 50; *Blanchard v. Johnson,* from the Sixth Circuit, 532 F.2d 1074; *County of Fresno v. Andrus,* 622 F.2d 436, from the Ninth Circuit; *Usery v. Brandel,* from the Western District of Michigan, 87 F.R.D 670 (1980). Applicants bear the burden of showing that the Rule 24(a)(2) requirements are satisfied.

As to timeliness, number one, in *NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648, the Court stated in 1973 that timeliness is to be determined from all the circumstances involved. This determination is left to the sound discretion of the trial court. I also draw your attention to *Stallworth v. Monsanto Company,* 558 F.2d 257, from the Fifth Circuit in 1977, and *Usery v. Brandel* that I have already cited, and *EEOC v. United Air Lines,* 515 F.2d 946, a Seventh Circuit case in 1975, cited and elaborated upon by me in my ruling in the *Hadix* motion, and considered again relative to the instant motions. I have also considered *Johnson v. North Carolina State Highway Patrol,* in the Eastern District of North Carolina, 1980, 91 F.R.D. 406, not cited previously.

Unlike the motion in *Hadix,* I do not believe either of the instant motions to be timely. It is clear that the applicants were aware or should have been aware in the *Jansson* case of this action in January, as were the plaintiffs in *Hadix.* Unlike the plaintiffs in *Hadix,* who filed a motion to intervene immediately, the applicants delayed filing until several months after the institution of this lawsuit, and at a time when the matter had reached a critical stage with entry of the consent decree looming. I believe there would be substantial prejudice to the parties to this action caused by the untimeliness of these motions should they be granted. On the other hand, as will be explained more fully in a moment, I do not believe there is prejudice to the applicants in denial of their motions.

Second, the interest relating to the property or transaction which is the subject of the action. Rule 24(a)(2) requires a "significant protectable interest" in the pending litigation. While I find it unnecessary to make a specific ruling as to this element of the intervention prerequisites because of my conclusions regarding the other elements, it is likely that both applicant actions would be able to satisfy this test.

Third, the protection of the interest may as a practical matter be impaired. As pointed out in my prior ruling, CRIPA provides in section 1997j that its provisions do not expand or restrict the authority of private parties to enforce their legal rights. Furthermore, consent decrees are generally accorded little or no weight in the determination of the right of persons not a party to them. In that latter regard, I cite the lawyers here to *United States v. City of Jackson,* cited in my previous rulings, from the Fifth Circuit in 1975.

When considering the *Hadix* motion, I found myself faced with concerns I do not find present in *Knop* and *Jansson.* *Hadix* was a class action that had been pending for four years when this case was filed. The parties had been negotiating toward settlement for more than twelve months. By contrast, *Jansson* has been pending since February 8th of this year, and it is not a class action. Although I am not privy to information as to the current status of that case, I can only assume that there has been little if any discussion of settlement. The *Knop* action is even younger, having been filed June 11th. There has been as yet no answer filed to

the complaint that I know of. Obviously, any discussion of settlement has been limited. These two actions may, of course, proceed despite the entry of this consent decree.

More importantly, there was some confusion at the time that I ruled on the *Hadix* motion concerning the Attorney General's position on the question of mootness and the effect of this consent decree on negotiations and litigation in that lawsuit. These concerns led me to look favorably upon intervention because I believed entry of the decree could impair or impede the disposition of *Hadix*. These concerns are no longer present. While *Hadix* is not settled, it appears to be that it is so far down the line to settlement that it will settle, and I cannot think of any way that the State or the defendants in that case can lack motivation based upon the comments made in this court today, and based upon the representations that I believe they have made to Judge Feikens.

However, even though it has not been resolved—and maybe in some weird way it will never be resolved—the consent decree as it presently stands before me contains a specific disclaimer of the mootness argument, and this statement in my opinion now relates and directly responds to *Jansson* concerns as well, and should be treated in the same manner as the *Hadix* concerns, and it is based upon the consent agreed upon here. It must be remembered that *Knop* and *Jansson* plaintiffs are free to continue to pursue the remedies they deem appropriate in spite of the entry of this consent decree. The State defendants must, of course, respond, and I am certain will respond, to those lawsuits. I do not believe under the circumstances as I understand them that the applicants have demonstrated that their plight may be impaired or impeded by the entry of this consent decree.

Fourth, and finally, the interest not being adequately represented by an existing party. On this, the final prerequisite under Rule 24(a)(2), I find that applicants have completely failed to make the requisite showing. The *Jansson* applicants are un-represented and are currently incarcerated. The *Knop* applicants are represented by the same attorneys presently representing the ACLU in this case. In their role as *amicus curiae*, these attorneys on behalf of the ACLU, have vigorously pursued a just and proper resolution of this dispute. They are more than adequate to represent the interests of every inmate in the three prisons subject to this consent decree. As I indicated in the decree, *amici*, the ACLU and *Hadix* group, will be provided with all documentation relative to this case. They will have the opportunity to respond in writing and to appear and argue at hearings. They surely will make all of the prisoners' arguments. Based upon the impressive pleadings and arguments presented thus far by *amici*, I do not believe applicants could hope to be better represented.

The important considerations in ruling on the *Hadix* motion to intervene, and also the ACLU motion to appear as *amicus curiae*, were allegations without proof that the Department of Justice would not vigorously pursue compliance with a consent decree, that it had accepted less than the State of Michigan was offering, that its internal policies were inconsistent with the protected rights of inmates, and that there were differences of opinion on constitutional interpretation. The transcripts of Congressional testimony of two ex-Justice Department attorneys added to this concern and uncertainty. Intimately tied with these issues was the concern that the proposed decree was vague and unenforceable, and subject to *ex parte* amendment by defendants. These latter concerns have been alleviated in my mind by the revisions of the consent decree. The former concerns, as I have indicated, are adequately addressed by the capable representation of *amici*. I find no reason to conclude applicants should be any further represented.

For all of these reasons, I deny the motions to intervene of both the *Jansson* and *Knop* applicants without prejudice, and on the assumption that the language the Court suggests in the one sentence not yet resolved is ultimately agreed upon by the State and the federal government.

Finally, there is a document entitled, quote, "Laymans Pleading," filed on June 15, 1984, by a prisoner at Jackson named Robert Carl Marr, M-a-r-r. Mr. Marr alleges that he has been incarcerated within the Michigan Prison System for the better part of the last thirty-eight (38) years. He claims to be qualified as an expert, friend of the court, party, or "anything else that this court will allow in the court's endeavor to arrive at a fair, lawful and just decision in this matter." Mr. Marr would like to testify as to the conditions at the various Michigan prisons, and as to the competence of Perry Johnson. The Court has already ruled that the consent decree, as amended, is fair, just and lawful, and shall be entered by this Court, provisionally, if that last sentence is agreed upon, and I do not believe that there is any need for the testimony or anything else from Mr. Marr.

BENCH OPINION OF JUNE 21, 1985 APPROVING PARTIES' STIPULATION AND ANNOUNCING INTENT TO APPOINT A SPECIAL MASTER

The past few months, it seems like this Court has spent an unusual amount of time in litigation styled the *United States v. State of Michigan.* Not, of course, the same litigation. But their submissions have been so voluminous here that it has taken a long time to try to understand what has happened here since we last met or approximately last met. In my judgment, this problem came to me in an unfortunate manner inasmuch as I was dissatisfied with the proposed consent decree when it first came to me, and felt very much like a vehicle just passing through some political considerations on to the other branches of government, and wouldn't do it because it was pointless; and after a while, as we got together, and worked on it, and negotiated really, came up with what I thought at least was a reasonable consent decree that the Court could interpret and enforce, make certain that the object of the, the objects of the consent decree were complied with; and I must say that I have read with interest all of the submissions that have come.

It seems to me as an initial matter that when you get a hearing like this, and I did not know what to expect at the hearing—I certainly knew, I certainly knew what were the written positions of the state and the United States of America. I did not know the positions of the *amici* except on the limited issue of the mental health plan. I would have expected as the years went by that I would have heard from the *amici* in the event that the *amici* believed that the State of Michigan's compliance was not sufficient to satisfy the requirements of the consent decree, and I did not with that single exception. There are three, at least three possible reasons why I didn't hear from the *amici.*

One is because the *amici* through their counsel were not aware of what was happening within the penal system of the State of Michigan. It seems to me that that is partly true and partly untrue. Ms. Alexander has indicated to me discontent in her visits to the prisons in the form of her dissatisfaction with being cast in the apparent role of a Justice Department employee, which of course she is not. Secondly, it would appear that she has not gotten all of the submissions called for in paragraph "O" of the consent decree. So she was in part ignorant of what was happening through no fault of her own, and I suppose it could also be argued that she was in large part satisfied with some things that were happening, which is why I didn't receive any reports.

Really, I come out here today, and I think you can boil down and summarize what I heard this morning in two fashions: First of all, you have the State of Michigan and the United States saying—well, you have the State of Michigan saying we have complied as best we can, we have not totally complied for reasons that were unknown to us at the time of the consent decree, including the illness of a psychiatrist, and including the time deadlines which were not realistic, including lots of other things having to do with construction and construction contracts, and the bureaucratic process that every government faces. The United States comes in and says, both, there has been some compliance, and we

are pleased with it, and where there has not been compliance we have insisted on a better situation within the realities of the real world.

Then the *amici* come in and say essentially there is a collusive situation between the two competing sovereigns in this litigation and what I have heard is not true. One I think could make—one has to make some conclusions. I am in a very unenviable position it seems to me for a number of reasons. First of all, some of the matters are impossible for me to correct because the deadlines weren't met. What can I do except hold somebody in contempt who hasn't met a deadline? That is the first unenviable position. The second one is, how do I cull the truth from what is being said to me today. After all, in the final analysis, isn't that my job? That is what I am paid to do, is to find the truth.

I can make some tentative conclusions, and I will make them. It does seem to me there has been substantial progress and the State of Michigan in many respects has to be complimented in what it has done in the year that has gone by. It sounds to me as though there has been a good faith effort on the part of the State of Michigan to do what is difficult to do. I cannot but sympathize with correction officials in this state or any state as not being an enviable job for them, either.

It seems to me like the United States has kept its word from what I am hearing in the courtroom. It has not simply agreed with the State of Michigan on all of its requests to put things off, and to come up with new deadlines, and I have to compliment the United States and the State of Michigan for that. And I do. It certainly sounds better than it did a year ago.

Like all other citizens, I do read the newspapers, and I see there has been some unrest, particularly at Jackson. Whether that unrest has any causal relationship to the issues before this Court, I don't know, but I have to suspect that it is so. I also recognize the realities of the need for the sovereigns through their counsel to put the executive branches of their respective governments in a good posture before the media that is attending this hearing. It is a reality that I have to deal with, I have to consider. I have to think if it makes any difference, does posturing in the courtroom have anything to do with the matter before the Court. I don't think it does. But I guess there is not much I can do about political considerations.

When you get right down to it, Ms. Alexander is saying two things: First, she is saying I haven't been fairly treated procedurally. So I can't get my interests before the Court because I haven't the material to do it. I haven't had the twenty (20) days promised by paragraph "O". But, and she says that is all she wants is for me not to sign the stipulation today because she hasn't had a fair opportunity. And she hasn't had a fair opportunity. She is right. That is easy. Obvious. Why, I don't know. Certainly the paragraph wasn't complied with. Then secondly she predicts that if I knew the real truth I wouldn't sign the decree anyway, if after her twenty (20) days we had another hearing and she could parade some witnesses before me or something I would find there hadn't been enough compliance. The answer to that is I don't know.

I am disinterested in the *Knop* litigation. That is a matter beyond this Court. I agree with Ms. Russell on that. I don't intend to improve her posture in the *Knop* case one way or the other, or hurt it one way or the other. I am just disinterested. I am interested only in the *United States v. Michigan* case. So how do I cull the truth out of that? Well, I don't know as much about the administration of penal institutions as I do about the people in this room, but I believe if I had two months or a month and one-half, I could myself find the truth by simply going to where I have to go, and that is, to the institutions, to the correction officers, to the inmates, to the, probably, the legislative officials and executive officials, and make my own mind up about compliance. I don't think that any court would do that or has the time to do it; and I am not going to do it. Therefore, I am going to remain in the dark. And that is not a hopeful thing, either.

Ordinarily, it seems to me that in a consent decree situation, in a consent judgment situation, when the parties are in substantial agreement, ordinarily it is the job of the Court to put an imprimature on that agreement, and I suspect courts for the most part in the ordinary situation do that. I certainly have found myself doing it on occasion, and I am sure that I will again. But this is public interest litigation, and it affects all the people of the State of Michigan and to some degree the United States. Furthermore, the subject matter of the litigation, the constitutional rights of the inmates, are in this litigation almost unrepresented. That is to say, the *amici* appear for the inmates, but the inmates have no counsel in these institutions, and it is the Eighth Amendment that brought this matter into the courtroom in the first place. I don't think it is analogous really to school children in a school desegregation case because the interests are represented for the most part, usually by a class of either plaintiffs or defendants including the governmental entities involved in that. This just has a group of people, numerous—I don't know how numerous, but numerous—who aren't here, and they are telling me something.

From time to time I have received letters from inmates. The parties know about that because I have always sent those letters right on to the parties, and I get the expected response, quote, we will look into that, end quote, and nothing else. So I act like kind of a clearinghouse for the inmates that are upset and write to me about their upset. That is kind of *ex parteing* the Judge, and I just send them on to the parties, the *amici*, and get no response except as I indicated, someday maybe we will get around to answering that.

Well, there are really two options in front of me right now. One is the option to sign the stipulation which of course I have read; and one is not to sign. What else can I do?

What I am going to do is the following: I am going to sign the stipulation. It will expire at 5:00 p.m. on August 21st. I have written that into the order. The order reads that the above stipulated agreement is an order of this Court hereby entered the 21st of June, 1985, at Kalamazoo, Michigan, and it expires on August 21st, 1985, 5:00 p.m.

That is of course about sixty (60) days from today. It is two months from today. In the *United States v. Michigan* involved in the Indian fishing rights case, I appointed a special master for the purpose of trying to expedite a settlement, and for that purpose principally alone. It was of help to the Court in the final analysis. And from the day this litigation was filed, I began to, this instant litigation, *U.S. v. Michigan* slash Prisons, I began to think about a special master, because I began to think that I would never be able to learn what I needed to learn about the conditions in Michigan's prisons, and probably might not recognize them myself if I saw them.

From that date to this date, I have seen two separate individuals in this courtroom on different litigation who have presented themselves to the Court, called by the litigating parties as ex-prison—they were both ex-prison administrators of some standing in the country. Both had been wardens as I recall it, and they helped the Court with their testimony with regard to the issues that I was facing then. One was, I specifically recall, involved in the case where an inmate was alleging that he had been raped at one of the institutions involved in this litigation maybe—maybe not—but with regard to the conditions of confinement; and I thought about this case at the time.

I intend to appoint a special master in this case pursuant to Rule 53 who will tell me, I hope, what the truth is with regard to implementation. I am going to give the parties the following assignment. I want them to—the parties include *amici*. I want them to brief by July 5th, that is, two weeks from today, issues involving a special master, including the following issues: The role of the master as the parties and *amici* see it; the question of funding provisions; and whether or not the master's fee ought to be shared by both governments, and if so to what degree. That is to say,

should it be 50–50 or something different. Funding provisions as the parties see it.

I will be interested in comments from the parties and *amici* about the value of the special master in this case; although I think that I have said to the parties the reason I feel the necessity. I need some independent person not bound to the United States, not bound to the State of Michigan, not bound to the *amici*, not bound to the inmates, but knowledgeable about the issues facing this Court; and I don't see that there is any other way that I can do that. I am about 85 percent convinced, but not 100 percent, that the United States and the State of Michigan are telling it to me like it is. But I need to have a percentage much greater. I need to get as close to 100 percent as I can.

I am also ordering that Ms. Alexander be served with all documents which paragraph "O" contemplates, that she hasn't been, by July 1st and no later, and I am ordering that the stipulation that I just signed be amended when it talks about service on the opposite party and the Court, that there be an amendment to that saying "and the *amici*" in each place where it appears in this 13, 14–page document, actually a 13–page document, a signature page. I did not make the amendments in pen. I am ordering it amended that way. Then I am ordering the parties and the *amici* to submit to this Court motions if they have any with regard to what ought to happen on August 21st together with briefs and supporting memoranda regarding what has been complied with from this date, June 21st, until that date, August 1st.

Some of the deadlines in the stipulation will have already occurred, and some will not have occurred as everyone here knows. And those briefs and motions should stop the legal paper unless it is necessary after August 1st. On August 21st, 1985, the day the stipulation and order expire, I order a hearing in this courtroom at 9:00 a.m. I hope to be able then to take the step that seems appropriate at that time. The master may or may not be in place by that date. I would hope to be able to issue an order of reference by mid to early part of

the latter part of the month of July, which would only give that master thirty (30) days at best.

But something has to be done. One of the things that disturbed me when I took the recess was that Ms. Alexander wanted me to delay the matter further by not signing the stipulation, and I don't want to delay the matter further. It creates by itself, obviously, delay. It is a problem that—it is the same problem on the same problem. I don't see any value in doing that. That is why I am not doing it.

We will meet again on August 21st. We will have more knowledge then than we have today. I hope that in the next two months the stipulated order works out— but I don't know the answer to that. There will be no further written notice from this Court I say to the parties, about the hearing date or about the briefing dates, other than this oral order. The stipulation that I have talked about is signed, and I will hand it to you, Ms. Chapman. I am not going to bother as I indicated making the corrections, inserting the *amici* in the stipulation, because it has just been done by my oral order.

MEMORANDUM OPINION AND
ORDER OF AUGUST 5, 1985

On June 21, 1985, a hearing was held in the above-captioned case on the subject of Defendants' (hereinafter referred to as "the State") compliance with the terms of the Consent Decree entered July 16, 1984. After being presented by the parties and amici curiae (amici) with seemingly incompatible versions of the State's compliance efforts, I indicated an intention to appoint an independent person; i.e., a Special Master, to assist the Court in overseeing implementation of the Consent Decree. The parties and amici were ordered to submit briefs on the subject of a Special Master by July 5, 1985.

The Court has, since July 5, 1985, received numerous pleadings from the parties and amici. The Plaintiff and Defendants strenuously object, on several grounds, to the appointment of a Special Master. Amici strongly favor the appoint-

ment. Having carefully considered the arguments made in these pleadings, both on the issue of the appropriateness of utilizing a Special Master and on the issue of the State's compliance efforts, I am still unable to make a comfortable and accurate assessment of the State's progress. Therefore, I remain of the opinion that input from an independent person on this important subject is necessary. However, I am persuaded by the parties that the Court's inquiries may be adequately addressed, and in the least intrusive manner, by the appointment of an independent expert rather than a Special Master. Should the selection of an independent expert prove to be an unsatisfactory manner in which to address the Court's concerns, the appointment of a Special Master will again be considered. Therefore,

IT IS HEREBY ORDERED that pursuant to Federal Rule of Evidence 706 and 28 U.S.C. § 1920, an independent expert shall be appointed to study and report upon efforts of the State of Michigan to comply with the Consent Decree entered July 16, 1984.

IT IS FURTHER ORDERED that the fees for said independent expert shall be shared jointly by Plaintiff, United States of America, and Defendant, State of Michigan.

IT IS FURTHER ORDERED that the parties and amici shall submit to the Court names and resumes of proposed independent experts within fifteen (15) days from the date of this Order. The Court will immediately thereafter select a qualified expert. If unsatisfied with any of the names suggested, the Court will make its own independent selection of a qualified expert.

IT IS FURTHER ORDERED that the hearing previously set for August 21, 1985 remains as scheduled. The issues of the implementation of the Consent Decree and the appointment of an independent expert will be addressed.

IT IS SO ORDERED.

BENCH OPINION OF AUGUST 21, 1985 EXTENDING THE PARTIES' STIPULATION; DENYING THE *KNOP AMICUS* MOTION TO AMEND THE STATE PLAN; AND DENYING THE UNITED STATES' REQUEST FOR SANCTIONS AGAINST THE *KNOP AMICUS*

The Court takes up the issue, I guess, joint issues of the *Knop* plaintiffs, *Knop amici*, motion to amend, and the other motions to strike the pleadings which were the argument that we heard just before I took the recess. In a motion and brief with attachments which exceeded 150 pages, the *amici* now move the Court for an order amending the substantive provisions of the state plan for compliance and the supplemental plans associated with the consent decree issued last year. These provisions include among other things psychiatric care, medical care, physical plant conditions, and sanitation and crowding, and protection from harm, and access to the courts.

The motion and brief also ask the defendants to cease to inform inmates that administrative actions result from the consent decree unless that turns out to be in fact true. In terms of what the brief contains, which is summarized briefly by counsel today, I think it is sufficient to say that it states *amici*'s view of the present conditions in the areas listed and the law as to what they believe is constitutionally required. They believe these modifications are necessary to the state plan in order to effectuate the purposes of the consent decree. Also cited in the brief are areas in which the state plan as it exists now is being complied with.

 Prior to addressing the question of whether the *amici* should be allowed, that is to say, have standing, if that is the proper term, to bring this motion, a comment is proper as far as the brief is concerned. It is exhaustive and well written, and if one has enough patience to read the 150 pages as I did there is interesting material there. However, as with all of the pleadings that I have read for the past several months, there is absolutely no way

for me to ascertain the truth of the allegations. Without being vulgar about it, it is the same stuff that I keep seeing over and over again; and although in the responsive briefs of the United States and the State the substantive arguments are not addressed, the substantive arguments have been addressed in the past and, I am sure, could be exhaustively treated if the United States and the State wanted to do that. The whole reason for my wanting to appoint a special master, or as I have altered that order, independent expert, was to give me some information, and that has not been done. I, therefore, as a preliminary ruling would indicate that the motion if allowable, if I were to allow it, is in my judgment premature because I have the same lack of information that I had in June.

It is obvious to me from reading the voluminous pleadings, the paper war that is going on between angry counsel and of which I am the unfortunate beneficiary, that the only way that I can determine what conditions are and what has been done by the State, or what has not been done by the State, as well as any extensions that might be necessary, is after I get the report or consult with the independent expert, which I haven't had the opportunity to do for a host of reasons that I will address in a few moments. The only option that I would have after reading that brief and the response is, without an independent expert, to conduct some kind of a trial, which I suspect would be very long and complicated, and which I suspect would be mostly unproductive.

I am concerned with the status of the *amici* here as far as the prison project is concerned. I am not unaware that they are the *Knop* plaintiffs. That is exactly the position they have here. The potential class action involves the totality of the conditions of the prisons involved in this case. I tend to agree with the parties in the case herein when they argue that the *amici* appear to be trying to litigate *Knop* in part at least. I know, and I assume that the lawyers know, that CRIPA requires only the, quote, "constitutional minimum." While there may be no way in this world to

accurately determine what satisfies a constitutional minimum, I note that *amici*, the *Knop amici*, were at one time satisfied with the terms of the consent decree and the state plan. In fact, the *Knop* plaintiffs stated they were not here to challenge the substantive provisions of the decree or the plan, only to be sure there were provisions for adequate monitoring and/or enforcement.

By reading between the lines of the pleadings, and that is all I can do, it appears to me that the *Knop* plaintiffs have changed their minds. It may be that they are seeking extra relief as plaintiffs in *Knop* rather than the limited status of *amici* in this case. As in all other matters in this case, I continue to be frustrated because I don't think anyone in this room, myself included, really knows what is constitutionally required as a minimum. If that is true, and I am persuaded by all that I have heard that it is, how can I be expected to make a judgment as to what should or shouldn't happen with regard to the issues set forth in the 150–page brief of the *Knop* plaintiffs? As I have indicated a few minutes ago, I do not believe that the *Knop* plaintiffs have standing or authority to bring a motion to change the state plan. 42 U.S.C. 1997 or the CRIPA Act clearly gives standing to seek remedies only to the United States. The *Knop* plaintiff or the *Knop amicus* is not a party, never was a party. Although *Hadix* was once an intervening plaintiff, *Hadix* isn't anymore, and if I have my way, and I think I will, *Hadix* will be out of this case altogether.

The pertinent provisions of the consent decree do not in my opinion support *amici*'s ability to bring this motion. The decree refers very specifically to parties, and I would underscore the word "parties," having stipulated and agreed to the entry of the decree. After addressing various conditions involved in the decree—and I call the record's attention and the lawyer's attention to paragraphs H, I, J, K, and L—I specifically stopped at paragraph O which in substantial part reads as follows: "The parties by agreeing to this decree do not intend to create any rights and obligations

enforceable by inmates. It is, nonetheless, recognized that for the purpose of entry of this decree the Court has granted limited intervention to the plaintiffs in the pending action of Hadix"—citation omitted—"and to the plaintiffs in the pending case of Knop"—citation omitted—"to participate as *amicus curiae*. To the extent that the defendants are required by paragraphs I, J, K, and L to this decree to furnish reports, plans, pleadings, memoranda or other documentation to the Court and the United States, an informational copy shall be provided at the same time to the *amicus curiae*. Any responses of the United States shall be similarly circulated. Within 20 days after receipt of said reports, plans, pleadings, memoranda or other documentation, *Hadix* and *Knop* plaintiffs may respond to the Court and parties as *amicus curiae*." Those are two words that ought to be underlined, it seems to me. "Further, *Hadix* and *Knop* plaintiffs have a limited right at the Court's discretion to participate as *amicus curiae* at any hearing which may be called."

That is a substantial reading of paragraph O of the consent decree previously entered. Paragraphs P and Q are of some assistance as well. Paragraph P indicates that the United States may seek appropriate orders for enforcement of the decree, but will not do so until first consulting with the defendants in an effort toward an informal resolution of the dispute; and Q says the Court shall continue its jurisdiction of this matter until further notice. "One year following the decree"—some material omitted—"the Court shall hold a hearing to determine whether the decree to the extent then implemented in accordance with the terms and provisions thereof is fulfilling its stated purpose to bring SPSM, RFC, MR, MBP and MIPC into constitutional compliance. Should it be determined at such hearing that the decree is in some respect deficient in such requirements, the Court may entertain motions for modification of the decree so as to correct the deficiency. The *Hadix* and *Knop* plaintiffs may participate as *amicus curiae* in said hearing." End Quote. Quite clearly Q and O indicate the status of the *Knop* plain-

tiffs, and that status is not as a party. Nor does it give the *Knop* plaintiffs any right to make a motion to amend. I believe these provisions grant the *amicus*, therefore, very limited authority, the type of authority usually granted to a person or an entity with an *amicus* status.

 I have to agree with the parties that the *amicus* does not have authority to make a motion to modify. Also, even if it did, or they did have the authority, it seems to me very untimely, over one year after the decree was entered and subsequent to the compliance hearing of June 21st, 1985. I think that the past briefs of *amicus* were very proper. They presented the Court with a third view of the facts and assisted me in understanding the requirements of the Constitution with regard to this legislation.

It seems to me this is the only role of an *amicus* at this stage. In fact, as you all will recall, I reduced the *Knop* plaintiff from litigating *amicus* to plain old *amicus* when the decree was entered. I disagree with the argument of *amici* that somehow my statement on June 21st in effect that the parties and the *amici* submit by August 21st such motions that they may have, about what should happen today, August 21st, was any kind of an open invitation to *amici* to make a motion to amend. I interpret my own remarks as an invitation to make motions, submit pleadings, regarding whether the stipulation should be extended past August 21st, nothing more, nothing less. I am hard-pressed to understand that it was a grant of some kind of authority to *amici* which hadn't been in the litigation before and isn't today. The ruling that I make, therefore, on the motion pending is that I grant the motion to strike the motion to amend as requested. I will continue. I will keep, however, the brief on file for use by me since it is well written, and since it may be of assistance to the Court and to the expert the Court appoints. The motion is stricken. The brief is not. The brief is still part of the Court's material.

Because the United States and because the State of Michigan responded to that motion by outrage, which is understandable

to me, they did not address any of the substantive portions of the materials contained in the *Knop* brief. If the government wants to do, governments want to do that, Michigan or the United States—and they may not want to as there is already a bevy of material here that addresses most of those issues—I am going to permit that to be done because certainly the expert that I appoint is going to have access to the *Knop* brief, and it seems to me only fair to permit the United States and the State of Michigan if they desire to submit responsive briefs as to the substantive portions of the *Knop amici*'s brief. I will give them twenty days to do that, twenty days from today. They are not required to. Neither entity is required. If they want to, they have the right to do that. Thus endeth that matter.

Also before the Court is a motion for sanctions regarding some of the background material involving the *Knop* plaintiff's counsel who unfortunately doesn't appear today because she is on vacation. The motion was brought pursuant to paragraph P of the consent decree. In part, the United States, it says the United States may seek appropriate orders for enforcement of this decree, but will not do so until first consulting with the defendants in an effort toward informal resolution of any dispute. The motion seeking sanctions against *amici* is in my judgment, has nothing to do with that paragraph, despite the fact that that is what I was pointed to, to do something about it. I don't think that I will go into all of the issues, but I certainly don't intend to hold a long evidentiary hearing in which—and there are already affidavits from both sides, and there is already animus that is not of benefit, that is reflected in the pleadings and is not to the benefit of any lawyer in this room or any lawyer not in this room. It is the kind of paper that I think no judge in the country wants to read. I certainly don't. It diminishes this professional greatly. My analyzation of the motion, and what all of the bevy of materials that have been sent to me, is essentially, as follows:

First of all, there is in my judgment apparent misunderstanding by *amici* as to

their authority in this case as I have just ruled. They are, as I have indicated, and will be treated as, traditional *amici*. I have read the pleadings, and from the pleadings and the materials that appeared, it appears to me that Elizabeth Alexander did not intend to act improperly. It does appear that she misunderstood the role of these experts vis-a-vis the United States. I, of course, have no way of knowing the truth here, and I wouldn't if we had a full evidentiary hearing. I, therefore, do not intend to hold an evidentiary hearing, a you did, you didn't kind of thing. I am not going to raise that issue to the level of dignifying it with a hearing. I expect, of course, that the matters contained in that motion, and the background from that motion, which was only filed August 13th, will not occur in the future. I am denying the motion for sanctions without prejudice in the sense that if problems occur in the future that motion may be raised again, and I will keep all of the materials that have been furnished to me including the affidavits for reference.

The motion for sanctions against Elizabeth Alexander is denied. That leaves on the agenda the principal issues for which I had set the hearing today, and that is what to do about the extension of the stipulation entered June 21st, what to do about the State's motion for relief from the order, what to do about the expert situation.

· · · · ·

The Court was in the midst of concern with the issues that were the same issues that I had back in June. In terms of the paper flow, the paper war, it is unfortunate, and I must confess as I have, it is becoming wearisome to me and to my whole staff. The background was not very helpful, either. It was on July 16, 1984, that the consent decree was finally signed by me after considerable difficulties. Paragraph Q of that decree provided that I would continue jurisdiction of this matter until further notice, and that one year following the entry, and specifically on June 21st, I would hold a hearing to determine whether the decree, to the extent then implemented in accordance with the terms

and provisions thereof, is fulfilling its stead purpose to bring the institutions into constitutional compliance. Should it be determined, the order reads, in such hearing that the decree is in some respect deficient in its requirements, the Court may entertain motions for modification of the decree so as to correct the deficiency. The *Hadix* and *Knop* plaintiffs as I previously indicated were permitted to participate as *amicus curiae* in that hearing.

The next year, I received copies of periodic reports from the State and copies from the United States on the steps being taken to comply with the decree. No objections or any comments whatsoever were ever received from *amici*. Just prior to the June 21st hearing, I received a motion from the State to modify the decree. That is, to extend some dates for compliance in various areas. The United States and State submitted a stipulation of their agreed upon time extensions. The A.C.L.U. Prison Project strenuously objected and submitted lengthy arguments and reports stating that the conditions of the prisons were not as indicated by the United States and the State. The United States and the State contended that the A.C.L.U. position was incorrect in every respect. Allegations flew back and forth, of no assistance to the Court.

And frustration, in frustration and not much else, I stated at that June 21st hearing that I could not ascertain the truth as to the compliance efforts of the State, and I ordered at that time that I would appoint a special master to help in making evaluations and reporting to me about his evaluations or her evaluations. I ordered the parties and the *amici* to brief by July 5th the issues involving the appointment of a special master. I also ruled that I had signed the stipulation to extend the date, that it would expire today, August 21st, on which date there would be another hearing. Then from the transcript I ordered the parties and the *amici* to submit to me motions—I covered that matter. I don't see any point in covering it again, I guess.

By July 5th anyway, I received a huge stack of papers on the question of the appointment of the special master. After listening to this material from my own office, since I was absent, I decided in my absence to appoint an independent expert instead of a special master. I reserved the possibility of appointing a special master at a later date if the expert proved to be an unsatisfactory manner in which to address my concerns. As of today, and only as of today, as far as I am—maybe it was yesterday or the day before—not very long ago —I received from the United States the names and resumes of three proposed experts. I received the names and resumes from the State of Michigan of three proposed experts; and I received from the *Knop* plaintiffs the names and resumes of three proposed experts. I have received one or two, possibly three, requests from individuals who simply knew about the litigation and submitted their own resumes.

I do not know whether the two governments and the *amici* know of each other's experts. I just got them myself, and I haven't actually had the opportunity to analyze the material therein. There are no names repeated. So I can tell at first blush that there is no single individual who bears the recommendation of either of the sovereigns or of the *amici*. What I don't know is if that may be true if all sides are privy to the individual recommendations made. What I am going to do about the expert problem then is this: I am going to order that the lawyers present today meet to discuss the expert issue with regard to the names and resumes submitted, and if the lawyers here don't have the resumes of certain individuals, we will get them Xeroxed so they do have them. The purpose of the meeting is to see, is to have me learn two things before the day is out: One, are there, is there a person or persons which are agreeable to the lawyers representing the United States and the State of Michigan, and the *amici* if possible. But my judgment is that, or my observation is that nothing is agreeable to the lawyers in this room. So I wouldn't expect that I would have any agreement. Nevertheless, in frustration, I try.

At the same meeting, perhaps, we can identify those experts who are not agree-

able for one reason or another based upon their resumes or other things. Several of the resumes that I have looked at, they appear to contain significant qualifications for the people who submitted them, and it could be that the lawyers haven't had an opportunity to see each other on the subject. That today may not resolve that issue. I hope it resolves that issue if the lawyers talk with each other in good faith. If it doesn't, I am going to give the government of the United States and the government of the State of Michigan ten days from this date to respond to me about all of the experts who have been submitted for my consideration.

I intend within one day of receiving those briefs to appoint the expert so that there will be no more delay. One of the significant problems that has occurred between June and today is that no progress has been made toward appointing an independent person to assist the Court in understanding what the problems of compliance with the Court's consent decree are. And that will continue ad infinitum, it appears to me, unless I get busy and appoint the expert.

For the reason that I don't have the expert, for the reasons that I have stated before, I continue to be in an unenviable position of not being able to do anything except what the parties want me to do. That is, I can either rubber-stamp the parties' request for extension, not being sure that I should, or I can deny it and just leave chaos in the case. So if I can't deny it, and I don't know the truth of the allegations, all I can do is extend it; and without any happiness at all I do extend it until January 17, 1986, at which time I hope to have heard from the expert on his or her views as to what happens with compliance. There will obviously have to be additional orders from the Court on briefing and other things. That is all I am doing right now is extending the stipulation of June 21st to January 16 (sic), 1986, at the close of business that day. I am ordering a hearing for that day at 9:00 a.m.

## OCTOBER 2, 1985 APPOINTMENT OF F. WARREN BENTON AS INDEPENDENT EXPERT AND ORDER FOR INSTRUCTIONS

■ Due to its difficulty in determining from the submissions of the parties and *amici* the degree of the State's compliance with the Consent Decree entered July 16, 1984, the State Plan for Compliance, and the Stipulation entered August 21, 1985, the Court finds it necessary to appoint an Independent Expert to study and report to it on the efforts of the State of Michigan to comply with the provisions of such documents. The Court believes the Independent Expert's report will provide it with an objective and thorough analysis of the status of the State's compliance in the subject prison facilities. The Court has considered carefully the qualifications of the candidates submitted by the parties and *amici*. Therefore, pursuant to Federal Rule of Evidence 706 and 28 U.S.C. § 1920, and with the consent of the parties,

IT IS ORDERED that F. Warren Benton is hereby appointed by the Court as its Independent Expert empowered to study and report on the State's efforts to comply with the Consent Decree, the State Plan for Compliance, the Stipulation entered August 21, 1985, and other plans and orders entered in this case. In furtherance of his duties, the Independent Expert shall have the authority set forth below.

### I. *Authority*

1. The Independent Expert shall have unlimited access to all facilities, buildings, or premises under the control of the Michigan Department of Corrections (hereinafter DOC) that are subject to this action, *i.e.*, those facilities, buildings, and premises at the State Prison of Southern Michigan ("SPSM") at Jackson, the Reception and Guidance Center ("RGC"), the Michigan Reformatory ("MR") at Ionia, the Marquette Branch Prison ("MBP") at Marquette, including the Michigan Intensive Programming Center ("MIPC"), and the Riverside Psychiatric Center. He shall have the authority to conduct tours of these facilities, buildings, and premises as

necessary. This access includes the DOC central administration facilities.

2. The Independent Expert shall have unlimited access to all relevant records, files, and papers maintained by the DOC and the Department of Justice (hereinafter DOJ) to the extent necessary to perform his duties as detailed in this Order. The DOC and the DOJ shall refuse no reasonable request for documents. The Independent Expert may, upon specific request, view *in camera* any relevant confidential documents in the possession of the parties, including individual inmate records and the consultant reports of the United States. The Independent Expert shall maintain the confidentiality of such information. The Independent Expert shall receive the following documents at the time of appointment:

A. The Consent Decree;

B. The State Plan for Compliance;

C. All Supplemental State Plans submitted to date, together with all comment letters from the United States and *amici;*

D. The Stipulation;

E. The semi-annual compliance reports of December 1984 and June 1985;

F. The *amici's* memorandum to amend the State Plan and the United States' responsive memorandum; and

G. Any other documents the Court may wish to provide.

The Independent Expert shall have ready access to all other papers filed with the Court.

3. The Independent Expert shall have access to all pertinent staff members and employees of the DOC and the DOJ. He may engage in both formal and informal conferences with such staff members and employees, including confidential personal or group interviews, and such persons shall cooperate with him fully and shall respond to all reasonable inquiries and requests relating to the State's compliance efforts. The State shall designate a representative to have the sole responsibility to coordinate tours of the relevant institutions or facilities, to assist in gathering documents, and

to provide any additional material or information the Independent Expert may request. Lawyers representing the parties and *amici* or otherwise associated with this action, or with the *Hadix* and *Knop* actions, shall not attend tours undertaken by the Independent Expert or otherwise participate in the Independent Expert's activities without notice to the parties and permission of the Court. Such lawyers shall not contact the Independent Expert except by Order of the Court. Such lawyers may, however, respond to any written questions or other submissions the Independent Expert may have, provided such responses are in writing, and provided further that the lawyers for the parties to this action and for *amici* in this action shall receive copies of such questions or other submissions and the responses. All communications between the Independent Expert and counsel for either party or for *amici* concerning substantive issues pertaining to compliance shall be reported to the Court, the parties, and *amici.*

4. The Independent Expert may conduct confidential interviews and meetings with any prisoner or groups of prisoners incarcerated at the subject facilities.

5. The Independent Expert may attend, upon his oral or written request, any formal or informal institutional, or central administration, meeting(s) or proceeding(s) conducted by DOC staff. The DOC shall not refuse any such requests.

6. The Independent Expert may require DOC or DOJ staff to prepare, where appropriate, written responses to any questions raised by him.

7. The Independent Expert is authorized to hire Mr. Don Stoughton to assist him with his study and report. The amount, coverage, and payment of Mr. Stoughton's fees and expenses shall be governed by the same terms governing the Independent Expert's fees and expenses, as provided for in part III of this Order. The Independent Expert may, subject to the Court's approval and with the consent of the parties, employ such other persons as he feels are needed for him to carry out his duties. The parties shall divide equally the

fees and other costs of such individuals, who shall be under the Independent Expert's supervision and control.

## II. *Procedure*

1. The Independent Expert shall give state officials reasonable notice of all tours, unless he believes such notice will interfere with the factfinding process. The Independent Expert, when possible, shall notify the State in advance of each tour of any special needs or arrangements that should be made, *e.g.*, staff interviews or confidential interviews with inmates.

2. Upon conclusion of the compliance hearing scheduled for March 7, 1986, either party or *amici* may petition the Court to terminate the grant of authority to the Independent Expert contained in this Order. The Court, however, retains the authority to order the Independent Expert, upon conclusion of such hearing and notwithstanding any petition for termination of the Independent Expert's authority, to perform such additional duties with respect to this action as it may direct or which the parties or *amici* may petition the Court to, within its discretion, direct, and which are agreeable to the Independent Expert.

3. Any and all disputes concerning the interpretation of this Order shall be resolved by the Court, with appropriate notice and opportunity to respond to the parties and *amici*. The Independent Expert shall have the unqualified right to contact the Court, without notice to either party or *amici*, with any questions he may have regarding this Order or any other aspect of this action. The Court, except as noted in the first sentence of this paragraph, shall respond to such contacts with or without notice to the parties or *amici*.

4. The Independent Expert shall submit his report to the Court, the parties, and *amici* on or before February 1, 1986.

5. The parties and *amici* shall have until February 14, 1986, to file with the Court any responses to the Independent Expert's report they may wish to make. The parties and *amici* shall have until February 21, 1986, to file with the Court any replies to such responses they may wish to make.

6. The Independent Expert shall be prepared to testify at a compliance hearing, scheduled for March 7, 1986, at 9:00 a.m.

## III. *Authorized Fees and Expenses*

1. It is understood that the parties shall divide equally all fees and reasonable expenses submitted by the Independent Expert, and approved by the Court.

2. The Independent Expert shall be compensated at the rate of four hundred dollars ($400.00) per day for services performed in accordance with this Order. The Independent Expert shall also be reimbursed for all reasonable and customary expenses incurred in the course of the performance of the duties outlined in this Order, including but not limited to airfare, cabfare, car rentals, parking, hotels, meals, tips, telephone calls, postage, and photocopying costs. Typist expenses are specifically excluded from the reimbursement provisions of this Order.

3. If an expense arises which is not customary and is over twenty-five dollars ($25.00), the Independent Expert shall seek authorization from the parties prior to submitting a bill. Authorization of the parties shall be in writing. No reasonable expense will be denied.

4. The parties shall provide the Independent Expert with appropriate billing instructions within ten (10) days of the entry of this Order.

IT IS SO ORDERED.

OPINION OF DECEMBER 2, 1985 DENYING THE *HADIX* PLAINTIFFS' REQUEST TO EXCLUDE THE CENTRAL COMPLEX AND THE RECEPTION AND GUIDANCE CENTER FROM COVERAGE UNDER THE CONSENT DECREE

### Introduction

Currently before the Court is a "request" by *amicus curiae* the *Hadix* Plaintiffs for permission to intervene as a party plaintiff and for the Court to exclude the inmates confined at the Central Complex of the State Prison of Southern Michigan

("SPSM"), including the Reception and Guidance Center ("RGC"), from coverage under the Consent Decree entered July 16, 1984, as amended August 21, 1985. On March 23, 1984, the Court granted the *Hadix* Plaintiffs a limited right to intervene as a party in this action so they could protect their interest in their own action before Judge Feikens of the United States District Court for the Eastern District of Michigan. The Court at that time, however, and at subsequent hearings, declined to exclude the Central Complex and the RGC from this action. After giving serious consideration to the *Hadix* Plaintiffs' latest request for exclusion, I still find, although it is a close question, that for the reasons discussed below the Central Complex and the RGC should—at least for the present—remain covered by the Consent Decree.

### Facts

The United States Department of Justice, through the Attorney General, initiated this action on January 18, 1984, pursuant to its authority under the Civil Rights of Institutionalized Persons Act ("CRIPA"). 42 U.S.C. § 1997 et seq. Concurrent with its filing of the complaint, the United States filed a motion to dismiss pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure ("FRCP") in which it requested the Court to accept and to enter a Consent Decree it had negotiated with the State of Michigan as the parties' settlement of the issues raised in the complaint. The Court set March 2, 1984, as the date for a hearing on the adequacy of the proposed consent judgment.

On February 2, 1984, the Court received a letter from the attorneys for the *Hadix* Plaintiffs advising it of their own action in the Eastern District of Michigan. The Court responded to this letter by inviting the *Hadix* Plaintiffs to participate in the hearing on the proposed consent judgment. On February 24, 1984, the *Hadix* Plaintiffs filed a motion to intervene as Plaintiffs in this action or, alternatively, for status as *amicus curiae*. The *Hadix* Plaintiffs stated in their motion that they sought to intervene for the sole purpose of excluding the Central Complex and the RGC from the proceedings before the Court. In an oral opinion rendered on March 23, 1984, the Court found that the *Hadix* Plaintiffs' satisfied Rule 24(a)(2)'s criteria for intervention as a matter of right, and accordingly allowed them to intervene "on the basis of their limited interest in the Jackson Prison." Transcript of March 23, 1984 Hearing, Vol. I, at 84. The Court also granted them status as *amicus curiae. Id.* at 85.

The Court indicated at subsequent hearings on the adequacy of the proposed Consent Decree that it was seriously considering excluding the *Hadix* Plaintiffs, *i.e.*, the Central Complex and the RGC, from this action and thus from the scope of the decree. *See* Transcript of June 12, 1984 Discussions on Consent Decree at 6. The Court nevertheless approved the Consent Decree with the Central Complex and the RGC included among the institutions subject to the decree, and changed the status of the *Hadix* Plaintiffs to that of strictly *amicus curiae.* Transcript of June 22, 1984 Hearing at 26; Consent Decree, para. O.

On August 20, 1985, the *Hadix* Plaintiffs, having negotiated a settlement of their own action with the State of Michigan, renewed their request for exclusion from the Consent Decree. They argued, among other things, that failure to exclude them from the Consent Decree would constitute a waste of judicial resources and that the inmates were confused by the two decrees. At the compliance hearing held on August 21, 1985, the Court once again indicated its desire to exclude the *Hadix* Plaintiffs from coverage by the Consent Decree. Transcript of August 21, 1985 Rulings at 7 & 15. The State of Michigan indicated at the hearing that although it felt there was no conflict between the two decrees, it would not object to the exclusion of the *Hadix* Plaintiffs. Transcript of Statements of Attorneys, Scheduling by Court, of August 21, 1985, at 11. The United States, however, objected strenuously to the proposed exclusion, *id.* at 7–9, and subsequently filed a brief on the issue. The *Hadix* Plaintiffs then filed a reply to

the United States' response to their request.

### The Parties' Positions

The *Hadix* Plaintiffs' motion or request presents two issues for the Court to resolve: (1) whether the Court should allow the *Hadix* Plaintiffs to intervene as a party for the sole purpose of seeking exclusion from the Consent Decree; and (2) if it should allow them to intervene for that purpose, whether it should grant their motion or request for exclusion. The *Hadix* Plaintiffs presented three arguments in support of their request in the motion they filed on August 20, 1985: (1) judicial supervision of the implementation of two separate consent decrees, in two different courts, covering the same institution, would constitute a waste of judicial resources and could lead to conflicting interpretations and enforcement measures; (2) the implementation of two separate consent decrees has created confusion and disharmony among the inmates at the Central Complex and the RGC, which in turn has created problems for the *Hadix* attorneys, who often have to explain that corrective measures to which the inmates object, and for which they blame the *Hadix* attorneys, are necessitated by the Consent Decree entered in this case; and (3) the entry of their consent decree has obviated the legal basis for continuing this Consent Decree with respect to the inmates they represent by removing the threat of irreparable injury required to support injunctive relief.

The United States filed a five-fold response to the *Hadix* Plaintiffs' request for exclusion. First, it argued that the *Hadix* Plaintiffs, pursuant to their status as *amicus* in this action, lack authority to file such a request, and that exclusion of the Central Complex and the RGC (which contain approximately 37.4% of the inmates affected by the decree and in which conditions are the worst) from the Consent Decree would significantly impair the United States' efforts to implement badly needed changes. Second, the United States argued that there are no conflicts between this Consent Decree and the one recently entered in *Hadix* that would justify excluding the Central Complex and the RGC from this action. It noted that the Consent Decree contains procedures for resolving any conflicts which may arise and that the State of Michigan stated at the August 21, 1985 hearing that it has taken the requisite steps to comply with the terms of both decrees.

The United States argued for its third ground that the *Hadix* Plaintiffs do not meet Rule 24(a)(2)'s requirements for intervention as a matter of right. It asserted in particular (1) that the *Hadix* Plaintiffs' request was untimely, (2) that the *Hadix* Plaintiffs do not have a "significantly protectable interest" in the Consent Decree, (3) that any interest they may have in the decree would not be subject to impairment, and (4) that the United States will adequately represent the *Hadix* Plaintiffs' interests. The United States argued as its fourth ground that the *Hadix* Plaintiffs have not established the requisite justification for changing or modifying the Consent Decree. Finally, the United States argued that exclusion of the *Hadix* Plaintiffs would subvert its efforts pursuant to its authority under CRIPA and the decree to remedy the egregious conditions existing at the subject institutions.

The *Hadix* Plaintiffs subsequently filed a vigorous reply to the United States' response to their request for exclusion. They stated that the decision to grant or to deny their request is not subject to any statutory bar but rather is committed to the sound discretion of the Court. The *Hadix* Plaintiffs noted that the Court had indicated at the August 21, 1985 hearing its desire to exclude them from this action, and argued that there exist strong reasons why the Court should modify the Consent Decree so as to accomplish that result. *Amicus Curiae* The National Prison Project filed a letter in support of the *Hadix* Plaintiffs' request.

### Analysis

■ The *Hadix* Plaintiffs' request has presented the Court with a peculiar problem to which it can find no firm answer in

the statutes or case law. The Court notes initially that because the Consent Decree is a final judgment, *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir.1983), the first issue it must resolve is whether it should allow the *Hadix* Plaintiffs to intervene as a party so they can request, under FRCP 60(b), the Court to modify the Consent Decree. I discuss this issue, even though I will deny the *Hadix* Plaintiffs' motion to exclude, to resolve any uncertainty regarding their right to intervene for the purpose of seeking exclusion.

The Court exhaustively discussed this intervention question at the hearing held on March 23, 1984, when it allowed the *Hadix* Plaintiffs to intervene "on the basis of their interest in the Jackson Prison case." Transcript of March 23, 1984 Hearing, Vol. I, at 62–85. I will not repeat that discussion and analysis here other than to update it to take into account certain changed circumstances and to answer the objections of the United States.

A proposed intervenor as a matter of right under Rule 24(a)(2) must satisfy four conditions: (1) the application to intervene must be timely; (2) the intervenor must have a significant protectable interest in the subject matter of the litigation; (3) the intervenor must show that the disposition of the action may as a practical matter impair or impede his ability to protect that interest; and (4) the intervenor must show that the parties already in the litigation cannot adequately protect that interest. *Triax Co. v. TRW, Inc.,* 724 F.2d 1224, 1227 (6th Cir.1984). The Court will discuss these factors in the order presented.

First, I find that the *Hadix* Plaintiffs' motion to intervene is timely. *See Michigan Association for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir.1981) (factors to consider in judging timeliness). As the *Hadix* Plaintiffs state in their brief, the United States answered its own objection of timeliness by noting in its brief that the *Hadix* Plaintiffs have on at least four occasions indicated their opinion that they should not be in this action. The Court thus does not find that their latest request should have surprised the United States.

It also does not believe that granting their request to intervene would unduly prejudice either the United States or the State of Michigan. This is not a case where the proposed intervenor has kept quiet until after entry of the consent judgment and seeks to intervene only after the original parties have finally settled their dispute. *Compare id.* at 105. The *Hadix* Plaintiffs have consistently made their desires known to the Court and to the parties. Finally, it is clear that the presence of the Consent Decree does not create an absolute bar to the proposed intervention. *See id.* at 105 (court considered request for intervention filed one month after entry of consent decree); *Stallworth v. Monsanto Co.,* 558 F.2d 257, 261–62 (5th Cir.1977); *EEOC v. ET & WNC Transportation Co.,* 81 F.R.D. 371, 373–76 (W.D.Tenn.1978).

Second, the Court finds that the *Hadix* Plaintiffs have a significant protectable interest in this litigation. A proposed intervenor under Rule 24(a)(2) must claim "an interest relating to the property or transaction which is the subject of the action." FRCP 24(a)(2). The *Hadix* Plaintiffs can claim two interests that certainly relate to the transactions which are the subject of this action—*i.e.,* the conditions of confinement in Michigan prisons and the consent decree—and which certainly are significant. The first is their constitutional interest in being free from cruel and inhumane treatment. The second is their interest in the effective implementation of their own consent decree, which may be affected by the implementation of the decree in this case.

The United States' argument that the *Hadix* Plaintiffs do not have a "significantly protectable interest" because the Consent Decree in this case will fully protect whatever interest they may have goes more toward the third requirement for intervention: that the *Hadix* Plaintiffs are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect that interest." FRCP 24(a)(2). In this case, the relevant "disposition" would be the implementation of the Consent Decree. This disposition may impair or impede the *Hadix*

Plaintiffs' ability to protect their interests by adversely affecting their efforts to enforce their right to be free from cruel and inhumane treatment through the effective implementation of their own decree. The *Hadix* Plaintiffs cannot effectively protect their interests in their present status as *amicus curiae,* moreover, because, as the United States argues, they cannot file a motion as *amicus curiae* for exclusion from the Consent Decree. The *Hadix* Plaintiffs are so situated that implementation of the decree may, at some point in the future, as a practical matter impair or impede their ability to protect their interests in this matter. Rule 24(a)(2) requires no more to justify intervention. *See Little Rock School District v. Pulaski County Special School District No. 1,* 738 F.2d 82, 84 (8th Cir.1984).

With regard to the final factor, the Court must determine whether the *Hadix* Plaintiffs' interests are adequately represented by an existing party, namely, the United States. The Court need not question the United States' efforts to enforce the Consent Decree to determine that for two reasons, the United States cannot adequately represent the *Hadix* Plaintiffs' interests. First, under CRIPA the United States does not represent the inmates directly but rather the public interest in seeing constitutional rights upheld. 42 U.S.C. § 1997a(a); S.Rep. No. 416, 96 Cong., 2d Sess., at 31, *reprinted in* 1980 U.S.Code Cong. & Adm. News 787, 813; Transcript of March 23, 1984 Hearing, Vol. I, at 28. The inmates at the affected institutions in fact have no right to seek to enforce the terms of the Consent Decree. Consent Decree, para. O. The *Hadix* Plaintiffs, however, directly represent the inmates at the Central Complex and the RGC. Second, the United States cannot represent the *Hadix* Plaintiffs' interest in seeing their own decree effectively implemented. These two reasons suffice to satisfy the "minimal burden" of proof the inadequate representation requirement imposes on the *Hadix* Plaintiffs. *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972). The Court therefore will grant the *Hadix* Plaintiffs' motion to intervene for the purpose of seeking exclusion of the Central Complex and the RGC from the Consent Decree.

Having found that the *Hadix* Plaintiffs are entitled to intervene in this action, the Court must now decide whether to grant their motion for exclusion. The Court finds that the *Hadix* Plaintiffs have not proven sufficient changed circumstances since the entry of the decree, or other extenuating factors, that would justify modification of the decree so as to exclude them from its coverage. The Court's discussion of this issue consists of two parts: (1) a discussion of the appropriate standards for determining whether a modification of the decree is justified, and (2) a discussion of whether the *Hadix* Plaintiffs have satisfied those standards.

 The *Hadix* Plaintiffs' request does not fit any of the established standards for determining whether a consent decree should be modified. The Court notes initially, however, that in general it has the power to modify the decree if it believes modification is required either to prevent the decree from being turned into an instrument of injustice or to fulfill the intent of the decree. "A consent decree is essentially a settlement agreement subject to continued judicial policing." *Williams,* 720 F.2d at 920. The prospective features of the decree, moreover, are analogous to a permanent injunction and as such are subject to modification as needed to meet the decree's intended purpose. *Id.; see System Federation No. 91 v. Wright,* 364 U.S. 642, 646–48, 81 S.Ct. 368, 370–71, 5 L.Ed.2d 349 (1961). The Court in addition has explicitly retained jurisdiction over this decree "until further notice." Consent Decree, para. Q; *see United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

Thus, although the Consent Decree is entitled to some respect under general principals of finality such as res judicata and law of the case as a final judgment of the Court, the Court has retained jurisdiction over it and has the discretionary power to modify it as necessary. In this case, moreover, principals of finality are entitled to

less weight because the underlying issues, although the subject of much negotiation between the parties, have not been subject to the crucible of litigation nor—in effect— resolved by the judicial branch. *Compare Arizona v. California,* 460 U.S. 605, 619, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("an issue *once determined* by a court of competent jurisdiction is conclusive") (emphasis supplied); *Swift & Co.,* 286 U.S. at 119, 52 S.Ct. at 464. The Court thus rejects the United States' argument that "principals of finality absolutely foreclose the reopening of the parties' final judgment for the purpose of implementing the *Hadix amici's* requested exclusion." *United States' Response* at 15.

 The standards for determining when a court should exercise its discretion to modify a decree may differ depending on whether the plaintiff or the defendant is requesting relief. *See New York State Association for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967–69 (2nd Cir.1983), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 757 (1984). A defendant seeking relief from the terms of a consent decree generally must show that the decree "has been turned through changing circumstances into an instrument of wrong" or that— even though the purposes of the decree have not been achieved—he is suffering a "grievous wrong evoked by new and unforeseen conditions." *Swift & Co.,* 286 U.S. at 114–15 & 119, 52 S.Ct. at 462 & 464; *see also Carey,* 706 F.2d at 968–69 (noting that a lesser standard may apply in some cases). A plaintiff, though, need only show that modification is necessary to achieve the intended effect of the decree. *United States v. United Shoe Machinery Co.,* 391 U.S. 244, 249, 88 S.Ct. 1496, 1500, 20 L.Ed. 2d 562 (1968). In general, however, courts should employ their power to modify consent decrees—whether at the defendant's or the plaintiff's behest—only for the purpose of insuring in light of changing circumstances that the intended effect of the decree is achieved. *See United Shoe Machinery Co.,* 391 U.S. at 249, 88 S.Ct. at 1500; *Carey,* 706 F.2d at 969.[1]

 The intended effect of the decree in this case, as well as the *Hadix* decree, is to improve the conditions of confinement at the subject institutions. The Court's primary concern thus is whether exclusion of the Central Complex and the RGC from the Consent Decree would hinder or facilitate implementation of the improvements this decree and the decree in *Hadix* require Defendants to make in the subject institutions. The *Hadix* Plaintiffs present some compelling arguments in favor of the latter conclusion. There appear to be several areas, for example, in which the provisions of the *Hadix* decree provide more protection for the inmates than the decree in this case. The Court has serious doubts, moreover, as to whether it is desirable—in terms of judicial economy, administrative convenience, and confusion among the inmates— to subject the *Hadix* Plaintiffs to both decrees.

The Court nevertheless believes that the *Hadix* Plaintiffs have not sufficiently supported their request for exclusion from the Consent Decree. The Central Complex and the RGC are in many ways at the core of the Michigan prison system, and the Court feels that it would not be appropriate to exclude them from the decree at this stage of its implementation. Such exclusion may hinder the United States' efforts to implement the decree as an integrated package of reforms. The finality to be accorded the Consent Decree, moreover, although not a bar to subsequent modifications of the decree, requires that the Court at least deny the *Hadix* Plaintiffs' request until it has more accurate and detailed information regarding the implementation of the decree.

---

**1.** The Second Circuit has stated, moreover, that a court should be particularly willing to modify a consent decree in institutional reform litigation, in which unforeseen obstacles are more likely to present themselves, a better understanding of the problem may emerge only after a decree is entered, and a court may have to consider a wider constellation of interest than is represented in the adversarial setting of the courtroom. *Carey,* 706 F.2d at 969–70; *see Brown v. Neeb,* 644 F.2d 551, 560 n. 17 (6th Cir.1981). The Court also believes it is significant that granting the *Hadix* Plaintiffs' request would decrease neither the benefits enuring to the inmates at the subject institutions nor the obligations imposed on the Defendants.

Such information should be produced at the compliance hearing scheduled for March 7, 1986. The Court therefore will deny the *Hadix* Plaintiffs' motion without prejudice for them to renew it following the March 7th compliance hearing. The Court will add that, for a couple of reasons, it would give serious consideration to granting a renewed motion. First, it cannot see the sense of having two separate comprehensive decrees covering the same institution. Second, and perhaps more importantly, there are significant issues arising out of the differing positions of the *Hadix* Plaintiffs and the United States. One strong argument favoring exclusion is that the *Hadix* Plaintiffs represent the inmates at the Central Complex and the RGC directly, whereas the United States under CRIPA represents its own interest or the "public interest" in seeing constitutional rights enforced. One need not cast any doubt on the United States' willingness or ability to enforce the terms of the Consent Decree to appreciate that the *Hadix* Plaintiffs have a more personal interest in seeing their decree enforced and thus may be more vigorous in pressing the Defendants to meet their obligations.

The Court also finds significant the United States' obligation under CRIPA not to take any actions that would "restrict the authority of parties other than the United States to enforce the legal rights which they may have pursuant to existing law." The legislative history states more explicitly that the authority granted the Attorney General under CRIPA "is in no way intended to preclude, delay or prejudice private litigants from enforcing any cause of action they may have." S.Rep. No. 96–416 at 31, *reprinted in* 1980 U.S.Code Cong. & Adm.News at 813. The Court quite frankly was surprised at the strength of the United States' opposition to the *Hadix* Plaintiffs' request. It rejects the United States' insinuation that the *Hadix* Plaintiffs may not be able to implement successfully their own consent decree. *United States' Response* at 22 n. 15. There is no indication that such is the case. If later events prove, moreover, that inclusion of the *Hadix* Plaintiffs in this decree is impairing or impeding their efforts to implement their own consent decree, and that they are receiving no benefits under this decree that they are not or would not be receiving under their own decree, then the Court would consider it to be the United States' obligation under CRIPA to accede to the *Hadix* Plaintiffs' exclusion from coverage under this Consent Decree.

The Court will enter an appropriate order in accordance with this opinion.

### ORDER

In accordance with the opinion dated December 2, 1985;

IT IS HEREBY ORDERED that *amicus curiae* the *Hadix* Plaintiffs' request to exclude the Central Complex and the Reception and Guidance Center from coverage under the Consent Decree is DENIED without prejudice.

### BENCH OPINION OF FEBRUARY 13, 1986 DENYING DEFENDANTS' MOTION TO MODIFY THE STATE PLAN REGARDING A MENTAL HEALTH PLAN AND GRANTING THE UNITED STATES' MOTION TO ENFORCE THE CONSENT DECREE REGARDING MENTAL HEALTH

The Court convenes a little late, having been buried in the mass of paper for the last several weeks in this case, needing a starting place, I think. The State of Michigan has been under an order to submit a comprehensive mental health care plan, or as the plan is labeled, Comprehensive Psychiatric Services Plan, for some considerable period of time. The Court granted extensions on numerous occasions to the State, and finally on October 9th the State submitted this plan which I have in front of me, and its bulk and volume can be seen.

The Court looks to the decree and notes in the decree in paragraph "K" that each plan upon submission shall be submitted to the United States for review, as this plan has been since October 9th. If there is no objection to the defendant's proposed plan, "the plan shall be appended to the state

plan and be subject to enforcement in accordance with the provisions of the decree." Before the Court, the Court turns to the question of modification which was simultaneously filed with the Court on October 9th. The most curious position. The State filed its long-awaited plan, on the same date, the same moment, requested modification.

Before I take up the question of modification, it seems to me the Court has to decide where it is, what does it have, and the Court believes there—well, for a number of reasons the Court believes the plan is part of the state plan for compliance and, therefore, part of the decree, and, therefore, subject to enforcement by the Court. I believe that I should accept the Comprehensive Psychiatric Services Plan or the Comprehensive Mental Health Plan for at least three reasons: First, because it is very late; Secondly, and more importantly I suppose, because there has been no substantive objection by any party or *amicus* or *amici* in this case whatsoever as the decree permitted. There just aren't any objections. The Court believes that the plan, that is to say, the Comprehensive Psychiatric Services Plan or the Comprehensive Mental Health Plan, whatever it is supposed to be labeled, meets constitutional standards. The issue is going to be, apparently, whether it exceeds constitutional standards, but there is no objection that it meets it from anything that I can see. The third reason that the Court believes it should accept the plan is because the inmates deserve a remedy to the problem identified in the original decree, and the remedy is already a year behind. We have just been slowly moving at all times. I understand that that should be done. I am doing it.

Therefore, I am ruling that the CPSP is in fact a plan not objected to and shall be, and hereby is, appended to the state plan and subject to enforcement in accordance with the provisions of the decree entered by the Court in 1984.

Now the Court meets for two purposes today having—we need a starting place. The starting place is the plan. That is the starting place, and it is part of the decree, or it is appended to the decree and subject to enforcement. As I indicated earlier, simultaneously, the defendants propose to modify the plan, and, as follows: The second paragraph of II.H.4 states that the professionally designed plan which is intended to assure that prisoners with serious mental illnesses have adequate access to care facilities, quote, "shall provide for full and continuous implementation of the entire said plan within an additional three years after its adoption or approval." The State proposes to amend the sentence to read, as follows: "The Department shall fully and continuously implement the plan to the extent necessary to assure provisions of constitutionally adequate mental health care to prisoners with serious mental illnesses as defined above." End quote. The State as I understand it thus is not willing to commit itself to full implementation of its own plan, but, rather, would implement the plan only to the extent, quote, "necessary to assure," end quote, of what it, the State, defines to be constitutionally adequate mental health care.

The State from its pleadings presents two arguments in support of this request. First, it argues that the plan purports to mandate treatment for inmates who fall beyond the legal definition of seriously mentally ill. The State also argues in this regard that the plan proposes unsupported, quote, "legal due process requirements for involuntary treatment and transfer of mentally ill prisoners." End quote. Secondly, the State argues that the plan overestimates the number of inmates in need of mental health care as defined by the Consent Decree and the state plan for compliance.

The State proposes first to identify the actual number of seriously mentally ill prisoners during the implementation phase of the plan and then to develop the precise type of care required by each subgroup pursuant to the reports' recommendations. The United States agrees with the State's proposal for three reasons: First, it believes that the proposed modification focuses the State's attention on constitutional requirements. The Department of Justice

states that the new mental health care plan apparently—I underscore the word apparently, the Justice Department did not—apparently recommends the adoption of certain practices that exceed the minimum requirements of the Constitution. That is the end of the quote. The modification would simply relieve the State of any self-imposed duty to carry out each proposed recommendation of the plan. Secondly, the DOJ argues the modification's insertion of the language, quote, "serious mental illness" to define the inmates the plan would cover is surplus and thus not objectionable since the Consent Decree already defines seriously mentally ill inmates as those requiring treatment under the plan. Finally, the proposed modification would not change the State's obligation to implement the plan by October 9th, 1988. The United States also notes that the implementation of the plan would not by itself satisfy all of the State's mental health obligations, but, rather, would be targeted primarily at items A.5 and .6 of the Consent Decree.

The *amici* object to the State's proposal. They note that the State has received several extensions on its obligation to present a professionally designed mental health plan, and now seek to have the Court relieve it of any obligation to commit itself to definite staffing or bed requirements.

The *amici* also argue, one, that the plan does not purport to treat inmates who are not seriously mentally ill, noting that the consultants explicitly stated in the plan that they were considering constitutional standards in developing the plan and, secondly, that numerous studies including the report of the Task Force that designed the plan have identified the, quote, "desperately inadequate" nature of the State's mental health care system.

The *amici* also object to the United States' position with regard to the defendant's request. They note the United States and the State seek to have the Court adopt a position that it rejected at the very beginning of this case, *i.e.*, that it is sufficient if the Court does nothing except order the State to obey the Constitution. The problem with this approach, the *amici* argue, is

that it allows the State and the United States to self-define what the Constitution requires and would force the Court to hold a trial on constitutional issues to determine if the defendants were obeying the Constitution. They note that the State repeatedly has refused to recognize the dimensions of the mental health care problem and urge the Court to reject the State's efforts to avoid direct consideration by the Court of the magnitude of the deficiencies in the State's system.

That is, in essence, the posture of the three litigating parties today as I understand their postures. Now I will start in a few minutes to hear what the lawyers want to say about the modification, modification requests, but I think I ought to say also that the fact that I accepted the plan as part of the Consent Decree does not mean that I would not be willing to listen to modification requests properly presented to the Court by any of the parties at any time; for it is certainly possible that the plan may need modification. I am not saying that the plan does not need modification by accepting the plan. I am saying that we have waited long enough to have a plan, and it is part of the decree. I am not sure who is going to be testifying today, and as a starting place I am looking at the United States' answers to or the State of Michigan's answers to some interrogatories with regard to who is going to testify.

. . . . .

I think that we should be interested in modifications. The State may well be right. But how does it help [the State] to attack the plan submitted by the State without giving me and the parties modifications? It leads nowhere. This morning when we started, the State started off by saying it was shocked about the Task Force report, but submitted it anyway in order to comply with the Court's extended deadline. Well, now I wonder about that, and I am going to indicate very clearly why I don't think the State is shocked. I call the record's attention and the parties' attention to the letter dated May 3rd, 1985, not from any consultant, but from Kenneth Faiver, the Associate Director of Health

Care for the Department of Corrections, written on Department of Corrections stationery. The purpose of that letter was to advise me why the State couldn't meet its deadline. Let me read the third paragraph into the record: "To meet the requirement for a professionally designed plan"— quotes around professionally designed— "the Department of Corrections has contracted with a number of outside mental health professionals. An initial group of consultants has been developed; however, approval was withheld by the Michigan Department of Management and Budget; and it was not until mid-March that final approval was received." End quote.

What does that say to me? That says to me that the State was carefully selective in consulting people to assist in developing a comprehensive plan, that OMB, the financial wing of the State government, had a shot at who those people were and held up the process, and then approved the process. That goes to the issue of the impeachment we are talking about. How can you impeach your own consultants when you spent this much time getting your consultants approved, not only by the Department of Corrections, not by the Department of Mental Health, but by the Office of Management and Budget?

Of greater concern to me in that same letter, on page two, is the first entire paragraph, and I am most concerned about that one. Again, Mr. Faiver writing to me: "The first meeting of the consultant group consisted of a discussion of materials written by the Office of Health Care staff"— repeat, Office of Health Care staff. Repeat, Office of Health Care staff, not the consultants. This is the defendant itself. Picking up the quote: "These materials encompassed an introduction to the project and to the requirements of the Consent Decree and the State Plan for Compliance; a review of scientific research and findings into the prevalence of mental disorders in the general community; an analysis of the impact of deinstitutionalization"—the testimony that we were hearing just a few moments ago—"homelessness, and the criminalization of disordered behavior on the prison population; and a summary of studies dealing with the prevalence of mental disorders within the prison community. This last part, which included studies from a variety of states, including several studies from Michigan, was completed at our two-day meeting." That is the end of the quote. I cannot emphasize enough how that negates the surprise comment, shock comment I heard this morning. You couldn't be shocked. That is exactly what Mr. Faiver was telling us in May of 1985 when the State couldn't come up with any plan at all.

Now I am trying to get, gain some, or get some order out of this amorphous hearing. The bottom line is going to be this, and I am going to return to it in a minute. I need specifics of modification requests, and I don't have them. If the State wants to modify its plan, I will with an open mind consider that, and I suspect it needs to be modified. The earlier testimony of Dr. Adams, which hasn't had a chance to be cross-examined, or, by anyone, suggests that. And I am going to listen to that. But I am not going to listen to it without the modification being in front of me. And before I, when I finish these remarks that I am making here, I am going to invite the parties, especially the defendant, to indicate to me what its proposed modification is, even though it is not prepared, and that will give us something, someplace to go.

But I hope it is clear what I am saying. How in the world does it help advance the problem to say that the report we submitted wasn't any good even though we submitted it, and our own staff prepared it, and we don't like our consultants, without saying and here is specifically what we can do that is constitutionally, minimally required? And the State hasn't done that, and I am going to give it every opportunity to do so. I am going to deal right now with the issue of the modification request before me because I can dispose of that in short order and still get, I hope, in the time left to the real important issues before us.

I might say just in passing before I do that that if I were to accept the proffered testimony of Dr. Adams and any other witnesses the State wanted to offer to im-

peach its own plan I am left with no alternative. What do I do? Go back to zero plan? That is why I accepted the plan when I came in today. After over a year's working for it, I refuse to do that, and I don't think any reasonable person should expect to, expect me to. That is why it doesn't take me anyplace. The State presents evidence that may even be persuasive. I don't know if it is or isn't. To say our plan isn't any good, but we have no alternative, Judge, doesn't help much.

The Court has been consistently troubled by the State's position with regard to the mental health issue. It appears to the Court that the State initially took the position that its present system of mental health care is constitutionally adequate. It maintained that position despite numerous reports beginning with Dr. Terry Kypers' 1982 report, and despite numerous admissions from the defendants' own staff members that the system is not adequate to meet the needs of seriously mentally ill inmates. In its memorandum in support of its motion of May 8, 1985, for an extension of time in which to submit a comprehensive mental health care plan, the State opined that its, quote, "current system provides necessary mental health care to those inmates with serious mental illness in accordance with," end quote, Eighth Amendment standards, and that the comprehensive plan is designed merely, quote, "to improve the delivery of these services if necessary in order to assure continual compliance with the requirements of the Constitution." End quote. And part of that was, the request, is where the Kenneth Faiver letter appeared. As the United States stated in its response to the defendant's May 8 motion, however, submission and implementation of a mental health care plan do raise constitutional issues. It is clear to me that the defendant's present mental health care system probably does not meet constitutional standards.

The Task Force that designed the plan indicated that there are several areas in which the defendants' present system is inadequate, and recent reports from psychiatric experts indicate defendants are not providing constitutionally adequate care for seriously mentally ill inmates of that system. The State apparently supported the work of the Task Force some of the time as is clearly indicated and right up to the time that it submitted its plan. The State submitted no documents to the Court prior to the present motion to modify indicating it either was dissatisfied with the work of the Task Force or that it was not planning to support the Task Force's final product.

As I have indicated, Kenneth Faiver, the Acting Director—the Director, he is acting I guess—sent that letter to me that I have put on the record, in part indicating that the consultant group was proceeding well with its plans, that the department hoped to submit a plan by October 9th, and it did. The members of the group were apparently approved by the department, and the group was headed by one of the department's own staff members, Dr. Ort, that I have spoken about earlier. The Office of Health Care's narrative statement concerning the plan, moreover, indicated that the department through the Office of Health Care would keep tabs on and review the consultant's work.

The Court cannot see how the department can now disclaim responsibility for the final product. The State, nevertheless, is before the Court arguing that the Court should not require it to implement fully the plan that it submitted on October 9th. Initially, the Court should make clear that it considers the plan defendant submitted on October 9th, as I have indicated earlier today, to be the State's plan, and believes that defendants are obligated to implement such plan fully absent a modification proposed and approved in accordance with the Consent Decree and the state plan for compliance. The Court does not consider the defendant's current proposal to be appropriate. If the Court were to accept defendant's proposed modification of the state plan for compliance I would be effectively allowing the defendants to decide, absent any judicial supervision, which inmates they must treat and what level of treatment they must provide, which is precisely

the problem that I was confronted with when the decree was first presented to me.

Furthermore, I can imagine easily, and it is clear today I think, a situation arising where the Court would be forced to conduct a mini-trial or a series of mini-trials on the issue of whether the treatment defendants are providing satisfies constitutional requirements. The purpose of the, the very purpose of the Consent Decree, the very purpose of the state plan for compliance and the various plans required by the State for compliance, was to modify this very situation, this very mini-trial situation.

The Court then must reject the State's proposed modification of the state plan for compliance. If the State believes that the mental health care plan it submitted on October 9th is defective in some respect, and it does, then its proper course of action is to submit a modified plan that meets the requirement of Section "K" of the Consent Decree. This means, among other things, that the plan must include, quote, "a detailed statement of the measures that the defendants will take to achieve timely compliance with the plan along with a detailed timetable setting forth dates for interim and final compliance measures."

The State indicated in its Stipulation Update of December 3, 1985, attachment "F", that it had hired a Mr. Fred Cohen to review the Comprehensive Psychiatric Services Plan and that it plans to, quote, "issue a definitive response and plan of action to the psych plan." The Court notes that whatever modified plan the State chooses to submit will be submitted well past the State's October 9th, 1985 deadline for submitting a Comprehensive Psychiatric Services Plan that it is willing to implement fully. The Court believes that the State's proposal would put it in a position of having no control over whether the State is providing constitutionally adequate mental health care to the inmate population. I cannot, and I will not, allow the State to determine by itself what level of implementation of the October 9th plan, and thus what level of mental health care, is constitutionally required.

Having reached that conclusion, however, puts the Court in a bit of an unusual position. In accordance with the State Plan for Compliance, the State was to have submitted a professionally designed plan to assure that prisoners with serious mental illnesses have adequate access to appropriate care. Given its current position, the State apparently believes it has yet to submit such a plan, even though almost a year has gone by since the State's original deadline of April 9, 1985 for submitting a plan. As I have discussed, I believe that the October 9th plan is the State's plan, and that the issue is whether I should allow the State to modify that plan on the basis of the October 9th modification request.

That issue raises a number of subsidiary issues that the process for submissions of plans established by the Consent Decree was designed to avoid entirely. For example, I do not know whether the plan submitted in October, on October 9th, merely satisfies the constitutional minimum, or rather provides more than the Constitution requires. I do not know whether the State's intended modifications, whatever they may be, would satisfy constitutional standards. It appears to the Court that the consultant group that designed the Comprehensive Psychiatric Services Plan stuck pretty close to constitutional requirements, such as in their definition of seriously mentally ill inmates, but I cannot tell for sure since I am not, of course, a psychiatric expert, and no one has had an opportunity to brief that issue for me. I do not, on the other hand, look forward to reviewing numerous briefs, supporting documents, and cases to determine what kind of plan or level of implementation of the present plan would meet constitutional requirements. The Court believes there are three or four ways that I have thought we could proceed. I am going to suggest a way for the lawyers to think about and tell me before the day is over, and we will be recessing after awhile.

Well, I want this hearing to continue, particularly with regard to the State presenting to me what it believes its plan is going to be, to give us some guidelines; but as a first step it seems to me the Court

has to require the defendants to submit a plan that the defendants believe satisfies the requirements of the Consent Decree and state plan for compliance, and one which they will be willing to fully implement. This plan may well be merely a variation of the October 9th plan, and tentatively, tentatively—let the lawyers think about this for a minute and maybe even consult with Dr. Benton—tentatively I want that plan by February 28th. If that happens, then the plaintiff, United States, and the *amici* might want to file comments they have regarding the plan sometime before the 27th of March, and my suggestion would be March 20th.

Specifically, I want Dr. Benton to comment on the plan. It seems to me that to assist Dr. Benton, and mostly to assist me, the Court ought to authorize him to contract with the psychiatric expert of his own choosing to evaluate the plan in light of the requirements of the Consent Decree and the State Plan for Compliance. Dr. Benton's current order of appointment provides that he may, quote, "subject to the Court's approval and with the consent of the parties, employ such other persons as he feels are needed for him to carry out his duties." End quote. Reading that as literally as it is, the defendants and the United States ought to agree to allow Dr. Benton to hire a psychiatric consultant. If they don't agree, I guess I could appoint Dr. Benton as a psychiatric expert under Rule 53. I would prefer not to do that. I prefer to do what I suggested.

I believe, moreover, that authorizing Dr. Benton to comment on the State's modified plan is absolutely consistent with his original authorization to, quote, "study and report on the state's efforts," end quote, at compliance. Whenever that is done, whether it is done by March 27th or not, and perhaps it can't be, I am going to make a comment about this in a minute—probably it can't be—but I am going to listen to input from the lawyers for the parties this afternoon. I will eventually consider the State's plan or any other modified proposals by the government or even the *amici*, and Dr. Benton; his comments will be of considerable importance to me. I end up

deciding whether it is March 27th or whether it is not, whether the modified plan is acceptable or whether some other modified plan is acceptable. I could then hold a hearing later if the time frame is insufficient to allow everyone, particularly Dr. Benton, a full opportunity to comment on the plan.

If the Court finds at the conclusion of the hearing or whatever hearings it holds to consider the state plan that the state plan turns out to be inadequate—and it may well be adequate—I can appoint Dr. Benton to work with the parties and the *amici* in formulating a plan that will be acceptable to the Court. Placing this responsibility on Dr. Benton would constitute an enlargement of his duties under the original order of appointment because that order provides, quote, "the Court retains the authority to order the independent expert upon conclusion of such compliance hearing, and notwithstanding any petition for termination of the independent expert's authority, to perform such additional duties with respect to this action as it may direct, and which are agreeable to the independent expert." End quote. So that power probably exists already.

The Court's order then is with regard to the current modification request of the defendants; that modification request is denied. However, the Court as indicated is open to whatever plan even tentatively the State has, and I would continue this modification hearing on the limited basis of letting the Court be informed as to how the State wants to modify the comprehensive plan even though it is not finalized.

. . . . .

The Court is going to modify what it has said in the schedule and ask the lawyers—I have it written down someplace. During our recess before the doctors showed up I had, I had opined without putting it in concrete—I now put it in concrete—that the State has until Monday, March 17th—that is two days more than the State asks—to submit a modified plan. I discovered that the 15th was on a Saturday, and the record I think discloses that not only did

the State's witness, Ms. Burke, say that she believed the State could come up with a plan, but counsel agreed. So the Court takes that as a reasonable period of time, having waited since, having waited almost a year for that plan. Monday, March 17th the plan is due.

The United States may respond to the plan and may submit a modification request if it requires, if it desires, by April 18th, 1986, a Thursday. And the *amici* may submit memoranda with regard to the State's modified plan on the same date. That is to say, April 18th, 1986. That happens to be a Thursday. No submissions should be submitted after that time. I think the Court will set May 8th and 9th for a hearing, which is a reasonable time for me and my staff to be able to look at the documentation submitted by both the State and the United States and the *amici*. May 8th and 9th is a Thursday and a Friday, and that is why I asked Dr. Ort if he were going to be free on that date, at which time on those two days—if we need more time than that, I will deal with it when we start. If I have to extend it, I will extend it.

How to structure the hearing I think is something we will have to wait and see when we see what the State's plan is. The Court had also considered the question of contempt with regard to the State, without leave to have a suggestion made by the ACLU or anybody else. That is premature at this time for at least one major reason. That is to say, that the State is entitled to a due process response to any such thing. Because I am concerned that the modified plan may not help—and I certainly hope that it does. I simply express that as a concern—I am ordering the State to show cause during the May 8th and 9th hearings why it should not be held in contempt for failure to produce a plan within the time specified by the Consent Decree that it itself could comply with. The Court granted an extension until October 9th only to find on October 9th that the State wasn't prepared to comply with its own plan.

It could entirely be that there will be an ability on behalf of the State to show that cause, but I am giving fairness notice to the State so that the State can come prepared to offer testimony with regard to this problem, and also I am doing it—I should be aboveboard with counsel—because I am trying to implore the State to come up with a plan that it can implement. That will also be a part of that hearing.

I am ordering you, Dr. Ort, to come as the Court's witness since nobody apparently wants to call you, and I will be in touch with your office as to the date, but there is no reason for you to be here two days, May 8th and May 9th. I will be in touch with you, and if I don't please get in touch with my office shortly before that, and we will let you know what date is convenient.

I think that the Court's concerns are matters of record today, and I am hopeful that—maybe a false hope on my part—but some progress will be made by then, by the middle of May, and I am hopeful that the State's plan is something of substance, I think if Ms. Burke has anything to do with it it will be. I just don't know how much Ms. Burke will have to say about the plan.

. . . . .

Okay, thank you. As to the state of the record with regard to this issue, the plaintiff's motion to enforce the Consent Decree and the stipulation, it is basically an undisputed record. The Court makes an easy finding of fact of violation in all of the areas described but not rebutted by the State in the slightest as far as I am concerned. There is no question but what the inmate population at the affected institutions are suffering unconstitutional conditions at this very moment in violation of the decree and in violation of the stipulation, and, of course, in violation of the Eighth Amendment to the Constitution.

The problem the Court faces is obvious. No one presented to me during the hearing—and I got some assistance—how to rectify that immediately. The Court is going to do the following, therefore. I am going to order the United States to prepare a proposed order as it suggested, but the order shall be in my hands by next Tuesday, which is the 18th day of February, 1986; and I will within 48 hours issue a

detailed written order. The order shall include in it, however, the following provisions: First of all, with regard to the psychotropic, well, with regard to the poly-pharmacy problem, the suggestions made by Dr. Sovner just now shall be incorporated in the order. That is why I had him make them. I take it the lawyers heard what he had to say. The problem in rectifying the situation is as he says. It is a case-by-case basis, and we don't have data on the length of time. But some things can be ordered right now.

One of the things the order should contain is that there should not be the prescription of psychotropic drugs in administrative segregation cases. With regard to the issue of seclusion, the order should contain a provision that the State immediately abandon the practice of secluding people in the Riverside facility for 48 hours; and the Court will adopt the suggestion of both physicians who testified, that it must be on a case-by-case basis, and there must be a rational reason to seclude someone immediately upon entry at the Riverside facility or any of the other facilities covered by the decree. The order should also contain a provision with regard to the recommendation of Dr. Sovner that there be no seclusion unless within one hour of seclusion a psychiatrist orders it, to give enough leeway to the Department of Corrections with regard to emergencies.

I don't know what to tell you, Mr. Wynn, what to do about the monitoring system now for reasons that are it seems to me apparent. The order should contain the suggestion made by Dr. Sovner that there be a computerized effort with the available software to be administered by the psychiatric heads in the corrections system. Unfortunately, that is probably going to take some time, and I don't know what to do; but I am going to be thinking about it between now and next Tuesday.

With regard to stiffening the audit procedures that are now in effect, I don't know what to do. That is very frustrating because the system is not working, and it can't work tomorrow morning, and I want it to work tomorrow morning; and I don't

know how to do it. Let me say some other things that ought to occur. It ought to cover the suggestion made also for the development of broad guidelines, specific guidelines, for prescribing physicians as suggested. Those guidelines ought to be in effect within fifteen days of the date of my order of sometime next week. Among other things, they ought to define the standard of care of physicians prescribing within the affected institutions, including a detailed description of what physicians must do or not do before prescribing additional psychotropic medication or any medications that are psychotropic in nature.

Perhaps, Mr. Wynn, you would think of other things, and I will certainly be anxious to see what you come up with when you do. The Court will ultimately design its own order, but I have to have a place to start somewhere. At this late hour, I don't know much more that I can do.

ORDER OF FEBRUARY 21, 1986 ESTABLISHING SUPPLEMENTARY MENTAL HEALTH CARE REQUIREMENTS

In accordance with the oral opinion rendered at the hearing held on February 13, 1986;

IT IS HEREBY ORDERED that defendants' Request for Modification of section II.H.4 of the State Plan for Compliance is DENIED;

IT IS FURTHER ORDERED that the Court hereby accepts the Comprehensive Psychiatric Services Plan submitted by defendants on October 9, 1985 as the plan required by section II.H.4 of the State Plan for Compliance;

IT IS FURTHER ORDERED that defendants shall have until March 17, 1986 to submit a modified comprehensive mental health plan to the Court, and that plaintiff and *amici* shall have until April 18, 1986 to submit comments on such plan;

IT IS FURTHER ORDERED that the Court's Independent Expert and his associate are authorized to study and to report on any modified plan(s) defendants may propose, and that they are authorized to

secure the services of a psychiatrist of their choosing to assist them in such effort. Defendants have agreed to pay the fees and expenses of such psychiatrist, subject to a reasonable limitation to be agreed upon by defendants, the Court, and the Independent Expert. The fees and expenses of the Independent Expert and his associate will be paid in accordance with the Order of Appointment. The Independent Expert's evaluation will be due on April 18, 1986 also, and defendants, plaintiff, and *amici* shall have until April 25, 1986 to submit comments on such evaluation;

IT IS FURTHER ORDERED that Plaintiff's Motion for Enforcement of the Consent Decree and the Stipulation is GRANTED. After considering the evidence presented at the hearing, the Court finds that defendants are failing to meet certain Consent Decree requirements regarding the provision of mental health care to seriously mentally ill inmates in the prison facilities covered by the Decree. Specifically, the Court finds that defendants' drug prescription practices, including polypharmacy; monitoring of drug induced side effects; use of seclusion and restraint; and practice of housing seriously mentally ill inmates in administrative segregation units violate paragraphs A.5, A.7, and A.9 of the Consent Decree and paragraph II.2. of the Stipulation dated June 21, 1985. Accordingly, the Court orders defendants to take the following steps to ensure compliance with the requirements of the Consent Decree and the Stipulation.

I. *Diagnostic Practices, Drug Prescription Practices, and Monitoring of Drug Induced Side Effects*

A. Definition of Terms
1. Acute Treatment:

Any time during the course of administration of psychotropic drugs when four or more changes in the dose or type of medication prescribed are made within any 30 day period. Stat doses, prn doses, and the use of pharmacological agents to treat psychotropic drug side effects are to be counted for the purpose of determining whether four or more changes in the dose or type of medication have occurred.

2. Maintenance Treatment:

Any time during the course of administration of psychotropic drugs when less than four changes in the dose or type of medication prescribed are made within any 30 day period. Stat doses, prn doses, and the use of pharmacological agents to treat psychotropic drug side effects are to be counted for the purpose of determining whether fewer than four changes in the dose or type of medication have occurred.

B. Establishment of a Central Drug Monitoring System

1. Defendants shall establish a central, computer-based system to track the prescription of medications and to monitor harmful side effects of such medications. The system shall be fully operational no later than 180 days from the date of this Order. Defendants may develop the system in conjunction with the chronic disease monitoring system presently under development.

2. The central drug monitoring system shall contain a file on each inmate receiving drugs.

3. Each file shall contain the inmate's name, identification number, and, at a minimum, the following information:
 (a) Current medical diagnoses;
 (b) Drugs prescribed, by name;
 (c) The drug dosage and times per day administered; and
 (d) The date when each drug was first administered.

4. The monitoring system shall be used to monitor daily doses of medication; to

prevent unjustified polypharmacy, in particular by identifying any combinations of medications not authorized by appropriate protocols; to ensure that diagnosed mental disorders are treated with appropriate medication; and to schedule ongoing monitoring for harmful side effects.

## C. Protocols

Within sixty (60) days from the date of this Order, defendants shall submit to the Court, the United States, and *amici* specific protocols as to the use of all psychotropic medications, including the specific conditions and associated medications for which copharmacy will be permitted, and the limited and specific conditions and associated medications for which polypharmacy will be permitted. The protocols will also include specific requirements relating to monitoring for harmful side effects caused by the medications. Defendants shall consider the following principles in developing these protocols:

—Avoidance or minimal use of polypharmacy, with explicit documentation and review.

—Use of the lowest dosage of anti-psychotic medication necessary for effective treatment.

—Documentation of the clinical gains associated with the initial and continued use of an anti-psychotic medication.

—Documented use of the AIMS or Rockland scales on any patient receiving antipsychotic medication on at least a quarterly, and preferably monthly, basis.

—Selection of psychotropic drug(s) in accordance with the patient's psychiatric diagnosis and accepted standards in the medical profession.

—Justification in the record of departures from standard prescription practices.

—Development of a list of approved inter-class polypharmacy regimens and the mental disorders for which the regimens can be prescribed.

—Development of a list of maximum daily drug doses for each psychotropic drug class, and inclusion of stat doses and PRN orders in the maximum daily dose calculations.

The protocols, moreover, shall provide for the following procedures:

### 1. Establishment of a Diagnosis

Prior to the initiation of any psychotropic drug regimen, a psychiatric diagnosis consistent with the terminology used in the Diagnostic and Statistical Manual of Mental Disorders, 3rd edition, (DSM III), shall be made and the mental disorder to be treated shall be identified.

The diagnosis and the justification for the diagnosis shall be written in the patient's chart or record; the diagnosis must be updated every three (3) months.

### 2. Establishment of Objectives

Prior to the initiation of any psychotropic drug regimen, the objectives to be achieved by use of the drugs, *i.e.*, the target signs and symptoms to be treated, shall be listed in the patient's chart or record. The objectives shall be updated every three (3) months.

### 3. Pretreatment Medical Evaluation

Prior to the initiation of any psychotropic drug regimen, defendants shall perform a medical evaluation of the patient who is to receive such drugs.

### 4. Renewal of Drug Orders

#### (a) Acute Treatment

During acute treatment, as defined in section I.A.1 of this Order, standing psychotropic drug orders must be renewed in writing every seven (7) days.

#### (b) Maintenance Treatment

During maintenance treatment, as defined in section I.A.2 of this Order, standing psychotropic drug orders must be renewed in writing every two (2) months.

### 5. PRN Orders

(a) PRN orders for psychotropic drugs must be in writing.

(b) PRN medication cannot be ordered by telephone.

(c) PRN orders must be renewed in writing every 72 hours.

(d) PRN orders cannot be written during maintenance treatment.

6. Stat Dose Orders

Only one Stat dose of a psychotropic drug for each 24 hour period shall be ordered by telephone.

7. Documentation of Drug Effects

The following documentation shall be maintained in the medical record of each seriously mentally ill inmate receiving psychotropic drugs:

(a) Acute Treatment Documentation

(i) A progress note pertaining to the use of psychotropic drugs shall be written at least every seven (7) days.

(ii) Progress notes shall contain the following information:

(A) Changes in the patient's target symptoms;

(B) Changes in side effects and their management;

(C) The rationale for any changes in daily drug dose;

(D) The rationale for changing the type of psychotropic drug prescribed;

(iii) A progress note shall be written each time PRN psychotropic drug therapy is ordered.

(b) Maintenance Treatment Documentation

(i) A progress note pertaining to the use of psychotropic drugs shall be written every two (2) months.

(ii) Progress notes shall contain the following information:

(A) Changes in the patient's target symptoms;

(B) Changes in side effects and their management;

(C) The rationale for any changes in daily drug dose;

(D) The rationale for changing the type of psychotropic drug prescribed.

(iii) A progress note shall be written each time PRN psychotropic drug therapy is ordered.

D. Within sixty (60) days from the date of this Order, defendants shall cease the distribution, by nonmedical staff, of psychotropic medications to inmates housed in segregation units in the subject institutions. On at least one shift per day, medication distribution within segregation units shall be performed by a psychiatric nurse practitioner.

E. Within thirty (30) days from the date of this Order, defendants shall develop, implement, and submit to the court, the United States, and *amici*, a procedure by which the prescribing physician will be notified daily of those inmates who fail to receive or decline to receive prescribed medication, except in those cases where the physician explicitly indicates on the prescription that the medication is to be provided "as needed" or upon the inmate's request. This procedure will apply to all psychotropic medications whether delivered by medical or correctional staff.

F. Within thirty (30) days from the date of this Order, defendants shall require the pharmacies servicing SPSM, MR, MBP, MICP, and RPC to maintain a log of all inmates receiving psychotropic medications. The pharmacy will notify the prescribing physician on any prescription that falls outside of a medication protocol or is a departure from standard prescription practices.

G. Within sixty (60) days from the date of this Order, defendants shall initiate monthly audits of all prescriptions of anti-psychotic medications. The audits shall include a summary review of all anti-psychotic medication prescriptions in effect, to ensure that all dosages and combinations fall within the limitations of the medication protocols. For a more intensive sample consisting of not less than 10% of all instances in which anti-psychotic medications are prescribed as well as all cases in which two anti-psychotic medications are prescribed simultaneously, the audit will assess compliance with the substantive provisions of the applicable medication protocol.

H. The protocols required by section I.C. of this Order and the procedure required by Section I.E. of this Order will be

subject to review by the United States in accordance with section K of the Consent Decree. The Court, however, retains the authority to review and to modify on its own motion such protocols and procedures.

## II. *Seclusion and Restraint*

A. Defendants shall comply with the requirements of Procedure OP–RPH 42.06, as approved for implementation in 12/85–1/86, entitled "Seclusion as a Therapeutic Intervention in Management of Mentally Ill Patients." Compliance with this procedure shall also encompass orders requiring restraint and shall include, but not be limited to, the following elements:

—Examination of the inmate by a physician, or by a qualified mental health professional specifically designated by the physician, within one hour after the patient has been placed in seclusion or restraint. The physician or other professional must:

 a. Examine the inmate;

 b. Sign a seclusion or restraint order; and

 c. Write a progress note documenting the mental state of the inmate and why the seclusion or restraint is necessary.

—Placement of a seriously mentally ill inmate in seclusion for no longer than six (6) hours unless a physician again examines the inmate, signs a seclusion order, and documents both the mental state of the inmate and why continuing seclusion is necessary.

—Placement of a seriously mentally ill inmate in restraints for no longer than two (2) hours unless a physician again examines the inmate, signs a restraint order, and documents both the mental state of the inmate and why continuing restraint is necessary.

—Examination by a physician every 24 hours thereafter, who will write a new order and justification if continued seclusion or restraint is necessary.

—Observation of the inmate every 15 minutes, or more frequently when needed, and recordation of each such observation.

Defendants shall modify Procedure OP–RPH 42.06 as necessary to satisfy these requirements.

B. Defendants shall issue copies of the above procedure to the United States, the Court, and *amici* within thirty (30) days of the issuance of this order, and shall notify the United States, the Court, and *amici* as to any modification of the above procedure. The United States and *amici* shall then have thirty (30) days to review the above procedure and to present to the Court proposals to correct any deficiencies that may exist in such procedure.

C. Defendants shall initiate monthly audits of all instances of the use of seclusion and restraint for mentally ill inmates or for inmates receiving anti-psychotic medications. The audits will include a summary review of all records of instances of seclusion or restraint for such inmates to determine that appropriate documentation is provided. For a more intensive sample of instances, to include not less than 10% of all instances in which anti-psychotic medications are prescribed as well as all cases in which two anti-psychotic medications are prescribed simultaneously, the audit, performed by competent medical authorities, will assess compliance with each element of the above procedure.

D. Within thirty (30) days of the issuance of this Order, the use of seclusion as a therapeutic intervention at SPSM, MR, MPB, and MIPC shall be consistent with the provisions of OP–RPH 42.06 and paragraph II.A. of this Order. This provision does not preclude the use of seclusion at SPSM, MR, MBP, and MIPC as a security or sanitation measure as may be provided for in other procedures. However, seclusion of any inmate who is seriously mentally ill, or for whom psychotropic medication is currently prescribed, must comply with the provisions of OP–RPH 42.06 and paragraph II.A. of this Order.

E. Within seventy-two (72) hours of the issuance of this Order, the Riverside Psychiatric Center will discontinue restrictions associated with the "Diagnostic Room Restriction Status" that have been applied on a general basis to newly admitted inmates.

Newly admitted inmates may be assigned to D status as this status relates to the general patient population, but further restriction must be based on a documented need as defined in Procedure OP–RPH 42.-06, specifically: a danger to self, a danger to others, a danger of causing substantial property damage, or serious interference with another patient's treatment. Use of seclusion and restraint must comply with Procedure OP–RPH 42.06 and paragraph II.A. of this Order.

F. Each unit covered by the Consent Decree shall maintain a log of the hours and reason each mentally ill inmate is secluded or restrained. The Chief of Psychiatry at each unit shall examine the logs monthly, prepare a monthly report detailing the hours and the reason each seriously mentally ill inmate was secluded or restrained, and send a copy of the report to the Assistant Director of Health Care, Psychiatry for review.

III. *Identification and Treatment of Seriously Mentally Ill Inmates in Segregation Units*

A. Within sixty (60) days of the issuance of this Order, any inmate assigned to disciplinary or administrative segregation, for whom an anti-psychotic medication has been prescribed, shall be examined by a psychiatrist within seventy-two (72) hours of initial placement on the segregation unit, and shall be examined on a daily basis by a psychiatric nurse practitioner. Following seven days of confinement, such inmate shall be interviewed by a psychologist weekly, and by a psychiatrist not less than monthly. The findings of such interviews shall be documented in the inmate's medical record.

B. Within thirty (30) days of the issuance of this Order, defendants shall develop and provide to the Court, the United States, and *amici*, a procedure for the identification and referral for appropriate housing and treatment of seriously mentally ill inmates housed in segregation units. The United States and *amici* shall have thirty days to review the above procedure and to present to the Court proposals to correct any deficiencies that may exist.

MEMORANDUM OPINION AND ORDER OF MARCH 19, 1986 REGARDING AN INDEPENDENT PSYCHIATRIC REPORT

█ Plaintiff has filed a document with the Court entitled *United States' Opposition to Enlarging the Authority of the Independent Expert by Authorizing him to Review and Employ a Psychiatrist to Help him Review the Defendants' Modified Comprehensive Psychiatric Services Plan.* The Court finds that its order enlarging the authority of the Independent Expert was in accordance with the Independent Expert's Order of Appointment, and therefore will reject plaintiff's opposition to its order on that ground. I find, however, that plaintiff is correct in its contention that the Court should follow the procedure established in Federal Rule of Evidence 706 in authorizing the Independent Expert to employ a psychiatrist to assist him in reviewing defendants' modified comprehensive mental health services plan.

Section II.2 of the Order of Appointment entered October 1, 1985, allows the Court, notwithstanding the objections of the parties, to order the Independent Expert "to perform such additional duties with respect to this action as it may direct." Plaintiff now claims that it never agreed to that language, and hence is not bound thereby. Plaintiff's Memorandum at 2 n. *. The Court simply notes that plaintiff did not object to the terms of the order of appointment at the time it was entered, and has never filed a motion for the Court to modify or to amend such order. It is too late now for plaintiff to raise such an objection.

The Court has found the Independent Expert's assistance to be indispensable, and believes it is amply justified in continuing to employ his expertise. The volume and detail of the materials on file in this case reflect its scope and complexity. The Independent Expert has assisted the Court considerably in evaluating this material, and the level of defendants' compliance with the requirements of the Consent De-

cree and the Stipulation. The Court does not doubt plaintiff's ability to monitor defendants' compliance with such requirements. I must, however, have an independent basis for judging whether defendants' are in compliance with such requirements, and the case law supports the use of an Independent Expert to accomplish that purpose.

Defendants have lodged no objections to the activities of the Independent Expert, and I believe his work has been significantly less intrusive, and less expensive to the parties, than the actions of monitors in similar complex prison litigation. Moreover, although heavy caseloads and the press of other work are not reasons, by themselves, to appoint Independent Experts and other such assistants to the Court, if the Court did not have the assistance of the Independent Expert in this case it would be forced to devote significantly more time to this case, and hence less time to other, equally important, matters. The alternative would be for the Court to give true meaning to the phrase "blind justice" and attempt to decide matters in this case without full knowledge of the facts. This I refuse to do. I therefore will decline to reconsider my decision to authorize the Independent Expert to review defendants' modified comprehensive mental health services plan.

The Court also believes that given defendants' willingness to bear the cost of such expert, it was justified under the Order of Appointment in authorizing the Independent Expert to hire a psychiatrist to assist him in reviewing defendants' modified plan. As plaintiff argues, however, it would be more appropriate for the Court to follow the procedure established in Federal Rule of Evidence 706(a) in appointing a psychiatric expert to assist the Independent Expert. An order of appointment issued pursuant to Rule 706 would clarify the psychiatric expert's ability to testify at the May 8th and 9th hearing on defendants' modified plan. Therefore, the Court will give the parties until March 26, 1986, to show cause why the Court should not adhere to its prior order authorizing the Independent Expert to employ a psychiatric expert to assist him in reviewing defendants' modified mental health services plan, and accepting defendants' offer to bear the expense of such expert. The Court will enter an appropriate order at the compliance hearing scheduled for March 27, 1986.

IT IS SO ORDERED.

### BENCH OPINION OF MARCH 27, 1986 ALLOWING *KNOP AMICUS* TO PRESENT WITNESSES AND APPOINTING AN INDEPENDENT PSYCHIATRIC EXPERT

Good morning. The Court anticipates four pretty full days based upon the materials that the parties have received and based upon the information that the Court has. And to make it go as well as I can, I am going to do two or three or four things this morning as we get started, to try to help everybody with a focus so that we don't waste any time. The Court never contemplated there would be any hearing on Wednesday, April 2nd, and there will not be, and it appears to me that we will have at least one issue left over for Tuesday, April 1st, which may or may not require the whole day. I hope that we can cover the materials in the fashion that I described in the earlier order. What I am going to do first is the following:

There are four, presently four motions in front of me. First, the United States' objection to the presentation of witnesses by the *Knop amicus* at the hearing, which has to be decided and I am going to decide it. Secondly, the designation of a psychiatric expert under 706(a). While that may not have to be decided today, I am going to decide it because it needs to be. Third, the State's motion to amend the mental health order of February 21st, 1986. I am not going to address that at the outset, but I believe that I am going to address part of it before the hearing ends. Fourth and finally, the *Hadix* motion, renewed motion, to exclude that group from the Consent Decree. I may or may not address that issue at the conclusion of the hearing, but it is not ripe for resolution at this stage of the hearing. Then I think what I am going to

do right now is decide two of the motions, and then we will move to something else. And then we will be able to get into the swing of things, I hope. First, the *Knop amicus* problem.

The United States objects to the *Knop amicus* being allowed to present two witnesses, one on mental health, and the other on sanitation and hygiene, for essentially four reasons as I understand the pleadings: First, the *Knop amicus* does not have the authority under paragraph "O" of the consent decree to present witnesses; Secondly, the introduction of witnesses would result in the *Knop* plaintiffs litigating *Knop v. Johnson* in this case; Thirdly, the presentation of witnesses would prejudice the United States which has not had an opportunity to depose the *Knop* witnesses; and, Fourth, the testimony of the *Knop* witnesses would be cumulative and unnecessary. I will address the last three of the United States' objections first rather than in seriatim fashion as I just announced them.

Initially, the Court is well aware of the position of the *Knop amicus* with respect to both its own case of *Knop v. Johnson* and this case. The two cases involve some overlapping issues, but each case also raises many unique issues. I have decided to allow the *Knop amicus* to present two witnesses on areas that I believe present substantial problems for compliance by the State under the Consent Decree. The Court has instructed the *Knop amicus* and the *Hadix amicus* that they should limit the testimony of their witnesses strictly to the issues presented in the Consent Decree and the stipulation. It is in my opinion not an abuse of the Court's discretion to allow the presentation of relevant evidence and to seek to gain a full understanding of the compliance issues in this proceeding today, and tomorrow, and Monday and Tuesday.

These efforts, moreover, cannot constitute unfair prejudice to any party. This latter point is particularly true since the defendant in this action, the party who today bears the burden of establishing that it is complying with the requirements of the Consent Decree and the stipulation, has had a full opportunity to depose and otherwise discover the testimony of the *Knop amicus'* proposed witnesses. I cannot see why allowing the *Knop amicus* to present two witnesses would prejudice the United States. The United States and *amici* presumably have the same goal of seeing that the defendant, defendants, comply with the requirements of the Consent Decree and the stipulation. At some point, of course, the introduction of testimony becomes burdensome and becomes unduly cumulative. I do not believe that allowing the *Knop amicus* to present two witnesses would exceed that point, however.

Third, I am well aware of the testimony that the United States intends to present at this hearing. The Court will not hesitate to cut off the testimony of the *Knop* witnesses, or the *Hadix* witnesses, if it feels that such testimony is not adding anything to what has already been introduced. By the same token, the Court will listen to testimony that adds to its understanding of the issues.

Finally, the Court believes that paragraph "O" of the Consent Decree grants it the discretionary authority to allow the *amici* to present witnesses at compliance hearings. Counsel may recall that there was a lengthy discussion at the hearing held on June 22, 1984, concerning the language in paragraph "O". The Court at that hearing rejected a proposal by the United States that the *amici* be allowed only to present oral argument and written submissions in regard to the compliance hearing. A fair reading of the transcript of that hearing, particularly the Court's comments on pages 35 and 36, indicates that the Court intended to retain, and did retain, the discretion to allow the *amici* to present witnesses at compliance hearings. As the Court notes, *amici* were not being granted the privileges of litigating *amici*, such as the right to participate in discovery or, as the Court demonstrated in its decision of August 21, 1985, to file motions. In summary, however, to participate, those two words, that language found in paragraph "O" of the Consent Decree, encom-

passes the authority with the Court's permission to present witnesses.

The Court believes, moreover, that allowing the *Knop amicus* to present two limited witnesses at this hearing is consistent with the traditional status of *amicus curiae*. See *Hoptowit v. Ray*, 682 F.2d 1237, especially at 1260, from the Ninth Circuit in 1982, in which the Ninth Circuit held the court did not abuse its discretion in allowing the United States Department of Justice and the United States Attorney to participate as *amicus curiae* in the lawsuit in which they had the full rights of a party and advocated almost exclusively in the plaintiff's behalf. The Court does not intend to allow the *Knop amicus* to participate in these proceedings as litigating *amici*, as I previously held, but as the United States Department of Justice has done in several cases. *See Hoptowit*, for example; *see In re Estelle*, 516 F.2d 480, at pages 482–83, Fifth Circuit in 1975; *see DeVonish v. Garza*, 510 F.Supp. 658, at 658–59, from the Western District of Texas in 1981. I do not believe, however, that allowing the *Knop amicus* to present two witnesses transforms them into litigating *amici*, and I will permit them to do so in this hearing.

I must now address briefly the State's response to the United States. As the Court understands the State's argument, the State is arguing that the Court must vacate paragraph "M" of the Consent Decree, which states in part that entry of the decree, quote, "shall not operate to render moot or otherwise to preclude any issues before ... the Western District of Michigan in *Knop v. Johnson*," before it can consider the United States' objection. The State apparently feels that allowing the *Knop amicus* to present witnesses at this compliance hearing will transform it into a litigating *amicus*, and that it would then be unfair to allow the *Knop amicus* to claim the benefit of paragraph "M" of the Consent Decree. Alternatively, the State argues that notwithstanding paragraph "M" of the Consent Decree, allowing the *Knop amicus* to present witnesses would render them parties to this proceeding, and thus also subject them to the doctrines of collateral estoppel and res judicata in their own

case, meaning, of course, the *Knop v. Johnson* case.

Initially, as I have noted before, I note that I am not extending litigating status to the *Knop amicus*, and I have no, absolutely no intention of doing so. The *Knop amicus* cannot participate in discovery and, more importantly, cannot file motions in this litigation. The *amicus'* inability to file motions or take other substantive action to enforce the terms of the Consent Decree and the stipulation is by itself sufficient to refute the State's argument that they have assumed the status of a party or of litigating *amicus*. Unlike the situation in *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210, moreover, the *Knop amicus* clearly are not directing and/or financing the activities of the plaintiff in this action and should not be subject to the estoppel doctrines. *Compare Montana* at 147–155 in the U.S. volumes, 440 U.S. at 154, 99 S.Ct. at 974, in 1979.

The Court sees no reason to consider whether it should vacate paragraph "M" of the Consent Decree since the activities of the *Knop amicus* in this action are not inconsistent with the benefits they derive from such paragraph. The role they will play in this proceeding is fully consistent with the status accorded them under paragraph "O" of the decree, and I see no need to modify that paragraph. The Court also does not see how the *Knop amicus* can now be considered a party to this proceeding, and thus subject to estoppel doctrines, particularly since it does not have the right to file motions. I, therefore, reject the State's argument and do not wish to consider further any arguments it has raised in motions filed in the *Knop* proceeding.

The second issue the Court must deal with this morning before beginning the hearing concerns its decision to appoint an independent psychiatric expert to assist Dr. Benton in reviewing defendants' proposed modified Comprehensive Mental Health Services Plan.

On March 19, 1986 the Court issued a Memorandum Opinion and Order in which it declined to reconsider its decision to re-

quest Dr. Benton to review defendants' proposed modified plan, and granted, quote, "the parties until March 26, 1986"—yesterday—"to show cause why the Court should not adhere to its prior order authorizing the Independent Expert to employ a psychiatric expert to assist him in reviewing defendants' modified mental health services plan, and accepting defendants' offer to bear the expense of such expert." End of quote. The Court is in receipt of the United States' objection to its decision to appoint an independent psychiatric expert to assist Dr. Benton. The United States argues that there is no reasonable basis for the Court to appoint an independent psychiatric expert under Federal Rule of Evidence 706(a), and that it therefore would be an abuse of discretion for it to do so. Plaintiff notes that its own psychiatric expert, Dr. Robert Sovner, will review the plan and provide the Court with sufficient information on its adequacy. It concludes accordingly that there is no need to have yet another expert review the plan.

■ District courts enjoy broad discretion in deciding whether to appoint independent experts under Rule 706. As the Court of Appeals for the Ninth Circuit has stated, "under Rule 706, the court is free to appoint an expert of its own choosing without the consent of either party. .... Appointments under Rule 706 are reviewable only for abuse of discretion." That quote comes from *Students of California School for the Blind v. Honig,* 736 F.2d 538. The quote comes from 549, and the decision of the Ninth Circuit was made in 1984. There is a long history of courts employing independent or special experts to assist them in resolving complex issues of law and fact. See, for example, *Hart v. Community School Board of Brooklyn,* 383 F.Supp. 699, at 762 and 764, from the Eastern District of New York, sitting across in Brooklyn, in 1974, affirmed by the Second Circuit at 512 F.2d 37, in 1975 also.

District courts, of course, do not enjoy unlimited discretion in deciding whether to employ independent experts to assist them in resolving particular cases or issues. I think I can say that as a district court judge, I have not been one to appoint an independent expert just because I was faced with a difficult issue of law or fact. The Court believes it is justified in this case, however, in appointing an independent psychiatric expert to assist Dr. Benton. Both parties recognize that the treatment of seriously mentally ill inmates is one of the most, if not the most, difficult compliance issues defendants face. That was evident at the February 13th hearing. Defendants in particular have had difficulty in preparing a comprehensive mental health services plan that is both acceptable to them and acceptable to the Court. I wish to resolve this issue once and for all and to get defendants busy implementing a satisfactory plan.

Dr. Benton and his associate, Mr. Stoughton, have been extremely helpful to the Court. I believe that the assistance of the psychiatric expert Dr. Benton has chosen, Dr. James, will be of equal benefit to the Court. The Court does not doubt in the slightest the competency of the United States' psychiatric expert. It believes, however, that it would also benefit from independent advice on this issue, and I have no hesitation in appointing Dr. James to provide me with that advice. This appointment, moreover, will not result in considerable expense to the United States as the State has agreed to bear Dr. James' fees and expenses.

The Court, therefore, pursuant to its authority under Federal Rule of Evidence 706(a), appoints Dr. James Franklin James to assist its Independent Expert, Dr. F. Warren Benton, to review and to report on defendants' proposed Modified Comprehensive Plan for Mental Health Services. Dr. James shall work under the authority and at the direction of Dr. Benton. He shall be compensated in accordance with the arrangement Dr. Benton and he have made with defendants. The report he shall prepare, in conjunction with Dr. Benton, on defendants' proposed modified plan shall be due on April 18, 1986, and shall be served on the parties and the *amici* as well as submitted to the Court on that same day. In accordance with Rule 706(a), moreover, Dr. James will be subject to deposition by

any party and shall be available to testify at the hearing on defendants' proposed modified plan to be held on May 8th and May 9th, 1986. Now then as required by Rule 706(a), I will enter an appropriate order of appointment in accordance with this opinion sometime in the next two or three days.

## ORDER OF APRIL 2, 1986 APPOINTING AN INDEPENDENT PSYCHIATRIC EXPERT

In accordance with the oral opinion rendered at the hearing held on March 27, 1986;

IT IS HEREBY ORDERED that pursuant to Federal Rule of Evidence 706(a), Dr. James Franklin James is appointed as the Court's independent psychiatric expert to assist Dr. F. Warren Benton, the Court's previously appointed Independent Expert, to review and to report on defendants' proposed modified Comprehensive Plan for Mental Health Services;

IT IS FURTHER ORDERED that Dr. James shall work under the authority and at the direction of Dr. Benton;

IT IS FURTHER ORDERED that Dr. James shall be compensated in accordance with the arrangement Dr. Benton and he have made with defendants;

IT IS FURTHER ORDERED that the report Dr. James shall prepare, in conjunction with Dr. Benton, on defendants' proposed modified plan shall be due on April 18, 1986, and shall be served on the parties and the *amici* as well as submitted to the Court on that date;

IT IS FURTHER ORDERED that in accordance with Federal Rule of Evidence 706(a), Dr. James will be subject to deposition by any party, and shall be available to testify at the hearing to be held on defendants' proposed modified plan on May 8th and May 9th, 1986.

## MEMORANDUM OPINION AND ORDER OF APRIL 3, 1986, GRANTING DEFENDANTS' MOTION TO MODIFY IN PART

Defendants have filed a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure requesting the Court to modify and/or clarify certain aspects of the order it entered on February 21, 1986. Plaintiff has responded to this motion. The Court will grant defendants' motion in part and withhold ruling on it in part in accordance with the following opinion.

The Court notes initially that plaintiff objects to the following of defendants' proposed modifications, and requests that the Court not deal with such modifications until the May 8th and 9th hearing on defendants' proposed modified comprehensive mental health services plan when its expert, Dr. Robert Sovner, will be available to testify on defendants' proposals: (1) defendants' proposed modification of section I.C.6 of the Order; (2) defendants' proposed modification of section I.G. of the Order; and (3) defendants' proposed modifications of section II.A. of the Order concerning the length of time an inmate can be secluded or restrained without being examined by a physician. The Court believes that plaintiff's request is reasonable, and will withhold ruling on those portions of defendants' proposal until the May 8th and 9th hearing. The Court also is concerned by defendants' request that a psychologist or a physician who is not a psychiatrist be allowed to conduct the examination section III.A. of the Order requires within seventy-two (72) hours after an inmate for whom an anti-psychotic medication has been prescribed has been assigned to disciplinary or administrative segregation. I thus will also withhold ruling on that request until the May 8th and 9th hearing, and request that Dr. Sovner address that issue as well in his testimony at such hearing. Of course, until the Court has ruled on the above proposals, defendants shall continue to abide by the February 21st Order.

The Court will grant defendants' remaining requests as follows:

1. Defendants request that the Court limit their computer-based system for tracking the prescription of medications to psychotropic medications. The Court believes that defendants' request is reason-

able and hereby modifies section I.B.1 & 2 of the Order to read as follows:

1. Defendants shall establish a central, computer-based system to track the prescription of medications and to monitor harmful side effects of such medications for all patients receiving psychotropic medications. The system shall be fully operational no later than 180 days from the date of this Order. Defendants may develop the system in conjunction with the chronic disease monitoring system presently under development.

2. The central drug monitoring system shall contain a file on each inmate receiving psychotropic medication.

2. Defendants also request that the Court modify the portion of the Order requiring them to maintain logs of inmates receiving psychotropic medications. The Court will modify section I.F. of the Order to read as follows:

F. Within sixty (60) days from the date of this Order, defendants shall require the pharmacies servicing SPSM, MR, MBP, MIPC, and RPC to maintain a log of all inmates receiving psychotropic medications. The pharmacy will notify the prescribing physician on any prescription that a) falls outside of a medication protocol submitted pursuant to section I.C. of this Order, or of any such protocol as thereafter modified in accordance with section I.H. of this Order, or b) is a departure from standard prescription practices.

3. With regard to defendants' request for clarification concerning placement of inmates in seclusion or restraint, it is allowable for "a qualified mental health professional specifically designated by the physician" to conduct the initial examination of an inmate placed in seclusion or restraint. The follow-up examination must be conducted by a physician.

4. Defendants' next request concerns the monitoring of inmates confined in seclusion or restraint. The Court will modify the third sentence of section II.C. of the Order to read as follows:

For a more intensive sample of instances, to include not less than 10% of all instances in which patients with current prescriptions of anti-psychotic medications have been secluded or restrained as well as all cases in which two anti-psychotic medications are prescribed simultaneously, the audit, performed by competent medical authorities, will assess compliance with each element of the above procedure.

IT IS SO ORDERED.

BENCH OPINION OF MAY 9, 1986 GRANTING UNITED STATES' MOTION FOR RELIEF AND SANCTIONS REGARDING MENTAL HEALTH; DENYING UNITED STATES' MOTION TO TERMINATE THE AUTHORITY OF THE INDEPENDENT EXPERT; AND REJECTING PARTIES' STIPULATION CLARIFYING ISSUES UNDER THE CONSENT DECREE

■ The Court is going to render three opinions, and because they aren't that lengthy, I would ask that those who are here to remain in court until the Court finishes instead of leaving partway through.

One leftover item, it seems tome, and I don't need to address the lawyers about this—I will simply take the decision myself—what to do about the additional documents supplied by Dr. Ort. The Court has accepted as the record shows, and as the lawyers know, one exhibit from him. It was bound in black and labeled I think Exhibit No. "A." And then I put on the record as best I could a label for the other documents that, that he furnished to the Court, and left the parties to view those during the lunch hour. I heard informally that the United States had no objection. I didn't hear about the *amici* or the State defendants.

The Court thinks as a result of some decisions that it has been, that it has arrived at—trying not to finish that in a preposition and failed—the Court isn't going to consider those documents. It is going to thank Dr. Ort for providing them, but they are not going to be terribly helpful to the Court. I do thank him for his

testimony. It was helpful in some respects.

I don't see the point in getting the documents. I know some would not help. I am already bogged down with more paperwork in this case than one can imagine. So that is the end of that problem. Now turning to the sanctions issue, a lot need be said, I guess, and maybe not much need be said. On the one hand, when I started out considering the problems here, I try to remember and do remember the good will expressed throughout this litigation by the Attorney General's office, through current counsel and previous counsel, and through the same level of good will demonstrated by Ms. Burke throughout this litigation. It is about the only solace that the Court has had in this lengthy, supposedly consented to decree.

Turning my attention to Plan Two, and the issue of sanctions. I think no one is in terrible disagreement in this courtroom about how the Court should view at least for the moment the totality of Plan Two. I will call it Plan Two because I think it is easier for the record. This hearing started off yesterday by making that reference, I think, through Director Brown and through his counsel, and the Court finds it helpful, rather than trying to repeat either the acronyms or the titles of the two plans. While there are a couple of things about Plan Two that the Court ought to and will accept, in reviewing the plan as a totality, the Court has to announce its dissatisfaction with the plan, as I think comes as no surprise. The reasons that the Court believes that Plan Two on its, in its totality is not compliant include but really are not limited to the following observations that I have made during the two-day hearing:

First of all, to me it is unclear, it is unclear whether it supplants Plan One or supplements Plan One depending upon what witnesses testify and what the witnesses' view is. But it certainly at the very least one can say is unclear. If it is unclear to the witnesses, it must certainly be unclear to the Court, and it is, and it would be impossible of course to try to implement, implement from that point of view.

Secondly, if it does supplement, as I have a tendency to suspect it does, it isn't clear to me what portions of Plan One it supplements. So I am equally in the dark. Neither plan, that is to say Plan One or Plan Two, provides a detailed blueprint for implementation. That is especially clear from Dr. James' testimony, but it is also fairly clear from Dr. Sovner's testimony. Dr. Sovner also testified, and the Court did not hear any real rebuttal of it, that Plan Two has no substance, basically said maybe it was a plan to have a plan or stated broad principles, but no more than that. The United States tends to look at that as a plan to have a manual, but I tend to look at it the way Dr. Sovner did, as a relatively hurried document that is a precursor or a predecessor to a plan.

Fifth (sic), it seems to the Court that the testimony of the Deputy Director of the Bureau of Health Care Services, Dr. Green, and the generous offer of proof by Mr. MacKenize, indicate that the plan as it is before the Court at the minimum needs the 11 recommendations of the expert witness. That is also under advice—there isn't any dispute about it. In other words, all 11 recommendations of the Independent Expert need at the minimum to be added to Plan Two to make Plan Two of any value. Because the Court realizes that what the lawyers have said today is of course true, that the Court has been waiting forever for a State mental health plan, it is substantially correct that it, the State, missed its deadline once or twice and the Court got it in October, and has, as I think Ms. Alexander pointed out—to the chagrin of the Court—the plan was being submitted, and the Court was asked not to implement it the same day, the same moment. That is extraordinary, and I think it placed the state, the defendants at that moment in contempt of the Consent Decree. And then to make matters worse, of course, in February we had a hearing, the Court gave the State more time until I believe the middle of March, or the 19th of March, some date like that, and another plan came in, and that is unacceptable for the reasons that I have just indicated, and as I said earlier in the hearing, one could imagine that the

Court is in a position that it has three choices. At least, I made this observation yesterday.

The three choices were that I accept Plan One, which the *amici* still want me to accept even though it contains no implementation and is shy in retardation issues, or, or, and I should stay on that subject— and a plan that the State through its Director of the Department of Corrections doesn't support. That is not a very enviable position for the Court to be in; or I could accept Plan Two, and for the reasons that I have already stated that is impossible; or go on to some third delay, and I don't intend to do that.

For the reasons that I have just set forth then, the Court upon consideration of the United States' Motion for Relief and Sanctions, and all pertinent evidence, and arguments presented at the hearing held these two days, May 8th, May 9th, the Court finds that the State of Michigan, the State of Michigan and some State defendants have violated Section II(A)(2) of the Stipulation, the Court's oral order of February 13th, 1986, and the February 21st, 1986 order.

It is therefore ordered, adjudged, and decreed on this 9th day of May, 1986, that the United States' motion is granted. The following relief and sanctions are hereby ordered:

First, the State is hereby declared to be in contempt of the 1985 Stipulation and the orders of February 13th and February 21st, 1986.

Secondly, the State may purge its contempt by submitting by June 9th, 1986, a detailed supplementary implementation schedule and specification designed to cure the mental health care deficiencies addressed in the Consent Decree and Stipulation.

Third. That the supplementary implementation schedule and specification shall include or be consistent with the following provisions:

A., a statement assuring that the provisions of the plan and schedule and specification shall apply at a minimum to all inmates with serious mental illness.

B., the schedule and specification will include a definition of serious mental illness that comports with the *Diagnostic and Statistical Manual of Mental Disorders*, Third Edition, or DSM–III.

C., that the supplementary schedule and specification will clearly define the precise steps the State will take to implement the two plans hereinbefore—excuse heretofore submitted to the Court. These provisions must meet or exceed the recommendations in the April, 1986 Report of the Independent Expert, as well as the applicable Consent Decree provisions.

D., the schedule and specification will provide for compliance with the recommendations of the April, 1986 Report of the Independent Expert according to the following schedule:

(1) Population projections, June 9th, 1986;

(2) Epidemiological study, June 15th, 1987. A parenthetical comment about that date. After listening to Mr. MacKenzie, one would be, would want to put that back six months because of the funding problem. Listening to the testimony of Dr. James, however, Dr. James believes an epidemiological study can be completed in six months. Taking the six months year-end time, and the six months testified to by Dr. James, that makes June 15th, 1987 a realistic date.

(3) Aggregate inpatient population by January 1st, 1987;

(4) Inpatient hospitalization by June 9th, 1986;

(5) Comprehensive care capacity, June 15th, 1987;

(6) Protected environment study by June 15th, 1987;

The numbers that I am using come, of course, from the Independent Expert's April, 1986 Report.

(6–a) PE corrective action by October 15th, 1987;

(7) Developmentally disabled prisoners by June 15th, 1987;

(10), omitting (8) and (9), outpatient services by September 1st, 1986.

End of numbers. The approach and timetable for implementation of recommendations 8, 9, and 11 will be described in the schedule and specification. I pause and depart from the order to call the lawyers' attention to page 12 of the Independent Expert's Report of April, 1986, and particularly with regard to the last paragraph which reads, as follows: "Accreditation by the Joint Commission on Accreditation of Hospitals· should be considered. While JCAH has traditionally focused upon more traditional medical and psychiatric hospitals, new certification processes have been developed to address the specialized needs of correctional psychiatric facilities." End quote. The Court has included the language in the order that I have just read because Dr. James has convinced me that given the Court's scarce, sparse judicial resources that the most comfort the Court could get would be from an accreditation by JCAH.

Dr. James would opine, secondly, that the next best thing the Court could hope to get without having to police its own order would be both a license and an accreditation certification with regard to Mental Health Care services issued by a state of Michigan agency, probably the Department of Mental Health. The Court by listening to the testimony of one of the defendants recalls that at best ten days from now Riverside facility may get a provisional license without the accreditation. The Court, of course, does not order the State of Michigan or any of its defendants necessarily to obtain JCAH accreditation or necessarily to get accreditation from the State of Michigan, but it is what is on the Court's mind with regard to that part of the order.

Continuing with the order.

E., the schedule and specification would include adequate description of professional and other staff, a multi-year hiring schedule, and a basis, that is to say, ratios or quantitative standards, by which the adequacy of staff can be determined and monitored. Any facility accredited by the Joint Commission on Accreditation of Hos-

pitals is exempt from the provisions of Section 3(e).

F., the defendants will develop by October, 1986 a manual or system of manuals to include all policies, procedures, and treatment protocols related to mental health care. All policies, procedures and treatment protocols will be consistent with the Consent Decree, consistent with the state plan, stipulation, and orders of this Court, and will be submitted to the plaintiff and the *amici* for review.

G., the schedule and specification will include an appropriate organizational structure for mental health services that ensures continuity of care.

H., all schedules, specifications, and other documents developed pursuant to paragraph three of this order will be submitted directly to the Court with copies to the plaintiff and *amici*. Plaintiff and *amici* will have two weeks following the submittal to comment on the adequacy and the sufficiency.

The Court will then accept the submittal or order additional changes along with coercive or punitive sanctions as they may become necessary.

The Court is then looking, of course, at a period of two weeks after June 9th, toward the end of June. The Court simply as advice to the State defendants indicates that it currently considers coercive sanctions in an amount up to $10,000 a day.

Fourth. The defendants will conduct an epidemiological study, of course, to determine the prevalence of serious mental illness and associated treatment needs. In selecting an independent professional researcher or research team to conduct that study, and in the subsequent design and conduct of the study the defendants will comply with the following provisions:

A., the defendants will consult with the plaintiff and the *amici* to order a researcher or research team acceptable to defendants, plaintiff, and *amici* if possible;

B., if, by July 1st, 1986, no mutually acceptable researcher or research team is identified, the parties will each submit one recommendation to the Court which will

designate the researcher or the research team from the submitted list.

If, in the opinion of the Court, all recommended researchers or research teams are roughly equivalent in competence and credibility to the parties, the Court will defer to the recommendation submitted by the defendants.

C., the study is to be completed and submitted to the Court and the plaintiff and the *amici* as I indicated earlier by June 15, 1987.

D., and lastly, pursuant to the findings of the study, the defendants may submit a request to modify the plan by July 15, 1987. The Court will determine whether the modification is to be granted and may conduct a hearing on the merits of the modification.

I have just read from a four-page document completed by me last evening, and modified throughout the day today. The Court has entered the order this second. Copies are available for counsel at the conclusion of this hearing. I don't believe that I brought enough on the bench with me, but the original order I will hand to the clerk. And one copy is here, and there are at least ten copies or twelve copies of that order. Is that right? Five copies of the order. More copies can be available if people want them.

. . . . .

Turning to the United States' motion to terminate the authority of the independent expert, at the conclusion of the March compliance hearing the United States filed a— and this is the exact name of it—a Motion to Terminate the Authority of the Independent Expert and Withdrawal of Consent to the Independent Expert's Continued Service. That is the style of the motion. The United States filed the motion pursuant to Section II(2) of the Court's order of October 2nd, 1985, which provides in pertinent part that, quote, "Upon conclusion of the compliance hearing scheduled for March 7, 1986, either party or *amici* may petition the Court to terminate the grant of authority to the Independent Expert contained in this order." end quote. This section goes on to state, quote: "The Court, however,

retains the authority to order the Independent Expert, upon conclusion of such hearing and notwithstanding any petition for termination of the Independent Expert's authority, to perform such additional duties with respect to this action as it may direct or which the parties and *amici* may petition the Court to, within its discretion, direct, and which are agreeable to the Independent Expert." That quote, both quotations come from the "Appointment of F. Warren Benton as Independent Expert and Order for Instructions," Roman number II, paren (2). The Court stated at the end of the compliance hearing, not having received any petition to terminate the Independent Expert's authority, that it was going to extend the authority of the Independent Expert in accordance with that section. That appears at page 794 of the transcript of the hearing.

▮ The United States, in a well written brief, sets forth three reasons, however, why the Court should not have extended the authority of the Independent Expert, and why it should not terminate that authority: First, it argues that the Independent Expert has completed the task the Court appointed him to accomplish, and that there thus is nothing left for him to do. It notes that the Independent Expert was appointed to study and report on the State's efforts to comply with the Consent Decree, the Stipulation, and the State Plan for Compliance, and that the parties had envisioned that his authority would terminate at the end of the compliance hearing initially scheduled for January and later rescheduled for March, 1986. The Independent Expert accomplished his appointed task, plaintiff argues, when he produced his report and appeared to testify at the compliance hearing.

Second, the United States argues that there is no reasonable basis, as required by Federal Rule of Evidence 706, for the Court to continue the appointment of the Independent Expert. The United States notes that it is fully capable of monitoring defendants' compliance with the terms of the Consent Decree and the Stipulation, and, as evinced by its actions with regard

to mental health, fire safety, and sanitation, safety, and hygiene, is fully committed to protecting the constitutional rights of the inmates at the subject institutions. It accordingly argues that extension of the Independent Expert's appointment, quote, "is unnecessary, redundant, and unduly costly." That is from the motion at seven. The United States notes, moreover, that the Consent Decree establishes an elaborate enforcement mechanism that it is committed to following, and has followed, and argues that continuation of the Independent Expert's appointment would unduly infringe on its role under that mechanism, and would in effect supplant the United States' efforts.

Finally, the United States argues that continuation of the Independent Expert's appointment would convert him into a Special Master, and that, as it argued last summer, there simply do not exist the requisite circumstances to justify the appointment of a Special Master. The United States concludes, moreover, that, quote, "the doctrine of sovereign immunity bars recovery from it of any fees or expenses that may be created by the appointment of a compliance monitor or special master."

The United States' motion and supporting memorandum caused the Court to pause and to reflect on the role of Dr. Benton, and his associate, Mr. Stoughton, in this litigation. There is some merit to the United States' arguments. After reflecting about where the Court was last summer, and where it is now, due in large part to the efforts of the Independent Expert, in terms of its understanding of this case and, more importantly, of the level of defendants' compliance with the requirement of the Consent Decree, the Stipulation, and the State Plan for Compliance, however, I conclude that the Court is fully justified in continuing the appointment of the Independent Expert in accordance with the terms of the October 2, 1985 order of appointment. Because the United States' arguments do have some merit, I believe they deserve discussion.

With regard to the first argument, the Court disagrees that the Independent Expert has completed the task for which he was appointed. The Court appointed Dr. Benton, quote, "to study and report on the State's efforts to comply with the Consent Decree, the State Plan for Compliance, the Stipulation entered August 21, 1985, and other plans and orders entered in this case." The Court noted that it believed that Dr. Benton's report would, quote, "provide it with an objective and thorough analysis of the status of the State's compliance in the subject prison facilities." No one disputes that Dr. Benton and his associate, Mr. Stoughton, have accomplished this purpose.

As Section II(2) of the Order indicates, however, the Independent Expert's appointment was not, contrary to what the United States argues, necessarily meant to be a "one-shot" deal. As I noted in my memorandum opinion and order of March 19, 1986, quote, "the plaintiff did not object to the terms of the order of appointment at the time it was entered, and has never filed a motion for the Court to modify or to amend such order," end quote, and I think it is too late for it to do so now. The Court does, indeed, thanks to the efforts of the Independent Expert, now possess an accurate portrait of the State's successes and failures in implementing the Decree. The United States' use of the word portrait is apt, however. A portrait captures a scene or situation as it is at one particular moment in time. It does not, and cannot, indicate what the scene or situation will be like in the future. The Independent Expert's report has given the Court a portrait of defendants' present level of compliance with the requirements of the Decree documents. It cannot, however, indicate what defendants' level of compliance will be in the future.

As I stated in my March 19th opinion, the Court does not doubt plaintiff's ability to monitor defendants' compliance efforts. It needs, however, an independent basis for judging defendants' compliance efforts, and the case law amply supports the use of an independent expert for this purpose. See, for example, *Reed v. Cleveland Board of Education*, 607 F.2d 737, at 740–41, from the Sixth Circuit in 1979, which court

noted that the district court had appointed two experts to assist a special master in implementing a school desegregation plan. Plaintiff admits that, quote, "the original appointment of Dr. Benton to study and report on mixed questions of fact and opinion certainly comports with Federal Rule of Evidence 706(a)." It is apparent that there still exist mixed questions of fact and opinion regarding defendants' level of compliance with the Decree documents. The Court accordingly does not agree that the Independent Expert has completed the task for which he was appointed. There still is a need for him to study and to report on defendants' efforts.

The discussion that I have just addressed also speaks, in part, about plaintiff's second argument. As the Court discussed in its March 19th opinion, it believes that there is a reasonable basis for it to continue Dr. Benton's appointment. See the order at page two. I believe that the United States' arguments in this regard evince its misconception that the Court should, for the most part, abdicate its responsibilities with regard to the Consent Decree and entrust the United States to determine, one, whether defendants are complying with the terms of the Consent Decree, the Stipulation, and the State Plan for Compliance, and, two, if they are not, whether such noncompliance implicates the constitutional rights of the inmates. I refuse to so abdicate my responsibilities as an Article III judge entrusted to do justice in this, and all other, proceedings.

The United States also argues that it now wishes to embrace, quote, "all of the procedural protections that an appointment under Rule 706 entails." I believe the United States has received full procedural protection in this matter. Since the Court first broached the idea of appointing a special master in this litigation last summer, the United States has not hesitated to make known its views regarding the appointment by the Court of an independent person, whether called a Special Master, Monitor, or Independent Expert, to report to the Court on defendants' level of compliance with the requirements of the Decree documents.

Finally, the Court does not believe that extension of Dr. Benton's authority as an Independent Expert would convert him into a special master or monitor. See Rule 53 of the Federal Rules of Civil Procedure. I note initially that Dr. Benton's role in this proceeding is a limited one. He clearly is not supplanting the United States' efforts to enforce the Decree documents. As the United States notes, both it and the *amici* have continued to employ their own experts to assess defendants' compliance with the requirements of the Decree documents, and the United States even notes at least one instance in which its expert was more critical of defendants' efforts than was the Independent Expert. The United States' role, of course, as the plaintiff, is to examine critically the defendants' compliance efforts. The Independent Expert's role, concurrently but not necessarily similarly, is to provide the Court with an independent and informed view of defendants' compliance efforts. To the extent that the United States' more critical comments are supported by the evidence, the Court has not hesitated to accept them, and will not hesitate in the future.

Secondly, the Court believes that its use of Dr. Benton in this litigation fits well within the Sixth Circuit's indications that district courts are to use the least intrusive means possible to monitor a defendant's compliance with the terms of a consent decree, particularly in a prison setting. See *Kendrick v. Bland,* 740 F.2d 432, at pages 438–39, from the Sixth Circuit in 1984, where the court noted that courts often appoint monitors in prison cases to enable the monitor to, quote, "oversee compliance with its continuing order"; also see *United States v. City of Parma,* 661 F.2d 562, at 578–79, from the Sixth Circuit in 1981. The Court's use of Dr. Benton does not constitute a significant· intrusion on defendants' affairs, and nor does it constitute a delegation of the Court's factfinding and interpretive powers.

Finally, the Court believes that a brief comparison of Dr. Benton's powers and authority with the powers and authority traditionally delegated to a special master

conclusively establishes that an extension of Dr. Benton's authority will not convert him into a monitor or special master, and thus exempt the United States from liability for his fees and expenses. Dr. Benton has been empowered to study and to report on defendants' compliance efforts. To accomplish that goal, the Court granted Dr. Benton the powers that an expert witness normally possesses, for example, the right to tour the subject institutions; to have access to documents possessed by the parties; to have access to staff members and employees of the Department of Corrections and the Department of Justice; and to conduct interviews with the inmates.

Significantly, however, Dr. Benton and his associate are empowered only to report on mixed questions of fact and opinion, that is to say, to give their professional view, as penologists, of defendants' efforts to comply with the requirements of the Decree documents. The Independent Expert was not empowered, and will not be so empowered under the terms of the extension of his authority, to conduct hearings or to resolve factual disputes between the parties, both of which traditionally fall within the duties and powers of a special master. See Federal Rule of Civil Procedure 53(c) indicating that a special master has the power to conduct hearings, receive and report evidence, require the production of documents, rule on the admissibility of evidence, and question witnesses under oath; or 53(e) whereby a special master may be required to make findings of fact and conclusions of law; and in non-jury actions the court, quote, "shall accept the master's findings of fact unless clearly erroneous"; and *Reed v. Rhodes*, 691 F.2d 266, at 269, from the Sixth Circuit in 1982, noting that a special master is an appointee of the court who acts, quote, "in a quasi-judicial capacity"; and as in *Reed* on page 741, where the district court empowered the Special Master to evaluate the practicability of defendants' desegregation plans and to, quote, "conduct such hearings and investigations as he deems necessary to the performance of his duties." See also *Ruiz v. Estelle*, 679 F.2d 1115, at 1162, from the Fifth Circuit in 1982, noting that the special master was given quasi-judicial powers, such as being permitted to hold hearings and make findings of fact that the district court would accept unless clearly erroneous. The Independent Expert will continue solely to study and to report on the defendants' compliance efforts. He shall continue to advise the parties of his findings, to be subject to deposition by any party, and to be available to testify at future compliance hearings, all within the purview of Rule 706(a) of the Federal Rules of Evidence.

The Court, therefore, will reject the United States' motion to terminate the Independent Expert's authority, and will continue Dr. Benton's authorization to study and to report on the defendants' compliance efforts. The Court anticipates that Dr. Benton and his associate will continue to study defendants' compliance efforts in accordance with the requirements of the Consent Decree, the Stipulation, and the State Plan for Compliance. Dr. Benton also will be studying defendants' compliance with the State Plan's requirements regarding the formulation and implementation of various subsidiary plans.

To the extent, of course, that the parties, or either party, wish to have Dr. Benton perform additional duties, such as to act as a factfinder in the sense of a Special Master or to act as a negotiator between the parties, they may apply to the Court for permission to have him assume such responsibilities. At that point, Dr. Benton would not be acting as an Independent Expert under Rule 706 of the Federal Rules of Evidence, and the parties would have to make different arrangements, other than that available under 28 U.S.C. Section 1920, for payment of his fees and expenses.

With regard to Dr. James, the Court will inquire of Dr. James' willingness and ability to serve in the capacities suggested by the defendants in this case. If he is willing to serve and able to serve in that capacity, the Court will issue an order continuing, or either continuing or appointing him under different authority, as the case may be. The Court will take that up with Dr. James at the first earliest practicable moment. I

am now sorry that I permitted him to leave as quickly as I did, but I can make up for that. The Court will enter an order in a day or two denying the United States' motion to terminate.

The Court turns next to the parties' stipulation clarifying issues under the Consent Decree. At the conclusion of the March compliance hearing, the Court requested the parties and *amici* to address, in writing, a number of interpretive issues concerning the Consent Decree and the State Plan for Compliance. That is found between pages 784 and 787 of the transcript, of the compliance hearing in Volume III. In response to a question from defendants' counsel, the Court indicated that it would consider, but not necessarily accept, a stipulation from the parties concerning such issues.

On April 18th this year, the parties submitted a "Stipulation Clarifying Issues Under the Consent Decree," and a motion for the Court to enter the stipulation as an order of the Court. As plaintiff explained in its post-hearing brief, the stipulation evinces the parties' belief that only two of the interpretive issues the Court raised at the hearing implicate the constitutional rights of the inmates: Number one, quote, "The continued use of inmate workers at the subject facilities to prepare sick call registers and, two, the possibility that windows at the subject facilities are not being repaired promptly." That is in the plaintiff's brief at page 17. It is in the Stipulation at pages 2 and 3. With regard to the remaining interpretive issues, the parties basically take the position that the Court's concerns do not implicate the constitutional rights of the inmates, and, therefore, cannot properly be considered under the Consent Decree. I believe at best that the parties may have misunderstood the Court's instructions with regard to these questions of interpretation, and believe that it might be useful to delineate the roles of the parties and the Court under the Consent Decree and the State Plan for Compliance.

First, the Court had envisioned and expected that the parties would address and brief how the issues I had raised were handled by either the Consent Decree or the State Plan for Compliance, not whether the issues presented concerns that are enforceable, because they are explicitly mentioned in the Consent Decree. The 60 square foot requirement of Section IV.A of the State Plan presents a good example of this dilemma or situation. The Court had asked the parties to brief a computational question, that is to say, whether each inmate's 60 square feet should be explicitly marked, whether areas such as day space should be taken into account in determining the 60 square feet, or whether space for compliance with fire safety requirements should be considered. See pages 786 and 787 of the transcript. Instead of addressing this computational issue, the parties simply stipulated that defendants are required only to, quote, "eliminate overcrowding in accordance with the standard articulated by the United States Supreme Court in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59, in 1981," end quote, and that the Consent Decree does not require the defendants to provide 60 square feet for every inmate.

I believe that the parties' proposed stipulation on this point reflects a gross misunderstanding of the Consent Decree. Section "H" of the Decree states that, quote, "defendants intend to fully implement the State Plan unless implementation is excused or modified in accordance with the terms of this Decree." Defendants have reiterated, both at the March compliance hearing and at this hearing, their intention to implement fully the State Plan—in fact, all the time that this litigation has existed.

As the Court interprets the Consent Decree, the defendants are bound to implement the State Plan, including the 60 square foot requirement, unless excused by the Court in accordance with the Decree. The procedure for excusing the State from full compliance with the State Plan is well established in Section "J," which states, as follows, quote: "Defendants shall report to the Court and to the United States any time they intend to modify their plan, and shall advise the Court and the United States, by legal memoranda, whether the

modification sought raises constitutional issues. The United States shall respond to such report within 20 days, by legal memoranda, whether it believes such a modification raises constitutional issues." The next two sentences the Court underscores once, twice, three times: "The Court will then determine whether to conduct a hearing and will in such event determine the modification request. The United States Department of Justice will monitor compliance with the State Plan." I could read the last two sentences there more than once to underscore them. I need not. The defendants have not asked to be excused from the 60 square foot requirement; and in any event, neither party has supplied the Court with what it would consider to be legal memoranda addressing the issue. Unless and until the Court modifies the State Plan to excuse the defendants from compliance with the 60 square foot requirement, they are bound under Section "H" of the Consent Decree—not just the State Plan for Compliance—to comply with that requirement.

The United States, moreover, is obligated under Section "J" of the Decree, as quoted above, to monitor the State's compliance with that requirement. A necessary corollary of the obligation to monitor compliance is the obligation to enforce compliance. The United States' monitoring and enforcement efforts with regard to the State Plan for Compliance as it is integrated into the Consent Decree is even more explicitly established in Section "I" of the Consent Decree, which provides as follows: "Implementation of the various provisions of the State Plan will be adequate to bring defendants into full compliance and thereby satisfy the terms and provisions of this Decree. The Court shall"—underscore the word shall—"be advised as to each failure" —underscore the words each failure—"to comply with the provisions of the State Plan, and, on request of either party or on the Court's own motion, a hearing may be held as to the constitutional implications of said failure and defendants' noncompliance. Nothing in this Decree shall be interpreted as requiring defendants to specifically comply with any state law, or any other provision of the State Plan that does not implicate the constitutional rights of the inmates."

I draw four basic principles from this section of the Decree and from Section "J." First, defendants must fully and specifically implement the State Plan for Compliance unless the Court explicitly approves a modification of such Plan. Defendants correspondingly must fully and specifically implement all other plans called for by the State Plan unless implementation is excused by the Court in accordance with the Consent Decree. Secondly, defendants may propose to modify the State Plan, or any subsidiary plan required by it. Defendants and plaintiff must comment on the constitutional issues raised by such a modification request as well as on such other issues as they deem important. The Court, the Court will then determine whether the modification is to be approved, and in so doing, will determine whether the requested modification implicates the constitutional rights of the inmates at the subject institutions.

Thirdly, the Court shall not interpret the Consent Decree to require defendants to comply specifically with state law. The Court, however, has the authority to require defendants to comply with state law, a., when noncompliance with state law implicates the constitutional rights of the inmates at the subject institutions, and, b., when compliance with state law is the most effective remedy for any specific unconstitutional conditions that may exist at the subject facilities. Citing for myself at least *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, at page 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), the court there saying, quote: "Once a right and violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Fourth, the United States shall monitor compliance with the State Plan for Compliance, and the subsidiary plans called for by that plan, and shall advise the Court of each and every failure by the State to comply with

the provisions of such plans. The parties, at the request of either party or of the Court, shall submit memoranda on the constitutional implications of such failure. The Court will then determine whether the State's failure to comply with the requirement of the State Plan, or of the subsidiary plan, implicates the constitutional rights of the inmates at the subject institutions.

In accordance with the above understanding of the Consent Decree, and the State Plan for Compliance, the Court rejects the parties' proposed stipulation, and orders the parties to submit memoranda on the interpretive issues the Court raised at the compliance hearing. The parties shall limit their briefs to the issue of what interpretation of the issues posed is contemplated by the Consent Decree and the State Plan for Compliance. The parties shall seek to clarify, not modify, the Consent Decree and the State Plan for Compliance. To the extent that such clarification is grounded in constitutional issues, the parties shall fully address such issues in their memoranda. The Court will also invite the *amici* to submit their comments on these interpretive issues. The parties' and *amici*'s memoranda on these interpretive issues are due May 23rd, 1986 at 5:00 p.m.

I note that I agree with the parties that the Consent Decree prohibits inmate workers from access to or participation in the creation of sick call registers or rosters at the subject facilities, and that it requires defendants to inspect windows at the subject facilities on a continuing basis and to replace promptly broken or missing glass. Due to the means by which the parties proposed these clarifications of the Consent Decree, however, the Court cannot accept them at this time, and, hence, will not adopt them as an order of the Court.

Speaking, I guess, by means of dicta, I have the following observations to make. The Court notes that the United States has vigorously involved itself in the compliance issues involving mental health, hygiene and sanitation, fire safety in the past few weeks, months, and I am pleased by that position that the United States has taken. I hope that the plaintiff monitors the other issues encompassed by the Consent Decree and the State Plan as vigorously as it has monitored these compliance issues involving mental health; and I hope the United States will leave it to the Court as the representative of the Third Branch of the government to decide what the Constitution requires of the defendants.

To the extent that the United States honestly believes that it does not possess the statutory authority under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. Section 1997, *et seq.*, to monitor and to enforce the defendants' obligations to comply with the requirements of the State Plan for Compliance as required by the Consent Decree—see, for example, United States' Post-hearing Brief at pages one through four in which the United States indicates it will force defendants to implement the State Plan only to the extent that it, the United States, believes that noncompliance implicates the constitutional rights of the inmates—the Court is left to speculate and wonder whether it is employing scarce judicial resources on a true case and controversy as required by the Constitution, and if it is not, whether the CRIPA, at least as it is interpreted by the United States, is constitutional itself.

ORDER OF MAY 12, 1986 GRANTING THE UNITED STATES' MOTION FOR RELIEF AND SANCTIONS

Upon consideration of the United States' Motion for Relief and Sanctions and all pertinent evidence presented at the hearing held on May 8–9, 1986, the Court finds that the State of Michigan has violated § II(A)(2) of the Stipulation, the Court's oral Order of February 13, 1986, and the Order of February 21, 1986.

It is therefore ORDERED, ADJUDGED, and DECREED on this 9 day of May, 1986, that the United States' Motion is hereby GRANTED. The following relief and sanctions are hereby ORDERED:

1. That the State is hereby declared to be in CONTEMPT of the 1985 Stipulation and the orders of February 13 and 21, 1986;

2. That the State may purge its contempt by submitting by June 9, 1986, a

detailed supplementary implementation schedule and specification designed to cure the mental health care deficiencies addressed in the Consent Decree and Stipulation;

3. That the supplementary implementation schedule and specification shall include or be consistent with the following provisions:

a) A statement assuring that the provisions of the plans and schedule/specification shall apply, at a minimum, to all inmates with "serious mental illness."

b) The schedule and specification will include a definition of "serious mental illness that comports with the *Diagnostic and Statistical Manual of Mental Disorders,* Third Edition (DSM–III).

c) The supplementary schedule and specification will clearly define the precise steps the State will take to implement the two plans heretofore submitted to the Court. These provisions must meet or exceed the recommendations in the *April 1986 Report of the Independent Expert,* as well as applicable *Consent Decree* provisions.

d) The schedule and specification will provide for compliance with recommendations of the *April 1986 Report of the Independent Expert* according to the following schedule:

1. Population projections—June 9, 1986
2. Epidemiological study (final)—June 15, 1987
3. Aggregate inpatient population— January 1, 1987
4. Inpatient hospitalization—June 9, 1986
5. Comprehensive care capacity—June 15, 1987
6. Protected environment study—June 15, 1987
6a. PE corrective action—October 15, 1987
7. Developmentally disabled prisoners —June 15, 1987
10. Outpatient services—September 1, 1986

The approach and timetable for implementation of recommendations 8, 9, and 11 will be described in the schedule and specification.

e) The schedule and specification will include adequate description of professional and other staff, a multi-year hiring schedule, and a basis, *i.e.* ratios or quantitative standards, by which the adequacy of staff can be determined and monitored. Any facility accredited by the Joint Commission on Accreditation of Hospitals is exempt from the provisions of section 3e.

f) Defendants· will develop by October 1986, a manual or system of manuals to include all policies, procedures, and treatment protocols related to mental health care. All policies, procedures, and treatment protocols will be consistent with the Consent Decree, State Plan(s), stipulation, and orders of this Court, and will be submitted to the Plaintiff and *Amici* for review.

g) The schedule and specification will include an appropriate organizational structure for mental health services, that ensures continuity of care.

h) All schedules, specifications, and other documents developed pursuant to paragraph 3 will be submitted directly to the Court, with copies to the Plaintiff and *Amici.* Plaintiff and *Amici* will have two weeks following the submittal to comment on adequacy and sufficiency. The Court will then accept the submittal or order additional changes along with coersive or punitive sanctions as may become necessary.

4. Defendants will conduct an epidemiological study to determine the prevalence of serious mental illness and associated treatment needs. In selecting an independent professional researcher or research team to conduct the study, and in the subsequent design and conduct of the study, Defendants will comply with the following provisions:

a) The Defendants will consult with Plaintiff and *Amici* to identify a researcher or research team acceptable to Defendants, Plaintiff, and Amici.

b) If, by July 1, 1986, no mutually acceptable researcher or research team is identified, the parties will each submit one recommendation to the Court, which will designate the researcher or research team from the submitted list. If, in the opinion of the Court, all recommended researchers or research teams are roughly equivalent in competence and credibility to the parties, the Court will defer to the recommendation of the Defendants.

c) The study is to be completed and submitted to the Court and the Plaintiff and *Amici* by June 15, 1987.

d) Pursuant to the findings of the study, Defendants may submit a request to modify the plan by July 15, 1987. The Court will determine whether the modification is to be granted, and may conduct a hearing on the merits of the modification.

IT IS SO ORDERED.

## ORDER OF JUNE 30, 1986 EXTENDING AND REVISING THE INDEPENDENT EXPERT'S ORDER OF APPOINTMENT

In accordance with the oral opinion rendered at the hearing held on May 9, 1986, and the Order issued on May 13, 1986;

IT IS HEREBY ORDERED that the authority of the Independent Expert, Dr. F. Warren Benton, and of his associate, Mr. Donald Stoughton, is extended in accordance with the terms of the Order of Appointment and Order for Instructions issued October 2, 1985, until further order of the Court, and except as modified as follows:

a. The parties and all *amici* shall serve the Independent Expert and his associate with copies of any and all documents, such as motions, memoranda, and reports, they file with the Court.

b. Section I, paragraph 3 of the October 2, 1985 Order is modified to read as follows:

3. The Independent Expert shall have access to all pertinent staff members and employees of the DOC and the DOJ. He may engage in both formal and informal conferences with such staff members and employees, including confidential personal or group interviews, and such persons shall cooperate with him fully and shall respond to all reasonable inquiries and requests relating to the State's compliance efforts. The State shall designate a representative to have the sole responsibility to coordinate tours of the relevant institutions or facilities, to assist in gathering documents, and to provide any additional material or information the Independent Expert may request. Lawyers representing the parties and *amici* or otherwise associated with this action, or with the *Hadix* and *Knop* actions, shall not attend tours undertaken by the Independent Expert or otherwise participate in the Independent Expert's activities, without notice to the parties and permission of the Court. Such lawyers shall not initiate contacts with the Independent Expert except by Order of the Court. The Independent Expert, however, shall not be precluded from contacting such lawyers, either orally or in writing, and the lawyers shall not be precluded from responding to such contacts, provided that the Independent Expert periodically provide a summary of such contacts and responses to the Court, the parties, and the *amici*.

c. The Independent Expert and his associate are further authorized to study and to report to the Court on defendants' efforts to formulate and to implement the subsidiary plans mentioned in section K of the Consent Decree. The Independent Expert shall, as appropriate, submit reports on defendants' efforts with regard to such plans. The parties and *amici* shall have fifteen days following the submission of such reports in which to file responses to them.

## OPINION OF JULY 15, 1986 INTERPRETING CERTAIN PROVISIONS OF THE CONSENT DECREE AND THE STATE PLAN FOR COMPLIANCE

At the compliance hearing held on April 1, 1986, the Court ordered the parties to address certain interpretive questions concerning the Consent Decree and the State

Plan for Compliance. Transcript of Compliance Hearing, vol. III, at 784–87. On April 18, 1986, the parties submitted a joint stipulation addressing such questions. The Court, for reasons it will not reiterate here, rejected the parties' stipulation in an oral opinion rendered at the hearing held on May 9, 1986, and ordered them to submit individual memoranda on the interpretive issues. Transcript, Concluding Statements by the Court, Opinions of the Court, at 23–24. The parties submitted such memoranda on May 23, 1986.

Before discussing the specific issues it had asked the parties to address, the Court will respond briefly to plaintiff's objections to that portion of its May 9th opinion in which it expressed its views on the proper relationship between the Consent Decree and the State Plan for Compliance. For the most part, plaintiff simply reiterates views it has made known to the Court at previous hearings and in previous briefs and memoranda. I do not believe that I need to repeat everything I said at the May 9th hearing on this topic. I carefully reviewed and considered plaintiff's arguments, and found nothing to change my views. Pursuant to Paragraph H of the Consent Decree, defendants must implement the State Plan for Compliance "unless implementation is excused [pursuant to paragraph I of the Decree] or modified [pursuant to paragraph J of the Decree]." Pursuant to paragraph J of the Decree, moreover, plaintiff "will monitor compliance with the State Plan", and, pursuant to paragraph I, it will advise the Court "as to each failure [by defendants] to comply with the provisions of the State Plan." Defendants may, of course, defend against a charge of non-compliance at a hearing held pursuant to paragraph I on the ground that such non-compliance "does not implicate constitutional rights of inmates", Consent Decree ¶ I, and they may seek modification of their obligations under the State Plan on the same ground. In either case, though, the Court expects that the parties would submit appropriate memoranda and evidence on the issues. The Court will not address this issue further, except to note

that it expects the parties to adhere to its May 9th ruling.

The parties submitted thorough and useful memoranda on the interpretive issues the Court had raised at the April 1st hearing. For lack of a better method, the Court will consider these issues in the order they are discussed in the United States' memorandum.

I. *Medical Care*

A. *Prompt Medical Care*

■■■■ The Court accepts defendants' interpretation that they "are mandated by the Plan to provide medical care to individuals as soon as reasonably possible, in a manner consistent with security and medical concerns." Defendants' Memorandum ("DM") at 3. The Court does not believe that a separate transportation system for inmates in need of medical treatment is required by either the Plan or the Consent Decree, or that it should place time limitations on the transfer of such inmates to the appropriate facilities. I am concerned, however, that inmates in need of care receive prompt treatment, and remind defendants that a delay in providing treatment may well, in specific cases, constitute deliberate indifference to serious medical needs. I agree with plaintiff, moreover, that although the "Constitution and the Consent Decree do not require that all inmates be treated for all medical problems within a specified period of time ... the question when patients should be afforded medical treatment is a medical decision that must be left to the professional judgment of competent medical practitioners." Plaintiff's Memorandum ("PM") at 8. Defendants thus may not allow security or transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment and must be transported to an appropriate facility.

B. *Employees That Serve as Both Psychologists and Resident Unit Managers*

The Court agrees with the parties that neither the Consent Decree nor the State Plan explicitly prohibit defendants from al-

lowing the psychologist at MIPC to function also as the Resident Unit Manager. The Court is concerned, however, that this psychologist, and other psychologists who also function as Resident Unit Managers, be aware and fully informed of mental health care procedures. In particular, the psychologist should be aware of all protocols concerning the identification and treatment of seriously mentally ill inmates in segregation units.

### C. Housing for Suicidal Inmates at the Michigan Reformatory

Defendants state that "[n]o prisoner who exhibits a serious threat of suicide or who attempts suicide is left at the Michigan Reformatory." DM at 3. Defendants, however, apparently use the "suicide observation cell" at the MR while they are evaluating inmates who may be suicidal. See id. at 3–4. The Independent Expert noted in his report that this cell is not separated from the remaining inmate housing and is not subject to continuous observation. The Court accepts defendants' representation that inmates are referred to the RPC once a medical professional has made a determination that they may commit suicide. It is concerned, however, that inmates may be confined in an inadequate cell pending this determination. The Court thus believes that section II.H.3 of the State Plan requires that any inmate "who exhibits a serious threat of suicide or who attempts suicide", or whom defendants strongly suspect may commit or attempt to commit suicide, should not be housed in the "suicide observation cell" at the MR for more than twenty-four (24) hours before being examined by an appropriate medical professional. The Court also assumes that defendants will continue to monitor this cell at least once every fifteen (15) minutes.

### D. Development and Implementation of Sick Call Plan

The Court accepts the parties' stipulation that "[t]he Consent Decree prohibits inmate workers from access to or participation in the creation of sick call registers or rosters at the facilities subject to the Consent Decree."

## II. Sanitation, Safety, Hygiene

### A. MIOSHA Inspections

The Court accepts the parties' stipulation that the State Plan does not require defendants to comply with MIOSHA regulations. It would be beneficial, however, although not required, if defendants were to keep the Court, plaintiff, and amici informed as to the outcome of their MIOSHA consultations and their ability to implement any recommendations that may arise from them.

### B. Annual Inspections

The provision of the State Plan at issue here requires defendants to "obtain complete, annual inspections of the subject prisons by qualified non-corrections Building and Constructions Trades Inspectors, qualified non-corrections agricultural inspectors; and appropriate follow-up inspection or re-inspection." State Plan ¶ I.C. Defendants state that this section was inserted only to acknowledge their desire "to cooperate with the annual inspections that are required under State law". DM at 5. The United States has no view regarding the proper interpretation of this part of the State Plan. PM at 13–14. The Court does not believe that the State Plan requires state agencies, such as the Department of Labor, to conduct inspections beyond those required by state law. Paragraph I.C., however, apparently means more than what defendants are willing to acknowledge. This paragraph does not state that these annual inspections must be conducted by personnel from the Department of Labor and the Department of Agriculture. The Court thus would request that defendants investigate means for complying with the requirements of this paragraph other than relying solely on inspections performed by state agencies if such inspections will not be performed on an annual basis.

### C. Food Service Sanitation Requirements

The Court accepts defendants' understanding that they are required to obtain a

score of "70 or above at all food service facilities at the affected institutions." DM at 5; *see* State Plan ¶ I.I.5. I also believe, moreover, that the last sentence of paragraph I.I.5 requires that defendants achieve full compliance on at least each item for which a score of 4 or 5 is indicated on the inspection form.

### D. *Inspections for Broken Glass*

As it indicated at the May 9th hearing, the Court accepts the parties' stipulation that the Consent Decree and the State Plan require defendants to inspect the windows at the subject facilities on a continuing basis and to replace promptly broken or missing glass.

### III. *Fire Safety: Storage of Combustibles*

It appears that defendants are planning to file a motion to modify the section of the State Plan concerning the storage of inmates' personal property in their cells. The Court thus will not discuss this issue further, except to note that it agrees with the United States that the inmates should not be prohibited from storing reasonable amounts of personal property in their cells.

### IV. *Overcrowding and Protection from Harm*

#### A. *Surveillance of Inmates*

The Court accepts defendants' understanding that surveillance may occur on an irregular basis, as long as the requisite number of rounds (24) will occur in any twenty-four (24) hour period. The Court also believes that defendants should apply the caveat that no more than 90 minutes may lapse between rounds to all of the institutions covered by the Consent Decree. The Court does not, of course, indicate at this time any view on whether defendants are actually in compliance with the applicable requirements of the Consent Decree and the State Plan.

#### B. *Food Loaf*

The Court will defer ruling on the issue of whether defendants may use "food loaf"

as an administrative measure for dealing with inmates who throw their food, *etc.* I would ask that the parties and *amici* provide the Court with additional information at the next compliance hearing on defendants' use of food loaf. The Court is particularly interested in knowing how many inmates are served food loaf in lieu of their regular meals; whether the loaf is consumed by the inmates; whether there is any limitation on the length of time an inmate can be served the loaf; and whether any inmates have suffered mental or physical injury from having to eat the loaf.

#### C. *Food Temperature*

There was some confusion at the compliance hearing concerning the applicable requirements for the storage, transportation, and service of hot foods. All parties agree that the Food and Drug Administration Food Service Sanitation Ordinance (1976 Recommendations) ("FDA Ordinance") governs defendants' actions with regard to this issue. The Court, after reviewing the FDA standards, finds that it must agree with plaintiff that defendants apparently have misinterpreted such standards. Defendants recognize that food which has an internal temperature within the danger zone of 45° F to 140%A F should not be served. Testimony of Michael J. Kirkwood, T at 572; Affidavit of Michael J. Kirkwood ¶ 6; *see also* Testimony of George Butler, T at 261. They apparently adopt the position, however, that hot food can be served at a temperature below 140° F provided that such food has not been maintained below this temperature for longer than four (4) hours. *See* Affidavit of Michael J. Kirkwood ¶¶ 4–9; T at 276 (statement of counsel for defendants).

It is clear, though, that, as Mr. Duel testified at the compliance hearing, the FDA's four-hour standard applies only to food that is being cooled for refrigeration. *See* T at 670–71. In such a case, the standards provide that the cooling period, during which the food is cooled from a temperature in excess of 140° F to a temperature of less than 45° F, "shall not exceed 4 hours". FDA Ordinance § 2–302(b). Section 2–302(b) indicates, moreover, that the

four-hour standard applies to food that is being "rapidly cooled". It apparently has no application to food that is merely being transported to cellblocks for service to inmates. Sections 2–303(b), which provides that "[p]otentially hazardous food to be transported shall be held at a temperature of 140° F or above", and 2–501, which provides that "[p]otentially hazardous food shall be kept at an internal temperature of 140° F or above during display and service", govern the latter kind of food. The Court thus rejects defendants' argument that they may take up to four hours to serve potentially hazardous hot food whose internal temperature has fallen below 140° F. Defendants should serve such food as soon as possible.

### D. *Personal Property in Administrative Segregation*

Based on the parties' submissions, the Court does not believe there is an issue for it to interpret or to resolve at this time.

### E. *Adequate Provision of Space*

The Court accepts defendants' interpretation that the areas considered in determining compliance with the sixty-square foot requirement should be limited to the inmates' sleeping area and should "not include recreational facilities or other areas." DM at 6. The Court also agrees that defendants are not necessarily required to "mark off that 60 square foot area in some visual manner."

## V. *Access to Courts*

The Court raised two issues regarding defendants' law libraries. With respect to the first issue, the parties argue that defendants' current stock of law books satisfies constitutional minima, but that they will meet periodically to ensure that defendants maintain this standard. The Court has not received any firm evidence that would lead it to disagree with the parties' general assessment of this situation. As it stated at the compliance hearing, however, the Court does believe that defendants *must* replace their treatise on habeas corpus law, which was published in

*1969*. T at 786. It is ridiculous that defendants have a seventeen year old treatise to guide inmates in this crucial area of the law. Use of such a treatise cannot possibly give inmates "meaningful access to the courts". Consent Decree ¶ E.

With regard to the second issue, the Court considers the six-month survey requirement as marking the maximum length of time defendants can defer identification and replacement of missing and mutilated volumes. I note, moreover, that the last sentence of section V.3 of the State Plan provides that "[a]ll missing or mutilated volumes, however discovered to be missing or mutilated, must be replaced or restored promptly." Defendants thus are obligated to replace or to restore missing or mutilated volumes whenever they discover them to be missing or mutilated, not just when they identify such volumes during a semi-annual survey.

## OPINION OF JULY 15, 1986 GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR RELIEF FROM ORDER

On March 4, 1986, defendants filed a motion for relief from the Court's Order of February 21, 1986, regarding various aspects of their mental health care system. On April 3, 1986, the Court issued a memorandum opinion and order in which it granted defendants' motion in part and withheld ruling on it in part pending the hearing on defendants' mental health care plan scheduled for May 8th and 9th. At the May 8th and 9th hearing, plaintiff's mental health expert, Dr. Sovner, testified regarding the portions of defendants' motion on which the Court had withheld decision. Having listened to Dr. Sovner's testimony, and having considered the other evidence presented at the hearing, the Court is prepared to rule on the remaining portions of defendants' March 4th motion.

The first remaining issue is defendants' request that the Court modify section I.C. 6 of the February 21st Order, which concerns the use of state doses. Specifically, defendants request that they be allowed to order more than one stat

dose by telephone in a twenty-four hour period. Dr. Sovner testified that defendants' requested modification did not comport fully with contemporary community standards, and indicated that the State should not provide emergency services by telephone but rather should have twenty-four hour psychiatric coverage of its facilities.

The Court tends to agree with Dr. Sovner that defendants' request may not comport with contemporary community standards. Concurrently, however, the Court recognizes that defendants may not presently possess the resources to maintain twenty-four hour psychiatric coverage, and that such coverage is not necessarily required by either the Consent Decree or the State Plan for Compliance, which require that defendants provide "[a]ppropriate use and distribution of psychotropic medications, that fully comports with the standards of use and distribution in the medical profession", Consent Decree § A.7., and "care of serious mental illness [that] meet[s] contemporary professional standards". State Plan for Compliance § II.H. The Court believes that the following modification of its February 21st Order best accommodates the competing concerns it must consider while granting priority to the rights of the inmates under the Consent Decree and the State Plan.

6. Stat Dose Orders

Only one Stat dose of a psychotropic drug for each 24 hour period shall be ordered by telephone, except that a physician may, in a subsequent telephone consultation, order one additional individual stat dose according to his or her medical judgment, provided that the physician fully documents the necessity and rationale for such order in the inmate's medical record on the next working day and that he or she promptly reports and justifies the occurrence in writing to the Medical Director of the facility.

Order of February 21, 1986, § I.C.6.

The second remaining issue is defendants' request that the Court modify section I.G. of the Order, concerning monthly audits of all prescriptions of anti-psychotic medications. The Court shares Dr. Sovner's concern that a relaxation of this requirement may allow the improper administration of medications to inmates who are treated for only a month or two to escape the attention of the auditors. The Court also appreciates defendants' concern, however, that the audits may unnecessarily consume valuable staff time. I also note, moreover, that Dr. Sovner appears to be concerned primarily with the improper use of polypharmacy. The Court therefore will amend section I.G. of the Order to read as follows:

G. Within sixty (60) days from the date of this Order, defendants shall initiate monthly audits of all prescriptions of anti-psychotic medications. The audits shall include a summary review of all anti-psychotic medication prescriptions in effect, to ensure that all dosages and combinations fall within the limitations of the medication protocols. For a more intensive sample consisting of not less than 10% of all instances in which anti-psychotic medications are prescribed, defendants shall conduct quarterly audits to assess compliance with the substantive provisions of the applicable medication protocols. In all cases in which two anti-psychotic medications are prescribed simultaneously, defendants shall conduct such intensive audits on a monthly basis.

Order of February 21, 1986, § I.G.

The third leftover issue concerns defendants' request that the Court modify section II.A. of the Order, concerning the length of time an inmate can be secluded or restrained without being examined by a physician. Defendants' primary concern seems to be that the February 21st Order places limitations on their use of seclusion and restraint that are more stringent than those contained in the State Mental Health Code or their own policies. As Dr. Sovner noted at the hearing, however, the State Mental Health Code does not necessarily reflect contemporary community standards. More importantly, however, he also noted that one needs to examine the history of the system, and testified that in his opinion modification of the Order in this area may well invite further abuse by in-

ducing a feeling that it is all right to resume "business as usual".

In light of plaintiff's essentially uncontradicted testimony, which it presented at both the February 13th hearing and the May 8th and 9th hearing, concerning the problems associated with defendants' use of seclusion and restraint, the Court finds no basis for granting defendants' requested modification at this time. I thus will decline to modify section II.A.'s requirements concerning defendants' use of seclusion and restraint, and will order defendants to modify their policies to reflect such requirements. After April 1, 1987, however, defendants may again request the Court to modify those requirements. Defendants must, of course, support any such request with appropriate evidence of their success at correcting the abuses that plaintiff has identified.

The final issue the Court must resolve concerns defendants' request that it modify section III.A. of the Order to allow a psychologist or a physician who is not a psychiatrist to conduct the examination required within seventy-two hours after an inmate for whom an anti-psychotic medication has been prescribed has been assigned to disciplinary or administrative segregation. The Court is troubled by the prospect of potentially unqualified personnel conducting this examination. I believe that Dr. Sovner suggested a reasonable solution to defendants' concerns, however, when he testified that he would be comfortable with a person from any of the following three groups of persons conducting this examination: (1) psychiatrists; (2) Ph.D.-level clinical psychologists; or (3) psychiatric nurse practitioners who have had a one to two year internship in a psychiatric facility. The Court therefore will modify section III.A. of the Order to allow a person from any one of the above three groups to conduct this examination.

OPINION OF JULY 22, 1986
REGARDING MARCH 1986
COMPLIANCE HEARING

*Introduction*

On March 27, 1986, through April 1, 1986, the Court held its first compliance

hearing in this case to evaluate defendants' efforts to comply with the requirements of the Consent Decree and State Plan for Compliance entered July 16, 1984, and the Stipulation entered June 21, 1985, as approved August 21, 1985. These requirements are intended to ensure the constitutionality of the conditions under which persons are confined at four Michigan institutions: the State Prison for Southern Michigan (SPSM); the Michigan Reformatory (MR); the Marquette Branch Prison (MBP); and the Michigan Intensive Programming Center (MIPC). To assist it in evaluating defendants' compliance efforts, the Court appointed an Independent Expert on October 2, 1985, and instructed him to study and to report to it, and to the parties and the *amici*, on such efforts. The Independent Expert submitted his report to the Court, the parties, and the *amici* on February 11, 1986, and the parties and the *amici* were given an adequate opportunity to comment on such report. The report represented a comprehensive survey of defendants' compliance efforts in each of the five major areas of concern: Medical Care; Sanitation, Safety and Hygiene; Fire Safety; Overcrowding and Protection from Harm; and Access to Courts. At the compliance hearing, the Court heard further evidence from the parties and the *amici* on defendants' compliance efforts. The following opinion, and the accompanying order, are based on the Independent Expert's findings and conclusions and on the evidence the Court heard at the compliance hearing. As the parties and the *amici* are aware, the issue of mental health has been effectively segregated from the other compliance areas, and thus will not be covered in this opinion and order.

On March 26, 1986, the United States filed a motion for an order enforcing certain aspects of the Consent Decree and the Stipulation. In particular, the United States was concerned that defendants were not in compliance with paragraphs B.6., C.1., and C.2. of the Consent Decree, and paragraphs II.b.3(4), II.C.3., and II.C.4. of the Stipulation, and requested that the

Court take appropriate action to ensure compliance. The United States' particular areas of concern involved fire safety and sanitation, safety, and hygiene. The Independent Expert's report and the evidence presented at the compliance hearing demonstrated, however, that the State is also experiencing compliance problems in the other three areas of concern and that there are problems in the areas of fire safety and sanitation, safety, and hygiene in addition to those the United States discussed in its March 26th motion. Therefore, although the Court is particularly concerned about the areas the United States discussed in its motion for enforcement, it believes that the other areas also deserve its attention. As discussed below, there are significant areas of noncompliance that defendants must address in accordance with this Opinion and its accompanying Order. The Court will discuss those areas in this Opinion. The accompanying Order will list the steps defendants must take to remedy their noncompliance.

The Court also finds that as defendants argue, there has been substantial compliance with the requirements of the Consent Decree, the State Plan for Compliance, and the Stipulation. I also do not believe that I currently have a substantial basis for finding that defendants are not engaged in a good faith effort to comply completely with such requirements. The Court thus will decline, for the moment, to consider whether it should issue an order requiring defendants to show cause why they should not be held in civil contempt of court for failing to comply with all the requirements that are presently due. Defendants should be prepared, however, to show significant improvement in the areas of noncompliance at the next compliance hearing.

The Court will first discuss its findings on fire safety. I will then discuss sanitation, safety, and hygiene; medical care; access to courts; and overcrowding and protection from harm. Due to the volume of paper that this case has already generated, and the parties and *amici*'s familiarity with the applicable requirements and the evidence, this discussion will be somewhat summary.

## I. *Fire Safety*

In many respects, this area presents the most troublesome problems of noncompliance. The Court finds that there are nine areas in which defendants are experiencing significant compliance problems. As the discussion indicates, the degree of significance varies, and in many areas defendants need only provide the Court with a status report on when they will achieve compliance. There are, however, several, more crucial, areas in fire safety in which compliance is due this month, July, 1986, and yet defendants do not expect to be in compliance. The Court received some idea at the hearing of when it might expect defendants to be in compliance in those areas. It needs, however, a more detailed schedule of when defendants will be in compliance, and an explanation of why they did not achieve compliance by the designated date. I note that attachment b of the Compliance Report Outline defendants submitted to the court on June 30, 1986, contains a memorandum from George Walter to Luella Burke concerning expected completion dates for many of these areas. The Court would ask that defendants provide another such progress report on October 1, 1986. Given the serious danger that fire poses in the prison setting, the Court expects defendants to make these requirements one of their top priorities.

## A. *Storage of Combustibles*

Testimony at the hearing revealed this to be the most significant area of noncompliance. The Court has little difficulty in finding that defendants are not in compliance with paragraph B.6. of the Consent Decree, which requires them to "[p]rovide for immediate proper storage or removal of combustible materials." The June 21, 1985 Stipulation gave defendants until that date (June 21, 1985) to document their full compliance with such requirement, Stipulation, ¶ II.B.4., even though compliance was originally due August 21, 1984. The Independent Expert noted that although many institutions have proper areas for the storage of combustibles, defendants frequently fail

to use such areas. He also noted problems with inmate personal property in their cells; material draped over the bars of the cells; the lack of suitable trash containers at MBP inside and trusty; and the lack of proper storage areas in certain places.

Plaintiff's fire safety expert, Mr. Copeland, more explicitly discussed these problems. He noted that defendants frequently fail to store combustibles properly, even when appropriate areas are available, Transcript ("T") at 290–91, and that there are excessive amounts of combustibles on the cells bars. T at 299. He also stated that in cellblock 5 at SPSM, defendants store laundry carts, which naturally are often full of clothes, in dangerous proximity to the living areas. T at 296–97; pls. exs. 1 & 3. Mr. Copeland in addition stated that the compressed gas cylinders in the hospital at SPSM are stored improperly, T at 299, and that individual cellblocks often are used for temporary storage of combustibles. T at 333. He gave his opinion that the improper storage of combustibles creates an unreasonable risk of harm to the inmates. T at 290, 291 & 298. Other testimony also supported Mr. Copeland's observations. T at 120–22 (testimony of Mr. Grossman).

Defendants, on their cross-examination of Mr. Copeland, were able to deflect somewhat the significance of his testimony. Individual defendants testified, moreover, that they are attempting to remedy the problems Mr. Copeland had identified. *See, e.g.,* T at 365–67 (testimony of Warden Foltz). The improper storage of combustibles, however, particularly within the inmates' living areas, is a significant problem.

### B. *Equipment Maintenance*

The Independent Expert noted in his report that defendants are experiencing difficulty in complying with paragraphs B.3. of the Consent Decree and III.H.4. of the State Plan. Testimony at the hearing indicated that defendants believe that they are in compliance with these paragraphs. T at 461–63 (testimony of Mr. Bristol); T at 479 (testimony of Mr. Walter). The Court merely notes that this may be a problem

area, and requests that defendants clarify the status of this requirement.

### C. *Water Flow and Automatic Alarms*

The Independent Expert's report indicates that defendants are experiencing major difficulties in this area. As with the immediately preceding area, however, the Court is not sure whether defendants are presently in compliance with this requirement. The Independent Expert noted that each of the three major complexes at SPSM was experiencing major deficiencies. It appears from defendants' June 1986 compliance report that they are still experiencing problems. The Court therefore will order defendants to provide appropriate documentation of their efforts to comply with this requirement.

### D. *Replacement of Nonconforming Tiles and Panels*

Defendants do not dispute that they are not in compliance with this requirement. Mr. Hinds testified at the hearing that a contract had been let at Marquette, and that work should be completed by July, 1986. Mr. Walter testified, apparently with respect to the remaining institutions, that compliance would not occur for another six to nine months. The Court therefore will order defendants to provide appropriate documentation of their efforts to comply with this requirement.

### E. *Absence of a Fire Safety Office at the MR*

With regard to this aspect of noncompliance, the Court will order defendants to report on their efforts to fill this position, or when the position was filled if it has been already. They also should report on the qualifications of whomever is or has been selected for the position. Finally, defendants should report on their efforts, if any, to cover this vacancy.

### F. *Lack of Monthly Inspections at SPSM*

Mr. Bristol testified at the hearing that defendants would start conducting monthly fire safety inspections at SPSM, as re-

quired by section III.J. of the State Plan, as of June 1, 1986. T at 465–66. Defendants are to report to the Court on whether they are conducting monthly inspections at SPSM and, if they are not, when they expect to start doing so.

### G. *Lack of Fire Extinguishing Systems on Kitchen Hoods at SPSM and the Magnum Farm*

Defendants should state whether they have installed the chemical extinguishing systems required by section III.B.3. of the State Plan at the Magnum Farm. With regard to SPSM, defendants shall report on the status of their conversion to the "quick-chill" food preparation system.

### H. *No Adequate Fire Safety Operations Plan*

The Court expressed concern at the hearing regarding defendants' Fire Safety Operations Plan. In the Order dated May 14, 1986, the Court accepted the United States' limited waiver of rights with regard to its consultant's report on such plan. I thus will not discuss this issue further, and expect that defendants will modify their plan in accordance with the concerns the Court expressed at the compliance hearing. T at 399–417 & 500–05.

### I. *Removal of Combustible Materials from Cellblock Areas*

The Independent Expert's report indicates that the subject facilities are in varying degrees of compliance, or non-compliance, on this requirement, and that it is unclear when defendants will be in compliance at all of the facilities. The Court therefore will order defendants to report on their compliance status, and when they expect to be in full compliance. Exhibit 13b to defendants' June, 1986 compliance report on the Central Complex indicates that they will be in compliance as of January 31, 1987. The Court will order defendants to report by October 1, 1986, on whether they will meet this deadline.

### II. *Sanitation, Safety, and Hygiene*

Sanitation, Safety, and Hygiene appears to be the second most troublesome area in terms of noncompliance. Specifically, the Independent Expert's report and the evidence presented at the compliance hearing identified five areas in which defendants are experiencing significant compliance difficulty.

### A. *Housekeeping Practices*

Paragraph C.1. of the Consent Decree requires defendants to establish, maintain, and implement "[h]ousekeeping systems, to be operated and managed by qualified staff with designated responsibilities, to prevent filth, vermin and rodent infestation." Attached to the State Plan for Compliance are sanitation plans defendants developed to satisfy this requirement of the Consent Decree. Defendants state that "[a]ll required sanitation systems and plans are in place" and that "[c]leaning supplies and materials are readily available." Memorandum Regarding Consent Decree Sanitation Requirements at 2. These statements may well be true. As the Independent Expert's report and testimony at the compliance hearing revealed, however, the problem is that the facilities are not being kept clean.

Specifically, plaintiff's expert, Mr. Butler, testified that the filth in 5–Block at SPSM was such that he has seen "cleaner zoos." T at 266. He noted in particular the presence of many birds in the area, T at 269, and opined that the risk of harm posed to inmates as a result of the filth and vermin infestation was "very serious." T at 281. Messrs. Kirkwood and Vogel testified regarding their efforts to ensure that the cellblocks are maintained in a clean condition, and Warden Bergman testified about his efforts to keep MIPC clean. *E.g.*, T at 571 & 347–48. It nevertheless is clear that at least some of the institutions, in particular SPSM 5–block and MIPC, are experiencing difficulty in this area.

### B. *Food Service Sanitation*

Paragraph C.2. of the Consent Decree requires defendants to establish, maintain, and implement "[s]ystems to ensure safe

and sanitary food service." Defendants' noncompliance with this requirement presents troubling issues. These issues break down into two major areas: (1) the presence of vermin, *etc.* in the food service areas; and (2) the service of food at unsafe temperatures.

Mr. Butler testified that the commissary at the Southern Complex, SPSM, definitely was suffering from a rodent infestation. T at 267. He also noted that in the Central Complex, garbage was improperly maintained near the food service area, T at 267–68, and stated that the application of rodenticides and pesticides would not, by themselves, cure the infestation problem. T at 272. *Amici's* expert, Mr. Duel, supported Mr. Butler's findings. T at 672–74, 676 & 736–37. Mr. McClellan testified that the introduction of the quick-chill food processing method may alleviate some of these problems, since the Central Complex kitchen would no longer be used to prepare most foods. T at 553 & 556–57. Mr. McClain testified regarding recent vermin control efforts at SPSM, T at 559–60, and stated that in his last inspection of the Central Complex, he did not find any rodents or vermin in the food service area. T at 566.

Mr. Kirkwood testified that there presently is not a vermin infestation problem at MBP. T at 571. He did state, however, that the kitchen floor and ceiling must be replaced as they can no longer be cleaned properly. T at 576–78. Finally, Mr. Vogel testified that he was taking steps to cure the vermin problem he had been experiencing at the Michigan Reformatory. T at 588–89. From this testimony, the Court finds that there is strong evidence of noncompliance by defendants in terms of food service sanitation, but that defendants are taking steps to cure the problems.

The second problem area concerns the temperature at which defendants serve hot food. Testimony at the hearing clearly established that at least some hot food is served below the safe temperature of 140° F. *See* T at 261 & 275 (testimony of Mr. Butler); T at 565–66 (testimony of Mr. McClain); T at 570 (testimony of Mr. Kirk-wood); & T at 587 (testimony of Mr. Vogel). There was vigorous disagreement, however, over whether this occurrence constituted a risk of harm to the inmates. After reviewing the testimony, the Court finds that the weight of the authority lies in plaintiff's favor on this issue.

Mr. Butler testified that maintaining food in the 98° F to 100° F temperature range promotes bacterial growth, T at 281–82, and stated that bacteria in hot food maintained at a temperature of less than 140° F would double every fifteen to twenty minutes. T at 276. Mr. Duel similarly testified that bacteria in food maintained at a temperature below 140° F would go "through a stage of growth every 20 minutes." T at 670. As the Court explained in its opinion regarding the interpretive issues, moreover, it credits Mr. Duel's testimony that the "four-hour" rule applies to refrigeration, not serving, time, and finds that defendant's understanding of the rule is erroneous. *See* T at 670–71. Given a proper understanding of the temperature at which hot food must be served to avoid the danger of bacterial growth, Mr. McClain's testimony that it has been taking up to two hours to serve inmates at the Central Complex (T at 560–61) and Mr. Butler's testimony that food often is stacked awaiting an inmate's return to his cell (T at 265–66) indicate that inmates may indeed be subject to a significant risk of harm. The Court thus considers it crucial that defendants devise faster methods of serving inmates, and purchase equipment, such as serving trays, that insulate the food better.

C. *Pipe Chases, Sewer Lines, and Ports*

In his report, the Independent Expert noted instances where the defendants had failed to "maintain pipe chases free of all standing water and filth; maintain, as properly closed, all sewer lines; and maintain, with proper plumbing fixtures, all clean-out ports" as required by paragraph I.I.2 of the State Plan. *See also* C.D. ¶ C.3. Mr. Butler testified that he had noticed several broken or disconnected vent pipes at the MR, T at 263, and Mr. Duel testified

that he had noted unclean pipe chases at the MR. T at 660–61; *see also Amici* ex. 1. Witnesses for defendants admitted that they were experiencing some difficulty in keeping the pipe chases clean, *see* T at 568 (testimony of Mr. Kirkwood), but stated that they were correcting the problems. Mr. Kirkwood also testified that there was a cross-connection problem in the kitchen at Marquette, T at 571, but noted that funding had been requested to resolve the problem. T at 576. Many of defendants' problems in this area, moreover, can be traced to antiquated plumbing that is supposed to be replaced soon. Thus, although the Court finds that defendants are not in full compliance in this area, it is hopeful that this situation will not last long. It will require defendants, however, to maintain a vigorous program of keeping the pipe chases clean and ensuring that all sewer lines are properly closed.

### D. *Broken Windows*

This is a serious problem that defendants must remedy immediately. Defendants acknowledge that they are obligated to repair or to replace broken windows immediately. *Compare Amici's* Proposed Order, attachment A. Mr. Butler testified that the presence of the broken windows allows birds and other vermin easy access to the facilities. T at 269 & 274. The Court thus will enjoin defendants to maintain a vigorous repair and/or replacement policy in this area. If such a policy is ineffective in keeping birds and other animals out of the facilities, particularly SPSM 5–Block, the Court will consider requiring defendants to screen problem areas.

### E. *Training Programs*

It appears from the Independent Expert's report and testimony at the hearing that defendants are having difficult ensuring that the appropriate employees receive sanitation training. Report at 47 & 52; *see* T at 568 (testimony of Mr. Kirkwood) (indicating that training programs for assistant food service directors and food service directors are not yet underway); T at 579 (testimony of Mr. Kirkwood) (indicating that the food service training program for

inmates also is not operational); T at 610 & 612 (testimony of Mr. Johnson) (indicating that only 50% of the appropriate personnel at Jackson have received sanitation training). Defendants indicate in their most recent compliance report that they still have achieved only partial compliance in this area. The Court expects, at a minimum, that defendants will complete the appropriate training by the end of this year.

### III. *Medical Care*

As the Court stated earlier, one of the key problem areas in the medical care field, mental health, has been and will be dealt with in separate hearings and opinions and orders. With regard to other medical care issues, Dr. Green, Dr. Faiver, and Mr. McMillan presented testimony at the hearing. The Court also notes that it heard testimony from *amici*'s expert, Dr. Rundle, on various aspects of defendants' provision of mental health care. The Court will not deal specifically with mental health care in this opinion. It believes, however, that Dr. Rundle presented some valuable testimony, particularly with regard to the provision of mental health care at SPSM, RPC, and MIPC, that it will consider when it deals with defendants' mental health care plan. The Court is particularly concerned about Dr. Rundle's conclusions regarding the provision, or lack, of mental health care at MIPC. *See* T at 443.

With regard to other areas of medical care, the Court finds that there are two areas of concern it should cover at this time: (1) defendants' training programs; and (2) defendants' staffing levels at the SPSM hospital. I will also note that I considered carefully the suggestions listed on pages ten through thirteen of the *amici*'s proposed order. The Court does not believe that there is a sufficiently substantial basis at this time for it to adopt such suggestions. The parties should be on notice, however, that I consider the problems *amici* discuss to be serious and expect them to take appropriate steps to resolve any problems that may exist. The Court is particularly concerned that inmates in need

of emergency medical care receive it; that inmates are not involved in the provision of medical care; that inmates at MIPC and MBP receive adequate mental health care; and that inmates with serious chronic diseases receive appropriate follow-up care.

With regard to defendants' training programs, the Court notes first that the Independent Expert found that many correctional officers still are not properly distributing medications. *See also* T at 618 (testimony of Mr. McMillan). The Court does not believe it would be appropriate at this time for it to order that only health care personnel distribute medication. I expect, however, that defendants will act promptly to correct this situation, and I will order appropriate compliance measures. I also expect that all non-medical personnel will receive adequate emergency training. *See* State Plan ¶ II.I.1.

The Court's second area of concern is staffing at the new SPSM hospital. Dr. Faiver testified about defendants' staffing plans at the hearing. T at 631–38. Dr. Green testified that she would like to have twenty-four hour physician coverage at the new hospital. T at 535. It is the Court's understanding that plaintiff will evaluate the adequacy of defendants' staffing plan once it is complete. I accordingly will not make any findings concerning staffing at this time, and will merely note my concern that the hospital is adequately staffed.

### IV. *Access to Courts*

This area was ignored at the compliance hearing. As *amici* indicate, however, the Independent Expert found three areas of noncompliance that deserve discussion. The first concerns the situation at the MR, where defendants, despite diligent efforts, have been unable to maintain adequate staffing. As a result, the law library is, or at least was, not open a sufficient number of hours during the evening to meet the requirement of paragraph V.1 of the State Plan. Defendants' latest compliance report indicates that they are now in compliance with this requirement in the MR–inside. The Court thus would request that defend-

ants clarify the status of their compliance at the MR.

The second area concerns the mini-law library at MBP, C–Block. The Independent Expert indicated in his report that defendants have plans to develop such a library, but have not yet done so. Defendants indicate in their latest compliance report that they are in compliance on this requirement at MBP. The Court would ask that defendants inform it whether there is a mini-law library at MBP, C–Block.

The final compliance issue in this area concerns the fact that certain of the books in the law libraries may be out-of-date. The Court discussed this issue in its separate opinion on the interpretive issues. I thus will not discuss it further here, other than to note that I interpret defendants' obligation to update each publication "promptly as revised editions, pocket parts, or advance sheets become available" to encompass an obligation to purchase new publications in particular areas if it becomes no longer possible to update the present ones.

### V. *Overcrowding and Protection from Harm*

There are seven issues the Court will address in this area.

#### A. *Plan to Decrease Overcrowding*

The Court accepts defendants' plan, as outlined in the April 29, 1986 memorandum from William L. Kime to Robert Brown, Jr., to reduce overcrowding at the decree institutions by January 1, 1987, and to end inappropriate security classification placements by 1989. The Court will request defendants to supply it, plaintiff, and *amici* with tri-monthly updates on their progress in meeting their goals. I will also request that the Independent Expert keep the Court informed on defendants' progress in this regard. The parties and *amici* shall have an appropriate opportunity to comment on any reports the Independent Expert may submit.

The Court, in addition, would be remiss if it did not recognize defendants' commit-

ment to maintaining single-celling at the subject institutions.

### B. *Conversion of MIPC*

The Court also accepts defendants' plan to convert MIPC to a maximum security protective custody unit. *See* April 29, 1986 memorandum from Dan Bolden to Robert Brown, Jr. The Court requests that defendants keep it, plaintiff, and *amici* informed on their progress in this regard. The Court will also request defendants to continue to inform it, plaintiff, and *amici* on their plans for the old infirmary at SPSM, and the effect of such plans on the operation of 5–Block at SPSM.

### C. *Surveillance of Inmates*

Paragraph D.2 of the Consent Decree requires defendants to "[e]nsure adequate guard surveillance of inmates." As it discussed in its opinion on the interpretive issues, the Court accepts defendants' interpretation of the surveillance requirement. It is clear from the Independent Expert's report and testimony at the compliance hearing, however, that surveillance is not always conducted properly. *See* Report at 80–81; T at 120–21 & 138–40; *see also* attachments to *amici*'s Memorandum in Support of Proposed Supplemental Order (concerning a suicide at MBP and a homicide at RCF). It appears that defendants' problems in this area are two-fold. First, defendants do not always have sufficient staff to conduct the requisite number of rounds. Second, the staffs view of the cell often is blocked by towels and other items. The Court will enter an appropriate order to ensure compliance with the surveillance requirement.

### D. *Segregated Housing*

Paragraph D.3 of the Consent Decree requires defendants to "[d]evelop and implement rules and procedures governing use of segregation housing units." In the Stipulation, moreover, defendants agreed to take additional measures to ensure that protective custody inmates and administrative segregation inmates are treated properly in accordance with the Consent De-

cree. Mr. Grossman testified at the hearing, however, that protective custody inmates still suffer significant disparate treatment when compared to general population inmates. T at 122–23 & 135–36. The Court expects defendants to take appropriate measures to end this disparity, and will enter an order to that effect.

A second problem involving protective custody inmates is that they apparently are occasionally exposed to administrative segregation inmates. *See* T at 122–23. Warden Foltz testified that using protective custody inmates as porters in the administrative segregation block creates a risk of harm. T at 370–72. The Court is aware, however, of defendants' security concerns with any alternative cleaning arrangements. *Id.* at 371–72.

Finally, the Court notes that it is concerned with indications that defendants are not complying with section IV.J.1. of the State Plan. I would ask that plaintiff and the Independent Expert keep the Court informed on defendants' efforts to comply with that requirement.

### E. *Classification*

Plaintiff has indicated that it has secured a copy of defendants' classification plan, which defendants apparently intend to retain as the plan required by paragraph D.1. of the Consent Decree, and intends to evaluate such plan. The Court would request that plaintiff complete its evaluation by June 1, 1987, or sooner if it wishes, and submit a copy of the evaluation to it, defendants, and *amici*. Defendants and *amici* shall then have until August 1, 1987 to comment on plaintiff's evaluation and/or defendant's plan. If necessary, the Court will consider obtaining the services of an Independent Expert to evaluate defendants' plan.

### F. *5–Block and MIPC*

The Court finds from its reading of the Independent Expert's report, its tour of 5–Block in February, 1986, and the testimony given at the compliance hearing that conditions in 5–Block and MIPC, particularly with respect to sanitation and fire safe-

ty, pose an unreasonable risk of harm to the inmates confined in those facilities. I note, for example, the excessive amount of combustibles present in both facilities and the unsanitary conditions that exist in them. The Court does recognize that defendants' most recent compliance report on MIPC indicates that conditions have improved significantly at that facility. Given defendants' plan to convert MIPC to a protective custody facility, moreover, the Court believes that they may soon eliminate any remaining problems.

With regard to 5–Block, the Court hopes that defendants' recent measures will be effective. I will ask that plaintiff, *amici*, and the Independent Expert keep the Court informed on defendants' progress in this area.

Finally, the Court will request plaintiff, defendants, *amici*, and the Independent Expert to address the issue of whether confinement of an inmate in a cell with solid doors at MIPC constitutes "isolation" within the meaning of paragraph IV.J.9. of the State Plan.

The Court also notes that defendants and *amici* have filed various comments on the testimony of Mr. Duel and Dr. Rundle. With regard to defendants' objections to the testimony of Mr. Duel, the Court believes that their first and third objections are effectively moot since it did not rely on such testimony. The Court will reject defendants' second objection based on its understanding that Mr. Duel was testifying on behalf of the *Hadix amicus* as well as the *Knop amicus*. With regard to defendants' objections to the testimony of Dr. Rundle, the Court rejects each objection. Dr. Rundle's testimony fell within the limitations imposed by the Court; the Court believes that his testimony concerning the Central Complex was relevant to the claims of the inmates whom the *Knop amicus* represent; and the Court did not rely on Dr. Rundle's testimony concerning the conversion of the infirmary to a segregation unit.

The Court also notes that *amici* have lodged certain objections to defendants' cross-examinations of Mr. Duel and Dr.

Rundle. With regard to Dr. Rundle, the Court agrees that certain aspects of defendants' cross-examination were highly objectionable. I therefore will order that lines 19–24 of page 449, vol. II of the Transcript, and lines 16–24 of page 455, vol. II of the Transcript, be stricken from the record. *See* Federal Rules of Evidence 608 & 611(a). With regard to defendants' cross-examination of Mr. Duel, the Court will caution defendants not to suggest that certain "facts" are true unless they have a foundation for such questions.

The Court will enter an order in accordance with the above findings and conclusions. It will discuss defendants' efforts in the mental health area in a separate opinion and order.

ORDER OF JULY 22, 1986 GRANTING PLAINTIFF'S MOTION FOR ORDER ENFORCING CONSENT DECREE AND STIPULATION

In accordance with the opinion dated July 21, 1986;

IT IS HEREBY ORDERED that plaintiff's Motion for Order Enforcing Consent Decree and Stipulation is GRANTED, and that defendants are found to be in violation of paragraphs B.6., C.1., C.2., D.2., and D.3. of the Consent Decree, and paragraphs II.B.4., II.C.3., II.C.4., II.D.2.b., and II.D.2.c. of the June 21, 1985 Stipulation;

IT IS FURTHER ORDERED that defendants are found to be in violation of other provisions of the Consent Decree and the State Plan for Compliance, as discussed in the Court's opinion;

IT IS FURTHER ORDERED that defendants shall take the following steps to ensure their compliance with the Consent Decree, the Stipulation, and, consistent with paragraphs H and I of the Consent Decree, the State Plan for Compliance.

I. With respect to Fire Safety, defendants are enjoined:

A. To immediately and on a continuing basis survey all prison areas subject to the Consent Decree and, with the exception of a reasonable amount of personal property

in inmate cells, immediately remove or store *properly* all combustible materials.

B. Within ten days of the date of this Order, and thereafter monthly on the 15th day of each month, to submit to the Court, the United States, and *amici*, affidavits from the Warden or Assistant Deputy Warden for Housing in each institution stating that such persons have personally surveyed all prison areas subject to the Consent Decree and that, as of the dates of the affidavits, all combustible materials, with the exception of a reasonable amount of personal property in inmate cells, have been removed or stored *properly.*

C. To clarify, by August 30, 1986, whether they are in compliance with paragraphs B.3. of the Consent Decree and III.H.4. of the State Plan at each of the subject facilities, and if they are not in compliance, to submit their plans for bringing such facilities into compliance.

D. To provide, by August 30, 1986, appropriate documentation regarding their efforts to comply with the requirement of paragraph III.B.2. of the State Plan concerning water flow and automatic alarms.

E. To provide, by August 30, 1986, appropriate documentation of their efforts to replace non-conforming tiles and panels in accordance with paragraph III.D. of the State Plan.

F. To report, by August 30, 1986, on their efforts to fill the fire safety officer position at the MR.

G. To report, by August 15, 1986, on whether they are conducting monthly fire safety inspections at SPSM.

H. To report, by August 15, 1986, on whether they have installed a chemical extinguishing system at the Magnum Farm, and on the status of their "quick-chill" food preparation system at the SPSM.

I. To report, by October 1, 1986, on whether they will meet their January 31, 1987 deadline for removing non-structural combustible materials from cellblock areas.

J. To report, by October 1, 1986, on their efforts to implement the requirements with respect to which compliance was due July, 1986.

II. With respect to Sanitation, Safety, and Hygiene, defendants are enjoined:

A. To remove immediately all trash, litter, and other filth from cellblocks and to maintain them on a continuous basis in sanitary condition.

B. To institute immediately measures necessary to assure the complete and effective eradication and control of all vermin, including birds. Such measures shall include such additional commercial pest control as is necessary to ensure complete eradication.

C. To inspect immediately, and on a continuing basis, all windows, and to replace promptly all broken or missing glass. If such a program is not effective in keeping vermin, particularly birds, out of the facilities by October 1, 1986, defendants shall screen all exterior windows which open and shut.

D. To implement immediately and in full each and every requirement specified in sections I and III of the Sanitation Plan attached as Appendix A to the State Plan for Compliance. The Warden and Assistant Deputy Warden for Housing in each institution shall file monthly on the 15th day of each month an affidavit stating that each requirement has been satisfied in full and, if not, the full particulars of non-compliance. The Resident Unit Manager of 5 Block, SPSM, shall likewise file an affidavit certifying performance consistent with sections I and III of Appendix A.

E. To correct as soon as practicable, but by no later than February 1, 1987, all inadequate plumbing in food service areas, including cross-connected plumbing hazards in MBP dishwasher facilities.

F. To implement as soon as practicable, but by no later than December 1, 1986, the Solid Waste Disposal Plan in all food service areas.

G. To take immediately all necessary steps to ensure that food is stored, prepared, transported, and served at safe temperatures. The institutional sanitarian at each facility shall submit an affidavit on the 15th day of each month stating wheth-

er such steps have been taken, and whether food is being served at the appropriate temperatures.

H. Consistent with paragraph G of the Consent Decree, to provide training programs to all food service workers by January 1, 1987, and to provide, on a continuing basis, such supervision of these workers as is necessary to ensure adequate food service sanitation.

I. Within thirty (30) days from the date of this Order, to submit to the Court, the United States, and *amici*, complete protocols and procedures designed to assure effective food sanitation, including adequate food protection, storage, preparation, and transportation; food handler cleanliness and practices; and effective equipment cleaning and storage. To the extent existing procedures and protocols address these areas, defendants shall review them and submit any revisions necessary to ensure the foregoing to the Court, the United States, and *amici*.

J. With respect to paragraphs E and F, to notify the Court, the United States, and *amici* within thirty (30) days of the date of this Order of the specific date by which they will meet the designated requirements.

K. To maintain a vigorous program of keeping pipe chases clean and ensuring that all sewer lines are properly closed.

III. With respect to Medical Care, defendants are enjoined:

A. To ensure that all correctional officers are properly trained in the distribution of medication, and to provide to the Court, plaintiff, and *amici* a proposal by September 15, 1986, for ensuring that all medication is distributed properly.

B. To provide appropriate emergency training to all non-medical personnel by January 1, 1987.

IV. With respect to Access to Courts, defendants are enjoined:

A. To clarify, by August 30, 1986, whether the library hours at the MR–Inside are in compliance.

B. To clarify, by August 30, 1986, whether there is a mini-law library at MBP, C–Block.

V. With respect to Overcrowding and Protection from Harm, defendants are enjoined:

A. To implement their plan to decrease overcrowding and to end inappropriate security classification placements, and to provide the Court, the plaintiff, and *amici* with tri-monthly progress reports on their efforts in this regard.

B. To proceed with their plan to convert MIPC to a maximum security protective custody unit, and to continue to inform the Court, plaintiff, and *amici* on their plans for the old infirmary at SPSM and the effect of such plans on the operation of 5 Block at SPSM.

C. To institute immediately, and on a continuing basis, direct observation of each cell, and of each inmate within the cell, by a correctional staff member on a schedule that complies with the requirements of the Consent Decree and the State Plan.

D. To remove immediately all combustibles and non-combustibles from cell fronts to the extent that such items prevent the observation required in paragraph C, and to maintain cells sufficiently unobstructed to permit a clear view of inmates for surveillance purposes.

E. To submit, by August 30, 1986, documentation of compliance with the requirements of paragraphs C and D. Such documentation shall include: a) the total number of surveillance rounds completed during each twenty-four hour period; and b) evidence that a correctional staff member directly observed each inmate.

F. To implement immediately and in full paragraphs II.D.2.b. and II.D.2.c. of the June 21, 1985 Stipulation, and to submit, by August 30, 1986, documentation evincing that the requirements of such paragraphs have been met, and if they have not, providing the full particulars of noncompliance.

G. To notify the Court, by August 30, 1986, of the status of their compliance with section IV.J.1. of the State Plan.

IT IS FURTHER ORDERED that plaintiff shall evaluate defendant's classification plan in accordance with the Court's opinion;

IT IS FURTHER ORDERED that plaintiff and the Independent Expert shall keep the Court informed as to defendants' efforts with regard to 5–Block, SPSM;

IT IS FURTHER ORDERED that plaintiff, defendants, *amici,* and the Independent Expert shall inform the Court by October 1, 1986, on whether confinement of an inmate in a cell with solid doors at MIPC constitutes "isolation" within the meaning of paragraph IV.J.9. of the State Plan;

IT IS FURTHER ORDERED that lines 19–24 of page 449, vol. II of the Transcript, and lines 16–24 of page 455, vol. II of the Transcript, be stricken from the Record.

### OPINION OF AUGUST 29, 1986 SCHEDULING A MENTAL HEALTH HEARING

On May 9, 1986 the Court granted the United States' motion for relief and sanctions with regard to defendants' failure to submit a satisfactory plan for the provision of mental health services to seriously mentally ill inmates. It found defendants to be in contempt of court, and stated that they may purge their contempt "by submitting by June 9, 1986, a detailed supplementary implementation schedule and specification designed to cure the mental health care deficiencies addressed in the Consent Decree and Stipulation." Defendants submitted their Implementation Schedule and Specification in accordance with the Court's order on June 9, 1986. The United States and the *Knop amicus* submitted criticisms of the schedule and specification, and asked the Court to find that defendants had failed to purge themselves of their contempt. Defendants responded to these criticisms on July 17, 1986. On July 29, 1986 the *Knop amicus* suggested that the Court allow oral argument on the mental health issues.

The Court finds some merit in the criticisms submitted by the United States and the *Knop amicus.* It is also evident, however, that defendants are attempting in good faith to comply with the Court's orders and the requirements of the Consent Decree and the Stipulation, and have developed and are developing specific policies, programs and other means for achieving such compliance. The Court believes that most of the United States' and the *amicus'* criticisms are based on defendants' apparent failure to have refined or communicated sufficiently the means by which they will comply with the Court's orders, the Consent Decree, and the Stipulation. I also believe that the Court can most expeditiously resolve these criticisms at a hearing preceded by further written submissions from defendants.

The Court accordingly will hold a hearing to consider defendants' continued efforts to bring their system of mental health care into compliance with the Consent Decree, the Stipulation, and the Court's prior orders on October 24, 1986 at 2:30 p.m. in Kalamazoo, Michigan. I do not want the parties or *amici* to present witnesses at the hearing, with the possible exception of Ms. Burke by defendants. The parties and *amici* should submit any further written information they wish on the mental health issues, including affidavits from appropriate persons, to the Court by October 10, 1986. The Court in particular would like defendants to address in their written submission the questions listed in the appendix attached to this opinion and the status of the compliance measures due on or before the hearing date, such as the opening of the Comprehensive Care Unit at the Riverside Correctional Facility and the implementation of outpatient services. The Court hopes that defendants, either through their written submissions or at the hearing, will be able to allay the concerns expressed by the United States and the *Knop amicus* and reflected in the Court's questions.

The Independent Expert may, if he wishes, also express his views on defendants' compliance efforts on the mental health issues. He should submit his report, if any, by October 17, 1986. The parties and *amici* may respond to the Independent Expert's comments at the hearing. The Court will also defer ruling on whether

defendants have purged themselves of contempt until the hearing. Finally, the parties and *amici* should be prepared to discuss future scheduling of compliance hearings and/or other means for assessing defendants' level of compliance with the terms of the Consent Decree, the State Plan for Compliance, and the Stipulation.

APPENDIX

1. How do defendants intend to assure that the provisions of the plans and Schedule/Specification shall apply, at a minimum, to all inmates with serious mental illness?

2. Are all sections of the Schedule/Specification equally binding on defendants?

3. Will the sixty (60) mental health spaces within the Department of Mental Health be fully used? What arrangements are in place to assure this?

4. How will the Comprehensive Care Units be licensed or certified with respect to psychiatric services? What psychiatric services standards will defendants be prepared to meet?

5. How will defendants evaluate the Protected Environments? Who will conduct the evaluations and what questions will the evaluations attempt to have answered? Will experts who are not employed by the Department of Corrections be involved in the evaluations?

6. How do defendants propose to determine and monitor the adequacy of staffing arrangements?

7. How do defendants intend to assure appropriate licensing, qualification, and training of staff?

8. If defendants continue to experience difficulty in recruiting and retaining staff, what additional efforts do they propose to undertake to provide a reasonable assurance that they will meet the applicable staffing requirements?

9. How will defendants staff the upper levels of their Mental Health Services organizational structure? What organizational structures will apply to each type of program unit?

ORDER

In accordance with the opinion dated August 28, 1986;

IT IS HEREBY ORDERED that the Court will hold a hearing on October 24, 1986 at 2:30 p.m. to consider defendants' compliance efforts in the area of mental health; the parties and *amici* may submit materials before the hearing in accordance with the opinion.

OPINION OF AUGUST 29, 1986
RESOLVING VARIOUS
MOTIONS

There remain a number of matters for the Court to decide in this case. The following opinion will discuss four of those matters: (1) the United States' Motion for Order Compelling the *Hadix* Plaintiff-Intervenors to Answer Interrogatories, and the *Hadix* Plaintiff-Intervenors' Motion for Extension of Time to File Response to Plaintiff's Motion; (2) questions that have arisen concerning defendants' plans to renovate the old infirmary at the State Prison of Southern Michigan; (3) the United States' Objection to Defendants' Revised Procedure OP–DWA–40.02; and (4) the United States' Motion to Strike *Amici*'s Response to the United States' Brief Opposing an Expansion of the Role of the *Amici Curiae*. Before discussing these matters, the Court reminds the parties and *amici* that in accordance with its Order of June 30, 1986 concerning the Independent Expert and his associate, they are to serve Dr. Benton and Mr. Stoughton "with copies of any and all documents, such as motions, memoranda, and reports, they file with the Court."

1. *Hadix*-Related Motions

On February 27, 1986 the United States served the *Hadix* Plaintiff-Intervenors with four interrogatories concerning the Intervenors' request to exclude the Central Complex and the Reception and Guidance Center at the State Prison for Southern Michigan from the Consent Decree entered in this case. The *Hadix* Intervenors filed an objection to the interrogatories on

March 31, 1986. On April 9, 1986 the United States filed a motion to compel the *Hadix* Intervenors to respond to the interrogatories. On June 30, 1986 the Court ordered the *Hadix* Intervenors to respond to the United States' motion by July 10, 1986. On July 18, 1986 the *Hadix* Intervenors filed their response and a motion for an extension of time in which to file such response. The United States has not responded to the Intervenors' request for an extension of time to respond. Given the circumstances of this case, the Court believes that the motion should be granted, and it will consider the *Hadix* Intervenors' response to the United States' motion to compel.

The *Hadix* Intervenors raise two arguments in response to the United States' motion: (1) that they are not a party to this proceeding, and thus cannot be served with interrogatories pursuant to rule 33 of the Federal Rules of Civil Procedure; and (2) that rule 33 does not apply in post-judgment proceedings. The Court must reject the first argument. The *Hadix* Intervenors correctly note that the Court reduced them to the status of *amicus curiae* at the June 22, 1984 hearing. In its opinion of December 2, 1985, however, the Court granted the *Hadix* Intervenors' motion to intervene "as a party for the sole purpose of seeking exclusion from the Consent Decree." Opinion of December 2, 1985 at 4 & 9. They thus are a party to this proceeding for that limited purpose. Since the United States' interrogatories are related to that purpose, the Court finds that it must reject the *Hadix* Intervenors' first ground of objection.

The *Hadix* Intervenors' second objection is more substantial. In general, the discovery rules, and in particular rule 33, apply only to pre-trial proceedings, and are inapplicable to post-trial proceedings. *See Goldy v. Beal*, 91 F.R.D. 451, 456 (M.D.Pa. 1981); *see also H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118–22 (6th Cir.1976). The Sixth Circuit's decision in *H.K. Porter* does not, however, completely foreclose the use of discovery procedures in post-judgment proceedings. The *Hadix* Intervenors' Motion for exclusion, moreover, does not concern matters that were the subject of pretrial discovery, and it does not represent a direct attack on the merits of the judgment the Court entered in this case. In certain respects, then, the *Hadix* Intervenors' motion is more analogous to the filing of a separate action and the arguments against allowing post-judgment discovery are less cogent. I note, moreover, that it is anomalous for the *Hadix* Intervenors to file a motion requesting to be excluded from the Consent Decree and then to resist revealing information the United States needs to defend against such motion.

Given these peculiar factors, the Court believes that the United States' interrogatories are proper and will grant its motion to compel. At the March compliance hearing, the Court stated that it would conduct a separate hearing on the *Hadix* Intervenors' request for exclusion. Transcript of Compliance Hearing, Vol. I, at 70–72. The Court accordingly will hold a limited two and one-half hour hearing on the *Hadix* Intervenors' request for exclusion on Monday, November 3, 1986 at 2:30 p.m. The *Hadix* Intervenors shall respond to the United States' interrogatories by October 10, 1986.

### 2. Renovation of the Infirmary

As was noted at the March compliance hearing, defendants plan to convert the old infirmary at the State Prison of Southern Michigan into a segregation unit. On July 11, 1986 defendants submitted preliminary drawings for the renovation of the infirmary to the Court. On July 29th the *Knop amicus* expressed concern that the cells would face each other, similar to the design at MIPC. The Court believes that defendants adequately responded to this concern on August 8th by noting that the cell doors would be solid with only a view window, thereby precluding the throwing of materials from one cell into another. The Court, however, has some other questions regarding the renovation of the infirmary that it would like defendants to address.

a. What are the staffing plans for this segregation unit?

b. Will the planned use for the infirmary allow defendants to comply with all of the requirements of the Consent Decree and the State Plan, particularly with respect to indoor and outdoor exercise?

c. How much supervision and surveillance will the cell doors allow?

d. What precautions have defendants taken to deal with flooding due to toilet overflows, particularly intentional ones?

e. Are there provisions for any programs involving small groups, such as education, worship, or group therapy?

f. Are there provisions for case management offices and related program support spaces?

Defendants should respond to these questions by September 30, 1986.

### 3. Procedure OP–DWA–40.02

On April 29, 1986 defendants submitted a revised procedure for the Identification, Referral, Evaluation and Treatment of Prisoners with Serious Mental Disorders Housed in Segregation Units in accordance with the Court's Order of February 21, 1986. *See* OP–DWA–40.02. The United States submitted some objections to defendants' revised procedure on July 7, 1986. The Court has reviewed the United States' objections, and believes that they may be well-founded. I also note, however, that the objections are based in part on the United States' concern that the revised procedure does not comply with the requirements of the Consent Decree even though it may comply with the Court's February 21st Order. In any event, defendants have not responded to the United States' objections. The Court accordingly will not make any rulings on the objections at this time, but rather will request the parties to attempt to settle their differences between themselves. Plaintiff shall inform the Court by September 15, 1986 whether defendants have satisfactorily revised OP–DWA–40.02. If the United States still has concerns about the procedure at that time, the Court will schedule a hearing to decide the issue.

### 4. United States' Motion to Strike

At the March compliance hearing the Court decided to allow the parties and *amici* to submit briefs on the *Knop amicus'* request to be allowed to participate in this proceeding as a litigating *amicus.* I stated that "I will just invite simultaneous briefs, and don't really want any response because I understand the issue, I understand what everybody is saying to me, and I just want to see if it is developed in any more persuasive manner by counsel between now and the 15th of April." Transcript of Compliance Hearing, Vol. III, at 520. Contrary to the Court's statement, the *Knop amicus* submitted a responsive brief on June 12, 1986. The United States accordingly filed a motion to strike such brief. As *amicus* argues, the Court did not explicitly forbid the parties from filing response briefs. It appears, moreover, that *amicus* did not receive the transcript page containing the Court's statement. The Court therefore will deny the United States' motion to strike. In fairness to the United States, however, I will give it until September 12th to file its own response brief, if it wishes to do so.

### OPINION OF SEPTEMBER 26, 1986 EXTENDING AUTHORITY OF INDEPENDENT PSYCHIATRIC EXPERT

The Court recently received a letter from Dr. James requesting clarification of his status in this proceeding. The Court has sent the parties and *amici* a copy of Dr. James' letter and its response to the letter. In accordance with the offer made by defendants at the May 8th and 9th hearing, the Court has decided to extend Dr. James' authority as an Independent Expert, with his fees and expenses to be paid by defendants, at least for the purpose of ensuring that defendants properly implement the recommendations which Dr. James and Dr. Benton made in their April, 1986 Review of the Comprehensive Plan for Mental Health Services, and which the Court adopted in its order of May 9, 1986. Transcript of Hearing and Rulings, vol. II, at 379–80 (May 9, 1986). The Court accordingly has requested Dr. James to testify at the October 24, 1986 hearing, and, if he desires, to

▬▬▬▬▬▬▬

submit written comments on defendants' mental health efforts by October 17, 1986. The parties and *amici* may respond to Dr. James' written comments, if any, either before or at the hearing.

The Court realizes that it ordered the parties and *amici* not to present witnesses at the hearing, with the possible exception of Ms. Burke by defendants. If it becomes obvious during the course of the hearing that the Court should hear live testimony from persons in addition to Dr. James and Ms. Burke before making any rulings, I will schedule an additional hearing.

### ORDER

In accordance with the opinion dated September 25, 1986;

IT IS HEREBY ORDERED that Dr. James' authority as the Court's Independent Expert is extended in accordance with such opinion and the prior orders of the Court;

IT IS FURTHER ORDERED that Dr. James shall testify at the October 24, 1986 hearing with regard to defendants' mental health efforts. Dr. James may submit written comments in advance of the hearing by October 17, 1986. The parties and *amici* may respond to such comments, if any, either before or at the hearing.

### BENCH OPINION OF OCTOBER 24, 1986 PURGING THE DEFENDANTS OF CONTEMPT REGARDING MENTAL HEALTH

▬▬ The Court called this hearing today for essentially two reasons: First, to determine whether defendants have purged themselves of contempt with regard to the mental health plan; and, secondly, something I will do in a few minutes, to discuss future scheduling problems. The hearing, of course, delved into questions of defendants' implementation of the Mental Health Plan as well as the substance of the plan. I believe, however, as I indicated, that the question of implementation is separate, albeit not completely distinguishable, from the issue of whether defendants have purged themselves of contempt.

The Court found defendants to be in contempt of court on May 9th, 1986, because they had failed to produce an acceptable plan for identifying and treating inmates suffering from serious mental illnesses, as required by previous orders of this Court; specifically, section II(A)(2) of the stipulation, the Court's oral order of February 13th, 1986, and the Court's written order of February 21st, 1986. At the May 8th and 9th hearing, the Court determined that defendants' Comprehensive Plan for Mental Health Services, commonly referred to as CPMHS or Plan Two, was unacceptable. I will not reiterate here the bases for that finding. The Court further determined at the May 8th and 9th hearing that defendants could purge themselves of contempt "by submitting by June 9, 1986, a detailed supplementary implementation schedule and specification designed to cure the mental health care deficiencies addressed in the Consent Decree and Stipulation." That is my order of May 9th, 1986, at page one. The Court listed a number of provisions that this schedule and specification should contain, and ordered defendants also to "conduct an epidemiological study to determine the prevalence of serious mental illness and associated treatment needs." Finally, the Court stated that it would consider the documents submitted pursuant to paragraph three of the order and either "accept the submittal or order additional changes along with coercive or punitive sanctions as may become necessary." That comes from the order at page three.

Defendants submitted a schedule and specification on June 9th, 1986, in accordance with the Court's order. Plaintiff and *amici* thereafter submitted critiques of the schedule and specification that, in the Court's mind, raised issues that needed further study. I thus scheduled this hearing, ordered defendants to respond to several questions I had about their schedule and specification and Plan Two, and requested Dr. Benton and Dr. James to express their views on defendants' compliance efforts. Opinion and Order of August 29, 1986; Opinion and Order of September 26, 1986. Defendants responded to the Court's questions, plaintiff and *amici* submitted addi-

tional comments, and Dr. Benton and Dr. James prepared an additional report on defendants' mental health plan prior to this hearing. I believe that these submissions further defined the ambiguities in defendants' plan and the areas in which further modification and/or clarification was needed.

The Court finds that defendants, with the assistance of Dr. Benton, Dr. James, plaintiff, *amici*, and this Court, have satisfactorily explained these ambiguities, and for the most part have provided appropriate modifications and/or clarifications of Plan Two and the June 9th implementation schedule and specification, and have otherwise resolved most of the Court's concerns about Plan Two and the implementation schedule and specifications. The Court further finds that defendants' Comprehensive Plan for Mental Health Services, as modified, clarified, etc., by the following: A., the June 9th, 1986, Implementation Schedule and Specification; B., the representations defendants made in their July 17, 1986, response to the plaintiff's and *amici's* criticisms of their June 9th submission; C., the representations defendants made in their response to the questions the Court posed in its order of August 29, 1986; and D., the representations defendants made at this hearing, on October 24, 1986, satisfies the requirements of Section II(H)(4) of the State Plan for Compliance and the other applicable orders of the Court, and therefore, should be and is accepted by the Court.

This finding, of course, preempts the Court's February 21, 1986, acceptance of the Comprehensive Psychiatric Services Plan submitted by defendants on October 9th, 1985, as the plan required by Section II(H)(4) of the State Plan for Compliance. It also means, of course, that the Court accordingly finds that defendants have purged themselves of contempt in accordance with the Court's May 9th, 1986, order.

The Court's acceptance of Plan Two, along with its various clarifications, modifications, etc., is, however, subject to the following qualifications: First, defendants are still obligated, of course, to produce the manual or system of manuals required by paragraph 3(f) of the Court's May 9th order. Secondly, defendants are still obligated to complete and implement the epidemiological study required by paragraph four of the Court's May 9th order in accordance with the provisions of that paragraph; and I have been told today they will do that. Third, the Court has determined only that defendants' Plan Two, along with its various clarifications, modifications, etc.,—that I have referred to—is acceptable as a means by which defendants intend to comply with the applicable substantive requirements of the Consent Decree, the Stipulation, the State Plan for Compliance, and the other applicable orders of this Court. The Court is expressing no opinion whatsoever on whether defendants are making adequate progress in implementing the provisions of this Plan or are otherwise in compliance with the substantive requirements found in the above documents. I note, however, that the testimony of Dr. James and other information elicited at this hearing suggests that defendants are experiencing some implementation difficulties. The Court, as evinced by its questions and comments at this hearing, intends to keep a close eye on this situation. I stress again that I have only determined that defendants have produced an acceptable "plan" for the provision of mental health services to inmates suffering from serious mental illnesses. I sincerely hope that defendants will be able to implement this "plan" successfully, and will otherwise be able to comply with the substantive requirements of the applicable orders of the Court.

Fourth, the Court, of course, retains jurisdiction to resolve any disputes that may arise regarding defendants' modification, clarifications, etc., of the Comprehensive Plan for Mental Health Services. Fifth, I agree with Ms. Alexander with regard to the ratio of outpatient teams with regard to average versus maximum, at page seven of the defendants' October 13th submission. There is a sentence on page seven which says that this staffing allows for each outpatient team to serve an average case load of approximately 192 patients. The Court, reading page 14 of the original

submission in April of 1986, of Dr. Benton's and Dr. James' review of the Comprehensive Plan for Mental Health Services, finds on page 14 the following sentence toward the top of the page, quote: "Given the above figures, the average psychiatrist might be able to support an active case load of 192 patients at any time." End quote. "Average" refers to psychiatrists, not the size of the case load. The Court's interpretation, therefore, is that the report means that an outpatient team should in no event handle more than 192 patients at any time. Therefore, with that caveat, those five caveats, the Court approves the plan, finds the defendants have purged themselves of contempt.

Now I chose at this stage to say the following, a couple of comments. First of all, I agree with Dr. Benton that this is a happier day for me and for the Court and for the inmates than I found in the past couple of years, particularly with regard to the mental health plan, and I congratulate the State of Michigan and all of the defendants for all the work that they have put in to try to make the situation work. There has rarely been any question of the good faith of the State of Michigan anyway. There has been a question of other things impeding progress. I am pleased with—I was pleased with the reaction of the State of Michigan in the beginning, the settlement of this lawsuit before it was ever filed; and I continue to be pleased with the efforts put in by many, many people, at least six of whom are in this room, and they deserve the accolades and the applause of this Court, and they hereby receive them from me.

A word of, a word of caution—and I don't think it is even necessary. The fact that I am as pleased as I am with the final, the finalizing of the plan, and the removal of the punitive sanctions should not be interpreted by those not in this room employed by the State of Michigan into believing that now it is time to coast, and that we are over the hurdle of the June 9th submission and the October 24th hearing. I hope that the lawyers here and Ms. Burke will communicate to those who are not here and unable to hear my words. I find it to be a

good day, and I am pleased that things were possible. I am pleased by the prospect that we can get some help from the University of Michigan, from Wayne State University, and from Michigan State University.

I think that while we are doing that, and I intend to have the lawyers stay around for a few minutes after we adjourn today so we can talk about what I intend to do with regard to that, that we ought to be looking for the quality assurance person that we have been so concerned about. Here is the ideal place to find a quality assurance person; and I hope that we can do that as well in our recruiting efforts, Ms. Burke, and others. And I am pleased that the State is willing to cooperate with me in this regard. Well, there are some other issues that concern the Court, and the Court wanted to get to today, and simply did not. Particularly am I concerned about the fire safety, the fire safety issue, and I had hoped that we would be able to get to it today. We did not get to it today.

So what I am going to do is, if I can find all of my notes, is the following: I stated in my opinion of August 29th that the parties and *amici* should be prepared to discuss future scheduling of a compliance hearing and/or other means for assessing the defendants' level of compliance with the terms of the Consent Decree, the State Plan for Compliance, and the Stipulation. The Court believes that it would be better to hold a series of one to two-day hearings on specific issues as opposed to the four or five-day hearing on all of the issues. I think this format will be more manageable and would allow me to focus on specific problems, specific areas. In particular, I see a need to examine the areas of fire safety and sanitation, safety and hygiene. Defendants filed a motion on September 29th, less than a month ago, for permission to modify certain parts of the state plan as they relate to fire safety. The Court recognizes the basis for the defendants' request, but believes that it must be judged in the context of the defendants' efforts to maintain an adequate level of fire safety

today at the institutions. I therefore believe that we need, and I am going to order, a mini-hearing of two days on fire safety before I will turn my attention to the defendants' pending motion.

The times that I selected during the recess for this hearing are January 15th and January 16th, 1987. That is a Thursday and Friday. I have cleared those dates with Dr. Benton, and they are acceptable to him. I am ordering him, however, to accelerate the Independent Experts' report with regard to the fire safety issue, so that we will have something, all of us, to go on when we have that hearing. If the parties wish to submit any further written communications with regard to the fire safety issue, I already have a lot of submissions, and those submissions are due by January 2nd, 1987. I also want by January 2nd the parties to indicate to the Court what witnesses they intend to produce with regard to the fire safety issue. I am prepared after that to submit to the parties—I will give you some proposed dates with regard to the other issues.

### ORDER OF OCTOBER 29, 1986 PURGING DEFENDANTS OF CONTEMPT

In accordance with the opinion rendered at the hearing held on October 24, 1986;

IT IS HEREBY ORDERED that the Court accepts defendants' Comprehensive Plan for Mental Health Services, as modified, clarified, *etc.*, by the following: (a) the June 9, 1986 Implementation Schedule and Specification; (b) the representations defendants made in their July 17, 1986 response to the plaintiff's and *amici*'s criticisms of their June 9th submission; (c) the representations defendants made in their response to the questions the Court posed in its order of August 29, 1986; and (d) the representations defendants made at the hearing held on October 24, 1986, as the plan required by Section II.H.4 of the State Plan for Compliance and the other applicable orders of the Court;

IT IS FURTHER ORDERED that the Court accepts this plan subject to the qualifications stated at the hearing;

IT IS FURTHER ORDERED that defendants have purged themselves of contempt in accordance with the Court's Order of May 9, 1986;

IT IS FURTHER ORDERED that the Court shall conduct a hearing on Fire Safety on January 15 and January 16, 1987, to begin at 9:00 a.m. on each day; plaintiff and defendants shall submit whatever further written information they wish on this issue to the Court by January 2, 1987; *amici* shall file their written submission by January 9, 1987; the parties and *amici* shall file their witness lists by January 2, 1987.

### OPINION AND ORDER OF JANUARY 29, 1987 ENFORCING THE FIRE SAFETY PROVISIONS OF THE CONSENT DECREE, THE STATE PLAN FOR COMPLIANCE, AND THE STIPULATION, AND GRANTING DEFENDANTS' REQUEST FOR MODIFICATION OF THE STATE PLAN

*Introduction*

On January 16, 1987 the Court held a hearing on defendants' efforts to comply with the fire safety requirements of the Consent Decree, the State Plan for Compliance, and the Stipulation. The Court considered two issues concerning those requirements: (1) whether defendants were, in general, complying with them; and (2) whether it should grant defendants' September 29, 1986 Request for Modification of the State Plan, and thereby excuse defendants' failure to have complied with several of the fire safety requirements. In developing the following opinion and the accompanying order, the Court considered the entire record of this case, and in particular the following evidence, which was prepared specifically for the January 16th hearing: (1) the January 1987 Report of the Independent Expert, which is entitled *Compliance Evaluation of Fire Safety Provisions;* (2) the testimony the Independent Expert, Dr. F. Warren Benton, presented at the hearing; (3) the testimony defendants' witnesses, George Walter and

Richard Hinds, presented at the hearing; (4) the testimony plaintiffs' expert witness, George Gray, presented at the hearing; (5) defendants' exhibit 1, which they introduced at the hearing; and (6) plaintiff's exhibits 1, 2, and 3, which were also introduced at the hearing. The Court stated at the conclusion of the hearing that it would take defendants' Request for Modification of the State Plan and defendants' efforts to comply with the fire safety requirements of the decree documents under advisement, and issue a written opinion and order.

As I will discuss in the following opinion, the Court finds that defendants are substantially *not* in compliance with the fire safety requirements of the decree documents. Defendants' noncompliance not only violates their solemn agreement with the plaintiff and the Court, as embodied in the Consent Decree, the State Plan for Compliance, and the Stipulation, to remedy dangerous conditions of confinement at the decree institutions, but also presents a serious risk of harm to the physical safety of the inmates confined at those institutions. The Court therefore reluctantly concludes that it must take significant action, as embodied in the order accompanying this opinion, to ensure that *all of the defendants* do everything within their power to fulfill their commitments to the plaintiff and the Court. As the Court informed the parties at the start of the hearing, it believes that defendants bear the burden of explaining four issues: (1) why they have failed to meet all of the applicable fire safety deadlines; (2) why the Court should in effect excuse their noncompliance and allow them yet more time to meet those requirements; (3) what assurances can they offer that they will in fact meet their new dates; and (4) what can they do to promptly enhance operational fire safety to mitigate the extended period of physical risk to the inmates that their request will cause. Before discussing these issues, defendants' compliance efforts, and defendants' Request for Modification of the State Plan, the Court will briefly discuss the history of this case regarding fire safety. I believe that this discussion will help to put current matters in the proper perspective.

## Background

The Court record shows that the events that led to the filing of this action began on October 9, 1981, when the United States sent William G. Milliken, who at that time was the governor of the State of Michigan, a letter announcing its intention to commence an investigation into conditions of confinement at the State Prison of Southern Michigan, the Michigan Reformatory, and the Marquette Branch Prison, pursuant to its authority under the Civil Rights of Institutionalized Persons Act of 1980. Attorneys for the plaintiff met with the Governor and other state officials on October 29, 1981 to discuss the scope of the investigation and other related matters. Between November 2, 1981 and April 4, 1982 plaintiff conducted six expert tours of the subject institutions, reviewed numerous official documents, and interviewed many witnesses. With regard to fire safety, a Mr. Jay Farbstein toured the institutions between March 29, 1982 and May 4, 1982 on plaintiff's behalf. Pages five through twenty-three of Mr. Farbstein's report on this tour, which deal with fire and life safety, make for some very interesting reading. J. Farbstein, *Report to the US Department of Justice Civil Rights Division on Life Safety, Architectural and Environmental Conditions in Three Michigan Prisons*, attached as part of exh. A. to Plaintiff's Feb. 24, 1984 *Memorandum in Support of Proposed Consent Decree* [hereinafter cited as "Farbstein Report"]. I think that it is proper for the Court to quote some portions of Mr. Farbstein's report at this time, to illustrate the seriousness of the fire safety issue:

> Correctional institutions are prone to very serious fire dangers. Because of open grills and bars, smoke can travel freely from one area to another. Since inmates are confined and are not free to remove themselves from exposures to heat or smoke, they are dependent for protection on the structure and for evacuation on the staff.
>
> Studies have shown that [it] is usually the toxic products of combustion which

cause the most serious injury. Relatively few inmates actually burn to death, while many are overcome and killed from inhaling smoke and fumes.

When fires erupt, they test both the ability of the structure to resist flame and smoke spread, and of the staff to control the fire and, if necessary, to release and safely evacuate the inmates. Under these highly stressful circumstances, even well meaning staff often fail with tragic consequences.

Farbstein Report at 5–6. Mr. Farbstein had many specific criticisms of fire safety at the subject institutions:

In general, provision for the protection of life from fire and smoke are appallingly deficient in the institutions visited. With the exception of certain essentially brand new facilities ... or facilities which are administered with a degree of independence ... there appears to be very little regard for life safety at these institutions.

Not only are the *facilities* entirely outmoded with respect to provision of exists, smoke enclosures, unlocking systems, marking of exits, and other physical facility issues, but of equal concern is the total inadequacy of *planning and operations* to cope with fire safety.

The only fire and life safety features commonly (though not universally) found throughout the institutions are fire extinguishers and emergency lighting.

[With regard to facility issues], Due to the size and design of most cell blocks, there are far too many inmates contained within each "smoke enclosure." From 300 to 500 inmates in each of the larger blocks are exposed to the hazards of their co-inhabitants in a situation where smoke can flow freely from one cell to another through bars and grills. No smoke evacuation system was observed in any of these blocks. Nor was any of the blocks equipped with sprinklers.

Due to outmoded locking systems, it would take staff an inordinantly long time to unlock the cells. Some staff would have to unlock the individual cell doors of an entire tier ... while others would have to operate four gang locks on each of five tiers.... The exit ways (consisting of passages, stairs, and doorways) are totally inadequate for the number of people they serve....

Not only are exit ways far too narrow, but the distance from many living areas to the point of exit from their smoke enclosure are much too great.

In addition a number of living areas have only *one* means of egress for their inmates, rather than meeting the requirement of *two remote* exits. If the one path of exit were blocked, many inmates would find no alternative and be stranded in an exposed and dangerous location....

Exit ways are almost universally unmarked, while they are required to have permanently illuminated exit signs....

There is an almost universal lack of smoke and/or heat detectors and of fire alarms which are necessary for the early detection and notification of emergencies. Nor are there automatic linkages to the local fire departments.

Farbstein Report at 8–10 (emphases in original). Similar criticisms are enumerated in the remainder of the report. The Court realizes that defendants have cured some of many of the problems Mr. Farbstein identified in his report and recognize their obligation to attack the remainder of them. I read these excerpts primarily to illustrate defendants' awareness of the fire safety problems at the subject institutions, and the serious risk of harm those problems pose to the inmates. I note, however, that defendants' Request for Modification of the State Plan directly implicates some of the more serious problems Mr. Farbstein identified in his report: such as not having ganglocks for all cells, not having two remote exits with appropriate doors, not having appropriate separations between smoke enclosures, not having sprinkler systems, and not having appropriate exit and directional signs.

On October 29, 1982 plaintiff officially notified defendants of its conclusion that at the subject institutions it had discovered what it believed "to be a pattern or practice

of egregious or flagrant conditions that are subjecting the prisoners incarcerated in each facility to grievous harm in violation of their Eighth Amendment rights." Letter of October 29, 1982 from Wm. Bradford Reynolds to Governor Milliken, attached as ex. B to plaintiff's February 24, 1984 *Memorandum in Support of Proposed Consent Decree.* Plaintiff had the following to say with regard to fire safety:

> ... Our life safety expert cautions that inadequacies in these prisons' provisions for fire safety threaten a disaster as major as any seen in a correctional facility. For example, facilities often lack necessary smoke separations, smoke detectors, alarms, remote exits, illuminated exit signs, posted evacuation procedures, and appropriate cell locking mechanisms. Fire safety and suppression equipment is inadequate, and professional inspections are too infrequent, if they occur at all. Staff training and staff and inmate drilling are inadequate, and certain areas often are understaffed or unstaffed at certain times, presenting a severe fire hazard to inmates locked in their cells. In addition, there is a critical overall lack of professional supervision of maintenance, sanitation, and fire safety.

Letter at 3. The parties thereafter undertook extensive negotiations to attempt to resolve the problems plaintiff had identified. By January, 1984 the parties had reached a formal agreement on those problems. The Court notes that the parties reached this agreement over two years after plaintiff had initially informed defendants of its concerns, and after over one year of extensive negotiations. These negotiations presumably involved the highest levels of state government.

On January 18, 1984 plaintiff filed its complaint against defendants, and concurrently filed a motion for the Court to accept the parties' negotiated settlement, which consisted of a five page Consent Decree and a forty-nine page Plan for the Michigan State Prisons. I note here that the following persons and entities were named as defendants in the complaint: State of Michigan; Governor Blanchard; the Michigan Corrections Commission, and

its members; the Michigan Department of Corrections; Perry M. Johnson, the director of the MDOC; Robert Brown, Jr., the Deputy Director of the MDOC; Dale Foltz, Warden at the SPSM; John Jabe, Warden at the Michigan Reformatory; Theodore Koehler, Warden at Marquette; John Prelesnik, the Administrator at the Reception and Guidance Center; and Jack Bergman, the Administrator at the Michigan Intensive Programming Center. Of course, new persons have been substituted for some of the individual defendants. See FRCP 25(d). Following several hearings, the Court finally approved entry of the Consent Decree and the State Plan for Compliance on July 13, 1984. These two documents contain many requirements concerning fire safety, which I will not enumerate at this time.

On June 21, 1985 the Court approved a stipulation between the parties that extended certain of the defendants' fire safety compliance deadlines. Specifically, defendants received extended deadlines for the installation of fire extinguishers; for the clearing of exitways; for the storage of combustibles; for the establishment of emergency evacuation procedures; and for the development and implementation of a program for the inspection of smoke detection units. In March and April of 1986, the Court held its first compliance hearing in this case. A major concern at the hearing was defendants' compliance with fire safety requirements. The Court stated in its July 22nd opinion on the hearing that the area of fire safety "[i]n many respects ... presents the most troublesome problems of noncompliance." The Court proceeded to discuss several deficiencies in defendants' performance that it will not repeat. I do note, however, two statements that are currently applicable: (1) that "[t]here are ... several ... crucial ... areas in fire safety in which compliance is due this month, July, 1986, and yet defendants do not expect to be in compliance"; and (2) that "[g]iven the serious danger that fire poses in the prison setting, the Court expects defendants to make these requirements one of their top priorities." Opinion of July 22,

1986 at 4. The areas of fire safety in which compliance was due in July, 1986 are adequately listed and discussed in the Independent Expert's February, 1986 report and the transcript of the compliance hearing. See February 1986 Report at 72–76; Transcript at 467–92. In the order accompanying the July 22nd decision, the Court ordered defendants "[t]o report, by October 1, 1986, on their efforts to implement the requirements with respect to which compliance was due July, 1986." Order of July 22, 1986, ¶ I.J.

In accordance with the Court's order, on September 29, 1986 defendants submitted a report, of sorts, on their efforts to implement the requirements for which compliance was due in July, 1986. The "report" consisted of defendants' Request for Modification of the State Plan. In this request, defendants ask the Court to modify the State Plan, and, as plaintiff and the *amici* point out, by implication the Consent Decree as well, to extend significantly the deadlines for completion of most of the fire safety construction projects that are required by section III, subsection E, of the State Plan for Compliance. These projects constitute items number 22 through 37 of the Independent Experts' February, 1986 and January, 1987 reports on fire safety. The Independent Experts' January, 1987 report indicates that defendants are in complete compliance with respect to only two of these sixteen items: (1) the breathing apparatus requirement (number 26); and (2) the requirement of a fire separation for the control room at MIPC, which is now part of the MBP (number 30). On all of the other requirements, defendants are in either partial or complete noncompliance. The Court will briefly discuss six of these requirements to illustrate its perception of the problem.

The State Plan obligated defendants to provide within two years of the date of the plan's approval, or by July, 1986, "in each cellblock or other housing area and in each activity, work, or indoor recreation area (including farm basement), no fewer than two operational remote exits with doors properly swinging to facilitate the flow of egress." Mr. Farbstein discussed the critical nature of this requirement in his 1982 report. Defendants asked in their September request that the Court extend the deadline for completion of this requirement until November 1, 1987 for MBP and MR, and until December 15, 1987 for SPSM. In his February, 1986 report the Independent Expert stated that defendants' staff had informed him during a tour of the institutions that January 1, 1987 was a realistic deadline for meeting that requirement. Report at 72. At the March compliance hearing, Mr. George Walter testified that October, 1986 was a possible deadline for that requirement. Transcript at 473. He also stated that defendants were proceeding with the work, and that "[t]here is not a tremendous amount of work on second exits, actually." *Id.* at 472–73. Indeed, in their request for an extension, defendants note that "[t]he work basically involves installation of new second exit doors and changes in the 'swing' of existing doors." Defendants' Memorandum in Support of Request for Modification at 4 [hereinafter "Defendants' Memorandum"].

Despite the apparent ease of this project, however, defendants have given the Court, either directly or indirectly, at least five different deadlines for its completion: the original date of July, 1986; the date of January 1, 1987 mentioned in the IEs' report; Mr. Walter's date of October, 1986; the dates listed in the Request for Modification; and, most recently, the dates listed in Defendants' Exhibit 1, introduced at the hearing. The latter set of dates indicate that defendants will not achieve full compliance until November, 1988, despite the dangers posed by the lack of second exits and doors that do not swing in the right direction.

A second requirement is for the installation of ganglocks in each housing unit "that will allow for the remote immediate unlocking of cells." This requirement applies at the SPSM—Central Complex. Defendants estimated a completion date of December 15, 1987, almost one and one-half years behind schedule, in their Request, and a completion date of February 28, 1988 at the hearing. Defendants' non-

compliance exists, and they request a significant extension of the June, 1986 deadline, despite the presumed importance of being able to release inmates quickly in a fire emergency.

A third requirement is for the enclosure of certain stairwells with two-hour fire resistant construction. The Independent Experts' January, 1987 report indicates that MR and MBP, but not SPSM, are in compliance with this requirement. Defendants estimated in their Modification Request that SPSM will not be in compliance until September 15, 1987, over one year behind schedule, and stated at the hearing that they will not complete construction until March 1, 1988, even though the project involves only three stairwells within the SPSM complex. Defendants' Memorandum at 6.

The fourth requirement is for the installation of magnetic hold-open devices on fire and smoke doors in areas where those doors are kept open. The IE indicates that defendants are in complete noncompliance on this requirement. At the hearing, defendants requested extensions for compliance until June 1, 1987 for MBP, July 1, 1987 for MR, and an undetermined date for SPSM. All three proposed extensions far exceed the July, 1986 deadline for what appears to the Court to be a relatively simple project.

The fifth requirement is for the provision of automatic sprinklers in the basement of buildings 18 and 19 at SPSM, the Central Complex. Defendants stated at the hearing that they anticipate that the sprinklers will be installed by no later than November 1, 1987. As I discuss later in this opinion, however, they have failed to provide the Court with any acceptable explanation of why this specific project is more than one year behind schedule.

The final requirement is for the provision of smoke barriers between sleeping areas and other areas in dormitories and farm barracks. Defendants state that MR and MBP should be in compliance on this requirement, but request an extension until March 1, 1988 for the Wing Farm at SPSM. Once again, the Court does not completely understand why defendants have failed to complete this project—which does not appear to be too difficult—on time.

The Court could continue this discussion for some time—drawing from both the Independent Experts' report and the defendants' December, 1986 Semi–Annual Compliance Report—but will save further discussion for later in this opinion. I believe that what I have said suffices to establish the basis for the Court's concern at the hearing. Before further discussing defendants' compliance efforts and Request for Modification of the State Plan, I note that in their December report defendants indicated for the requirements that were due in July, 1986 that the Court had already granted the requested extensions on that deadline, as opposed to marking themselves as being noncompliant. So that the record is clear for whomever may bother to read those reports, defendants should have marked themselves as not being in compliance on those requirements rather than as having been granted extensions on the compliance deadline.

### Analysis of Defendants' Compliance Efforts

The Court will divide the fire safety requirements of the decree documents into two major areas, and will discuss separately defendants' efforts to comply with each set of requirements. The first area covers the capital or physical improvement projects defendants have agreed to perform. This in general covers items number thirteen (13), fourteen (14), and nineteen (19) through thirty-seven (37) of the Independent Experts' report. The second area covers what I will broadly describe as the operational aspects of defendants' fire safety commitments. This area covers the remaining items in the Independent Experts' report. The Independent Experts thoroughly discussed all of the fire safety requirements in their report.

Before discussing specific fire safety requirements, the Court observes that the parties and the *amici* agree with most of the Independent Experts' findings and conclusions regarding fire safety. Thus, with

the exception of the following findings and conclusions, the Court adopts the Independent Experts' January, 1987 *Compliance Evaluation of Fire Safety Provisions* as a complete and accurate representation of defendants' compliance efforts. There are seven items that require some clarification and modification.

The first is item number 12, which concerns fire extinguishers. The rating for MBP–Inside for this item should be changed from a two (2) to a four (4). The second is item number fourteen (14), which concerns fixed dry chemical fire extinguishers in kitchen range hoods. The rating for SPSM, central complex, should be changed from a one (1) to a five (5), and the rating for SPSM, south complex, should be changed from a one (1) to a four (4). Third, the ratings for SPSM central complex, north complex, and the reception and guidance center for item number twenty-eight (28), which requires the installation of fire separation between cellblocks, should be changed from sixes (6s) to ones (1s). Defendants apparently installed fire separators, but they were inadequate and the project needs to be redone. The fourth change is that since MR now has a fire safety officer, the ratings for items number two (2) and ten (10) for that institution should be changed from ones (1s) to sixes (6s).

The fifth change concerns the Independent Experts' determination that the SPSM central complex and reception and guidance center are deficient in keeping their exits clear and in storing combustibles. I find based on George Gray's report and testimony at the hearing and on defendants' representations at the hearing that the defendants are in compliance with items number three and four of the Independent Experts' report at the CC and the R & GC. The ratings for those items at these institutions thus should be changed from twos (2s) to fives (5s) or sixes (6s). The sixth change concerns the Independent Experts' finding that SPSM, Central Complex is not in compliance with item number 21, which concerns magnetic hold-open devices for doors. Defendants explained at the hearing that the old infirmary is no longer being used as

a hospital, and that the hold-open devices accordingly are not required since the doors are no longer held open. The rating for this item therefore should be changed from a two (2) to a six (6). The final change concerns defendants' attempts to implement items number twenty (20) and twenty-one (21), which concern ceiling tiles, at the MBP. Defendants explained at the hearing that the areas that still need work are in classrooms and the visiting area, not in inmate housing or exit areas. The Court believes that the one (1) rating should remain since defendants are not in full compliance with this requirement, but does not consider this noncompliance to pose a serious threat to inmate safety.

With the exception of these seven changes, the parties and *amici* agree with and accept the Independent Experts' findings and conclusions. Anyone reading the Independent Experts' report will realize that by accepting these findings and conclusions, defendants have acknowledged that they have failed to comply with many fire safety requirements, and in particular with the requirements that fall within the area of capital improvement projects. The Court does not believe it needs to discuss every aspect of defendants' noncompliance. Rather, I will simply discuss (1) some of the highlights to illustrate the seriousness of the situation, (2) defendants' explanations for why they are not in compliance with the fire safety requirements, and (3) the measures the Court can take to ensure compliance in the future.

### A. *Capital or Physical Improvement Projects*

With regard to the capital or physical improvement projects defendants have agreed to perform, the Court discussed the highlights of defendants' noncompliance in this area earlier in this opinion. I would add only that the testimony at the March, 1986 compliance hearing, defendants' request for modification of the state plan, the Independent Experts' January, 1987 report, the exhibit defendants introduced at the January 16th hearing, and the testimony of defendants' witnesses at that hearing

evince defendants' repeated and continuing inability to complete these projects in a timely manner. Rather than further detail the extent of defendants' noncompliance, the Court believes it would be more profitable to examine defendants' responses to the first two of the four questions the Court posed at the beginning of this opinion: (1) why have defendants failed to meet the fire safety construction deadlines; and (2) why should the Court excuse their noncompliance and allow them more time to complete the construction projects.

Defendants' primary witness on these two issues was George Walter, who is the supervisor and coordinator for the fire safety construction projects, or at least for those aspects of the projects over which the Department of Corrections has control. In very detailed and extensive testimony on the physical improvement projects, Mr. Walter weaved a sad, and judicially frustrating, tale of bureaucratic incompetence and lack of foresight and initiative at the highest levels of state government. Mr. Walter started his testimony by informing the Court that most of the extensions that defendants had requested in their September 29th Request for Modification of the State Plan—which defendants had formulated only after an extensive meeting with the plaintiff and its expert witness in July, 1986—were inadequate, and that defendants needed yet more time to complete their projects. He then introduced a new schedule of completion dates, this time including interim dates for significant steps in the planning, approval, and construction process. See Defendants' Ex. 1. Mr. Walter testified that these new completion dates and interim deadlines represented the best effort of department personnel to provide the Court with an accurate schedule with which defendants could comply.

Mr. Walter then proceeded to discuss the requested extensions, explaining why the projects had not proceeded on schedule and how the Department planned to attempt to ensure that the new deadlines will be met. The Court does not believe it needs to repeat Mr. Walter's testimony in detail. I will, rather, discuss three aspects of Mr. Walter's explanations that I find significant.

First, Mr. Walter's testimony revealed a significant and serious lack of concern about and coordination of these fire safety projects within state government. There was a significant lack of foresight on the part of defendant the State of Michigan on how it was going to complete the physical improvement projects it had agreed to in the State Plan for Compliance. This lack of foresight existed despite the fact that defendants had agreed to the Consent Decree and the State Plan for Compliance only after extensive negotiations with the plaintiff that had presumably involved the highest levels of state government. It is also clear that completion of these projects has not been a major, or even a significant, priority of the State. This lack of concern, foresight, and priority is apparent in the lack of inter-agency cooperation on these fire safety projects. Mr. Walter testified, for example, to several instances of where progress on a project has been delayed pending another agency's review of a certain aspect of the project. This lack of concern, foresight, and priority is also evident in defendants' failure to anticipate the need to comply with Department of Labor and State Fire Marshal regulations for projects costing more than $15,000, and in their failure to expedite compliance with those regulations once they became aware of them.

Second, the Court believes that the Department of Corrections itself has failed to make completion of these construction projects a priority, and has failed to coordinate its efforts to complete them. With regard to the first factor, the Court notes that the Department has failed to staff Mr. Walter's office adequately, has burdened Mr. Walter with many assignments that have adversely affected his ability to coordinate the construction projects, and, perhaps most egregiously, failed to cover for Mr. Walter's responsibilities when he was out for *fourteen (14) weeks* with a back injury. With regard to the second factor, Mr. Walter testified to two instances—one involving a study of electrical generator capacity at the subject institutions and the

other involving a decision by the Fire Marshal to reject a smoke detection or smoke barrier project—of where he was not timely informed of decisions, actions, or lack of action that adversely affected defendants' ability to complete the construction projects. The Court believes that Mr. Walter and other individuals within the Department are making a good faith and concerted effort to complete the projects. Any task of this magnitude, however, requires more than individual effort. Such tasks also test organizational ability, dedication, and competence, which appear to be lacking in this instance.

Finally, it appears that defendants may have tried to accomplish too much at once, without adequately thinking through and examining the ramifications of attempting to plan and to complete several major construction projects simultaneously. Mr. Walter testified, for example, to instances of where defendants' decision to lump several projects together, and to schedule sequential completion times for projects, caused some delay.

Defendants thus attempted to answer the Court's first two inquiries. Because of Mr. Walter's testimony, the Court understands why defendants have failed to meet the deadlines for the physical improvement projects. Defendants have not, however, answered the second inquiry to the Court's satisfaction, and, relatedly and perhaps more importantly, failed to address the third inquiry adequately at the hearing. With regard to the second inquiry, defendants' justifications indicate that they have failed to devote their full efforts toward complying with the fire safety requirements of the decree documents. As I stated previously, some individuals within the Department of Corrections have made significant efforts to bring the Department into compliance. The Court heard little or no evidence, however, that would indicate that all of the defendants—in particular Governor Blanchard, the State itself, including *all* of its departments and agencies, and the Corrections Commission—have made significant efforts to ensure compliance with the fire safety requirements. I thus fail to detect a reasonable excuse for defendants' noncompliance. The Court believes, moreover, that a solid, good faith effort by *all* of the defendants is a *sina qua non* for an unfettered extension of the compliance deadlines. *Cf. Kendrick v. Bland,* 740 F.2d 432, 439 (6th Cir.1984) (indicating that a court should consider a defendant's "cooperation and good faith" in fashioning a remedy for a constitutional violation).

More importantly, defendants failed at the hearing to offer the Court any reasonable assurances that they will in fact meet the new completion dates that they have proposed. Mr. Walter offered two reasons why the Court should have some confidence in those dates: (1) defendants formulated them after extensive consultation with all of the relevant department personnel; and (2) he will personally do his best to see that defendants meet the new deadlines. Mr. Walter acknowledged, however, that he could not offer the Court an ironclad guarantee, primarily for two reasons: (1) he has no control over the actions of other state departments and agencies; and (2) there are some factors, such as whether materials will be available on the open market when defendants need them, that are beyond even the State's control.

Defendants do not, of course, have much control over the second factor. They do, however, have control over the first factor, and Mr. Walter admitted toward the end of his testimony that the involvement of some person with the ability to coordinate the efforts and responsibilities of all of the state departments and agencies involved in the construction projects would aid defendants' compliance efforts significantly. The Independent Experts and plaintiff's expert, Mr. Gray, similarly indicated that someone in a position "organizationally superior to the agencies normally involved in the conduct of" the fire safety projects should become involved in the compliance effort. See Independent Experts' January, 1987 Report at 4; Testimony of George Gray (indicating that the Court should consider whether defendants have made the projects a priority and whether someone with sufficient authority is administering them, and

stating in particular that the Executive Department of the State must make the projects a State priority and not simply a MDOC priority). Defendants failed, though, to offer the Court any suggestions in this regard.

As the Court stated at the conclusion of the hearing, it is an easy finding to make that defendants are not in compliance with the requirements of the decree documents that concern physical improvements in fire safety at the subject institutions. The issue of how to remedy this noncompliance is a more difficult one to resolve, and is intimately connected to defendants' Request for Modification of the State Plan. The Court thus will defer any further discussion of that issue until it discusses defendants' Request.

### B. *Fire Safety Operations*

The Court was interested in two issues concerning fire safety operations at the January 16th hearing. First, it wanted to know if defendants are in compliance with the fire safety operations requirements of the decree documents. Second, as the Court indicated earlier in this opinion, it wanted to know what steps defendants could promptly take to enhance their fire safety operations and thus to mitigate the extended period of physical risk to which their inability to complete the physical construction projects will subject the inmates. With regard to the first issue, once again, the parties and *amici* agree that the Independent Experts' report accurately assesses defendants' compliance efforts. The Court thus will not discuss the level of defendants' compliance with the fire safety operations requirements, other than to make a couple of important observations.

First, defendants' compliance with those requirements, although much better than their compliance with the physical construction project requirements, is far from complete. I note in particular defendants' failure to conduct monthly inspections at SPSM; their failure to ensure that combustibles are removed from all cell bars at SPSM–CC; their failure to store oxygen bottles properly at the Welding School at SPSM; and their failure to implement in full the fire safety operations plan at SPSM and MR. With regard to the last issue, Mr. Gray testified that some of the posted evacuation diagrams are inaccurate and misleading and that the Scott Air Pack training at the MR and the SPSM obviously is inadequate; he noted that out of four guards he asked to demonstrate the pack, only one, who happened to be a trainer, was able to use it properly. The Court realizes, however, that defendants acknowledge their shortcomings in this area and are taking steps to remedy their noncompliance.

The real issue the Court must address in this area is whether there are steps defendants can take to enhance immediately their level of compliance in order to mitigate the danger posed by their failure to have completed the construction projects on time. The Independent Experts observed in their report, and Mr. Richard Hinds testified at the hearing, that defendants are taking a step in that direction by having Mr. Hinds work to coordinate fire safety operations at the three subject institutions, and thus to enhance the effectiveness of the fire safety operations plan. After the hearing, moreover, defendants submitted a document indicating that they are creating a full-time fire safety coordinator position. The Court agrees that this is a step in the right direction, and will discuss later what it wants defendants to do to mitigate the harm posed by their construction delays. For now, I will simply note that once again defendants offered little, if anything, at the hearing in response to the Court's fourth inquiry of what can be done to enhance operational fire safety immediately.

### *Defendants' Request for Modification and Remedies for Noncompliance*

Defendants' failure to have complied with the physical construction fire safety requirements of the decree documents has put the Court in a difficult position. Given that defendants do not dispute their ultimate obligation to complete the construction projects, the standards the Court discussed at the hearing for modifying a con-

sent decree are not completely relevant, although they do underscore the heavy burden defendants bear in convincing the Court that their requested modifications of the Consent Decree and the State Plan either are not inconsistent with the purposes of the Consent Decree, or if they are, that they can mitigate those inconsistencies by other means. The issue before the Court, rather, is what steps it should take to ensure that defendants come into compliance with the fire safety requirements of the decree documents as soon as possible. This issue breaks down into three subissues: (1) whether defendants' new proposed deadlines are realistic; (2) what actions the Court should take to ensure that the defendants adhere to those deadlines; and (3) what actions it should take to mitigate the danger posed by defendants' requested extensions. Again, I emphasize that in addressing these issues, my primary concern is to fullfill, both in the short-term and in the long-term, the intent of the Consent Decree and the State Plan for Compliance to ensure the fire safety of inmates at the subject institutions. *See New York State Association for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967–71 (2d Cir.1983), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1984).

With regard to the first issue, the Court finds, based on Mr. Walter's testimony at the hearing, that the final and intermediate deadlines defendants propose in exhibit 1 are realistic. It also finds for the record that defendants have missed the July, 1986 deadline and cannot meet the deadlines they proposed in their September 29th Request for Modification of the State Plan. The Court therefore, with great reluctance and regret, accepts defendants' proposed extensions in the completion deadlines for the fire safety construction projects as set forth in the document defendants introduced at the January 16th hearing as Defendants' Exhibit 1. I accordingly will enter an order granting defendants' September 29, 1986 Request for Modification of the State Plan, as that Request is modified by Exhibit 1. I accept, moreover, not only the final completion dates listed in exhibit 1, but also all of the interim deadlines for

completion of relevant phases of the construction projects that defendants list in that exhibit. The Court therefore expects and orders defendants to comply with *all of both the interim and the final deadlines* given in Exhibit 1.

With regard to the second issue, the Court believes that the Independent Experts, Mr. Walter, and Mr. Gray have suggested a primary part of the answer to it, *i.e., all* of the defendants in this case must make completion of the fire safety construction projects one of their primary concerns and they must place in control of those projects a person with the authority to monitor and to administer them effectively. This monitor, coordinator, or administrator—whatever job title defendants wish to give her or him—must be in a position where she or he will be kept fully informed of any and all actions taken toward the completion of the projects and of any and all slippages that occur in the project timetables, and must have the authority to coordinate the activities of all of the relevant state agencies and departments and otherwise to ensure that any slippages are remedied immediately and that the projects are completed on time. Defendants' continuing inability to complete these projects leaves the Court with little choice but to order that they take stronger measures. They also seem to be unable to comply with general requirements, and require specific guidance on their compliance obligations.

With regard to the third issue, the Court believes that defendants need to take measures to ensure that the operational aspects of their fire safety program are sufficiently effective to mitigate the danger posed by the construction delays. The Independent Experts' Report, the testimony of Mr. Gray, and the testimony of Mr. Hinds indicate that the appointment of a full-time coordinator to oversee and to ensure compliance with the fire safety operations requirements of the decree documents would be an effective way to achieve that goal. The Court notes that defendants have indicated that they intend to appoint such a coordinator. The Court

also believes that defendants are fully capable of implementing in full all of the fire safety requirements that do not require physical improvements in the subject institutions.

In the order accompanying this opinion, therefore, I will require defendants to take appropriate actions, including the appointment of a full-time fire safety coordinator for the consent decree institutions, to ensure immediate and full compliance with the operational fire safety requirements of the decree documents. To the extent that any portion of my order may require defendants to take actions beyond those required by the decree documents, I believe that it is fully justified because of the extensive extensions defendants request in their construction deadlines and of the need to mitigate the danger that such extensions pose to the safety of the inmates confined at the subject institutions. With regard to this last statement, I note that Mr. Farbstein identified in his report the critical need for defendants to upgrade the physical structure of the decree institutions and that Mr. Gray recognized at the hearing the relationship between physical improvements at the decree institutions and operational fire safety.

In accordance with the above opinion, the Court will enter an order (1) finding defendants not to be in compliance with the fire safety requirements of the decree documents as set forth in the Independent Experts' January, 1987 Report and in this opinion, (2) granting defendants' modified September 29, 1986 Request for Modification of the State Plan, and (3) requiring defendants to take certain actions to ensure that they will come into compliance with the fire safety requirements of the decree documents as soon as possible. The Court realizes that defendants have made substantial improvements in the area of fire safety. I also realize that running a large prison system, particularly while concurrently attempting to implement extensive reforms, is a complex and difficult task. For that reason, the Supreme Court and the Sixth Circuit have consistently admonished district courts to act cautiously in requiring state officials to remedy unconstitutional conditions of confinement. *See Kendrick,* 740 F.2d at 438. Yet a Court is not required to stand by while a defendant violates the terms of a consent decree, particularly when the decree was entered after extensive negotiations between the parties, such defendant consistently has been unable to achieve compliance, and such defendant offers no compelling justification for its noncompliance. As the Sixth Circuit stated in *Kendrick,* "[i]n the event that the state fails to avail itself of the deferential opportunity to correct its constitutional defects with minimal federal intrusion, the federal court may implement a more intrusive remedy." *Id.* at 439.

In short, there is a limit to the deference a federal court must accord state officials. In the case of fire safety, I believe that I have just about exhausted my patience and deference. The testimony offered at the March, 1986 compliance hearing, the Independent Experts' January, 1987 Report, and the testimony offered at the January 16, 1987 compliance hearing demonstrate that the defendants—which include the State of Michigan and the governor of the State of Michigan—have not put forth their best efforts to bring the subject institutions into compliance with the fire safety requirements of the decree documents. The Court therefore believes that it is amply justified in entering the attached order.

### ORDER

In accordance with the opinion dated January 29, 1987;

IT IS HEREBY ORDERED that the Court finds defendants not to be in compliance with the fire safety requirements of the Consent Decree, the State Plan for Compliance, and the Stipulation, as identified and discussed in the Independent Experts' January 1987 *Compliance and Evaluation of Fire Safety Provisions* and in the Court's opinion;

IT IS FURTHER ORDERED that the Court GRANTS defendants' September 29, 1986 Request for Modification of the State Plan, as modified by the document defendants introduced as Defendants' Exhibit 1 at

the January 16th hearing, and ACCEPTS and ORDERS defendants to *comply in full* with the *interim and final deadlines* for completion of the fire safety construction projects that are contained in exhibit 1;

IT IS FURTHER ORDERED that within fifteen (15) days of the date of this opinion and order, Governor Blanchard, as a named defendant and as the chief executive officer of defendant the State of Michigan, shall designate an official who is or shall be located within the Office of the Governor, and who has or will have regular access to the Governor, to monitor the progress of the fire safety construction projects, to ensure the proper coordination, management, and execution of the work on those projects, and to report to the Court in the event that any of the interim and final deadlines set forth in Defendants' Exhibit 1, and adopted as an order of the Court, are not met. In such an event, the report from this official must (1) explain the reason(s) for the delay, (2) explain what actions defendants, including the State of Michigan and the Governor, have taken to correct the deficiency(ies), and (3) demonstrate why defendants should not be held in contempt of court and assessed monetary and other coercive sanctions for failing to meet the deadline(s). This official shall file an appropriate report with the Court within ten (10) days of any missed interim or final deadline;

IT IS FURTHER ORDERED that within ninety (90) days of the date of this opinion and order, the Department of Corrections shall implement and provide to the Court an enhanced fire safety operations program to mitigate the dangers and risks associated with the construction delays that defendants have proposed and the Court has accepted. This program must include, at a minimum, the following:

1. The appointment of a full-time coordinator of fire safety for the Consent Decree Institutions, who shall be approved by the Court;

2. The establishment of two full-time positions to assist the coordinator. One of these positions may be used to provide clerical support for the coordinator; the other position shall be used to provide a person to assist the coordinator in the development and implementation of procedures and training programs;

3. The provision of adequate staff at each Consent Decree Institution to implement the operational fire safety provisions of the Consent Decree, the State Plan for Compliance, the Stipulation, and, in particular, the Fire Safety Operations Plan. This staff shall include not less than one fire safety officer and one clerk for the Michigan Reformatory, one fire safety officer and one clerk for the Marquette Branch Prison, and one fire safety officer and one clerk for each of the three complexes—North, South, and Central—at the State Prison for Southern Michigan, at Jackson. Defendants shall authorize these positions within sixty (60) days of the date of this opinion and order, and shall fill these positions within ninety (90) days of the date of this opinion and order;

IT IS FURTHER ORDERED that defendants may request the Court to dissolve the above provisions concerning a project coordinator and an enhanced fire safety operations program once they have completed all of their fire safety construction projects and can demonstrate to the satisfaction of the Court that they possess the capacity to ensure continuing compliance with the fire safety requirements of the Consent Decree, the State Plan for Compliance, including the Fire Safety Operations Plan, and the Stipulation;

IT IS FURTHER ORDERED that the Court will conduct a compliance hearing on Medical Care, excluding Mental Health issues, on March 27, 1987, and will conduct a hearing on Sanitation, Safety, and Hygiene on May 15, 1987.

## OPINION OF MARCH 27, 1987 MODIFYING IN PART THE PARTIES' STIPULATION REGARDING MENTAL HEALTH CARE

At the October 24, 1986 mental health hearing the parties presented and placed on the record certain stipulations they had agreed to concerning defendants' mental health obligations. See Transcript of Oct.

24, 1986 Hrg. at 4–19. On January 16, 1987 the parties submitted a written version of their stipulations. On January 26, 1987 *amici* filed certain objections to the written stipulations. Independent of the *amici*'s concerns, the Court has its own problems with the parties' stipulations. Rather than having the parties file amended stipulations, the Court will modify their January 16, 1987 stipulations as follows:

1. *In-patient psychiatric hospital beds*

The Court has accepted defendants' use of the sixty (60) beds operated by the Department of Mental Health at the Ypsilanti Forensic Center to meet the one percent (1%) requirement the Court adopted in its May 9, 1986 Order. This acceptance, however, does not foreclose proof that to maintain an adequate level of mental health care, the Department must maintain sufficient unrestricted, actually used, bedspace to service one percent (1%) of the inmate population.

2. *Dormitory Space at the Riverside Comprehensive Care Unit*

The Court shares *amici*'s concern over this issue. The Court wants to receive defendants' proposed clinical criteria for placement in the dormitory, plaintiff's critique of those criteria, and defendants' final criteria, if I do not already have them. Beyond that, the Court for the present will trust that defendants will not place inappropriate inmates in the dormitory area.

3. *Staffing Ratios*

The Court accepts defendants' November 26, 1986 staffing ratios as a starting point. I note that these ratios may be altered during the JCAH accreditation process. *See* Order of May 9, 1986, ¶ 3.e). The Court's understanding is that JCAH accreditation for the Comprehensive Care Units is a compliance issue, at least for the present, and not a voluntary goal of the defendants. In its May 9th Order, the Court adopted the Independent Experts' recommendation that defendants seek some form of external accreditation or licensure of the CCUs. Defendants accepted this recommendation in their June 6th submission, and more specifically agreed to pursue JCAH accreditation in their October

14th response to the Court's August 29, 1986 questions. Implementation Schedule and Specification, § 3c., # 8 & § 3e); Defendants' Response of Oct. 14, 1986 at 4–5; *see also* Transcript of Oct. 24, 1986 Hrg. at 6 & 19–20. The Court specifically relied on this acceptance of JCAH accreditation in accepting defendants' Comprehensive Plan for Mental Health Services and in finding that defendants had purged themselves of contempt. *Id.* at 83 (relying on representations defendants had made "in their response to the questions the Court posed in its order of August 29, 1986" and on the "representations defendants made at this hearing"); Order of October 29, 1986. The Court thus believes that JCAH accreditation is a compliance issue at this time, and that such accreditation may affect defendants' staffing levels.

4. *Treatment of the Developmentally Disabled*

The Court does not interpret the parties' stipulation as supplanting either recommendation number seven (7) of the Independent Experts' April, 1986 Report or paragraph 3.d)7. of the Court's May 9, 1986 Order.

### ORDER

In accordance with the opinion dated March 27, 1987;

IT IS HEREBY ORDERED that the parties' January 16, 1987 Stipulations Clarifying Comprehensive Mental Health Plan and the Implementation Schedule are MODIFIED.

### SHOW CAUSE ORDER OF APRIL 1, 1987 REGARDING OVERCROWDING

In accordance with the oral opinion rendered at the hearing held on March 27, 1987;

IT IS HEREBY ORDERED that the Court shall conduct a hearing on overcrowding and sanitation, safety, and hygiene on May 20, 21, and 22, 1987 in Kalamazoo, Michigan;

IT IS FURTHER ORDERED that at such hearing, defendants shall be prepared

to show cause why they should not be held in contempt of Court for failure to comply with Section D.5. of the Consent Decree, section IV.A. of the State Plan for Compliance, paragraphs I.4. and II.D.1 of the June 21, 1985 Stipulation, and section V.A. of the Court's July 22, 1986 Order;

IT IS FURTHER ORDERED that the parties and *amici* shall be prepared to discuss the effects of overcrowding on the following requirements of the Consent Decree and the State Plan for Compliance:

—provisions relating to adequate staffing;

—provisions relating to surveillance and security;

—provisions relating to the delivery of required programs and services;

—provisions relating to out-of-cell activities;

—provisions relating to the appropriate assignment of inmates to housing units;

—provisions assuring that inmates likely to be violent will not be assigned to dormitory units;

—provisions relating to sanitation; and

—provisions relating to physical and operational fire protection.

The parties and *amici* shall also consider and be prepared to discuss conditions that existed prior to the hearing dates as well as conditions that can be anticipated based on defendants' plans, projects, and projections.

IT IS FURTHER ORDERED that the parties shall submit any reports of their expert witnesses to the Court, the Independent Expert, the other party, and *amici* by May 11, 1987.

### OPINION OF MAY 8, 1987 ENFORCING THE MEDICAL CARE REQUIREMENTS OF THE CONSENT DECREE, THE STATE PLAN FOR COMPLIANCE, AND THE STIPULATION

On March 27, 1987 the Court held a hearing on defendants' efforts to comply with the medical care requirements of the Consent Decree, the State Plan for Compliance, and the Stipulation, which I shall collectively refer to as the decree documents. The following persons testified at the hearing: the Court's Independent Expert, Dr. F. Warren Benton; plaintiff's expert witness, Dr. Charles A. Braslow, M.D.; Defendants' Consent Decree Coordinator, Ms. Luella Burke; the Director of Nursing at the Marquette Branch Prison ("MBP"), Ms. Gloria Anthony; the Director of Nursing at the State Prison of Southern Michigan ("SPSM"), Ms. Jacklyn Tietlebaum; and the Medical Director at the SPSM, Dr. Silas Norman, M.D. The Court accepted into evidence as exhibits Dr. Braslow's curriculum vitae, Dr. Braslow's expert report, and defendants' March 25, 1987 Status Report on Mental Health Staffing. The Court also has considered the Independent Experts' *March 1987 Compliance Evaluation of Medical Services Provisions*, which the parties and *amici* have had an opportunity to review and to challenge, in preparing this opinion. The following opinion constitutes my findings of facts and conclusions of law concerning defendants' efforts to comply with the medical care provisions of the decree documents, excluding those provisions relating to mental health care, which will be the subject of a separate hearing later this year.

In general, the Court believes that the Independent Expert's report and the evidence introduced at the March 27th hearing established that defendants' efforts to comply with the medical care requirements of the decree documents are succeeding. I observe in particular that defendants are committed to providing medical care to the inmate population that is consistent with contemporary professional standards. They have, for example, opened a new hospital at the SPSM that impressed plaintiff's expert, and are implementing an annual health care audit program that should allow them to discover, and presumably to correct, any deficiencies that may exist in their system of health care. Defendants are, moreover, aware of most, if not all, of the defects in their health care system and are taking actions to remedy them. In this opinion, the Court will discuss (1) the defects or problem areas that the Independent Expert and the persons who testified at the hearing have identified in defend-

ants' health care system and (2) what it believes defendants either have agreed to do or should do to remedy those defects and problem areas.

### 1. *Surgical Backlog at SPSM*

The Court understands that due (at least in part) to the delayed opening of the surgical unit at the SPSM hospital, there currently is a backlog of inmates waiting to undergo surgery at the hospital. The IEs' report and the testimony at the hearing indicate that the surgical unit is now open and that the hospital staff is beginning to reduce the backlog. I did not, moreover, receive any evidence indicating that the backlog has caused or is causing inmates to suffer any significant harm. The Court therefore simply will note this as a potential problem area and request defendants to include a special notation on their July, 1987 semi-annual compliance report concerning the status of the surgical backlog, if any, at the SPSM hospital.

### 2. *24–Hour On–Site Physician Coverage at the SPSM Hospital*

Defendants currently do not have a physician at the SPSM hospital twenty-four (24) hours a day. Dr. Norman testified that on the night shift, a physician's assistant ("PA") is on duty and a physician is on-call. He also stated that a hospital emergency room is only five minutes away and that defendants are prepared to transport any inmate in need of emergency treatment that either the PA or the on-call physician cannot provide. Dr. Norman in addition testified that defendants have no plans to provide 24–hour on-site coverage at the hospital, even though Dr. Lynn Green, the Deputy Director of the Bureau of Health Care Services, testified at the March, 1986 compliance hearing that defendants planned to provide such coverage once they had sufficient staff. Transcript of Compliance Hearing, vol. III, at 535. Dr. Braslow testified, moreover, that given the size of the institution at SPSM and the presence of an operating room and an emergency room at the hospital, there should be 24–hour on-site physician coverage.

The Court does not believe it has sufficient evidence before it at this time to determine whether it should require defendants to provide 24–hour on-site physician coverage at the SPSM hospital. The Consent Decree requires defendants to provide "adequate medical ... services ... to respond to the serious needs of the prisoners," para. A, while the State Plan provides that "the services and practices" at the new SPSM hospital "shall be no less than those that would be required for licensure in a non-prison setting." Sec. II.B.1. Defendants argue that their current system is adequate because during the night shift they have a PA on duty, a physician on call, and a hospital emergency room only five minutes away. Dr. Braslow believes that defendants should have 24–hour physician coverage on the hospital premises, and Dr. Green appears committed to that goal. The Court, however, received little evidence indicating that the lack of 24–hour on-site coverage in this context either poses a specific risk of harm to the inmates or falls below contemporary professional standards. I therefore will leave the situation as it is for the moment, with the provisos that defendants should clarify at the May 20th hearing whether they intend to provide 24–hour on-site coverage once all of the physician positions at the SPSM are filled, and that plaintiff is free to move the Court to require defendants to provide 24–hour on-site physician coverage at the hospital.

### 3. *Limitations on Surgery at the SPSM Hospital*

The SPSM Hospital apparently is not equipped to perform certain kinds of operations, particularly those that require invasive surgical techniques, complex orthopedic procedures, and neurosurgical procedures. Defendants indicated at the hearing that they recognize the hospital's surgical limitations and will not attempt to perform operations for which the hospital is not properly equipped.

### 4. *Respiratory Therapy Staff at the SPSM Hospital*

Dr. Braslow recommended in his report that defendants acquire respiratory thera-

py staff "as a necessary service for management of general anesthesia patients and patients with chronic lung disease." Report at 3. Dr. Norman testified that defendants currently have qualified staff to deliver respiratory therapy at the hospital, but the Court understands that defendants have agreed to establish a respiratory care unit at the hospital anyway. The Court accepts defendants' agreement, subject to the proviso that plaintiff must approve the care unit.

### 5. Medical Examination Room at the Michigan Reformatory Dormitory

Dr. Braslow stated in his report that the examining room at the Michigan Reformatory ("MR") Dormitory is quite small and is employed for on-site sick call evaluations only once a week. At other times during the week, sick inmates must walk to the medical care area inside the reformatory. Dr. Braslow believes that "[e]xpansion of the size and utilization of the medical area within the dorm would be helpful in improving access to medical care of the inmates housed there." Report at 3. Dr. Braslow testified at the hearing that the sick call area is minimally adequate, but also observed that several inmates perceived difficulty in getting to the main institution for medical care; he noted in particular that several inmates who apparently were unable to walk to the main institution also were unable to secure transportation there.

The Court is concerned about this situation, but is unsure where to place it in the context of the Consent Decree and the State Plan. The State Plan requires defendants to upgrade the examination room at the dormitory, which they apparently have done, and to ensure that the room complies "with minimal professional standards as necessary to protect inmate health." Sec. II.B.2. The Plan's provision on access to health care states, moreover, that defendants will "make adequate provisions to assure that inmates will be transported as needed from housing or other areas to the health care facility." Sec. II.D.1. I interpret this provision as requiring defendants to transport inmates in need of care who are unable to walk from the dormitory to the main institution at the MR. As an alternative, defendants may wish to expand their on-site sick call evaluations at the dormitory. Regardless of how defendants choose to proceed, the Court believes that they are required to ensure that inmates unable to transport themselves are provided with appropriate access to a medical care area.

### 6. Prompt Medical Treatment for Transferees

The amici expressed concern that inmates in need of treatment are not being transported quickly enough to institutions where they can receive appropriate care. This problem appears to be particularly acute at the MBP, where inmates in need of treatment often must be transported to the SPSM. In his report, the Independent Expert reported instances of where inmates had to wait three or four weeks to be transported to the SPSM for treatment. The Court received no evidence, however, indicating that inmates are suffering from this transportation delay. I expect, moreover, that defendants are adhering to my July 15, 1986 interpretation of the Consent Decree and the State Plan as requiring them not to "allow security or transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment and must be transported to an appropriate facility." Opinion of July 15, 1986 at 3. I therefore will take no action on this issue at this time.

### 7. Involvement of LPNs in Triage Decisions

The Independent Experts, plaintiff, and amici expressed concern that Licensed Practical Nurses ("LPNs") may be performing triage decisions. The State Plan provides that "uncredentialed staff are not to make triage decisions." Sec. II.E.2. The concern apparently is that LPNs constitute "uncredentialed staff" where triage decisions are concerned. The Court is unable to resolve this issue at this time for two reasons. First, I am not sure whether LPNs actually are performing "triage" decisions. Second, I have an insufficient factual basis for determining whether LPNs

are qualified to perform triage decisions. I note that defendants have provided the Court with a description of the LPNs' duties. The Court therefore will await further comments, arguments, and evidence from the parties and *amici* before taking any action on this issue. At the present, I am not convinced that there exists a problem I need to resolve, and thus will take no action.

### 8. *Chronic Disease Index Plan*

The State Plan requires defendants to establish a "professionally designed plan ... to provide for systematic follow-up care for inmates with serious chronic disease." Sec. II.G. At the MR and the MBP, defendants have established a computer-based chronic disease index and are in full compliance with the State Plan's requirement. At the SPSM, however, defendants still are operating a manual card system and apparently are having difficulty keeping the system up-to-date. The Independent Experts indicate that the system was not in operation from May, 1986 until October, 1986, but that as of February, 1987 it was back in operation and in the process of being updated.

The Court believes that a manual system probably is adequate to satisfy the State Plan's requirement, provided the system is maintained and serviced on a regular basis. I expect that defendants will continue to maintain the system at the SPSM that they had reactivated in October, 1986, and expect them to report to the Court immediately any breakdowns in that system.

### 9. *Staffing at the MR and the SPSM*

It is clear from the Independent Experts' report and from the testimony at the hearing that defendants continue to experience significant staffing problems at the SPSM and, to a lesser extent, at the MR. The primary staffing problem at the MR appears to be a vacancy in a physician's position. Dr. Braslow indicated that defendants should fill that position as soon as possible. The Court, however, heard no evidence that the vacant position creates an unacceptable risk of harm to the inmates. I thus urge defendants to fill that position

as soon as possible, but will not establish a specific deadline for them to do so.

The staffing problem at the SPSM is more severe. It appears that defendants' staffing plan for this institution is adequate, provided all of the positions are filled. I thus agree with defendants that the Independent Experts' 2 rating for the SPSM hospital for requirement number 43 reflects defendants' failure to have filled all of the positions rather than a defect in the staffing plan itself. Dr. Braslow did testify at the hearing, however, that the SPSM's current level of staffing is not minimally adequate. Dr. Norman disagreed with that assessment, stating that the current vacancies do not affect defendants' ability to deliver health care services.

The Court does not believe that the situation at the SPSM is sufficiently serious that it should, as *amici* suggest, require defendants to contract out for services. I am concerned, however, about the vacancies' effect on defendants' ability to provide an adequate level of health care to the inmates. I believe that defendants should fill all vacant medical care positions at the SPSM by July 24, 1987. On that date, defendants shall file a status report on their efforts with the Court. If positions remain vacant, defendants shall describe their efforts to fill those positions and shall provide a detailed assessment of the effect of such vacancies on their ability to comply with the medical care requirements of the decree documents. Plaintiff and *amici* shall then have until August 10, 1987 to respond to defendants' submission, and to suggest actions the Court should take to alleviate or to remedy any problems. Defendants shall have until August 17, 1987 to reply to the plaintiff's and *amici*'s submissions.

### 10. *Medical Administrative Audits*

The State Plan requires defendants to conduct annual administrative audits "by Health Care administrators and persons qualified in various specialized support services to assess the organization of health services, quality and quantity of health care staff, adequacy of policies and procedures, processing of grievances, and in-

mate perception of quality of care." Sec. II.M.2. The Independent Experts question whether these audits assess "inmate perception of quality of care." Defendants acknowledge that they have failed to consider this factor, but agree to do so in the future, such as by examining inmate grievances on the health care system. The Court accepts defendants' agreement and expects them to follow through on it.

### 11. Problem–Oriented Health Record System

The State Plan requires defendants to maintain their modified problem-oriented health record format. The Independent Experts' report suggests that defendants have had difficulty keeping the records at the SPSM up-to-date. The Court believes that defendants recognize the problem and are taking steps to cure it, and therefore will take no action on the issue at this time.

### 12. Access to Health Care

The most contentious issue at the hearing concerned defendants' system for providing inmates access to the health care system. The Consent Decree requires defendants to provide "inmate access to adequate medical facilities and medical staffing including licensed, qualified physicians and psychiatrists, dentists, registered nurses, and such other medical personnel as defendants deem necessary." Para. A.1. The State Plan establishes more detailed access to health care requirements:

1. Within 60 days from the date of the implementation of this plan the Department will submit a plan pursuant to decree Section VI on Plans, by which all inmates will be afforded daily access on each weekday to a sick call register. Any inmate who registers for sick call shall within 24 hours receive an appointment to be seen by medical staff within a reasonable time given the particular medical complaint, except those registering on a Friday may have their appointments determined on the following Monday. Inmates shall be afforded direct access to a register, which health care staff then collect. The register shall provide an opportunity to request care for

serious medical, serious mental health, and serious dental conditions.

The Department's plan for direct access to health care must provide at least equivalent daily access on weekdays for inmates in segregation units (administrative, punitive, protective) and MIPC. While the procedure may differ for such inmates, the access may be no less. Sec. II.D.1.

Defendants promptly submitted a plan for access to health care that, in general, establishes a kite system for such access. An inmate in need of care or treatment fills out a kite (a piece of paper) on which he discusses his need and symptoms. The kites are collected on a daily basis, on weekdays, and are reviewed by qualified health care personnel who establish an appointment for the inmate to see a health care specialist. The inmate generally receives an appointment to see someone on the next sick-call day for his living unit. The health care personnel base their appointment decisions, in general, on a review of the inmate's kite, sound professional judgment, and applicable procedures and protocols. They are instructed to take further action to investigate the inmate's complaint if necessary, and are instructed to respond promptly to complaints that require emergency treatment. Depending on the institution, sick-call days are held one to three days a week. In addition, licensed health care providers, who appear to be predominately registered nurses ("RNs"), make daily rounds in the segregation units. Finally, at the SPSM defendants conduct daily afternoon drop-in clinics for inmates who cannot or do not wish to wait for the weekly sick-call day. To access this system, however, an inmate must request a correctional officer for permission to go to the clinic. The kite sick-call system by comparison bypasses the correctional officers.

In his report, Dr. Braslow expresses concern about defendants' system of access to health care. He states that in his opinion, "the major purpose of the plan, which is to allow inmates 'to receive health-related services at other times' than once or twice

weekly, has not been accomplished as the plan has been implemented at MBP and SPSM." Report at 5. Dr. Braslow's primary concern is that defendants base their judgment on when an inmate will actually see a health care professional on a paper review of the kite rather than on an actual physical examination of the inmate. He believes that "information on a kite may be insufficient for determining the true urgency of a medical condition, even for those with 'sound professional judgment.'" *Id.* Dr. Braslow argues that defendants should conduct daily sick-calls, at least on weekdays, as is done at the MR. He also observes that although health care personnel make daily rounds in the segregation units, care must be taken to ensure that the rounds are not rushed, but rather are "conducted thoroughly and carefully in order to pick up signs of significant medical or mental disorders." *Id.* at 6.

Dr. Braslow reiterated these concerns at the hearing. He testified that the current system is not adequate to meet inmates' health needs, primarily because under the current kite system inmates enjoy no direct contact with the medical staff on a daily basis. He acknowledged that defendants could adequately screen medical emergencies based on a review of a kite *if* inmates could adequately describe their conditions and the severity of their symptoms. He doubted, however, inmates' ability to do so, and also expressed doubt as to whether defendants could develop a protocol that would allow for proper triaging based on a review of a kite. He believes that one cannot diagnose certain conditions based simply on a kite. Dr. Braslow in addition testified that the afternoon drop-in clinic system defendants operate at the SPSM is not an adequate substitute for daily sick-calls because it involves the correctional officers, who must allow an inmate out of his cell to attend the clinic.

Defendants' witnesses, Ms. Anthony, Ms. Tietlebaum, and Dr. Norman, testified that the present kite system is adequate to provide inmate access to the health care system. The Court did not, however, find their testimony sufficient to allay the concerns that Dr. Braslow, who has had extensive experience in the provision of medical care in prison settings, expressed in his report and at the hearing. Ms. Anthony testified that she has had no experience reviewing kites and that she had based her testimony on oral orders she had given her nurses and on what she expects them to do. I also observe that she testified that implementation of a daily sick-call system probably would not increase the number of patients seen or otherwise make much of a difference. Ms. Tietlebaum had been in her present position for only six months and acknowledged that defendants base their handling of an inmate's request for treatment largely on the information he has supplied on his kite. Finally, Dr. Norman is not directly involved on a daily basis with the review of kites, but rather performs more an oversight function. The Court accepts Dr. Norman's testimony that in a significant number of cases, a health care professional can adequately judge the severity of an illness on a review of the kite. I also credit Dr. Braslow's testimony, however, that in an equally significant number of cases a personal examination of the inmate is required, and I cannot accept Dr. Norman's assertion that defendants generally are able to judge when further investigation is needed. In short, the Court finds that defendants' present system of access to health care in the general population units at the MR and the SPSM is inadequate to protect the inmates from a serious risk of harm.

The Court also is unsure about the adequacy of defendants' system for providing regular access to health care to inmates confined in segregation units. Defendants apparently have sick-call in the segregation units once a week. As I stated previously, however, defendants also have health care professionals make daily rounds in the segregation units. Dr. Braslow indicated both in his report and in his testimony at the hearing that these daily rounds could comprise sick-call visits if the persons making such rounds are thorough and are able to identify inmates with problems and to provide them with adequate care. He also indicated that although RNs trained in

physical assessment could fulfill this function, he would prefer to see PAs making the rounds.

In accordance with the above discussion of this issue, the Court will enter an order requiring defendants to produce a revised system of inmate access to health care at the MBP and the SPSM that is acceptable to the plaintiff. The parties shall have thirty (30) days from the date of this Opinion to negotiate an improved system. If they are unable to agree on a revised system within that time frame, they shall submit their proposals to the Court along with supporting memoranda, and the Court will issue a written decision on the issue. I note here that my strong preference, based on Dr. Braslow's testimony at the hearing, is for a system that allows inmates daily direct physical access to the health care system (on weekdays) (*i.e.*, daily sick-calls), and that provides for an increased percentage of PAs to perform these sick-calls, particularly in the segregation units. In the segregation units, however, the Court will accept assessments performed by RNs who are adequately trained in that function.

There remain for discussion two additional issues the Court had asked defendants to report on at the March 27th hearing. The first concerns the overcrowding problem at the decree institutions. The Court has scheduled a hearing on this issue for this month and thus will not discuss it further here. Second, the Court had asked defendants to report on their efforts to fill the vacant mental health care positions. Defendants submitted at the hearing an extensive status report that details the actions they have taken to recruit qualified mental health care personnel. I see little that I can do in this area at the present, although I strongly believe that defendants must fill those vacancies as soon as possible. It appears that defendants are making a good faith attempt to do just that, and the Court hopes that their efforts are soon rewarded.

### ORDER

In accordance with the Opinion dated May 7, 1987;

IT IS HEREBY ORDERED that defendants shall clarify at the May 20, 1987 compliance hearing whether they intend to provide twenty-four (24) hour, on-site physician coverage at the SPSM hospital;

IT IS FURTHER ORDERED that defendants shall file a status report on July 24, 1987 on their efforts to fill the medical care vacancies at the SPSM; they should make every possible, reasonable, effort to fill those vacancies by that date;

IT IS FURTHER ORDERED that defendants shall have thirty (30) days from the date of the Court's opinion to produce a revised system for inmate access to health care at the MBP and the SPSM that is acceptable to the plaintiff.

### BENCH OPINION OF MAY 21, 1987 ISSUING TEMPORARY RESTRAINING ORDER REGARDING OVERCROWDING AT THE RECEPTION AND GUIDANCE CENTER

Have to take a roll. Is everybody here? The Court has heard two full days of testimony. It is 7:00 o'clock at night. There is going to be more testimony tomorrow, and I will have to make my final decision obviously based upon what I hear tomorrow, compared to what I have already heard. What I am going to say now, I am going to modify possibly—or possibly I am not. The Court issues a restraining order at this very moment; and the restraining order is that no prisoners shall be received at the Reception and Guidance Center from this moment, 7:00 o'clock tonight, until at least Tuesday, May 26th, which is the day after the holiday. I may modify that. I may extend it. I may abolish it after I have heard testimony tomorrow. I make this ruling, this restraint, based upon the extreme risk of harm as presented to this Court so far in two days, on the testimony of Mr. Gray, the testimony of Mr. Miller, and especially the testimony of Deputy Director Bolden and all that he said just today, including his being extremely embarrassed by the risk of harm to inmates both from a fire safety point of view, from a sanitation point of view, and from a gen-

eral risk of harm point of view. Perhaps I will wish to modify that when I hear more testimony tomorrow from the State. That is to be seen.

The Court observes in making this restraint at this time, and in considering a much broader restraint tomorrow, the following matters of concern: First, as I indicated at the outset of this hearing, Section D.5 of the Consent Decree provides that the defendants shall "Take each and every step within their lawful authority to eliminate overcrowding." That section further provides that the defendants shall have complied with this requirement as appears in the State Plan no later than June 30th, 1985. Second, Section IV.A of the State Plan for Compliance additionally says: "This plan assumes continuation of single celling. Dormitories shall provide 60 square feet per inmate. Space requirements for administrative segregation are set out elsewhere herein." Thirdly, and a scant nine days before that deadline was to be met, a Stipulation was filed with this Court on June 21st, 1985, wherein the parties recognized that, "the minimum security dorms are presently overcrowded, are not providing 60 square feet per inmate according to the State Plan requirement."

The Stipulation provided, however, the State with an extension of time to comply with the State Plan, provided the State should keep the Court and the United States fully informed as to the State's effort to reduce overcrowding, and extended the time until June 30th, 1986 to comply with Section D.5 of the Consent Decree which had not been complied with by the State. The reason that the Court signed the Stipulation, it was because it had, or the order, accepted it, was because it had no real choice, and the Court was concerned that the situation be consistent with *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), as I indicated before.

Fourth, by Section V.A of the Court's July 22nd, 1986 order—which, there was another request to extend past the June, 1986 period of time and submitted to the Court as I recall in about April or May as

the deadline was again running out—the Court ordered by July 22nd when the second deadline had been missed, ordered the defendants to implement their plan and decrease overcrowding and end inappropriate security classification placements, and provide the Court and *amici* with tri-monthly progress reports—based upon the testimony of Ms. Burke who assured the Court that regardless of population influxes and classifications there would be no problem in meeting the deadline on January 1st, 1987. As everybody knows, it has not been met. So the Court obviously is considering at this moment issuing an order tomorrow—as a possibility—of immediately ordering compliance. I mean they are five months past the third missed requirement. We have heard all of the reasons why that has happened. The record is full of that.

The Court also believes that it doesn't understand from the defendants' lawyers what it is being asked to do. I have the vague feeling after the last two days and after reading materials that the lawyers are asking me to do something, but they won't tell me what it is. Maybe they are saying to me they want another motion to modify. If they want a motion to modify— and I don't know that they do. I don't know that they are prepared at this moment to tell me—they should do so by 9:00 o'clock tomorrow morning; and if they do so by 9:00 o'clock tomorrow morning they should tell me what it is the State defendants propose to do about the overcrowding situation. It should incorporate, this motion if it is made, a plan they may wish to propose. I don't know. And that was clear from my asking Mr. Kime whether or not a plan was being presented to me or not. And in that motion, if a motion is to be filed, they should tell me what sanctions should be applied by this Court if the State defendants again fail to comply with now what I would call the fourth plan, or the fourth attempt. It is not really the fourth plan. It is the third plan. But it is the fourth new deadline date if there is a new deadline date. I don't know if there is. I am not aware what I am being asked to do. I want to know about that at 9 o'clock tomorrow morning. If the State defend-

ants wish to produce a witness, that is fine. I will take anything. I don't understand what is happening. If not, the Court will just act as if there were no motion to modify, and I think that to act accordingly I have got to clear out the consent institutions from overcrowding tomorrow. I don't see any other alternatives. That includes more than the Reception and Guidance Center. It includes everything in the Consent Decree institutions.

As I say, I have the feeling that somebody is asking me to do something, but nobody is looking me in the face and nobody is saying this is what we want you to do. If there is something that somebody wants me to do, I want to know about it. That is the State's assignment anyway. I am not sure what I need to say to Justice tonight.

### MAY 22, 1987 TEMPORARY RESTRAINING ORDER

In accordance with the bench opinion rendered at the hearing held on Thursday, May 21, 1987;

IT IS HEREBY ORDERED that defendants, their officers, agents, and employees, and anyone else hearing or receiving notice of this Order, is enjoined and restrained from receiving any new inmates into the Reception and Guidance Center at the State Prison of Southern Michigan, Jackson, Michigan, from seven o'clock in the evening Thursday, May 21, 1987 until six o'clock in the morning Tuesday, May 26, 1987.

### BENCH OPINION OF MAY 22, 1987 FINDING THE DEFENDANTS IN CONTEMPT OF COURT REGARDING OVERCROWDING AT THE DECREE INSTITUTIONS

The Court is going to address, I guess, three or four issues: First, the situation at the Reception and Guidance Center; Secondly, the situation with overcrowding at the Decree Institutions; Thirdly, the motion made by the defendants this morning; and, Fourthly and finally, some matters about posttrial submissions and a mental health hearing that I will set today.

Starting first with the Reception and Guidance Center situation, the Court has heard a lot of testimony over the past three days. As everyone in this room knows by now, one of the Court's primary concerns is with the situation at the Reception and Guidance Center at the State Prison of Southern Michigan at Jackson. Last night, of course, I found the situation of the inmates on the base at the Reception and Guidance Center sufficiently serious to justify an order forbidding the defendants from admitting any inmates into the institution until at least Tuesday, May 26th, 1987. I withheld taking any further action, however, to allow defendants more time to justify their position on the placement of inmates on the base at the Reception and Guidance Center. Having heard additional testimony from defendants this morning, I remain convinced that inmates cannot be housed at all on the base at the Reception and Guidance Center, and can be housed on the bulkheads at the Reception and Guidance Center only as a *temporary—i.e.,* not lasting more than three days—emergency measure to handle unexpected influxes of inmates.

Deputy Director Bolden testified for defendants that putting inmates on the base and in the bulkheads at the Reception and Guidance Center was the last thing that he wanted to do, but that he had no choice because there simply was and is no room in the system to put the inmates who have completed the intake process. He also stated that to eliminate overcrowding at the Reception and Guidance Center simply would create equally serious problems elsewhere in the system. I am convinced, however, that the situation at the Reception and Guidance Center is sufficiently serious that I would be abdicating my judicial responsibility, and could easily have a significant disaster on my hands, if I were to do nothing about it. I am further convinced that defendants have a multitude of options regarding the placement of inmates that would not create serious problems elsewhere in the system, or elsewhere in our society.

I think that just a brief summary of the testimony will suffice to illustrate the seri-

ousness of the situation at the Reception and Guidance Center. Mr. George Gray, plaintiff's fire safety expert, states in his report that the stairways at the Reception and Guidance Center are inadequate to handle the inmate population, particularly when the bunks in the bulkheads partially block the stairs. He also criticized defendants for having an insufficient number of exits and for having extensive travel distances to the exits. More importantly, he had the following to say regarding the placement of bunk beds on the base of the institution. Quote: "Bunks beds at base are so crowded that in some cases they barely miss touching and would not permit access to the bed from either side. This creates a condition wherein an inadvertent or deliberately set fire could quickly ignite bedding and other inmate combustible materials and flash to adjacent and overhead material in such a way as to become quickly uncontrollable. A flash fire through this area would almost certainly cause a loss of life. The rapid generation of smoke and its rise within the block could catch many before they could get down and out. The few staff with air pacs could be so overwhelmed as to cause a real disaster. The typical arrangement of bunk beds with at least a three-foot spacing and inmate personal possessions in steel lockers disperses the combustibles in such a way that an incipient fire can probably be caught and dealt with. The crowding in this particular situation substantially defeats that probability." He concludes that, quote, "at cellblock 7, overcrowding does increase risk not only to the inmates housed above the normal capacity but also to the normal capacity population itself."

Mr. Gray's testimony was equally damning. He stated that the Reception and Guidance Center was seriously and dangerously overcrowded. He explained again the inadequate stairways, the bunks that are too close to the stairs, the dangers posed by the extremely long cellblock, and the special concerns posed by the bunk beds on the base. Mr. Gray concluded that in terms of fire safety, the Reception and Guidance Center was a hazardous situation that should be remedied immediately before a tragedy occurs.

Plaintiff's other expert witness, Mr. Miller, also noted the dangerous conditions that exist at the Reception and Guidance Center. He noted in his written report that no storage areas are available for the inmates' private possessions; that many inmates suffer from boredom and idleness; and that the, quote, "base dorm must be seen to be fully appreciated." I think Mr. Miller summed up his feelings in the following paragraph of the written report on page 9: "Many inmates have stretched an extra sheet or large plastic bag over the length of the top bunk as a defense against the 'Jackson Air Force', i.e., the pigeons that infest the cellblock. This is not some inmate fable; walking around the upper tiers of the cellblock one encounters pigeons on patrols of their own, especially in the walkway behind the cells. Also, one can see the bird excreta on the sheets and bags stretched across the top bunks. In addition, the Jackson Air Force apparently will hold occasional maneuvers during mealtimes, resulting in the befouling of food on people's plates. Since the food is brought over from a main kitchen based on a definitive count, there are no extras available to replace portions on which the birds have left their mark. To say that this situation causes tension and unrest is to state it mildly. Being stuck on or immediately adjacent to one's bunk under such crowded, filthy conditions is untenable. Even though these people are convicted criminals, it is atrocious that any human being would be kept in such conditions. While not being a sanitarian, even I can readily see that such conditions are filthy and an abominable comment on the lengths to which the system is forced to go in an effort to cope with overcrowding. Even with the extra correctional officer staffing, one can only observe that these conditions are atrocious and cannot or should not be sustained as adequate housing. The base dorm should be closed. Even if the pigeon problem were to be resolved, there are still too many people packed into this area. In addition to the base dorm, inmates are also housed on the bulkheads on the third and

fourth galleys. On each galley, one cell is kept open for use as a lavatory. On the day of my visit, neither cell had hot water. People stay on the bulkheads for two to three weeks and I seem to recall one man who had been there for two and one-half months. As with the base dorm, there is no furniture other than double bunks. Storage of personal property is a definite problem, when the inmates leave the bulkhead for showers, meals or outdoor exercise, their goods are at the mercy of the other inmates who use the stairways at either side of the bulkhead as their main mode of transit within the cellblock. Furthermore, several bunks are just too close to these stairways, if a quick evacuation of the upper galleys were necessary. Boredom, idleness and a total lack of privacy are the order of the day. The one saving grace that prevents major trouble is the placement of a correctional officer right in the middle of the base dorm with backup, if necessary, coming from the other officer stationed on that galley. Two major problems with this arrangement are the inherent opportunities for theft and the potentially negative impact on emergency evacuation."

Mr. Miller reiterated these concerns in his testimony at the hearing. He testified that out of the 550 to 600 prisons he has seen in this country, the Reception and Guidance Center was the worst in terms of the base dorm. He testified that the inmates confined in the base dorm are, quote, "very definitely exposed to harm as well as potential for harm," end quote, and that the base dorm, quote, "cannot be justified as housing for human beings." He strongly suggested that the Court close the base dorm forthwith, and concluded that conditions are so indefensible that the Court should close the base dorm regardless of the consequences elsewhere in the system.

The Court finds that defendants were unable to rebut this testimony, or the conclusions I should draw from it. Deputy Director Bolden admitted that defendants have a serious problem at the Reception and Guidance Center and stated that, testified actually, he was ashamed to hear Mr. Gray's and Mr. Miller's testimony regarding conditions there. Warden Jabe agreed that the base dorm should be closed although he thought that it did not have to be closed immediately. I note, however, that Warden Jabe is not a fire safety expert and has been at the SPSM only since May 1 or for 22 days maximum. Fire safety, moreover, is not the kind of situation where you may get a second chance to correct "management problems"; one disaster is enough. One disaster is the end. Mr. Camp agreed it was desirable to get inmates off the base and bulkheads, and the word "desirable" was the strongest statement that he would make about conditions at the institution, wherever they might occur.

I am, of course, pleased that the defendants have made an effort to clear out the Reception and Guidance Center base area and bulkhead area voluntarily today, although a little late, but the Court cannot do anything except order that it stays that way; and I return to the statement that I made at the start of this brief opinion, that is, that it would be an abdication of my judicial responsibility if I failed to take affirmative action regarding the base dorm in the Reception and Guidance Center. The record more than amply supports the complete closure of the dorm area. It also supports an order restricting use of the bulkhead areas to emergency, overflow type situations. As additional support for this action, if any is needed, I do not believe that closure of the base dorm will, as Mr. Bolden testified, simply create equally dangerous situations elsewhere in the system. I thus see no sense to waiting until sometime in June, as Mr. Bolden urges, to close the base dorm.

Specifically, the record indicates that there are at least five measures the defendants can take to relieve the overcrowding situation (I would note parenthetically, not only in the Reception and Guidance Center but throughout the Consent Decree institutions) that will not enhance the problems that exist elsewhere in the system and that are consistent with defendants' Consent Decree obligation to, quote, "take each and every step within their lawful authority to

eliminate overcrowding." First, Governor Blanchard can invoke his powers under the Emergency Powers Act to reduce overcrowding in the system. Mr. Kime testified that use of the EPA could reduce the prison population by 500 to 600 inmates over the next two to three months. He also stated that the inmates who would be released are inmates who would be getting out on parole within the next three months in any event. The increased harm to the public thus should be minimal, if in fact any exists at all. In this regard, one will remember Mr. Kime's testimony as to the fact that since the EPA has not been used since 1984 and since the "bottom of the barrel" was being scraped then, that this would be one of the best times to use the EPA in the last seven years.

Secondly, Mr. Kime testified that—well, I should say this. He indicated in his May 12th, 1987 memorandum to Luella Burke, and in his testimony yesterday, that the department could add 400 inmates to the Lakeland Correctional Facility immediately. The only barrier to placement of additional inmates in this facility appears to be an agreement Director Brown had made with the community that he would not place any more inmates there without the community's consent. The Court appreciates the department's desire to maintain good relations with the local communities and with neighbors of the system. This agreement, however, clearly does not bind Governor Blanchard, and it does not bind the legislature, both of whom I remind everyone are defendants in this action; and I do not believe that a community's wishes outweighs defendants' and the Court's obligation to ensure that the constitutional rights of the inmates are protected and that the Consent Decree is enforced.

Thirdly, defendants apparently can place about 56 additional inmates in the Macomb County Jail. The only barrier to this action appears to be the wishes of a local sheriff. Once again, the Court fails to see how a local sheriff can hamstring the defendants in this action, particularly the Governor of this State and the State legislature. It is difficult for me to see how his wishes can override defendants' obligation to implement the Consent Decree and the State Plan for Compliance and to protect the constitutional rights of the inmates.

Fourthly, defendants could reopen the farms at the State Prison of Southern Michigan. This would, of course, require legislative action. The State, however, including the legislature and the Governor, is a defendant in this action, and thus must, as an entity, abide by its constitutional and contractual obligations. There is, moreover, nothing in the record to indicate that to reopen the farms would create a danger that would outweigh the harm facing the inmates confined at the Reception and Guidance Center. Finally, the state legislature and the Governor could remove the population cap on the Dunes Correctional Facility. Deputy Director Bolden testified that without the legislative cap he could easily place additional prisoners in the facility without overcrowding it.

In accordance with the above discussion, the Court hereby finds defendants in contempt of Court, and specifically in contempt of my July 22nd, 1986 Order that they, quote, "implement their plan to decrease overcrowding and to end inappropriate security classification placements"—end quote—with regard to the situation at the Reception and Guidance Center at the State Prison of Southern Michigan, in Jackson. To purge themselves of this contempt citation, defendants shall remove all inmates from the base dormitory at the Reception and Guidance Center no later than May 26, 1987. In addition, they shall remove all inmates in the bulkheads by that date, and shall thereafter use the bulkheads only for short-term, emergency, overflow housing. Operationally, I mean by this to say that all the bulkheads shall be clear at least four days out of every seven days. In addition, defendants shall not double cell inmates at the Reception and Guidance Center to compensate for the closure of the base dorm and the limited closure of the bulkheads. In other words, by May 26, 1987 defendants shall be operating the Reception and Guidance Center at its rated capacity, and not more, with an

exception for the limited allowable use of the bulkheads already discussed.

If defendants fail to take this action by May 26, 1987, they shall be subject to fines in the amount of $10,000 per day until compliance with the Court's order is achieved. They also, moreover, will be subject to a fine of $10,000 for every day the population at the Reception and Guidance Center exceeds the limitations set forth in this order. Furthermore, in addition to fines, if defendants fail to comply with the Court's order regarding the Reception and Guidance Center by May 26, 1987, they shall be enjoined from admitting any more inmates to that institution until they have achieved absolute, total compliance with this order.

No court likes to take action of this nature. In light of the testimony I have heard at this hearing, however, I am left with no choice. I again reiterate that the good faith of the defendants is not an issue here. What does appear to be an issue, however, is the continued failure of certain defendants—specifically the Governor and the legislature—to recognize that they too are defendants in this action. I find it absolutely incomprehensible, for example, that the legislature could be defeating its own plan to eliminate overcrowding by continuing legislative caps on the populations of institutions that apparently can accommodate additional inmates or by closing down the State Prison of Southern Michigan farms.

Thus end the comments that I wish to make about the Reception and Guidance Center.

The Court's interest in this show cause portion of the hearing regarding the overcrowding of the Decree institutions is as it always has been to ensure that the State lives up to its contractual obligations as those obligations appear in the Consent Decree and the State Plan for Compliance. I note here that the State first entered into these commitments on July 13th, 1984, nearly three years ago, but I also note that this followed a lengthy fact-finding and negotiation period with representatives from the Department of Justice of the United States. At that time, July 13th, 1984, the defendants agreed to, quote, "take each and every step within their lawful authority to eliminate overcrowding," end quote, at the Decree institutions by June 30, 1985. On June 21, 1985, a scant nine days before the deadline agreed to by the defendants, this requirement was extended for another year until July 30, 1986.

At the March, 1986 compliance hearing, the issue of overcrowding once again reared its ugly head. On May 1st, 1986, the defendants proposed a plan to this Court in which they stated they would end all overcrowding at all Decree institutions no later than January 1, 1987. The Court accepted this representation and ordered the defendants to implement its order, implement its plan, by this Court's order of July 22, 1986.

Up until January 9th, 1987, the defendants failed to inform the Court that they would not be able to meet the deadline which had passed eight days before they informed the Court. At the March, 1987 hearing, therefore, on medical care, this Court once again raised the overcrowding issue. By that time it appeared obvious that the defendants were in serious noncompliance with the Court's July 22nd, 1986 order. On April 1st, 1987, the Court ordered the defendants to show cause why they should not be held in contempt of Court for failure to comply with Section D.5 of the Consent Decree, Section IV.A of the State Plan for Compliance, paragraphs 1.4 and II.D.1 of the June 21st, 1985 stipulation, and Section V.A of the Court's July 22nd, 1986 order.

It is patently obvious from the evidence received at this hearing that the defendants continue to be in serious noncompliance at the Decree institutions. Moreover, it was not until this morning, May 22nd, 1987, that the Court for the first time learned what defendants now believe to be the first moment they can be in compliance at the Consent Decree institutions on the overcrowding issue, and even then I had to extract that information by ordering the defendants last evening to inform the Court what it was that they wanted the

Court to do for them in order to be compliance with the July 22nd, 1986 order.

I, of course, expected a response to my April 1st show cause order well in advance of the hearing scheduled for May 20–22, 1987. This morning counsel indicated to the Court that the defendants, as I recall it, quote, "sort of intended," end quote, to file a motion for a modification of the State Plan. The Court has seen no legal memoranda, has had no law cited to it, and knows of no reason why it should grant this request. In particular, the Court notes that the defendants appear to be asking for a modification of paragraph D.5 of the Consent Decree and not a mere modification of the State Plan for Compliance. The defendants make this request despite their complete failure to have established that they have taken each and every step within their lawful authority to eliminate overcrowding at the Consent Decree institutions.

The Court earlier in this opinion, and with reference to, specifically, to the Reception and Guidance Center has already pointed out at least five alternatives which earlier had been pointed out to the Court by the defendants' own witnesses. It is obvious that the defendants are in contempt of the Court's July 22nd, 1986 order. Particularly egregious was the information received by the Court during this hearing that the Department of Corrections has been frustrated in trying to accomplish the goals that it agreed to by the actions and inactions of other defendants to this action, including but not limited to the Governor and the legislature. I believe that these actions constitute direct violation of Section D.5 of the Consent Decree in addition to the Court's July 22nd, 1986 order. The defendants have presented little in this hearing to excuse these failure and foreclose a finding of contempt, including declining my invitation to address the contempt issue at the conclusion of today's hearing.

I, therefore, find the defendants in contempt of Court. They may purge themselves of this contempt by eliminating overcrowding at the Consent institutions in accordance with the Consent Decree, the State Plan for Compliance, and the Court's July 22nd, 1986 order no later than November 1st, 1987. Failure to have purged themselves of contempt by that day shall subject them to fines of $10,000 per day, said fines to continue from day to day until they have fully complied.

As I previously observed, the defendants requested of the Court to modify the State Plan for Compliance, and certainly that would require a modification of the Consent Decree itself. The defendants bear a heavy burden in requesting a modification of a consent decree, and this is not something that a court should treat lightly. A defendant seeking relief from the terms of a consent decree, any consent decree, must show that the decree, quote, "has been turned through changing circumstances into an instrument of wrong," end quote, or that even though the purposes of the decree have not been achieved they are suffering a, quote, "grievous wrong evoked by new and unforeseen conditions." End quote. The quotes and the thoughts are from *United States v. Swift and Company,* 286 U.S. 106, at pages 114, 115, and 119, 52 S.Ct. 460, at pages 462, 463, and 464, in 1932. This the defendants have failed to show.

Therefore, the Court denies the motion made this morning. The Court is, of course, extremely sensitive to conditions at the non-decree institutions. This sensitivity was heightened by the testimony of Deputy Director Bolden who testified that the system was, quote, "seriously and dangerously overcrowded." The Court trusts and indeed hopes that all others in this room are just as sensitive, and notes in particular that the testimony of Mr. Bolden ought to give the Department of Justice pause to consider whether or not Bolden's testimony alone triggers the beginning language of the Civil Rights for Institutionalized Persons Act in relation to the non-Consent Decree institutions.

I note that I would not be taking this step if I were faced with a situation where defendants had no other options, quote, "within their lawful authority to eliminate

overcrowding," end quote, at the Decree institutions other than to create intolerable conditions elsewhere. This, of course, is not such a situation. If such a situation does develop, however, the defendants should feel free to request the Court for appropriate modification of the Consent Decree and the State Plan for Compliance. At such a time the defendants will be required of course to show that there are no steps they can take within their lawful authority to maintain uncrowded conditions at the Consent Decree institutions other than to create intolerable situations elsewhere in the system.

There remains of course the requirement that the Consent Decree institutions remain uncrowded after November 1st. This relates directly to defendants' plan to eliminate crowding systemwide. The Court is unsure how it should address the situation, but is meaning to say it is unclear what defendants are requesting the Court to accept as their, quote, "new plan." Therefore, by June 5th, the defendants shall formulate their plan and suggest appropriate sanctions for compliance as discussed earlier in this hearing.

Post-hearing submissions on the issues that were brought up today are due June 5th, 1987, two weeks from today. In those submissions the lawyers should note in particular those portions of the Independent Expert's report with which they disagree, if any there might be.

### ORDER OF MAY 28, 1987 HOLDING DEFENDANTS IN CONTEMPT OF COURT

In accordance with the bench opinion rendered at the hearing held on May 22, 1987;

IT IS HEREBY ORDERED that defendants are in Contempt of Court for having failed to comply with section D.5. of the Consent Decree, section IV.A. of the State Plan for Compliance, paragraphs I.4. and II.D. 1 of the June 21, 1985 Stipulation, and section V.A. of the Court's July 22, 1986 Order—and specifically for having failed to comply with the Court's July 22, 1986 Order that they "implement their plan to decrease overcrowding and to end inappropri-

ate security classification placements"—with regard to the situation at the Reception and Guidance Center at the State Prison of Southern Michigan, in Jackson, Michigan. Defendants may purge themselves of this contempt by removing all inmates from the base dormitory and from the bulkheads at the Reception and Guidance Center by May 26, 1987, and by thereafter maintaining the inmate population at the Reception and Guidance Center at or below the Center's Rated Capacity. Defendants may, however, use the bulkheads for short-term, emergency, overflow housing. Operationally, this means that defendants shall keep all of the bulkheads clear at least four days out of any seven-day period. If defendants fail to purge themselves of contempt in this matter, they shall be subject to a fine in the amount of $10,000 per day and shall be enjoined from admitting any additional inmates to the Center until they do comply with the Court's Order.

IT IS FURTHER ORDERED that defendants also are in Contempt of Court for having failed to comply with the above-cited provisions of the Consent Decree, the State Plan for Compliance, the Stipulation, and the Court's July 22, 1986 Order—and in particular for having failed to comply with Section D.5. of the Consent Decree and section V.A. of the Court's July 22, 1986 Order—with regard to the remaining institutions covered by the Consent Decree and the State Plan for Compliance. Defendants may purge themselves of this Contempt by eliminating overcrowding at the Consent Decree Institutions in accordance with the Consent Decree, the State Plan for Compliance, and the Court's July 22, 1986 Order by no later than November 1, 1987. If defendants fail to purge themselves of contempt in this manner, they shall be subject to a fine of $10,000 per day to continue day to day until they have so complied with the Court's Orders.

IT IS FURTHER ORDERED that defendant's May 22, 1987 Oral Motion to Modify the Consent Decree and the State Plan for Compliance is DENIED.

IT IS FURTHER ORDERED that defendants shall have until June 5, 1987 to

submit whatever revision of their May 1, 1986 plan to eliminate overcrowding through-out the system, and thereby to ensure compliance with the overcrowding provisions of the Consent Decree and the State Plan for Compliance, they wish to propose; defendants shall also submit at that time proposed sanctions for failure to comply with the revised plan.

IT IS FURTHER ORDERED that the plaintiff and the *amici* shall have until June 19, 1987 to submit comments on defendants' proposed revision and sanctions; both parties and *amici* shall have until June 19, 1987 to submit post-hearing briefs on the other issues covered in the Independent Expert's Report and/or at the hearing; the parties and *amici* shall indicate in particular in their briefs those aspects of the Independent Expert's Report to which they object.

IT IS FURTHER ORDERED that the Court will conduct a hearing on the mental health aspects of the Consent Decree and the State Plan for Compliance on July 30 and 31, 1987, beginning at 9:00 a.m., in Kalamazoo, Michigan; the Independent Expert shall submit a draft report on mental health by approximately June 15, 1987; the parties and *amici* shall submit their comments on the draft report and the reports of their expert witnesses to the Court and the Independent Expert by July 20, 1987 at 12:00 p.m.; the parties and the *amici* shall meet on July 29, 1987 to discuss the mental health issues.

## OPINION OF JULY 2, 1987
## SCHEDULING MENTAL
## HEALTH HEARING

In its May 27, 1987 Order the Court scheduled a compliance hearing on the mental health aspects of the Consent Decree, the State Plan for Compliance, and related documents for July 30 and 31, 1987. In its May 9, 1986 Order the Court had given defendants until July 15, 1987 to submit any requests for modification of their plan for the delivery of mental health services they may wish to make based on the epidemiological study that was due to be completed by June 15, 1987. On June 8,

1987 defendants submitted a motion requesting an extension of the July 15, 1987 deadline. In support of their motion, defendants state that the epidemiological study will not be completed until July 1, 1987. Defendants also suggest that the Court consider rescheduling the July 30 and 31 hearing date. *Amici* oppose defendants' motion, arguing that any delay in holding the hearing will have serious implications for the inmates. Plaintiff supports defendants' motion, noting that its own mental health expert would not be prepared to testify at the July hearing.

The Court reluctantly agrees with the parties that it should reschedule the July hearing in favor of a later date. I share *amici*'s concerns about the inmates access to appropriate mental health care. My concerns are particularly acute in light of the Independent Experts' draft report on mental health care, in which they identify several significant compliance problems. On the other hand, the Court believes it is important to have the mental health hearing when the parties will be prepared to discuss the issues intelligently and fully. In particular, given the extension of the hearing date, I expect the parties to submit full and complete reports from their experts on defendants' compliance efforts, to be fully and completely prepared to discuss such efforts at the hearing, and to be fully and completely prepared to discuss practical solutions to any problems of noncompliance that may exist. In addition, defendants shall be fully and completely prepared to document their compliance efforts and to provide acceptable explanations for any problems of noncompliance that may exist. Finally, defendants shall be prepared in particular to discuss the following issues at the hearing: (1) the status of their administrative staffing for mental health; (2) the status of their professional staffing for mental health; (3) their plans for the recommendations contained in the June 12, 1987 Protected Environment Study; and (4) their plans for the recommendations contained in the June 12, 1987 Developmentally Disabled Prisoner Program.

The Court will reschedule the Mental Health Hearing for September 24 and 25, 1987 in Kalamazoo, Michigan. The parties and *amici* shall submit their comments on the Independent Experts' draft report and the reports of their expert witnesses to the Court and the Independent Experts by September 1, 1987 at 5:00 p.m. Defendants shall file any modification motions they wish to make by September 1, 1987. Plaintiff and *amici* shall have until September 18, 1987 to respond to any such motions. The Independent Experts shall have until September 18, 1987 to submit their final report to the Court, the parties, and the *amici*. The parties and *amici* shall meet on September 23, 1987 to discuss the mental health issues.

### ORDER

In accordance with the opinion dated July 2, 1987;

IT IS HEREBY ORDERED that the mental health hearing scheduled for July 30 and 31, 1987 is rescheduled for September 24 and 25, 1987.

### OPINION OF JULY 20, 1987, DENYING *PRO SE* MOTION TO INTERVENE AND MOTION FOR ORDER OF CONTEMPT

There are two matters pending in this case that the Court will deal with in this opinion. The first is a *pro se* motion to intervene and motion for order of contempt that two inmates filed on May 4, 1987. The second is the issue of whether confinement of an inmate in a cell with solid doors at the MIPC, now A–Block of the MBP, constitutes "isolation" within the meaning of paragraph IV.J.9 of the State Plan for Compliance. For the reasons discussed below, the Court will deny the *pro se* motion to intervene and for contempt, and will request the parties to address the solid doors issue further at the Mental Health hearing.

A. *Motion to Intervene and Motion for Order of Contempt*

Proposed intervenors Ronald L. Jordan and Carl L. Ashley are inmates confined at the Marquette Branch Prison. They seek to intervene in this action for the purpose of enforcing the out-of-cell activity requirement of the State Plan for Compliance, which provides in part that defendants are to provide activities such "that at SPSM and MR, 75% of all inmates, and at MBP all general population inmates, may be active out of their cells and dormitories, including exercise, meal, shower, and law library time, no fewer than 7 hours daily on weekdays and 5 hours daily on weekends." State Plan for Compliance ¶ IV.H.2. Mr. Jordan and Mr. Ashley allege that inmates at the MBP receive significantly less than seven hours per weekday, and five hours on weekends, out-of-cell time, and support their allegation with affidavits and petitions. They also allege that defendants have refused to remedy this violation of the State Plan, and that the plaintiff and *amici* in this case also have failed to take action on this issue. Finally, the proposed intervenors seek to hold defendants in contempt of court for having failed to comply with this requirement of the State Plan.

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that "[u]pon timely application anyone shall be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." FRCP 24(a)(2). The Court will deny the motion to intervene for three reasons. First, I believe that it is untimely. The Consent Decree in this case was signed over three years ago, and in the interim the parties have undertaken extensive action to implement and to enforce the Decree and the accompanying State Plan for Compliance. Under these circumstances, I believe this motion to intervene is untimely. *See Michigan Association for Retarded Citizens v. Smith*, 657 F.2d 102, 105 (6th Cir. 1981).

Secondly, I disagree with the proposed intervenors that they have the right to

intervene to protect their interest as third-party beneficiaries of the Decree. The Decree specifically provides that it does not "create any rights or obligations enforceable by inmates." Consent Decree ¶ 0; *compare South v. Rowe,* 759 F.2d 610, 612 (7th Cir.1985) (intervention allowed where the inmate "was an intended third-party beneficiary of the consent decree"). Third, although the proposed intervenors can claim an interest relating to this action, I believe that the United States and the *Knop amicus* are adequately representing that interest. In particular, counsel for the *Knop amicus* has been diligent in protecting her clients' interests, which I believe includes the interests of the proposed intervenors.

For these reasons, the Court will deny this motion to intervene. I also will deny the motion to hold defendants in contempt. I am concerned, however, about the out-of-cell activity situation at the MBP, and would ask the Independent Expert to investigate it when he does his next report on that requirement of the State Plan.

### B. *Solid Doors at MBP–A Block*

During the March 1986 compliance hearing the issue arose of whether the cells at the MBP–A Block that have solid doors are subject to section IV.J.9 of the State Plan, which provides that "[n]o inmate may be held in isolation (no sight or sound contact) from all other inmates for more than 2 days in any month, unless the isolation occurs for medical reasons in a medical area or unless the inmate is evaluated on a daily basis by a psychiatrist or a clinical psychologist who states in writing, that the inmate is not suffering serious harm." State Plan for Compliance ¶ IV.J.9. In its July 22, 1986 Opinion and Order, the Court asked the parties to address that issue by October 1, 1986. The parties and *amici* subsequently filed written submissions on the issue.

The Court unfortunately then lost track of the issue and discovered it only recently while reviewing the file in this matter. While I wish to resolve it as soon as possible, there are some unresolved factual matters concerning these cells that the parties and *amici* should be prepared to address briefly at the Mental Health hearing. Specifically, they should be prepared to inform the Court of the exact use of these cells; how long inmates are confined in them without contact with other inmates; whether inmates have free access to other parts of the institution or cellblock; and whether the cells are used for punitive detention. On receipt of this information, the Court will decide whether the cells are subject to section IV.J.9 of the State Plan.

OPINION AND ORDER OF JULY 28, 1987 ENFORCING PROVISIONS OF THE CONSENT DECREE, THE STATE PLAN FOR COMPLIANCE, AND THE STIPULATION REGARDING OVERCROWDING AND PROTECTION FROM HARM AND SANITATION, SAFETY AND HYGIENE

On May 20th, 21st, and 22nd, 1987 the Court held a hearing on defendants' efforts to comply with the requirements of the Consent Decree, the State Plan for Compliance, the Stipulation, and related opinions and orders concerning overcrowding and protection from harm and sanitation, safety, and hygiene. In conjunction with this hearing, the Independent Expert submitted a report on defendants' compliance efforts. During the hearing, the Court listened to a number of lay and expert witnesses and received into evidence a number of exhibits. It also issued two bench opinions, and two written orders, concerning the overcrowding situation. See Temporary Restraining Order dated May 22, 1987; Order of May 28, 1987. On June 23, 1987 the parties submitted a stipulation and proposed order concerning the overcrowding and various sanitation-related issues, as well as the sick call issue the Court had addressed in its May 7, 1987 opinion. The Court was pleased to see the proposed order, and will adopt it with some modifications. The order, however, fails to address several significant issues the Independent Expert had identified in his Report, and thus will be supplemented by this opinion and the attached order. In addition, in this opinion the Court will discuss defendants'

July 16, 1987 motion for relief from portions of the Court's July 22, 1986 order. The order attached to this opinion consists of two parts. The first part reflects the parties' stipulations, as modified by the Court. The second part reflects the following opinion on the compliance hearing and defendants' motion.

The Court will first discuss nine issues concerning sanitation, safety, and hygiene. The parties covered some of these issues in their proposed order; the rest were discussed in the Independent Expert's Report but not by the parties in their order. The Court also observes that this opinion does not cover all of the problem areas the Independent Expert identified in his report. Rather, I have selected for discussion those areas that I believe require the most attention.

The first area concerns various renovation projects defendants have agreed to undertake. The most urgent problem appears to exist in the area of ventilation. Mr. Powitz testified that the ventilation in 5–Block is practically nonexistent. Transcript ("T") at 417. This situation exists even though defendants had agreed to provide adequate ventilation by July, 1986. Stipulation at 9–10; I.E.Rpt. at 13. Similar problems apparently also exist in housing areas at the Marquette Branch Prison and the Michigan Reformatory. In addition, both Mr. Powitz and Mr. Butler testified about the lack of adequate ventilation in the food service areas. *See* T at 427–28 (Testimony of Mr. Powitz).

The parties address the food service ventilation problem in their proposed order, in which defendants agree to survey "all food preparation areas to assess ventilation requirements to determine whether existing exhaust systems need to be repaired or replaced." The Court in addition will require defendants to submit a schedule of any necessary repair or replacement work. With regard to ventilation in the housing units, defendants clearly are in violation of the June 21, 1985 Stipulation and the Consent Decree. In their response to the Independent Expert's report, moreover, defendants indicated that at the MBP they will not be in compliance until February 5, 1988. Under the circumstances, I think it is emminently fair and reasonable to require defendants to submit, with respect to the housing areas, a detailed schedule for completing the ventilation projects. See Stipulation at 10 (defendants agreed to "keep the Court and the United States fully informed of its progress in meeting the Decree date"). In addition, for any projects that will not be completed by July 1, 1988, two years past the original due date in the Consent Decree, defendants shall submit a detailed explanation of why they will fail to complete the project(s) by that time. If the problem is the presence of asbestos, defendants shall detail the steps they are taking to solve that problem. The schedule and the explanation (if any) are due sixty (60) days from the date of this Opinion.

The second area of concern is the building trades inspection requirement. See State Plan for Compliance, ¶ I.C. The Court interpreted this provision in its opinion of July 15, 1986, dealing with certain interpretive issues that had arisen under the Consent Decree and the State Plan. As the Independent Expert notes in his Report, however, defendants apparently have done little, if anything, to achieve compliance with this requirement. In their response to the Report, in fact, defendants acknowledge, at least with respect to the MBP, that they "are in an unresolved quandry of trying to determine who will inspect, and what will be the nature and scope of the inspections." The Court will give defendants until November 1, 1987 to resolve this quandry. The issue is an important one in terms of defendants' continued compliance with the requirements of the decree documents. External inspections certainly appear to be one way to ensure that once remedied, unconstitutional conditions of confinement do not thereafter reappear. By November 1, 1987, then, defendants shall submit a report to the Court on how they intend to comply with this requirement of the State Plan.

The third area of concern is with kitchen sanitation. Mr. Butler testified that the situation is much improved, and the inspection reports that the Court has reviewed

reflect this improvement. Nonetheless, defendants still have not fully complied with the requirement that they "achieve full compliance on at least each item for which a score of 4 or 5 is indicated on the inspection form." Opinion of July 15, 1986 at 6. Defendants appear to be on the right track, though, and in their proposed order have agreed to take some additional steps in this area. For the present, then, the Court will not order any additional remedial measures.

The next area of concern is with the laundry system at 5 Block in the Central Complex at the SPSM. The Independent Expert stated in his report that substantial problems exist in this area, with respect to both the frequency of the laundering and the handling and storage of the linens. Mr. Powitz, moreover, testified as to his concerns with defendants' failure to provide the inmates clean linens on a regular basis. T at 411–12. This is a serious problem that defendants should remedy as soon as possible. At the hearing and in their response to the Independent Expert's Report, defendants put forth no explanation for this breakdown in laundry service in 5–Block. Therefore, within thirty (30) days of the date of this opinion defendants shall submit to the Court a plan for remedying this problem as soon as possible.

The fifth area of concern is with the temperature of the food served to the inmates, particularly to those inmates confined in the segregation units. In the parties' proposed order, defendants agree to "take all reasonable steps to ensure that food arrives at food service areas, including food served in cell block areas, at the required temperatures...." I note that Mr. Powitz observed in his April 20, 1987 report that the poor condition of the insulated trays may be a cause of the problem, and I request the Independent Expert to continue to monitor the situation.

The next area of concern is the requirement that defendants provide sufficient electrical outlets and lighting for inmates in their cells. Compliance with this requirement was due in July, 1986. Stipulation at 9. The Independent Expert states

in his report, however, that certain facilities do not comply with this requirement, and that full compliance is not expected until November, 1988. The Court will order defendants to submit a detailed construction schedule, with an explanation for why the construction was not completed on time, within sixty (60) days.

The seventh area of concern is defendants' continued failure to comply with the hot water requirements of the State Plan. The Court will not order any remedial action at this time, but simply notes the situation as one to be remedied under the Consent Decree and the State Plan.

The eighth area of concern is the showers situation. Testimony at the hearing and the Independent Expert's Report indicate that inmates confined in the overcrowded areas of the decree institutions may not have access to the required number of showers. This problem should disappear, however, once defendants have remedied the overcrowding situation; in addition, in the parties' proposed order defendants have agreed to provide additional showers and lavatories to the inmates in the North Complex Gymnasium. *Amici*, however, also raise questions about whether inmates at the MBP may have been denied shower privileges in the recent past; whether these inmates are forced to go to the showers without their clothes on; and whether these inmates are shackled during their shower times, allegedly in violation of the Consent Decree and the State Plan. Defendants, therefore, shall submit a report to the Court within thirty (30) days of the date of this Opinion indicating whether MBP inmates have been denied shower privileges for any period of time since January, 1987, and if so the reason(s) for the denial; whether MBP inmates are forced to go to the showers without their clothes on; and whether MBP inmates are shackled during their showers, and if so whether that practice violates either the Consent Decree or the State Plan.

The final area of concern is defendants' use of the food loaf. In my July 15, 1986 Opinion dealing with certain interpretive questions I deferred ruling on the issue of

whether defendants may use food loaf as an administrative measure for inmates who are disciplinary problems. I asked the parties and *amici* to provide additional information on the following issues: "how many inmates are served food loaf in lieu of their regular meals; whether the loaf is consumed by the inmates; whether there is any limitation on the length of time an inmate can be served the loaf; and whether any inmates have suffered mental or physical injury from having to eat the loaf." Opinion of July 15, 1986 at 7. They have failed to provide this information. I therefore request them to do so at the mental health hearing, and I will resolve the issue then.

With regard to overcrowding and protection from harm, there are four issues the Court will discuss in this opinion. The first issue concerns the staffing levels, and the experience of the staff, at the various institutions. In his report, the Independent Expert expressed concern about the high turnover of staff at the SPSM and the relative inexperience of that staff. Mr. Miller also expressed concern about the staff turnover situation and the requirement that staff work a significant amount of overtime, T at 206; Deputy Director Bolden confirmed the high turnover rate and the significant use of overtime. T at 289. The Court has no suggestions at this time for remedying this problem, but raises it so it is not buried and forgotten.

The second issue concerns defendants' extensive use of waivers to place inmates in institutions that are outside of their security classification, thus severely compromising the housing assignment plan and the classification system required by the State Plan. The Independent Expert's Report and testimony at the hearing adequately documented the use of these waivers, and I see no need to repeat that evidence here. I agree with plaintiff that whether the classification system "is compromised by lack of appropriate housing at each security level" is an issue that needs to be explored. See Letter of June 2, 1987 from Andrew Barrick to Thomas Nelson at 2. Although the elimination of overcrowding should solve this problem, defendants do not plan to eliminate overcrowding system-wide until 1990. In the interim, there is a need to monitor the situation. I agree with plaintiff that it would help if defendants periodically reported on the waiver situation. Defendants therefore should file with the Court any reports, and subsequent updates, they develop concerning the waiver situation.

The third area of concern is defendants' out of cell activity plan(s). I agree with *amici* that in his next report on this issue, the Independent Expert should analyze whether the inmates actually participate in the programs defendants offer, and should attempt to determine whether the programs are effective and actually used. Defendants arguably cannot comply with the Consent Decree and the State Plan by offering activities that the inmates reject.

The final issue in this area concerns defendants' "plan" to eliminate overcrowding in the decree institutions and to ensure that they remain in compliance with the space requirements of the Consent Decree and the State Plan for Compliance. In May 1986 defendants submitted a "plan" to eliminate overcrowding in the decree institutions by January 1, 1987, and to eliminate overcrowding system-wide and thus end inappropriate security classification placements at the decree institutions by 1989. In my July 22, 1986 Opinion and Order I accepted defendants' plan and ordered them to implement it. In late 1986 and early 1987 it became apparent that defendants would not be able to adhere to that plan. In their March 20, 1987 Update, defendants' exhibit 1, defendants acknowledged that they were not in compliance with the plan and that periods of noncompliance would exist over the next couple of years. In their May 13, 1987 Update, defendants' exhibit 5, defendants indicated that they had to make adjustments to their May 1986 plan. See Memorandum dated 5/12/87 from William L. Kime to Luella Burke; Letter dated May 6, 1987 from Robert Brown, Jr. to Robert Naftaly. At the hearing, witnesses for the defendant indicated that they wanted the Court to accept these adjustments. See T at 393–95

(testimony of William Kime); *cf.* T at 331–37 (testimony of Dan Bolden). Defense counsel even indicated during the hearing that he considered the May 13th submissions to be modifications of the May 1986 plan.

By the end of the hearing, however, the Court was not sure what adjustments or modifications defendants intended to make in their May 1986 plan to eliminate overcrowding and inappropriate security classification placements at the consent decree institutions. In my May 27, 1987 Order, therefore, I gave defendants until June 5, 1987 "to submit whatever revision of their May 1, 1986 plan to eliminate overcrowding through-out the system, and thereby to ensure compliance with the overcrowding provisions of the Consent Decree and the State Plan for Compliance, they wish to propose." Order of May 27, 1987 at 3. The Court anticipated that defendants would submit a revised plan that combined their May 1986 plan with elements of their May 13, 1987 submission.

In their June 8, 1987 submission, though, defendants proposed no changes in their May 1986 submission, but indicated rather that they intended to adhere to that submission or plan. The Court cannot accept this submission for two reasons. First, although defendants must end overcrowding at the decree institutions by November 1, 1987, they state in their June 8th submission that "it may become necessary to exceed rated capacities at some areas of the Consent Decree institutions after November 1, 1987 due to unanticipated population increases or other factors beyond the control of the Defendants." Memorandum at 3. This statement indicates that the population levels at other institutions in the Michigan system affect the population levels at the decree institutions, and that the Court, plaintiff, and *amici* are entitled to know that defendants have population and construction projections that they can live with and which will eliminate the problem. Second, defendants' ability to satisfy their promise to eliminate improper security classification placements at the decree institutions by 1989 also depends on their ability

to control the population levels at nondecree institutions.

In summary, the Court is seeking a commitment by defendants to an overall plan to eliminate overcrowding throughout the system—and thus to ensure that the decree institutions will not be overcrowded and that improper security classification placements will not be used at the decree institutions—that they can live with and implement. I thought I had that commitment in May 1986. It turned out I was wrong. Defendants should propose a plan, whatever it may be, that the Court can count on to accomplish the tasks required by the Consent Decree and the State Plan. I will give them sixty (60) days from the date of this Opinion to do so.

One final note concerns defendants' July 16, 1987 Motion for Relief from Portions of the July 22, 1987 (sic) Order of the Court. I have reviewed defendants' motion and *amici*'s response. I have not yet received a response from the United States. I sympathize with defendants' objections to the reporting requirements and recognize that in certain respects the requirements may no longer be serving a useful function. In addition, I agree with both defendants and *amici* that it makes sense to structure the reporting requirements so as to achieve their intended goal with the least possible administrative burden on the defendants. I believe, however, that the requirements are important and, despite defendants' substantial improvements in the areas of fire safety, sanitation, and inmate surveillance, should be maintained in some form.

Rather than have the Court somewhat arbitrarily devise new reporting mechanisms, though, I think the parties, *amici,* and the Independent Expert should discuss this issue in their meeting before the Mental Health hearing. I realize that they may have to extend this meeting in order to discuss all of the issues to be covered at the hearing. I think, however, that the issue of how to reduce defendants' administrative burden while maintaining an effective reporting mechanism is one that the parties and *amici* should attempt to re-

solve among themselves, preferably without the necessity of judicial intervention.

I will enter an appropriate order in accordance with this opinion. I observe again, in closing, that this opinion covers only the most significant areas of noncompliance. Defendants must, of course, remedy all of the defects the Independent Expert identified in his Report.

## ORDER

In accordance with the opinion dated July 27, 1987;

IT IS HEREBY ORDERED that defendants shall implement the following version of the parties' proposed order concerning medical care, overcrowding and protection from harm, and sanitation, safety, and hygiene:

### Medical

To assure prompt inmate access to *nonemergency* medical care, defendants shall institute the following procedure at Marquette Branch Prison ("MBP") and the State Prison of Southern Michigan ("SPSM") in lieu of the present "sick call" system:

1. Within 24 hours following the receipt of an inmate request for medical care ("medical kite"), an inmate in general population or trusty division shall have his medical kite screened by a registered nurse, and the following actions shall be taken according to the contents of the kite:

a. If the medical kite merely requests information, the kite shall be answered.

b. If the kite requests an ordinary, *nonemergency*, dental or optometric appointment the matter shall be referred to the appropriate clinic and an appointment shall be scheduled.

c. If the kite requests medication or diet renewals, the request shall be immediately reviewed and, if appropriate, the request shall be renewed within seven days of the kit's submission; in no event, however, shall a medication or diet requirement that should be renewed be allowed to lapse.

d. If the kite requests an appointment for a *routine follow-up review* of a chronic medical condition such as diabetes or other similar continuing pre-existing condition documented in the inmate's medical record, a clinical appointment shall be made within seven days of the kite's submission; this provision in no way modifies defendants' obligation to respond immediately to medical emergencies arising out of chronic diseases.

e. If the kite indicates a "new complaint" which does not fall within the above categories, the inmate shall be seen at the clinic by appropriate medical staff within 24 hours of the screening. If the medical kite indicates, for example, that the inmate wishes to "see a doctor" or "go to the clinic," an appointment shall be promptly scheduled and the inmate shall be seen within the required 24 hours. If the medical kite is ambiguous, it shall be presumed that the kite reflects a "new complaint" which shall be treated according to the procedure set forth herein.

2. Segregation units at MBP and SPSM shall continue their current policy of providing daily access to medical staff, for nonemergency medical care, by the utilization of medical staff rounds. The rounds shall be performed by qualified medical personnel, *i.e.*, either physician assistants or registered nurses who have received some form of specialized training in that function.

3. Defendants shall promptly implement a program advising inmates of the change in "sick call" procedures. They shall advise inmates of the new system for access to health care by means of inmate newspapers, inmate forums, and similar means of notification, and shall provide documentation of these efforts to the United States. Commencing one month after the implementation of the foregoing "medical kite" procedures at each facility or unit, defendants shall file a report each month for a six month period which shall set forth the total number of medical kites received during one week in the preceding month by category of kite, and in particular, the number of inmates scheduled and seen as "new complaints."

4. Defendants shall implement the foregoing system of medical access at the North Complex and South Complex of SPSM within three months of the entry of this order and shall implement it at the Central Complex of SPSM and at the MBP within six months of such time.

### Overcrowding

In their memorandum submission of June 5, 1987, defendants stated that they "intend to eliminate overcrowding at the remainder of the Consent Decree institutions no later than November 1, 1987, in accordance with the May 27, 1987 Order of the Court." Defendants have agreed to implement, and shall implement, the following additional measures to alleviate the adverse effects of overcrowding at certain housing units prior to the final compliance date of November 1, 1987.

1. *Marquette Branch Prison Gym:* The gymnasium which is attached to Dormitory 1 in the trusty division is currently not used to house inmates. Defendants shall not use this area for housing absent a clear need for *temporary* emergency housing.

2. *Michigan Reformatory Gym:* The gymnasium adjacent to Unit B is not presently being used to house inmates. Defendants shall not house inmates in the gym under any circumstances.

3. *State Prison of Southern Michigan—Wing Farm:* By July 1, 1987 the population of this housing unit shall not exceed 106 inmates. After that date, defendant shall not send additional inmates to this unit so that the population will be reduced by attrition at the expected rate of four or five inmates per week. Population reduction will continue by attrition until the unit reaches its rated capacity on or before November 1, 1987.

4. *State Prison of Southern Michigan —North Complex Gym:* Until November 1, 1987 defendants may continue to house a maximum of eighty (80) inmates at this unit. To assure the safety of staff and inmates, defendants shall immediately implement the following procedures and actions:

a. Correctional officer staffing shall be increased from the current staffing of three officers per afternoon and evening shift to four officers per afternoon and evening shift;

b. An elevated platform shall be constructed and shall be manned at all times by a correctional officer so that adequate lines-of-sight may be maintained;

c. Within ten days of the entry of this order, defendants shall install a toilet and shower trailer containing a minimum of four (4) showers and four (4) water closets each, and shall maintain said trailer so long as the Northside Gymnasium continues to be used for housing purposes.

d. Inmates selected for placement in beds located in the North Complex Gym shall at least meet the following criteria:

 i. Not have a criminal conviction or documented history as an arsonist;

 ii. Not be a predatory homosexual;

 iii. Not be seriously mentally ill;

 iv. Not have a history of being unmanageable in an open dorm setting.

### Sanitation and Environment

With respect to sanitation and environmental matters, defendants shall take the following additional steps to achieve full compliance with the Consent Decree. The Court recognizes that defendants have demonstrated great improvement in environmental conditions in kitchen areas and that bird and vermin control projects that will represent a capital outlay in excess of four million dollars are about to commence in accordance with the requirements of the *Hadix* Consent Decree.

1. *Food Service Ventilation:* Within sixty (60) days of the entry of this order, defendants shall complete a survey of all food preparation areas to assess ventilation requirements and to determine whether existing exhaust systems need to be repaired or replaced. Within an additional sixty (60) days, defendants shall submit to the Court a proposed schedule for performing any necessary repairs and replacements.

2. *Pipe Chases:* Defendants recognize those areas of remaining problems identified by the Independent Expert and Plaintiff's Sanitation Expert in their May 1987 reports and testimony with regard to pipe chases. All areas so identified shall be subject to ongoing corrections efforts including, but not limited to, repair or replacement of broken vents.

3. *Food Transport:* Defendants shall take all reasonable steps to ensure that food arrives at food services areas, including food served in cell block areas, at the required temperatures as described in the Consent Decree and State Plan, including, but not limited to, minimizing food transport times.

4. *Operational Items:* While the following described measures are not specifically required by the State Plans as submitted or modified, defendants recognize the importance of such actions in achieving the goals of the Consent Decree and Plans submitted in accordance therewith. Therefore, defendants shall undertake the following actions:

a. At all subject facilities, take all reasonable and practical measures to eliminate access routes to food storage and preparation areas for vermin including, but not limited to, repair or replacement of defective, missing, or broken doors. Take all reasonable and practical measures to reduce or eliminate access to sources of food that may attract vermin including, but not limited to, prompt repair or replacement of broken or missing lids on dumpsters, where used.

b. At all food preparation services, in all subject facilities, take all reasonable and practical steps to ensure cleanliness of food service workers including, but not limited to, requiring food service workers to wear appropriate protective clothing and to receive appropriate training.

5. *Bird and Vermin Control—State Prison of Southern Michigan:*

Defendants shall complete the Window and Screen Renovation Project in residential cell blocks in accordance with the *Hadix* Consent Decree. Within ninety (90) days of the entry of this order a construc-

tion contract shall be awarded and, barring extraordinary and unanticipated construction delay, all phases of the project shall be completed within seventeen (17) months of the award of the construction contract. In recognition of the particular acuity of the bird infestation in cell blocks 4, 5, 6, and 7, said blocks shall be a priority in the replacement program. The new window system in blocks 4, 5, 6, and 7 shall be completed no later than twelve (12) months from the awarding of the construction contract. Defendants shall advise the Court, plaintiff and *amici* of the progress toward completion of each phase of the project in periodic reports. This commitment does not, however, preempt the requirement of paragraph II.C. of the Court's July 22, 1986 Order that defendants inspect "on a continuing basis, all windows" and "replace promptly all broken or missing glass."

6. With respect to the kitchen and bakery at SPSM Central Complex, defendants shall immediately, and on a continuing basis, take all reasonable and practical measures to eliminate all access points for the entry of birds and other vermin into the bakery and kitchen areas. In addition, immediately, and on a continuing basis, defendants shall take all practical and reasonable measures to eliminate existing populations of birds and other vermin in the kitchen and bakery areas.

IT IS FURTHER ORDERED that defendants shall do the following:

A. Submit, within sixty (60) days of the date of the Opinion, a detailed schedule for completing ventilation projects in the housing areas and, for any projects that will not be completed by July 1, 1988, a detailed explanation of why they will fail to complete the project(s) by that time;

B. Submit by November 1, 1987 a report on their plan(s) to comply with the building trades inspection requirement of the State Plan;

C. Submit, within thirty (30) days of the date of the Opinion, a plan for remedying the laundry problem at 5–Block;

D. Submit, within sixty (60) days of the date of the Opinion, a detailed construction

schedule for the electrical outlets and lighting requirement of the State Plan, with an explanation of why the construction was not completed on time;

E. Submit, within thirty (30) days of the date of the Opinion, a report on the shower situation at the Marquette Branch Prison;

F. Be prepared to address the food loaf issue at the Mental Health hearing;

G. Submit any reports, and subsequent updates, they may develop concerning the use of waivers in the security classification system;

H. Submit, within sixty (60) days of the date of the Opinion, a plan to ensure that the decree institutions will not be overcrowded and that no improper security classification placements will be used at the decree institutions.

IT IS FURTHER ORDERED that the parties, *amici*, and the Independent Expert shall discuss defendants' Motion for Relief from Portions of the July 22, 1987 (sic) Order of the Court in their meeting before the Mental Health Hearing.